Keith J. Shapiro (Admitted Pro Hac Vice)
Andrew Cardonick (Admitted Pro Hac Vice)
David W. Baddley (Admitted Pro Hac Vice)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: 312/456-8400
Facsimile: 312/456-8465

John D. Fiero (CA Bar No. 136557)
Kenneth H. Brown (CA Bar No. 100396)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010

E-mail: jfiero@pszjlaw.com
kbrown@pszjlaw.com

[Proposed] Attorneys for Debtor and Debtor in Possession
Heller Ehrman LLP

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re: | Case No.: 08-32514 |
|---|---|
| Heller Ehrman LLP, | Chapter 11 |
| Debtor | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR ORDER AUTHORIZING THE ESTATE'S PURCHASE OF TAIL LEGAL MALPRACTICE INSURANCE COVERAGE PURSUANT TO 11 U.S.C. § 363(B)(1)** |
| | Date: January 28, 2009 [Requested]<br>Time: 1:30 p.m. [Requested]<br>Place: U. S. Bankruptcy Court<br>235 Pine Street, 22nd Floor<br>San Francisco, CA<br>Judge: Honorable Dennis Montali |

**I.**

**INTRODUCTION**

A major cost of business for any large law firm is the cost of legal malpractice insurance. No firm is immune from malpractice claims and it is common for law firms and their insurers to pay

significant amounts each year on account of these claims. The fact that a law firm pays significant sums to insure against, settle or otherwise resolve malpractice claims should not at all indicate that the firm's lawyers lack high levels of legal skill or expertise. Rather, it is simply a fact of life in the legal professional that, taking into account the number, complexity and magnitude of transactions, proceedings and other legal representations, claims (often substantial claims) against the firm will arise. And typically, the inherent risk and cost in litigating those claims in court, as well as other factors, will weigh in favor of settling malpractice claims with payments by the firm and/or its malpractice insurers.

In the Motion, the Debtor seeks authority to pay $3,480,000 in premiums for up to $20 million in 36-month "tail" legal malpractice insurance (which already has been bound), to ensure that the estate remains protected against legal malpractice claims, which could assert potentially substantial amounts in damages. The Debtor's current insurance (a "claims made" policy) will expire on April 15, 2009, and if it remains in place until expiration, all claims will need to be reported by approximately June 14, 2009 to receive coverage. In other words, the Debtor's estate currently has no insurance in place to report claims after June 14, 2009. This is problematic because, typically, the Debtor does not learn of the circumstances giving rise to a malpractice claim (so they can be reported to the insurer) until several years after the alleged wrongful act occurs.

Based purely on the Debtor's prior claims history, the Debtor estimates that the estate could face an additional $7.5 million in liabilities for malpractice claims (above any self-insured retention amounts) that could be asserted in the 36-months after the current reporting period expires. Of course, the number could be much larger. Thus, absent the proposed tail coverage, the defense and payment of these claims will be uninsured, and ultimately, could substantially diminish the estate. The Debtor has thoroughly investigated a variety of options for tail coverage, and after careful analysis, has determined that the tail insurance described below has the terms most favorable to the Debtor and is in the best interests of the Debtor's estate. For these reasons, and as described more thoroughly below and in the Hayden Declaration, the Debtor believes that the decision to purchase tail insurance is based on sound business judgment, and therefore, should be approved pursuant to Section 363(b) of the Bankruptcy Code.

## II.

## JURISDICTION AND VENUE

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicate for the relief sought herein is Section 363(b)(1) of the Bankruptcy Code.[1]

## III.

## STATEMENT OF FACTS

### A. Procedural Background.

On December 28, 2008 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued in possession of its property and is operating and managing its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

On January 5, 2009, the United States Trustee for this district appointed an official committee of unsecured creditors (the "Committee"). No request has been made for the appointment of a trustee or examiner.

### B. The Debtor's Current Operations.

The Debtor, a 118 year-old international law firm, is currently winding down its business and affairs following the adoption of a Plan of Dissolution by the shareholders of the Debtor's limited partners on September 26, 2008. Although the Debtor is no longer engaged in the practice of law, there remain a substantial number of unperformed, yet necessary, tasks relating to winding down the business, maximizing the value of the Debtor's assets for the benefit of its creditors and equity interest holders, and discharging the Debtor's obligations to former clients. All of these remaining operations are taking place in a reduced space at the Debtor's San Francisco office. *See* Hayden Declaration at ¶4.

