STEVEN H. FELDERSTEIN, State Bar No. 056978
THOMAS A. WILLOUGHBY, State Bar No. 137597
FELDERSTEIN FITZGERALD WILLOUGHBY &
PASCUZZI LLP
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435

Proposed Attorneys for The Official Committee of
Unsecured Creditors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re: | CASE NO.: 08-32514 |
|---|---|
| HELLER EHRMAN LLP, | Chapter 11 |
| Debtors. | Date: January 28, 2009<br>Time: 1:30 p.m.;<br>Place: U.S. Bankruptcy Court<br>235 Pine St., 22nd Floor<br>San Francisco, CA<br>Judge: The Hon. Dennis Montali |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OPPOSITION TO
MOTION FOR ORDER AUTHORIZING THE ESTATE'S PURCHASE OF TAIL
LEGAL MALPRACTICE INSURANCE COVERAGE PURSUANT TO
11 U.S.C. § 363(B)(1)**

The Official Committee of Unsecured Creditors (the "Committee") hereby files its preliminary opposition (the "Opposition") to Motion For Order Authorizing The Estate's Purchase Of Tail Legal Malpractice Insurance Coverage Pursuant To 11 U.S.C. § 363(B)(1) (the "Motion") and respectfully represents the following:

**I.
REQUEST FOR RELIEF**

1. The Committee currently respectfully requests that the Court deny the Debtor's Motion; and grant such other relief as is just and appropriate in the circumstances of this case.

///

///

-1-

Opposition To Tail Coverage Motion

## II.
## SUMMARY OF ARGUMENTS

2. The Debtor failed to meet its burden of proof because it has not introduced any evidence that demonstrates that the purchase of the tail coverage makes economic sense in the context of this bankruptcy case.

3. The Committee submits that the Debtor should purchase the tail coverage from a business perspective only if the cost of the total allowed malpractice claims that are resolved by the purchase of the tail coverage and the incurring of the cost of the self-insured retention equals or exceeds the total allowed malpractice claims that would be resolved if the claims were simply allowed as general unsecured creditors and paid pro-rata with the other creditors. The following table demonstrates the general analysis, which is based on the Debtor's own assumptions:

| Projected Cost Of Tail And Self Insured Retention | Projected Percentage Distribution In Heller Case | Amount Of Pre-Petition Unsecured Malpractice Claims That Could Be Paid Pro-Rata If Costs Not Incurred | Projected Amount Of Allowed Malpractice Claims Resolved By Purchasing Tail Coverage And Funding The Self Insured Retention |
|---|---|---|---|
| $10,250,000.00 | 10% | $ 102,500,000.00 | $14,250,000.00 |
| $10,250,000.00 | 30% | $ 34,166,666.67 | $14,250,000.00 |
| $10,250,000.00 | 50% | $ 20,500,000.00 | $14,250,000.00 |
| $10,250,000.00 | 70% | $ 14,642,857.14 | $14,250,000.00 |
| $10,250,000.00 | 100% | $ 10,250,000.00 | $14,250,000.00 |

4. The purchase of tail coverage and the concurrent future obligation to pay $2,000,000.00 per claim in self-insured retentions are payments on pre-petition unsecured claims, in violation of 11 U.S.C. §§ 1123 and 549. Further, there is no doctrine of necessity in the Ninth Circuit that would justify such a payment. *B & W Enterprises*, 713 F.2d 534 at 537 (9th Cir. 1983).

5. The Debtor's assumptions are not valid at least with respect to the projected claims to be paid from the tail coverage.

6. Under California, malpractice claims are recourse claims in any event, and to the extent that significant malpractice exposure exists, the estate may pursue the Debtor's partners for those liabilities if the case were converted to a Chapter 7 under section 723 of the Bankruptcy Code.

## III.
## BACKGROUND

7. Heller Ehrman LLP (the "Debtor") filed a petition under chapter 11 of the Bankruptcy Code on December 28, 2008.

8. The Debtor is liquidating its assets and winding up the partnership affairs as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9. On or about January 5, 2009, the Office of the United States Trustee appointed the following creditors of the Debtor to serve on the Committee:

    a. 333 Bush Associates;

    b. MEPT St. Matthews LLC;

    c. Williams Lea, Inc.;

    d. Alfred D. Moore; and

    e. Guckenheimer Enterprises, Inc.

10. The Committee held an interview process and on January 12, 2009, selected the Felderstein Fitzgerald Willoughby & Pascuzzi, LLP law firm to represent it in this case ("Committee Counsel").

