STEVEN H. FELDERSTEIN, State Bar No. 056978
THOMAS A. WILLOUGHBY, State Bar No. 137597
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435

Attorneys for The Official Committee of Unsecured
Creditors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>HELLER EHRMAN LLP,<br><br>Debtor. | CASE NO.: 08-32514<br><br>Chapter 11 |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
SECOND INTERIM STATUS REPORT**

The Official Committee of Unsecured Creditors (the "Committee") hereby submits to the Court and to the Creditors its Second Interim Status Report:

**INTRODUCTION**

1. This is the second report of the Committee regarding its activities since appointment on January 5, 2009.

2. The purpose of this status report is to inform the Bankruptcy Court and the creditors of the status of the case from the Committee's perspective.

**BACKGROUND**

3. Heller Ehrman LLP (the "Debtor" or "Heller LLP") filed a petition under chapter 11 of the Bankruptcy Code on December 28, 2008 ("Petition Date").

4. The Debtor is liquidating its assets and winding up its affairs as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. On or about January 5, 2009, the Office of the United States Trustee appointed the

following creditors of the Debtor to serve on the Committee:

    a.    333 Bush Associates;

    b.    MEPT St. Matthews LLC;

    c.    Williams Lea, Inc.;

    d.    Alfred D. Moore; and

    e.    Guckenheimer Enterprises, Inc.

6. On May 29, 2009, following the resignations of Alfred D. Moore and Guckenheimer Enterprises, the U.S. Trustee amended her appointment of the Committee of Unsecured Creditors by adding Wondie Russell and William R. Mackey as members.

7. Previously, on January 30, 2009, the Bankruptcy Court authorized the Committee's employment of the law firm of Felderstein Fitzgerald Willoughby & Pascuzzi LLP to represent it in this case ("Committee Counsel").

**UPDATE ON MATTERS DISCUSSED IN FIRST INTERIM REPORT**

8. The March 9, 2009 court-approved retention of Development Specialists, Inc. ("DSI") to supervise the wind down of the Debtor's operations and collection of its accounts receivable has greatly reduced the time and expense of the Dissolution Committee.

9. DSI developed a budget for all professional fees and costs. Interim fees and costs are being allowed pursuant to the budget.

10. DSI is investigating the prepetition financial affairs of the Debtor including, among other things, the date of the Debtor's insolvency and potential claims against third parties including the Debtor firm's former shareholders.

11. At the urging of the Committee, the scope of the Debtor's post-petition engagement of Greenberg Traurig, LLP ("GT") was reduced to several specific matters, and GT is in the process of completing its last task.

12. On April 21, 2009, the Bankruptcy Court entered its order (the "April 21, 2009 Order") designating the Committee as the estate's representative to investigate and pursue certain claims against third parties, including Bank of America and Citibank to set aside their security interests and recover preferential payments made to them.

13. Pursuant to that April 21, 2009 Order, on April 23, 2009 the Committee filed an adversary complaint against Bank of America and Citibank (Case No. 09-3071) (the "Preference Action").

14. The April 21, 2009 Order also designated the Committee as the estate representative to recover profits earned by other law firms on work transferred from the Debtor to them, arising under the *Jewel v. Boxer* doctrine. The Debtor and the Committee have jointly retained the law firm of Lovitt & Hannan, Inc. to investigate those claims and entered into a court-approved joint defense agreement so privileged information can be shared. A further report on the status of the Preference Action is set forth below.

**SUMMARY OF COLLECTION OF ACCOUNTS RECEIVABLE**

15. In late January 2009, the Committee interviewed and, along with the Debtor, hired DSI as their joint financial advisor. DSI's first task was to evaluate the Debtor's ongoing collection efforts and to develop a protocol for approving settlements of accounts receivable collections by both the Debtor and the Committee. DSI was also tasked to evaluate the utility of using Debtor's in-house personnel to do the collecting versus sending all collections to outside agencies.

16. Over the course of the next several months, DSI regularly reported back to the Committee and Debtor on the status of collections. Protocols were implemented and when DSI determined that it was no longer useful to collect receivables using internal collectors, the collection efforts were shifted to outside agencies and law firms. At present, most of the internal collectors have been laid off, and the remaining employees in the collection department are primarily collating files to be transferred to the third party collection agencies and law firms.

17. Though the progress of collections has been viewed as confidential because of the potential adverse effect of settlements on future recoveries, the Committee is filing this status report to correct erroneous information that may exist and to inform the creditors of the actual facts as of July 31, 2009.