Among the Debtor's key winding down projects are the proper transitioning of client matters to new law firms and the safeguarding and proper handling of confidential client files. Many of the

---

[1] The Bankruptcy Code refers to title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

Debtor's former clients were engaged in active matters at the time of the firm's dissolution. The Debtor must ensure that these active matters are properly transitioned to the client's new lawyers so that the client can continue to receive the timely legal services that it requires. Further, the Debtor still possesses, or has control over, a substantial amount of client files for inactive or closed client matters, which nevertheless still must be properly safeguarded pending the Debtor's ability to either return or destroy the files. Because the Debtor has been, and will continue to be, working to comply with its obligations to former clients (both in the transitioning of matters and safeguarding of client files), it is important that the Debtor's estate continue to have insurance for post-petition activities. This coverage is provided under the Debtor's current policies, which are set to expire on April 15, 2009. As the Debtor's role in transitioning active matters will continue to decrease over the next few months (as matters are completely transitioned to other firms), the Debtor believes that the need for coverage for wrongful post-petition acts will continue to decline, such that coverage for acts occurring after April 15th likely will be unnecessary. *See* Hayden Declaration at ¶5.

While the Debtor's existing insurance continues to provide coverage for post-petition activities, it will not protect the estate against malpractice claims (whether occurring pre-petition or post-petition) that are reported to the insurer more than 60 days after the April 15th policy expiration date (or, June 14, 2009). Because malpractice claims are typically reported many months, or even years, after the alleged wrongful act took place, the Debtor's estate will be exposed to potentially substantial liabilities unless tail coverage is purchased. Therefore, the Debtor believes that it is critical for the estate to acquire tail insurance in order to ensure that the estate does not become substantially diluted by uninsured malpractice claims. *See* Hayden Declaration at ¶6.

**C.  The Debtor's Current Legal Malpractice Insurance Coverage and Claims History.**

The Debtor's current legal malpractice insurance coverage is for $200 million per claim ($400 million in the aggregate). The Debtor has $10 million in primary coverage under a policy that was issued by Lexington Insurance Company and reinsured by MPC Insurance, Ltd. ("MPC").[2] The

---

[2]  MPC is a "group captive" insurer, licensed in Vermont and Delaware, that was formed by a group of law firms in 1986. The insured law firms also hold equity interests in the company. With the Debtor's dissolution, MPC now has nine active members.

4

Debtor's primary coverage contains a $2 million self-insured retention per claim ("SIR"), with no dollar limit on how much the Debtor may be obligated to pay in any given year by way of the SIR. The Debtor also has $190 million per claim ($390 million in the aggregate) excess insurance coverage that is provided in layers under a group of policies with various insurance providers. *See* Hayden Declaration at ¶7.

The Debtor financed the cost of the primary and excess malpractice premiums through AFCO Premium Acceptance, Inc. ("AFCO"). The Debtor pays approximately $433,000 to AFCO on the 15th day of each month under the premium financing arrangement. As of the Petition Date, the Debtor had three remaining payments due to AFCO (on January, February and March 15th). The current insurance program, which is comprised of "claims made" policies, runs through April 15, 2009 and notice of potential claims under the policies must be provided to the insurers within 60 days after the policies terminate. Thus, if the Debtor continues its current program through the April 15, 2009 term, then the Debtor will have until roughly June 14, 2009 to report potential claims arising from conduct occurring prior to the April 15th expiration date. *See* Hayden Declaration at ¶8.

According to information provided to the Debtor by its insurers on November 18, 2008, between 2000 and 2008, the Debtor has reported between 10 and 21 claims or circumstances per year to its malpractice carriers (averaging approximately 15 per year). Also since 2000, the Debtor has paid between $1,051,771 (in 2001) and $4,994,356 (in 2007) per year under the Debtor's self-insured retention limits (averaging approximately $2.25 million per year). Further, during this same time period, MPC (the reinsurer under the Debtor's primary policy) has paid as little as $984 (in 2007) and as much as $12,220,620 (in 2004) per year in liabilities exceeding the SIR amounts (averaging approximately $2 million per year). The Debtor's excess insurers also have paid a total of $5,025,387 in claims between 2000 and 2008 (averaging approximately $550,000 per year). *See* Hayden Declaration at ¶9.

///

///

///

///

**D. The Proposed "Tail" Coverage.**

After the Debtor adopted its Plan of Dissolution, the Debtor investigated options for acquiring tail legal malpractice insurance.[3] Marsh, Inc., the Debtor's broker ("Marsh"), informed the Debtor that the cost of three-year tail insurance generally is between 200% and 300% of the expiring annual premium. MPC initially quoted the Debtor a premium of $7,735,000 (or 250% of the Debtor's current premium) for three-year tail coverage. After negotiations, MPC lowered its quote to 225% of the annual premium, but also required certain unfavorable conditions (such as posting a bond to secured SIR obligations, the right to veto the filing of any action against former clients owing money, and a $50,000 underwriting fee). *See* Hayden Declaration at ¶10.