11. After a preliminary review of the information filed in this case, a meeting with members of the Dissolution Committee and the Committee, further meetings between Committee member Mr. Rylan Malerbi, representative of Williams Lea, Inc., and Mr. Brad Scott, the Debtor's employee overseeing the wind up, a review of preliminary financial information provided pursuant to a confidentiality agreement, communications with DSI, the proposed financial advisor to the Committee and the Debtor, and other information that is publicly available, the Committee respectfully submits that there is no dispute that:

a. the partnership has commenced its wind up and is no longer a going concern;

b. there is no prospect for any sale as a going concern;

c. for some significant period of time, the Debtor has been insolvent at the unsecured creditor level, with no funds in prospect for any distributions to equity in this case; and

d. Debtor does, however, appear to be solvent at the administrative and priority levels as long as the case is administered efficiently and the professional costs of this case are kept under control.

12. Given solvency at the administrative and priority levels and insolvency at the equity level, the Committee believes that Debtor is essentially acting as a fiduciary charged with maximizing the return for general unsecured creditors, the same creditors represented by the Committee.

13. Given the overlapping fiduciary duty of the Debtor and the Committee, the Committee strongly believes that the case must be administered efficiently to eliminate areas of overlap by having the Debtor concentrate on areas where they have no conflict; and the Committee or an independent third party control the many areas where the Debtor and its partners have conflicts of interest with the estate and its creditors.

14. The Committee respectfully submits that the present Motion is in the specific area where the Debtor's Dissolution Committee has conflicts because each member of the DC is a former attorney at Heller and each member faces potential future malpractice exposure individually. Neither professional corporations nor professional LLPs insulate individual attorneys from malpractice exposure.

15. As part of the motions heard on January 23, 2008, the Debtor and the Committee attempted to address these concerns by agreeing to various matters that were put on the record, including the joint retention of a financial advisor.

///

///

16. The Debtor and the Committee agreed to two potential financial advisors from which the Committee could select. Interviews were held on January 21 and 22, 2009, and DSI (Brad Sharp and Kyle Everett) was selected late on the 22nd.

17. DSI visited the Debtor's offices and is coming up to speed on the myriad issues, including tail coverage.

18. DSI sent the attached email to both the Debtor and the Committee stating that paying this amount of money this early in the case is not warranted. *See* January 27, 2009, email from Brad Sharp, which is attached as Exhibit 1, and is incorporated herein by this reference.

19. It is the Committee's understanding that Mr. Sharp will be at Court and available to testify at the hearing on this Motion.

**IV.**
**DISCUSSION**

**A.  The Debtor has not Met its Burden of Proof and in any Event, the Economics Argue Against Approval of the Motion.**

20. The Debtor has the burden of proof on the payment of tail coverage by the estate. The Debtor has not introduced any evidence to satisfy its burden of showing that a purchase of the tail is in the best interest of the bankruptcy estate. Nothing in Debtor's moving papers informs the Court or the Committee of the impact on the estate and any potential future distributions to unsecured creditors of paying $3,500,000.00 to purchase tail coverage and to guarantee payment of $2,000,000.00 per claim in self insured retention payments over a three year period.

21. The Committee has performed the following economic analysis based on the Debtor's own assumptions that demonstrates that in any case where less than nearly full payment to unsecured creditors is projected, purchasing the tail makes no economic sense.

22. The first step in the analysis is to determine the projected claims against the claims coverage over the projected three year term of the tail policy. The Debtor's evidence on this issue is derived from the projected claims against the tail coverage by calculating the average amount of legal malpractice claims asserted against the Debtor per year since 2000 ($2,500,000.00) and then "[a]assuming this rate of payment were to continue during the tail coverage period . . ." of

-5-

three years for a total of "$7.5 million in insured liabilities (again in excess of the Debtor's self insured obligation)." Declaration of Jonathan P. Hayden in Support of Motion for Authority to Purchase Tail Legal Malpractice Insurance on file herein, pg. 6, ¶ 16, lines 27-28.

23. The second step is to determine the projected additional cost to the estate of funding the Debtor's self insured retention. Based on information provided by Mr. Hayden to counsel for the Committee, the average payment per year on the Debtor's self insured retention was $2,249,442.33 (rounded to $2.250M for balance of this analysis). As set forth in paragraph 5 of Debtor's Responses to Questions Posed by the Court, on file herein, before there is any obligation of the tail insurance to pay any malpractice claims, the Debtor must have funded $2,000,000.00 per claim for expense costs (i.e. before a plaintiff can access any portion of the tail policy, the Debtor must have expended $2,000,000.00 in defense costs or payments on the claim and this is for every claim separately). Thus, using the Debtor's methodology, over the three year period that the tail coverage is in place, the Debtor would have to pay $6,750,000.00 in order to obtain the benefit of the tail insurance being purchased.

24. The third step is to determine what the projected allowed claims would be that if not objected to would be paid pro-rata with the other unsecured claims in this case. The Committee submits that the amount of the claims would include the projected payments on the self insured retention ($6.750M based on Debtor's assumption described in step 2 above) plus the projected amount of recoveries from the insurance payables ($7.5M based on Debtor's assumption described in step 1 above) for total projected malpractice claims cost of $14.250M.