18. Since the firm dissolved in September 2008 and prior to the filing of the bankruptcy case in December of 2008, the Debtor collected approximately $70,000,000 of its

receivables. Post-petition, the Debtor has collected approximately $23,000,000 of its receivables.

19. Thus, from September 2008 through July 31, 2009, the Debtor has collected approximately $93,000,000 or 63% of its outstanding accounts receivable and work in progress that existed on the Debtor's date of dissolution.

20. From the filing date, the Debtor has collected $23,000,000 or approximately 30% of the outstanding accounts receivable and work in progress that existed on the date of petition, based on the $76,921,851.38 of accounts receivable and work in progress detailed in the Debtor's Schedule B filed in this case.

21. There are significant receivables remaining in this case (all work in progress (WIP) have now been either written off or billed). DSI continues to evaluate the collectability of the remaining receivables and does not have at present an estimate for how much will ultimately be collected or written off.

22. The Committee is not satisfied with a sixty-three percent collection rate, but unfortunately the most important three months of collections – the three months immediately after dissolution – occurred while Bank of America and/or Citibank was essentially managing the Debtor through its absolute control over each check released and paid by Bank of America and/or Citibank. By the time of the Debtor's bankruptcy filing, most accounts were more than ninety days old. Thus, a 30% collection rate post-petition is essentially in the range of what the Committee anticipated very early in this case – in other words, the low hanging fruit had already been picked by the time of the bankruptcy filing.

**STATUS OF PREFERENCE ACTION**

23. As set forth above, the Committee was appointed representative of the Bankruptcy Estate to bring a preference action against Bank of America and Citibank ("Bank Group").

24. Since the filing of the February 26, 2009, First Interim Status Report to creditors, such action has been filed, seeking the return from the Bank Group of in excess of $58,000,000.

25. Discovery is ongoing. All parties have served written discovery. There is currently no discovery cutoff and no trial date has been set.

26. There have been no substantive settlement discussions to date.

27. The next status conference hearing before the Court is scheduled for August 28, 2009.

## CLAIMS AGAINST FORMER SHAREHOLDERS

28. Since formation, the Committee has been actively investigating the Bankruptcy Estate's potential claims against the Shareholders (defined below in paragraph 32). The following details one of the potential claims that the Committee has been investigating, which is based on both State and Federal fraudulent conveyance statutes.[1]

29. The Committee believes that it has uncovered certain facts and circumstances likely to give rise to valid claims by the estate to recover approximately $106,000,000 in distributions made to (or for the benefit of) Shareholders starting in December 2007, and in 2008 under the relevant constructive fraudulent conveyance statutes.

30. The following analysis is subject to the proviso that all facts set forth below are preliminary and are based on the best information that the Committee currently has available. As the investigation continues and/or as more formal discovery is undertaken, the facts outlined below may change and/or additional facts may be uncovered that may be relevant to this analysis.

**Background Facts Leading Up to December 2007:**

31. As early as 2003, Heller LLP started on a strategy of growth, and over the next four years, Heller LLP expanded its operations globally. By December 2007, the strategy had failed, and as detailed below, Heller LLP could no longer support and maintain its far-flung operations.

32. The financial problems faced by Heller LLP were compounded by its ownership structure. Heller LLP is owned by several professional corporations (the "Heller PCs"), which are then owned by the actual shareholder attorneys of Heller LLP (the "Shareholders").

///
///

---

[1] Other areas that are not addressed in this Status Report include but are not limited to potential claims against successor firms on the *Jewel v. Boxer* lines of recovery and potential breaches of fiduciary duty by members in management. The Committee is also participating in a Joint Investigation with the Debtor regarding certain claims v. third parties.

Committee's Second Interim Status Report

33. This unusual structure[2] forced Heller LLP to distribute all of its earnings at the end of each calendar year ". . . in order to avoid double taxation of its income . . . and used a line of credit to fund operations until the subsequent year's cash flow caught up with its outlays."[3] It was usually August, eight months into the year, before income caught up with operating debt.[4] Heller LLP relied on a single line of credit from Bank of America and affiliated entities.

34. In 2007, Heller LLP experienced financial distress. Discovery is expected to produce significant evidence from the files of Heller LLP and its advisors detailing this financial distress and the unusual changes in financial practices and policies that Heller LLP adopted in response. While such evidence is being developed, the Committee has already located significant evidence in the public record and in Heller LLP financial records it has reviewed. According to newspaper reports, litigation was 60% of Heller LLP's business, and several major litigation cases settled or were dismissed.[5] Key shareholders began leaving, taking their books of business with them.