The Debtor then obtained quotes from Marsh for a variety of alternatives on the open market. The Debtor instructed Marsh to seek quotes for tail coverage with a self-insured retention of less than $2 million, but none were received. All quotes for primary coverage had a $2 million SIR. Ultimately, the Debtor received six quotes for primary tail coverage and nine quotes for excess tail coverage. A list of the quotes that the Debtor received from Marsh is attached to the Hayden Declaration as Exhibit A. *See* Hayden Declaration at ¶11.

After significant review, analysis and consideration of options, the Dissolution Committee (established under the Plan of Dissolution) ultimately decided that the best and most economical option for a tail coverage package was a $10 million primary policy offered by American International Specialty Lines Insurance Company ("AISLIC") and a $5 million excess policy issued by Valiant Insurance Company ("Valiant"). Upon exhaustion of the excess coverage, the primary limits reinstate for an additional $5 million in coverage (but not for the same claim that exhausted the excess amounts). Like the Debtor's current coverage, there is a self-insured retention of $2 million per claim. The cost of the tail insurance is $3 million for the primary coverage and $480,000 for the excess coverage, plus taxes. The primary carrier would not agree to the $5 million reinstatement unless the Debtor purchased at least $5 million in excess coverage. The tail coverage

---

[3] Paul Sugarman, one of the four members of the Dissolution Committee, led that effort for the Debtor. Mr. Sugarman specialized, during his career, in insurance recovery matters, and served for many years as the Chair of MPC's claims committee. Mr. Sugarman kept the other members of the Dissolution Committee informed of the progress of his investigations and negotiations. Mr. Sugarman is out of the country and unavailable to make a declaration, and the following information about the course of the negotiations is based on his reports to the Dissolution Committee, upon which Mr. Hayden serves as a member. *See* Hayden Declaration at ¶10.

6

program provides 36 months of tail malpractice insurance reporting (until June, 2012) for claims or circumstances arising prior to January 1, 2009. Brokerage commissions would be paid out of the premiums. The tail coverage has been bound and the Debtor must pay the full premium by no later than January 30, 2009. The coverage was bound shortly before the bankruptcy filing on December 28, 2008. Because of the filing and the fact that the tail coverage has been bound, the Debtor believes that the other options presented by Marsh for coverage are no longer available. Indeed, the Debtor believes that tail coverage would, under the present circumstances, be either unavailable or significantly more expensive. *See* Hayden Declaration at ¶12.

## IV.

## LEGAL DISCUSSION

**A. The Debtor's Decision to Purchase Tail Insurance Coverage Is Governed By The Business Judgment Test.**

The Debtor believes it has the right, under the existing policies, to continue its existing malpractice insurance coverage through the end of its term, or April 15, 2009. The Debtor believes that continuing its existing coverage is an ordinary course transaction for the Debtor and for law firms in general, and thus, pursuant to Section 363(c)(1) of the Bankruptcy Code, court approval is not required.[4] However, for purposes of this Motion only, the Debtor assumes that purchasing tail coverage (so that claims can continue to be reported after expiration of the Debtor's current coverage) is a use of estate property other than in the ordinary course of business, which is governed by Section 363(b)(1) of the Bankruptcy Code and requires Court approval. As such, the Debtor seeks authorization pursuant to Section 363(b)(1) to purchase the 36-month tail legal malpractice

---

[4] Section 363(c)(1) of the Bankruptcy Code provides:
If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee [or debtor in possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. §363(c)(1). Continuing to pay for insurance for ongoing operations by the Debtor is a transaction in the ordinary course of business, which does not require notice or court approval. *See In re H&R Transportation Co., Inc.(United States v. Estate of Deutscher)*, 115 B.R 592, 599 (M.D. Tenn. 1990). To the extent the Court determines that continuing the Debtor's pre-petition coverage is not an ordinary course transaction governed by Section 363(c) of the Bankruptcy Code, the Debtor requests authority as part of this Motion to continue such coverage pursuant to Section 363(b)(1) of the Bankruptcy Code, for the reasons stated herein.

insurance coverage from AISLIC and Valient for approximately $3,480,000, plus taxes. *See* Hayden Declaration at ¶13.

Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, after notice and a hearing, "may use, sell or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. §363(b)(1). Section 363(b)(1) is silent on what standard the court should apply when deciding whether to authorize the use of estate property for a non-ordinary course transaction. However, courts have generally approved transactions under Section 363(b)(1) when the transaction is justified by a "sound business purpose." *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (and cases cited therein); *In re Ernst Home Center, Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997); *Cf. In re Lahijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005) (explaining that trustee's decision to act under Section 363(b)(1) is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection). Bankruptcy courts applying the sound business judgment test will typically uphold the debtor's business decision "unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion." *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985). In the end, the Court has considerable discretion in applying Section 363(b)(1) and the decision will be reversed on appeal only for an abuse of discretion. *See In re Montgomery Ward*, 242 B.R. at 152-53.