25. In order to examine the economic benefit to the estate, the cost of purchasing the tail plus funding the self insured retention ($10.250M) must be balanced against the alternative course of simply making pro-rata distributions on the projected 14.250M in claims. As set forth in the spreadsheet in ¶ 3 above, unless this Heller case provides a 70% or greater distribution to unsecured creditors, purchasing the tail does not make economic sense.

///

///

///

B. **Regardless of the Economic Merits of the Motion, the Motion Can Not be Approved Because It Seeks Court Approval to Prefer Malpractice Claims Over the Claims of Insiders.**

26. The Ninth Circuit has unambiguously ruled that bankruptcy courts may not use the doctrine of necessity to create a new class of priority claims. *B & W Enterprises*, 713 F.2d at 537.

27. 12. The United States District Court for the Northern District of California has cited with approval the *B & W Enterprises* holding in *In re The Sweeney Company, Inc.*, 1994 U.S. Dist. LEXIS 10447, *5 (N.D. Cal. July 29, 1994). In *Sweeney*, the Northern District Court stated that the *B & W Enterprises* case precludes the payment of employee benefit claims in excess of the statutory cap (at that time $2,000.00 per employee).

28. Purchasing the tail coverage guarantees 100% distributions to certain categories of malpractice claims.

29. Additionally, purchasing the tail coverage makes no sense, unless the Court concurrently approves the Debtor spending up to $2,000,000.00 for each and every malpractice claim on defense costs and on 100% payment on claims or the malpractice tail coverage will never be available to pay malpractice claims.

30. The Committee respectfully submits that such payments contravene the *B & W Enterprises* and *Sweeney* cases because the Court would be immediately creating within the first month of the case a new class of priority claims not covered by the Bankruptcy Code's priority scheme, and specifically 11 U.S.C. § 1123. *Sweeney* at *4-5 (granting the trust fund's requested priority claim was " . . . inconsistent with 11 U.S.C. Section 1123, which requires that a reorganization plan must "provide the same treatment for each claim or interest," quoting *B & W Enterprises* 713 F.2d at 534).

C. **The Debtor's Assumptions are False.**

31. Notwithstanding the use of the Debtor's assumptions in the Committee's economic analysis set forth above in ¶ 4(A), Mr. Hayden is not the Dissolution Committee member with the most knowledge in this area.

32. The Debtor informed the Committee that Mr. Sugarman is the designated Dissolution Committee member who is the point person on malpractice insurance as he has

-7-
Case: 08-32514  Doc# 105  Filed: 01/27/09  Entered: 01/27/09 17:49:44  Page 7 of 9
Opposition To Tail Coverage Motion

served for multiple years as the head of the claims committee on the Debtor's current malpractice carrier, which is essentially a coop of multiple law firms totaling approximately 8,000 lawyers.

33. Mr. Sugarman has been out of the country and unavailable except for one afternoon, Monday, January 19, 2009, and the Committee's counsel interviewed Mr. Sugarman at that time.

34. Mr. Sugarman is apparently going to be available and will be made available by the Debtor at the time of the hearing by the Debtor to testify.

35. Based on the interview, it is the Committee's belief that Mr. Sugarman will present testimony that will undercut the Debtor's estimate of $7.5M in projected claims to be paid by the tail coverage if it is purchased.

36. The Committee requests that the Court require Mr. Sugarman to be available and testify at the hearing on the Motion if the Debtor's arguments above alone are insufficient to persuade the Court that the Motion should be denied.

**D.    The Debtor's Motion Does Not Consider the Potential Section 723 Claims.**

37. Finally, the Debtor's papers to not address how section 723 of the Bankruptcy Code would effect the decision to purchase tail coverage.

38. Section 723 grants to Chapter 7 Trustees the power to bring claims against partners for recourse obligations of the partnership under California law.

39. Neither the Debtor's organization as a professional limited liability partnership, nor the purported organizational structure whereby the partners of the Debtor are professional corporations, whose employees include shareholders effects the liability of the individual attorneys for their own malpractice. As such, any allowed malpractice claims are "recourse" claims under California law, and the estate under section 723 may be able to recover the amount of such claims against at least the Debtor's corporate partners, if not the actual attorney shareholders.

40. Because of the section 723 claims, purchasing the tail coverage is more likely to only benefit the corporate partners and/or their shareholders.

///

| | |
|---|---|
| 1 | WHEREFORE, the Committee respectfully requests that the Court deny the Motion as set forth in the Relief Requested section of this Opposition. |
| 2 | |
| 3 | Dated: January 27, 2009 |

FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP


By _____*/s/ Thomas A. Willoughby*_____
THOMAS A. WILLOUGHBY
Proposed Attorneys for the Official Committee
of Unsecured Creditors