35. And, the future looked bleak. Heller LLP's Chairman foresaw the reasonable possibility of a further decline in revenue, and was quoted: "In 2008, there may be more pressure on law firms than in the past just in terms of volume of work."[6]

36. Heller LLP's rapid expansion increased its costs and its risks, including risk of loss of partners. Heller LLP's heavy reliance on credit also increased the risk of insolvency, and its total reliance on a single line of credit from Bank of America and affiliated entities further

---

[2] The partners of Heller LLP were Professional Corporations (PC) (the "Heller PCs"), and the equity-holding attorneys were both shareholders of and employees of the Heller PCs (the "Shareholders"), not of Heller LLP.

[3] Attributed to former managing partner Stephen Ferruolo in San Francisco Chronicle article "Heller Ehrman Law Firm to Dissolve Friday", available at http://www.seattlepi.com/business/380691_heller26.html

[4] January 26, 2009, Wall Street Journal, Nathan Koppel "Recession Batters Law Firms, Triggering Layoffs, Closings."

[5] September 15, 2007 Wall Street Journal law blog. "A Dark Monday for Heller Ehrman," http://blogs.wsj.com/law/2008/09/15/a-dar-monday-for-heller-ehrman/taab/print

[6] January 18, 2008, San Francisco Business Times "Lawyers Cautious After Record Year."

increased its risk of having that line of credit cut off.

**Facts Uncovered to Date that Support the Constructive Fraudulent Conveyance Claims:**

37. When Heller LLP's rapid expansion strategy was unraveling, its management made some very troubling business decisions:

- Unlike most prior years, in 2007, Heller LLP elected not to follow its standard practice in prepaying approximately $3,000,000.00 in 2008 expenses;
- Instead of prepaying 2008 expenses, starting in October 2007, and continuing through December 2007, Heller LLP began to allow vendor payments to go past due. But in a distortion of the reporting of these past due accounts, Heller LLP printed 118 checks that were written in payment of valid 2007 expenses, but those checks were held and not paid until the payments were past due in January of 2008;
- The total amount of the held checks on past due accounts exceeded $3,000,000.00;
- Despite unpaid expenses and a decline in 2007 profits, Heller LLP in December of 2007 decided to pay Shareholders over $9,000,000.00 in excess of aggregate firm profits for calendar year 2007;
- To hide these excess distributions (which were initially booked as excess distributions), the Heller LLP accounting department was directed to instead book these excess distributions as "shareholder loans;"
- When a member of Heller LLP's accounting department prepared acknowledgements of these shareholder loans to be sent to the Shareholder recipients that would have confirmed that these were shareholder loans, he was told not to send them;
- Bank of America's counsel has informed Counsel for the Committee that Bank of America has information that Heller LLP never intended to collect on these "shareholder loans," but intended to forgive them in 2008;
- The Debtor has not, to date, scheduled the foregoing $9,000,000.00 in "Shareholder Loans" as an asset of the estate;

- In December 2007, Heller LLP distributed approximately $74,000,000 in "Annual Bonuses" to its Shareholders;
- In January 2008, Heller LLP distributed approximately $24,000,000 in deferred compensation to various pension plans on account of contributions for the benefit of Shareholders;
- In 2008, during the lead up to dissolution, Heller LLP returned approximately $8,000,000 in Capital to departing Shareholders;
- By September 2008, the Heller LLP Shareholders voted to dissolve.

38. The Committee respectfully submits that these facts indicate that in December 2007, Heller LLP was in demonstrable financial distress and was in a downward spiral from which it could not and did not recover.

39. In order to prop up its financial performance in 2007, Heller LLP borrowed $15,000,000[7] from its 2008 projected revenue stream. This robbing of Peter (i.e., 2008) to pay Paul (i.e., 2007) was particularly troublesome when it was done at the same time that Heller LLP's Chairman was forecasting "volume issues" at large firms.

40. Heller LLP's business strategies for partner retention and for merger that underlay its decisions to artificially boost 2007 distributions to Shareholders are irrelevant to establishing a constructive fraudulent conveyance claim.

41. The Committee believes that the facts will demonstrate that by December of 2007, Heller LLP was using creditors' funds to overpay Shareholders instead of observing its duty to make timely payments to its creditors and properly reserve funds for its operations.

**Constructive Fraudulent Conveyance:**

42. In order to prevail on its constructive fraudulent conveyance claim,[8] the Committee or the Bankruptcy Estate must demonstrate that (a) the Shareholders did not provide

---

[7] $9 million+ in "shareholder loans" to be forgiven in 2008, $3 million in prepaid expenses that were not paid in 2007, and $3 million+ in held checks that were due to creditors.