### B. Acquiring the Tail Legal Malpractice Insurance Is Supported by Sound Business Judgment and is in the Best Interest of the Debtor's Estate.

As noted above, the Debtor's current malpractice coverage will expire on April 15, 2009 and, assuming that coverage runs through its term, all claims and circumstances arising prior to April 15, 2009 will need to be reported by approximately June 14, 2009 in order to be covered by that insurance. Based on the Debtor's prior claims history, it is a near certainty that the Debtor will not receive notice of all of the potentially coverable claims or circumstances prior to the reporting deadline under the Debtor's current coverage. Indeed, it is not at all uncommon for the Debtor to receive notice of a potential malpractice claim several years after the alleged wrongful act took place. Further, some former clients may not even learn of a malpractice claim until years after the

wrongful act occurs. Although this could happen in virtually any practice area, it is common in practices such as trusts and estates (where a mistake in preparing an estate plan does not become evident until the will is submitted for probate, or the Internal Revenue Service seeks to impose a large tax penalty on the estate due to a drafting error) and litigation (where an apparent victory at trial turns out to be a loss following appeal). *See* Hayden Declaration at ¶14.

Accordingly, based on the inherent delay between the wrongful act giving rise to a legal malpractice claim and the Debtor's receiving notice of the claim (or the circumstances giving rise to such claim), it is likely that, after June 14, 2009, the Debtor will continue to receive notice of alleged wrongful acts that occurred prior to January 1, 2009. This may lead to the filing and allowance of numerous malpractice claims against the estate that are not covered by any insurance. As stated above, since 2000, the Debtor has, on average, reported 15 claims per year to its malpractice insurers. Assuming this rate were to continue during the tail coverage period, there could be approximately 45 potential malpractice claims asserted against the estate that would be covered by the tail policy. *See* Hayden Declaration at ¶15.

Further, as explained above, since 2000, the Debtor's primary and excess coverage insurers have paid, on average, approximately $2.5 million per year on account of legal malpractice claims asserted against the Debtor. Notably, these are amounts paid *in excess of* the amounts paid by the Debtor under its $2 million per claim self-insured obligation. Assuming this rate of payment were to continue during the tail coverage period, the estate could face approximately $7.5 million in uninsured liabilities (again, in excess of the Debtor's self-insured obligation). The Debtor believes that its claims history justifies spending $3,480,000 in insurance premiums to protect the estate from legal malpractice liabilities that could easily more than double that amount. *See* Hayden Declaration at ¶16.

The Debtor understands that there is no way of knowing whether the decision to purchase tail insurance will be the "correct" decision until after the coverage period runs and the amount of allowed claims becomes known. And this is precisely why the decision of whether to purchase tail insurance is a matter of business judgment -- it is inherently based on unknown economic risk, and thus, subject to judgment and 20/20 hindsight. As explained in the Hayden Declaration, the Debtor

has considered a number of insurance options, obtained multiple quotes for coverage, reviewed its claims history and, following consultation with the Debtor's professionals and advisors, determined as a matter of business judgment that obtaining tail insurance coverage is prudent and in the best interests of the estate. *See e.g., In re Lavigne*, 114 F.3d 379, 385 (2nd Cir. 1997) (holding that doctor's cancellation of malpractice insurance *without* purchasing tail insurance would be a transaction other than in the ordinary course of business because, among other things, "a reasonable physician practicing high risk laser surgery, facing a multitude of claims and who has lost the ability to generate income would not have cancelled his insurance policy without opting for tail coverage.") The Debtor believes that failing to purchase tail insurance will expose the estate to substantial claims, which could severely dilute the distributions to other unsecured creditors. While, no doubt, paying the policy premium will itself cause a reduction in the amount of funds available for distribution, the Debtor believes that the benefit of limiting the estate's exposure to potentially massive liabilities justifies this expense. *See* Hayden Declaration at ¶17.

### C. Waiver of the 10-Day Stay Under Bankruptcy Rule 6004(h) is Required For the Debtor to Timely Acquire the Tail Insurance.

As noted in the Hayden Declaration, the Debtor must pay the premiums for the tail insurance by January 30, 2009 in order to preserve the bound tail coverage. Therefore, the Debtor requests a waiver of the 10-day stay of any order approving this Motion under Bankruptcy Rule 6004(h).

Dated: January 14, 2009　　　　　　　　PACHULSKI STANG ZIEHL & JONES LLP

By　*/s/ John D. Fiero*
　　John D. Fiero (CA Bar No. 136557)
　　Kenneth H. Brown (CA Bar No. 100396)
　　[Proposed] Attorneys for Debtor and
　　Debtor in Possession
　　Heller Ehrman LLP