[8] This Status Report addresses the classic or constructive fraudulent conveyance analysis. In 2005, the United States Congress also created an alternative fraudulent conveyance action based on excessive compensation under an employment agreement. The Committee strongly believes that it can prevail under that alternative theory as well. 11 U.S.C. § 548(a)(1)(B)(ii)(V).

reasonably equivalent value for the distributions,[9] and (b) at the time of the distributions, Heller LLP had unreasonably small capital[10] given the financial risk of its business.[11]

**Reasonably Equivalent Value:**

43. Initially and by definition, the subject distributions were not made for "reasonably equivalent value" but rather on account of an equity interest rather than value received. *In re Agricultural Research & Tech. Group, Inc.,* 916 F.2d 528, 532 (9th Cir. 1990). The Bankruptcy Code definitions distinguish between "value" and "equity security," which is a share in a corporation (11 U.S.C. § 101(16)(A)), so where a distribution is made in consideration for an equity interest, a finding of reasonably equivalent value is precluded.

44. With respect to any services rendered by the Shareholders, the employment agreement each Shareholder executed provided that the Shareholders' "Base Salary" was compensation "*for all services rendered by Employee . . . .*"[12]

45. Though the Committee believes that grounds may exist to recover some or all distributions to Shareholders from the point at which Heller LLP had unreasonably small capital, including the Base Salary, for the purposes of this status report only, it is assumed that the Bankruptcy Estate elects not to pursue recovery of the Base Salary paid to the Shareholders. *See, e.g., Annod v. Hamilton and Samuels*, 100 Cal.App.4th 1286 (2002) (finding reasonably equivalent value provided by law partners in return for their reduced monthly draws based on their continuing to work and bill and collect funds from clients).[13]

---

[9] 11 U.S.C. § 548 (a)(1)(B)(i) and 11 U.S.C. § 544, incorporating Cal. Civ. Code §3439.04(a)(2): "Without receiving a reasonably equivalent value in exchange for the transfer . . . ."

[10] The Committee also believes that facts have been uncovered that will give rise to a finding of "insolvency" under either the equity or balance sheet tests, but for brevity is only addressing unreasonably small capital in this status report.

[11] 11 U.S.C. § 548 (a)(1)(B)(ii)(II) and 11 U.S.C. § 544, incorporating Cal. Civ. Code Cal. Civ. Code § 3430.04.

[12] Employment Agreement, ¶ 4.1.

[13] In *Annod,* in contrast to the Heller LLP situation, the *only* compensation the law partners received was their partnership draw; they were drawing far less than market values for their services. *Id.* at 1295, and were sometimes drawing even less than their secretaries. *Id.* at 1296.

46. Instead, this report focuses on other distributions, such as the fully discretionary "Annual Bonus" that could, but was not required to, be paid in December of each year. The Annual Bonus in 2007 was based on each Shareholders' attributed ownership interest in Heller LLP.[14]

47. Under the *Annod* case, and under the terms of the Shareholder employment agreements, which specifically stated that the Base Salary represents compensation for "all services," the distribution of the Annual Bonuses in 2007 in the approximate amount of $74,000,000 were on account of the Shareholders' attributed ownership interests in Heller LLP and were without consideration.

48. Similarly, the payments of deferred income to the various pension plans in the approximate amount of $24,000,000 in January 2008 – to the extent that these payments were not a part of the Base Salary – were not on account of contemporaneous services rendered but were instead on account of the Shareholders' attributed ownership interests in Heller LLP. Such payments to pension plans were not compensation and should be recovered to the estate for the benefit of creditors.

49. Finally, the approximate amount of $8,000,000 of capital paid to retiring Shareholders was a return of equity to the Shareholders, and again is on account of the Shareholders' attributed ownership interests and not on account of contemporaneous services rendered and were therefore without consideration and subject to recovery.

**Unreasonably Small Capital:**

50. "Unreasonably small capital" is something short of "insolvent," but foreseeably in peril of insolvency. The test is triggered when the debtor is solvent but the transfer has placed in motion "difficulties" that are likely to lead to insolvency. *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)* 174 B.R. 557, 591 (N.D. Cal. 1994). The test asks whether "a firm can withstand some perturbation to the bad side and still remain solvent."

---

[14] The attributed ownership percentage as used by Heller LLP converted each Shareholder's ownership interest in the respective Heller PC into an imputed ownership interest in the Heller LLP base.

*MFS/SUN Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913 (S.D.N.Y. 1995). Debtors have been found to be undercapitalized both where their own capital was low, even where borrowing was available (*Wells Fargo Bank v. Desert View Building Supplies, Inc.* 475 F.Supp. 693, 697, aff'd 633 F.2d 221 (9th Cir. 1980)) and where it was reasonably foreseeable that its line of credit would be cut off. *Kendall v. Sorana* 151 B.R. 1012 (Bankr. N. D. Cal. 1993). Reasonable foreseeability of insolvency is the standard for unreasonably small capital. *See Moody v. Security Pac. Business Credit*, 971 F.2d 1056, 1073 (3rd Cir 1993).

51. In December of 2007, Heller LLP started manipulating its financial practices and financial accounting. It stopped paying valid claims to creditors in October of 2007 and stretched payables in the amount of $3,000,000. It paid Annual Bonuses to Shareholders in an amount that would result in excess distributions to Shareholders of over $9,000,000. It changed prior practice and did not prepay expenses in December 2007 to lessen the tax burden on Shareholders.

52. As explained above, Heller LLP's business strategies for partner retention and for merger that underlay its decisions to artificially boost 2007 distributions to Shareholders are irrelevant to fraudulent conveyance analysis.

53. Whatever the rationale, the reality was that Heller LLP boosted its 2007 financial numbers at the expense of the 2008 numbers, even though 2008 looked to be an even worse year for the firm's revenues.

54. For example, if "saving the firm" or "keeping certain key Shareholders" in December of 2007 required Heller LLP to shift $15 million from 2008 numbers to 2007 numbers, what would the firm do in December of 2008? If it merely met the 2007 revenue numbers, would it have had to transfer $30 million from 2009 revenues to keep the firm in operation? Or, given the anticipated decline in revenues, would it have had to transfer $30 million plus an amount to compensate for the decline in revenues in order to keep the firm viable?

55. In essence, by making the decision to move $15,000,000 from 2008 to 2007, the Heller LLP management took a huge gamble with funds that by then truly belonged to the creditors by reason of Heller LLP's already damaged financial profile.

-11-

Committee's Second
Interim Status Report

56. The Committee believes that the facts will show that Heller LLP had insufficient capital to fully fund the 2007 Annual Bonuses ($74 million), the 2008 pension plan payments ($24 million), and the return of capital in 2009 ($8 million), in a total amount of approximately $106,000,000.

## TIMELINE FOR CONCLUDING CASE

57. In a liquidating Chapter 11, the Debtor remains in possession and is authorized to liquidate assets and distribute the proceeds of those assets to creditors subject to Court approval and with the participation and oversight of a Creditors' Committee. As an alternative to Chapter 11, in a Chapter 7 case, a Chapter 7 Trustee is appointed to do those tasks.

58. The Committee continues to believe that remaining in Chapter 11, as opposed to converting to Chapter 7, is currently in the best interests of creditors. First, an estate can resolve multiple issues early in the case through a negotiated Chapter 11 plan. Second, payments to creditors through a plan can be made earlier than the distributions in a typical Chapter 7 case.

59. The Committee also believes that by remaining in Chapter 11, the case can provide a vehicle for settling the complicated and potentially time-consuming litigation that will otherwise proceed against the Shareholders. If sufficient funds are received from an early Shareholder settlement, the Plan could possibly provide for an initial distribution to the creditors by year's end in 2009.

60. In pursuit of these two goals, the Committee has recently entered into an agreement in principle with the Debtor that a joint Plan will be filed in September 2009 (target date September 15, 2009, though extension of exclusivity request is through October 2, 2009). This Plan will include a settlement amount for each specific Shareholder, agreed to by the Committee. The Committee has also agreed to participate in a mediation process with several Shareholder groups with respect to the proposed settlement number.

61. If a settlement with the Shareholders is reached, it is possible that an initial distribution could be made by year's end in 2009. The Committee unfortunately does not have the facts at this time to estimate what that initial distribution might be or what a projected total potential return to all creditors might be in the case. The Committee hopes that with the

additional information from the claims analysis that is currently underway, some recovery estimates might be included in the Disclosure Statement that is currently scheduled to be filed concurrently with the Plan in September of 2009.

Dated: August 7, 2009

                      FELDERSTEIN FITZGERALD
                      WILLOUGHBY & PASCUZZI LLP


By   */s/ Thomas A. Willoughby*
     Thomas A. Willoughby
     Attorneys for the Official Committee
     of Unsecured Creditors