1  John D. Fiero (CA Bar No. 136557)
   Kenneth H. Brown (CA Bar No. 100396)
2  Teddy M. Kapur (CA Bar No. 242486)
   PACHULSKI STANG ZIEHL & JONES LLP
3  150 California Street, 15th Floor
   San Francisco, California 94111-4500
4  Telephone: 415/263-7000
   Facsimile: 415/263-7010
5  E-mail: jfiero@pszjlaw.com
           kbrown@pszjlaw.com
6          tkapur@pszjlaw.com

7  Attorneys for Heller Ehrman LLP,
   Debtor and Debtor in Possession
8
   Steven H. Felderstein (CA Bar No. 56978)
9  Thomas A. Willoughby (CA Bar No. 137597)
   Jason Rios (CA Bar No. 190086)
10 Joan S. Huh (CA Bar No. 225724)
   FELDERSTEIN FITZGERALD WILLOUGHBY &
11 PASCUZZI LLP
   400 Capitol Mall, Suite 1450
12 Sacramento, CA 95814
   Telephone: (916) 329-7400
13 Facsimile: (916) 329-7435

14 Attorneys for The Committee of Unsecured Creditors

15            UNITED STATES BANKRUPTCY COURT
             NORTHERN DISTRICT OF CALIFORNIA
16               SAN FRANCISCO DIVISION

| 17 | In re: | Case No.: 08-32514 |
|---|---|---|
| 18 | **HELLER EHRMAN LLP**, | Chapter 11 |
| 19 | Debtor. | **DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION OF HELLER EHRMAN LLP** |
| 20 | | |
| 21 | | |
| 22 | | **Disclosure Statement Hearing**<br>Date: November 9, 2009<br>Time: 1:30 p.m. |
| 23 | | |
| 24 | | **Confirmation Hearing**<br>Date: TBA<br>Time: TBA |
| 25 | | |
| 26 | | Place: United States Bankruptcy Court<br>235 Pine Street, 22nd Floor<br>San Francisco, CA |
| 27 | | Judge: Honorable Dennis Montali |
| 28 | | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION AND PLAN OVERVIEW ........................................................... 1

   A.    Introduction ................................................................................................. 1

   B.    Information Regarding the Plan ................................................................. 2

          1.    Plan Governing Document ............................................................. 2

          2.    Source of Information. .................................................................... 2

          3.    Warning Regarding Federal and State Income Tax Consequences of the Plan. ..................................................... 3

          4.    Bankruptcy Court Approval. ........................................................... 3

   C.    Voting Instructions ..................................................................................... 3

          1.    How to Vote. .................................................................................. 3

          2.    Who May Vote. .............................................................................. 4

   D.    Confirmation ............................................................................................... 4

   E.    Disclaimers ................................................................................................. 6

   F.    Plan Overview ............................................................................................ 7

II. OVERVIEW OF CHAPTER 11 CASE ............................................................... 10

   A.    Events Leading Up to the Filing of the Chapter 11 Case ........................ 10

          1.    Description of the Debtor. ............................................................ 10

          2.    The Debtor's Pre-Petition Credit Facility .................................... 11

          3.    Events Precipitating the Debtor's Filing ...................................... 12

   B.    Summary of Events During the Chapter 11 Case ................................... 14

          1.    "First Day" Pleadings .................................................................. 14

          2.    Filing of Schedules, Meeting of Creditors and Bar Date ............ 15

          3.    Retention of Professionals ........................................................... 15

          4.    Entry of Key Employee Retention Plan Order ............................. 16

          5.    Disposition of Unexpired Real Property Leases .......................... 16

          6.    Client File Disposition Procedures ............................................... 17

          7.    Authorization of Committee to Pursue Certain Estate Causes of Action ........ 17

          8.    The Joint Investigation Agreement .............................................. 18

          9.    Wind Down of the Retirement Plan .............................................. 19

          10.   Solicitation Procedures ................................................................ 19

III. DESCRIPTION OF THE PLAN ....................................................................... 19

   A.    Description Of Classes .............................................................................. 20

   B.    Treatment of Classified Claims and Interests .......................................... 20

   C.    Treatment Of Unclassified Claims ........................................................... 20

   D.    Implementation of the Plan ...................................................................... 21

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

E.    Executory Contracts ................................................................. 21

F.    Conditions to Confirmation of the Plan ................................... 23

G.    Effects of Confirmation ........................................................... 23

IV. DISTRIBUTIONS TO HOLDERS OF SECURED CLAIMS .................... 23

V. DISTRIBUTIONS TO HOLDERS OF UNSECURED CLAIMS ................ 24

VI. NO DISTRIBUTIONS TO HOLDERS OF INTERESTS ........................... 26

VII. OTHER PLAN PROVISIONS ............................................................... 27

A.    Source of Plan Funding ........................................................... 27

B.    Retained Claims and Defenses ................................................ 27

C.    The Shareholder Liquidation Trust .......................................... 27

    1.    Funding of the Shareholder Liquidation Trust ............... 27

    2.    Use of Shareholder Liquidation Trust Funds .................. 27

    3.    Management of Shareholder Liquidation Trust ............... 28

D.    Identification of Litigation Claims ........................................... 28

    1.    The Bank of America Adversary Proceeding ................. 28

    2.    Mediation with the Former Shareholders. ...................... 30

    3.    Intellectual Property Contingent Fee Representation of Ronald A Katz Technology Licensing LP; and A2D Licensing Technology LP ("Katz") ...... 31

    4.    Potential lawsuit against certain Former Shareholders who practiced in the Intellectual Property portion of the Debtor. .................... 31

    5.    Potential lawsuit against Covington & Burling LLP and possibly others ....... 33

    6.    Potential lawsuit against Greenberg Traurig, LLP ............ 34

    7.    Potential lawsuit against Ernst & Young ........................ 35

    8.    Potential lawsuit against the Heller Ehrman LLP Retirement Plan, Keith Betzina, as Plan Administrator, and City National Bank as Trustee ..... 37

    9.    Claims to profits from unfinished business and business opportunities ......... 39

    10.    Preservation of Other Causes of Action .......................... 40

E.    Management of Liquidating Debtor ......................................... 41

F.    The Biggers Adversary and Biggers Settlement ....................... 41

    1.    Introduction ................................................................... 41

    2.    Description Of The Class Action .................................... 42

    3.    The Proposed Settlement ............................................... 45

    4.    Release of All Claims Related to Termination Employment and Effect of Approval of Settlement Agreement ................. 48

G.    Priority Tax Claims ................................................................. 49

H.    Administrative Claims ............................................................. 49

    1.    Non-Professional Administrative Claims. ...................... 49

    2.    Services By and Fees of Professionals Prior to the Effective Date. ................ 50

    3.    Services by Professionals and Certain Parties After the Effective Date .......... 51

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

VIII. TAX DISCLOSURE ...................................................................................................... 51

    A.    Tax Consequences to the Liquidating Debtor ........................................... 52

    B.    Tax Consequences To Creditors ............................................................... 54

    C.    Tax Consequences to Holders of Interests ............................................... 55

IX. LIQUIDATION ANALYSIS ........................................................................................... 56

X. RISK ANALYSIS .............................................................................................................. 57

XI. CONFIRMATION OF THE PLAN ................................................................................. 57

    A.    Confirmation Hearing ............................................................................... 57

    B.    Requirements For Confirmation ............................................................... 58

    C.    Classification of Claims and Interests ...................................................... 58

    D.    Acceptance ................................................................................................ 59

    E.    Best Interests of Creditors ........................................................................ 59

    F.    Feasibility .................................................................................................. 60

    G.    Cramdown .................................................................................................. 60

    H.    Alternatives to Confirmation of Plan ....................................................... 61

XII. RECOMMENDATION AND CONCLUSION ............................................................... 61

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.

## INTRODUCTION AND PLAN OVERVIEW

**A.**   **Introduction**

On December 28, 2008 (the "Petition Date"), Heller Ehrman LLP (the "Debtor"), commenced the above-captioned bankruptcy case by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor's case is administered in the United States Bankruptcy Court for the Northern District of California, San Francisco Division, before the Honorable Dennis Montali.

This Disclosure Statement (the "Disclosure Statement") contains information with respect to the proposed plan of reorganization (the "Plan") proposed by the Debtor and the Committee of Unsecured Creditors (the "Committee," and together with the Debtor, the "Proponents"). Except as otherwise provided herein, capitalized terms used in this Disclosure Statement shall have the meanings set forth in the Plan.

Pursuant to section 1125 of the Bankruptcy Code, this Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtor and the Committee have examined various alternatives and, based on information contained in this Disclosure Statement, and for the reasons set forth below, have concluded that the Plan provides the best recovery to creditors and, depending on the ultimate outcome of litigation of the allowance of the Claims, could result in full payment to Unsecured Creditors.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of the Debtor; (2) the proposed wind down of the Debtor and liquidation of its remaining receivables and claims pursuant to the terms of the Plan; and (3) the proposed distribution to Creditors and holders of Claims against the Debtor. The Proponents request that you carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    Your vote on the Plan is important.  In order for the Plan to be accepted by a Class of Claims

2    or Interests, the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number

3    of Allowed Claims or Interests in such Class who vote on the Plan must vote for acceptance.

4    Non-acceptance of the Plan may lead to a liquidation under chapter 7 of the Bankruptcy

5    Code, or to the confirmation of another plan.  These alternatives may not provide for a distribution

6    of as much value to holders of Allowed Claims and Interests as the Plan.  Accordingly, the

7    Proponents urge you to accept the Plan by completing and returning the enclosed ballot no later than

8    _____, 2009.

9    **B.**    **Information Regarding the Plan**

10           **1.**    **Plan Governing Document.**

11   Although the Proponents believe that this Disclosure Statement accurately describes the Plan,

12   all summaries of the Plan contained in this Disclosure Statement are qualified by the Plan itself and

13   the documents described therein which are controlling.

14           **2.**    **Source of Information.**

15   Factual information, including all financial information contained in this Disclosure

16   Statement, has been provided by the Debtor, the Committee, or their professionals, or has been

17   obtained from the Debtor's records, except where otherwise specifically noted.  None of the

18   Proponents' attorneys, accountants or other professionals make any representation regarding that

19   information.  The Debtor does not represent or warrant that the information contained in this

20   Disclosure Statement is free from any inaccuracy.  The Debtor has, however, attempted to present

21   the information accurately and fairly, and the Debtor believes that the information is substantially

22   accurate.  The assumptions underlying the projections contained in this Disclosure Statement

23   concerning the sources and amounts of payments to Creditors and Interest Holders represent the best

24   estimate of the Debtor as to what it expects will happen.  Because these are only assumptions about

25   or predictions of future events, many of which are beyond the Debtor's control, there can be no

26   assurances that the assumptions will in fact materialize or that the projected realizations will in fact

27   be met.  Except as otherwise provided herein, this Disclosure Statement will not reflect any events

28

which occurred subsequent to the date that the Debtor submitted the Disclosure Statement to the Bankruptcy Court for approval.

**3.** **Warning Regarding Federal and State Income Tax Consequences of the Plan.**

The tax consequences of the Plan will vary based on the individual circumstances of each holder of a Claim. Accordingly, each Creditor and Interest Holder is strongly urged to consult with its own tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

**4.** **Bankruptcy Court Approval.**

Following a hearing held on November 9, 2009, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Proponents to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not, however, approved the Plan itself, nor conducted a detailed investigation into the contents of this Disclosure Statement.

**C.** **Voting Instructions**

**1.** **How to Vote.**

A ballot is enclosed herewith for Creditors and Interest Holders to use in voting on the Plan. To vote on the Plan, indicate on the enclosed ballot that you accept or you reject the Plan and sign your name and mail the ballot in the envelope provided for this purpose.

**In order to be counted, ballots must be completed, signed and returned so that they are received no later than 5:00 P.M. prevailing Pacific Time on _____, 2009 at the following address:**

[                                    ]

**Do not send your ballot via facsimile or e-mail.**

If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to the above address.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 08-32514    Doc# 681    Filed: 10/09/09    Entered: 10/09/09 00:22:34    Page 7 of 65

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

3

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## 2. Who May Vote.

The Plan divides the Claims of Creditors into six (6) Classes. There is one (1) Class of Interests.

Classes of Creditors that are impaired by the Plan are entitled to vote, unless no compensation or payment is provided for such Class, in which event such Class is conclusively deemed to have rejected the Plan. Each holder of an Allowed Claim in an impaired Class that will receive distributions under the Plan on account of such claims may vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights attaching to the claims or interests of the Class are modified, other than by curing defaults and reinstating maturities.

All Classes under the Plan, which include Class 1 (Priority Employee Claims), Class 2 (Biggers Priority Employee Claims), Class 3 (Secured Claims of Bank of America and Citibank), Class 4 (Insured Malpractice Claims), Class 5 (Unsecured Claims), Class 6 (Subordinated Biggers Unsecured Claims) and Class 7 (Interests), are impaired under the Plan and are entitled to vote thereon.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim. Generally speaking, a Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtor as other than disputed, contingent or unliquidated, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim which has not been objected to or disallowed prior to computation of the votes on the Plan. The Ballot form which you received does not constitute a proof of Claim.

## D. Confirmation

"Confirmation" is the technical phrase for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Debtor must demonstrate that they have met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code for Confirmation of the Plan.

1   Voting is tabulated by class.  As discussed above, a class of creditors or interest holders has

2   accepted a plan of reorganization if the plan has been accepted by two-thirds (2/3) in dollar amount

3   and more than one-half (1/2) in number of creditors or interest holders holding allowed claims or

4   interests in that class who actually vote to accept or reject such plan.

5   Even if a class of creditors or interests votes against a plan of reorganization, that plan may

6   nevertheless be confirmed by the Bankruptcy Court, notwithstanding the rejection of the Plan by

7   such class, so long as certain statutory requirements are met by the plan.  This procedure is called a

8   "cram down."  The Debtor will seek confirmation of the Plan through a cram down if any Class

9   rejects the Plan.

10   The Bankruptcy Court has set _____, 2009, as the hearing date to determine

11   whether the Plan has been accepted by the requisite number of Creditors and whether the other

12   requirements for Confirmation of the Plan have been satisfied.  This hearing may be continued from

13   time to time and day to day without further notice.  If the Bankruptcy Court confirms the Plan, it will

14   enter the Confirmation Order.  Any objections to Confirmation of the Plan must be in writing and

15   must be filed with the Clerk of the Bankruptcy Court and served on the parties set forth below on or

16   before the date set forth in the Notice of Confirmation Hearing sent to you with this Disclosure

17   Statement and the Plan.

18   Objections must be served upon:

19   (1) The Debtor:

20   Heller Ehrman LLP
     333 Bush Street, 10th Floor
21   San Francisco, CA  94104
     Attn: Shelly Salinero
22   Telephone:  (415) 772-6463
     Facsimile:  (415) 772-6268
23
     (2) Counsel for the Debtor:
24
     John D.  Fiero, Esq.
25   Teddy M.  Kapur, Esq.
     Pachulski Stang Ziehl & Jones LLP
26   1509 California Street, Suite 1500
     San Francisco, CA  94111
27   Telephone:  (415) 263-7000
     Facsimile:  (415) 263-7010
28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   (3) Counsel for the Committee:

2   Thomas A. Willoughby, Esq.
    Felderstein, Fitzgerald, Willoughby & Pascuzzi, LLP
3   400 Capital Mall, Suite 1450
    Sacramento, CA 95814
4   Telephone: (916) 329-7400
    Facsimile: (916) 329-7435

5
    and
6
    (7) The Office of the United States Trustee
7
    Minnie Loo
8   Office of the United States Trustee
    235 Pine Street, 7th Floor
9   San Francisco, CA 94104
    Telephone: (415) 705-3333
10  Facsimile: (415) 705-3379

11  **E.    Disclaimers**

12      THIS DISCLOSURE STATEMENT CONTAINS INFORMATION WHICH MAY BEAR

13  UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN.

14  PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THIS DISCLOSURE

15  STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN

16  SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE

17  NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S

18  BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE

19  INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT

20  CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C.

21  § 1125(a).

22      FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT

23  SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY

24  SUMMARY. *IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS*

25  *DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING*.

26      THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

27  CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST

28

HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

**F.** **Plan Overview**

The Plan provides that the Liquidating Debtor will continue to wind down its affairs and make distributions to Creditors. The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Plan. Amounts listed below are estimated.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| N/A | Allowed Administrative Claims | 100% | Each Allowed Administrative Claim, unless the holder of such Claim has agreed to a different treatment, shall be paid in full by the Liquidating Debtor from Available Cash or the Reserved Claims Pool Account (as applicable) on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such date as the holder of such Claim and the Liquidating Debtor may agree. |
| N/A | Allowed Claims for Professional Fees | 100% | Each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Debtor in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order. |
| N/A | Allowed Priority Tax Claims | 100% | Each Allowed Priority Tax Claim, unless the holder of such Claim has agreed to a different treatment, shall receive at the option of the Liquidating Debtor the following: (i) payment in full by the Liquidating Debtor from Available Cash on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the tenth Business Day after such Claim is Allowed, or as soon thereafter as practicable; and (d) such date as the holder of such Claim and the Liquidating Debtor may agree, or (ii) deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the rate of five per cent (5%) per annum or at such other rate as |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

36869-001\DOCS_SF:67879G7

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

7

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| | | | may be determined by the Court or agreed upon between the Liquidating Debtor and the appropriate governmental unit, provided that, in the event that the Liquidating Debtor elects payment option (ii), the Liquidating Debtor may prepay any or all such Claims at any time, without premium or penalty. |
| 1 | Allowed Priority Employee Claims | 100% | Each holder of an Allowed Priority Employee Claim who is not employed by the Debtor as of the Effective Date of the Plan shall receive full payment of the Allowed amount of such Claim from Available Cash on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim.<br>The Liquidating Debtor shall either pay or honor in the ordinary course of business, any Allowed Class 1 Priority Employee Claim for any employee who is employed by the Liquidating Debtor on the Effective Date of the Plan.  Holders of Class 1 Claims who are members of the Biggers Class shall receive their distribution hereunder even if they Opt-Out of the Biggers Settlement. |
| 2 | Allowed Biggers Priority Employee Claims | 100% | Each holder of an Allowed Biggers Priority Employee Claim who is not employed with the Debtor as of the Effective Date of the Plan shall receive full payment of the Allowed amount of such Claim from Available Cash only after the Biggers Approval Order becomes a Final Order, unless prior to the deadline for balloting on the Plan, such holder of a Class 2 Claim delivers to the Proponents a fully executed original Biggers Settlement Release, in which case such Claim shall be paid to the Claimant earlier (simultaneously with the payment of Class 1 Claims). |
| 3 | Secured Claims of Bank of America and Citibank | 100% of principal and interest | The Class 3 Claims are Disputed Claims.  On the Effective Date, Bank of America and Citibank shall effect a payment of the principal and interest (but not attorneys fees and costs) then claimed to be owing to them on the Class 3 Claim by applying their cash collateral thereto, and then return to the Liquidating Debtor the balance of collateral currently held by Bank of America and/or Citibank.  The Bank shall retain all of its liens and cash collateral rights until receipt of the payments required hereunder.  The Liquidating Debtor and the Bank shall make such customary arrangements and execute such customary documents, as mutually agreed upon, to effectuate a release of the Bank's security interests or liens in the Liquidating Debtor's assets upon receipt of the payments required hereunder.  The Court shall retain jurisdiction to resolve any disputes which may arise in connection with the foregoing matters.  Notwithstanding the foregoing, |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| | | | nothing in this Plan shall affect or diminish the Debtor's Retained Claims and Defenses against Bank of America or Citibank, nor shall it affect or diminish the Debtor's rights in the Bank of America Preference Action. |
| 4 | Insured Malpractice Claims | 100% from insurance | On the Effective Date, or as soon as practicable, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Class 4 Insured Malpractice Claim, each Class 4 Insured Malpractice Claim shall be paid solely from the proceeds of any applicable Malpractice Policy, with respect to the Insured Portion of the Claim. Any Claim, or portion of a Claim, for the Uninsured Portion of any Malpractice Claim, including the Net SIR, shall be treated as a Class 5 Unsecured Claim. No holder of an Allowed Class 4 Claim shall receive any distribution from Available Cash on account of such Class 4 Claim. |
| 5 | Unsecured Claims | 20-60% The estimated dividend is based on projected litigation recoveries. The actual dividend could be less than 20%, or if the litigations are extremely successful, could be higher than 60% | Each holder of an Allowed Unsecured Claim shall receive, in exchange for and in full and final satisfaction of such Claim, including any post-petition interest at the annual rate of five per cent (5%) per annum, a Pro Rata Share of Available Cash, net of amounts reserved for Disputed Claims or Plan Expenses. To the extent that all Class 5 Unsecured Claims have been paid in full, including post-petition interest as set forth above, and funds remain in the Claims Reserve Account, such funds shall be used by the Liquidating Debtor to fund the expense of claims in Classes 6 and 7, as described below. |
| 6 | Subordinated Biggers Unsecured Claims | 0% | Once Allowed Class 5 Claims are satisfied in full with interest, as described above, each holder of a Biggers Unsecured Claim shall receive, in exchange for and in full and final satisfaction of such Claim, including any post-petition interest at the annual rate of five per cent (5%) per annum, a Pro Rata Share of Available Cash, net of amounts reserved for Disputed Claims or Plan Expenses. To the extent that all Class 6 Biggers Subordinated Unsecured Claims have been paid in full, including post-petition interest as set forth above, and funds remain in the Claims Reserve Account, such funds shall be used by the Liquidating Debtor to fund the expense of claims in Class 7, as described below. |
| 7 | Interests | 0% | On the Effective Date, the Interest Holders shall have no ability to direct or control the affairs of the Liquidating Debtor, but shall retain their status as partners of the Liquidating Debtor. Interest Holders shall receive nothing under the Plan until the Allowed Claims of Classes 1 through 7 are paid in full, with interest at the rate of five percent simple interest, at which point all Available Cash, net of amounts |

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AND RECOVERIES | TREATMENT |
|---|---|---|---|
| | | | reserved for Disputed Claims or Plan Expenses, shall be paid to the Interests Holders consistent with the extent of their Interests. |

## II.

## OVERVIEW OF CHAPTER 11 CASE

This section of the Disclosure Statement discusses the significant events in the Chapter 11 Case to date, including events leading up to the commencement of this case. Copies of all relevant court papers are on file with the Bankruptcy Court.

A.      **Events Leading Up to the Filing of the Chapter 11 Case**

1.      **Description of the Debtor**

Heller Ehrman, LLP, a California limited liability partnership (the "Debtor"), adopted a Plan of Dissolution as of September 26, 2008 (the "Dissolution Plan"). The Dissolution Plan was adopted by the affirmative vote of more than two-thirds (2/3) of the shareholders of the Debtor's limited partners who were eligible to vote. Pursuant to the Dissolution Plan, the Dissolution Committee (as provided in the Dissolution Plan) is authorized to, among other things, wind up the Debtor's business and affairs and to cause the ultimate dissolution of the Debtor, including through the filing of a voluntary petition under the Bankruptcy Code.

The Debtor's predecessor law firm was founded in San Francisco, California roughly 110 years ago, in 1890. Over the following years, the Debtor expanded by adding attorneys to the firm and by adding additional office locations. Ultimately, the Debtor grew to more than 730 attorneys in offices all across the United States and in Europe and Asia, including offices in New York City, Los Angeles, Washington, D.C., London, Hong Kong, Beijing and Singapore.

The Debtor adopted its current form of organization – a limited liability partnership, the partners of which are professional corporations – in 2000. The Debtor is a California Limited Liability Partnership whose six partners are professional corporations organized under the laws of the principal states where the Debtor operated. The Debtor was the entity which provided legal services, billed for those services, and employed the associates, special counsel and staff who

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  provided those services.  The firm's "shareholders" were each employed by one of the six

2  professional corporations pursuant to written employment agreements.

3  After experiencing financial difficulties and following unsuccessful merger attempts with

4  several other law firms, and as a result of its lenders declaring a default under the Debtor's line of

5  credit triggered by shareholder departures that caused a breach of lending covenants, the Debtor

6  decided it was in the best interests of its creditors, equity interest holders and other parties in interest

7  for the Debtor to wind down the business of the firm, leading to the adoption of the Dissolution Plan.

8  Following adoption of the Dissolution Plan, the Debtor immediately began to wind down operations.

9  Among other things, the Debtor focused on billing and collecting accounts receivable, and began

10  selling or otherwise disposing of the Debtor's other assets, paying or otherwise discharging claims

11  against the Debtor, vacating leased premises, and transitioning and securing client files and business

12  records.  Through this process, the Debtor paid off substantially all of its secured debt, negotiated

13  settlements with landlords, and made other substantial progress in winding down the Debtor's

14  business and affairs.

15  **2.**     **The Debtor's Pre-Petition Credit Facility**

16  Bank of America, N.A., as agent for itself and CitiBank (the "Agent"), is the Debtor's only

17  prepetition secured creditor.  Bank of America, N.A.  is the Administrative Agent, Swing Line

18  Lender and L/C Issuer under that certain prepetition Credit Agreement (the "Prepetition Credit

19  Agreement") by and among the Debtor, certain other lenders and Banc of America Securities LLC as

20  Sole Lead Arranger and Sole Book Manager.  These same parties also entered into and executed

21  various other agreements and documents, which together with the Prepetition Credit Agreement, are

22  referred to herein as the "Prepetition Loan Documents."

23  Through the Prepetition Credit Agreement, the Debtor obtained a revolving line of credit up

24  to the amount of $50 million (the "Line of Credit") and letter of credit commitments of $20 million

25  (the "L/C Commitment").  On July 30, 2008, the parties executed an amendment to the Prepetition

26  Credit Amendment that, among other things, provided for a term loan of $10 million (the "Term

27  Loan").  The obligations to the Agent under the Prepetition Loan Documents are purportedly secured

28  by a security interest in and lien upon all or substantially all of the Debtor's personal property.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Agent attempted to perfect its security interest by filing a UCC Financing Statement with the California Secretary of State on January 3, 1991 (the "Original Financing Statement"), which was amended and continued by subsequent UCC filings. However, the Agent terminated the Original Financing Statement pursuant to a UCC Financing Statement Amendment filed on August 3, 2007 (the "Termination Statement"). Over a year later, apparently recognizing that its security interest had or may have become unperfected, the Agent filed a UCC Correction Statement on October 1, 2008 (the "Correction Statement"), which stated that the Termination Statement "was filed in error and as a result of a clerical error" and purported to continue the Original Financing Statement. The Agent then filed a new UCC Financing Statement covering the Debtor's assets on October 2, 2008 (the "New Financing Statement"), which purported to "reaffirm" the Original Financing Statement and set forth the collateral covered by its security interest. The Debtor filed this chapter 11 case on or before December 31, 2008 in part to ensure the filing of the New Financing Statement fell within the 90-day preference period under Section 547 of the Bankruptcy Code. During the 90-day period preceding the Petition Date, the Agent received approximately $51 million in payments from the Debtor on account of the Debtor's principal obligations under the Prepetition Loan Documents.

**3.      Events Precipitating the Debtor's Filing**

It is important to note that the Debtor's decision to file this case was not prompted by the Debtor running out of money. Through the hard work and dedication of the Debtor's former shareholders and remaining employees, the Debtor had great success in collecting outstanding receivables pre-petition and believed that they would continue to do so. Notwithstanding this success, the Debtor decided that a Chapter 11 filing was in the best interests of the Debtor, its creditors and other parties in interest, for the reasons discussed next.

In November 2008, the Debtor became aware of the Termination Statement and the Agent's attempt to "correct" the termination of its perfected security interests through the Correction Statement and New Financing Statement. The Debtor subsequently informed the Agent that the Debtor believes the Correction Statement and New Financing Statement purport to perfect new liens on the Debtor's assets, which under the Bankruptcy Code, could be avoidable transfers. If the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Agent's liens are avoidable, then it would not be entitled to receive distributions on its claims any

2   greater than the pro rata amount distributed to the Debtor's general unsecured creditors. The Debtor

3   attempted to reach a settlement with the Agent that would fund treatment of the Debtor's unsecured

4   creditors comparable to the treatment they would likely receive in a bankruptcy case, and potentially

5   avoid the need to file this case, but was unable to reach a satisfactory agreement that would be in the

6   best interests of the Debtor and its creditors.

7           A second circumstance contributing to the decision to file this case relates to the Debtor's

8   San Francisco landlord, 333 Bush Associates. The Dissolution Committee and the Debtor's

9   professionals have devoted extensive efforts in attempting to negotiate a settlement with its San

10  Francisco landlord. The San Francisco landlord filed suit against the Debtor in San Francisco

11  Superior Court and, over the Debtor's objection, was able to obtain a Writ of Attachment from the

12  Court on December 19, 2008. Although the Debtor was nevertheless able to negotiate settlement

13  terms with the San Francisco landlord that would, in the view of the Dissolution Committee, have

14  permitted equitable treatment of other creditors, a requirement of this settlement was an immediate

15  cash payment to the San Francisco landlord. As a result of the levy of the landlord's writ of

16  attachment and internal bank procedures that (according to the Agent) were triggered by that levy,

17  the Debtor was unable to make this payment before it became apparent that this Chapter 11 case

18  would have to be filed in any event due to the intransigence of the Agent in the Debtor's settlement

19  negotiations as described above. Hence, an added consequence of this Chapter 11 case was to cancel

20  the lien of the San Francisco landlord's attachment.

21          The Debtor had hoped that it would be able to wind down the Debtor's business and treat all

22  creditor claims outside of the jurisdiction of the Bankruptcy Court. Among other things, an out-of-

23  court dissolution (assuming resolution of the issues with the Agent and the San Francisco landlord)

24  may have ultimately led to larger distributions to creditors because the Debtor would have been able

25  to avoid administrative and other bankruptcy-related expenses. Until literally hours before its filing

26  for chapter 11 bankruptcy protection, the Debtor continued to negotiate for an acceptable resolution

27  with the Agent on a basis that would have been fair and reasonable to all of the Debtor's creditors.

28

Despite extensive efforts, the Dissolution Committee was unable to reach an agreement that, in its business judgment, would have been fair and equitable to all of the Debtor's creditors.

Based on these facts and circumstances, the Debtor believed that filing this case would, among other things, ensure the Debtor will have access to the cash it needed to effectively and efficiently wind down operations and administer the estate, and also preserve whatever rights and claims the Debtor may have with respect to the perfection of the Agent's security interests and the rights and claims of the San Francisco landlord.

**B.** **Summary of Events During the Chapter 11 Case**

The following is a summary of important events that have taken place since the Petition Date.

**1.** **"First Day" Pleadings**

Contemporaneously with the filing of the Debtor's chapter 11 petition, the Debtor filed certain standard "first day" pleadings (the "First Day Pleadings") requesting relief from the Bankruptcy Court that would minimize the disruption caused by the bankruptcy filing to its ordinary business operations, including the following:

• *Motion of Debtor and Debtor in Possession for Order (1) Authorizing Debtor and Debtor in Possession to (A) Pay and Honor Pre-Petition Employee Wages and Other Employee Obligations in the Ordinary Course of Business, and (B) Continue Honoring Employee Obligations, Including Wages, Benefits and Retention Bonuses, on a Post-Petition Basis; and (2) Providing Related Relief* [Docket No. 5]

• *Motion of the Debtor for Order (A) Authorizing Maintenance of Existing Bank Accounts and Continued Use of Existing Business Forms and Checks, and (B) Authorizing Continued Use of Existing Cash Management System* [Docket No. 7]

• *Debtor's Application for Order Appointing Peter J. Benvenutti Responsible Individual* [Docket 8]

• *Motion of Debtor and Debtor in Possession for Order: (1) Granting Debtor and Debtor in Possession Interim Use of Cash Collateral; (2) Scheduling Deadlines Relating to a Final Hearing on Permanent Use of Cash Collateral; and (3) After Conclusion of a Final Hearing, Authorizing Permanent Use of Cash Collateral* [Docket No. 9]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  The Bankruptcy Court held an expedited hearing on the First Day Pleadings on December

2  29, 2008.  Following the December 29, 2008 hearing on the First Day Pleadings, the Bankruptcy

3  Court entered several orders related to the First Day Pleadings on December 30, 2008, which orders,

4  as well as certain subsequent orders, are discussed in the following paragraphs.

5  **2.    Filing of Schedules, Meeting of Creditors and Bar Date**

6  On January 6, 2009, the Debtor filed its Schedules with the Bankruptcy Court.  The

7  Schedules provide detailed information on the Debtor's assets and liabilities, as well as other

8  information about its business.  In addition, on January 27, 2009, the United States Trustee

9  conducted the Section 341 meeting of creditors in the Debtor's chapter 11 case.  Pursuant to rules

10  2002(1) and 9008 of the Federal Rules of Bankruptcy Procedure, the deadline for filing proofs of

11  Claim in the Bankruptcy Case for non-Governmental Units was April 27, 2009.  The Debtor has

12  filed monthly operating reports commencing with the fiscal month ending January 9, 2009, and

13  continues to file such reports.

14  **3.    Retention of Professionals**

15  The Bankruptcy Court has authorized the Debtor to retain the following professionals:

16  • Pachulski Stang Ziehl & Jones LLP, as general bankruptcy counsel, which
17  employment was approved on January 21, 2009;

18  • Greenberg Traurig LLP, as general bankruptcy co-counsel, which employment was
approved on April 28, 2009;

19  • Manatt Phelps & Phillips, LLP, as special employment litigation counsel, which
20  employment was approved on February 27, 2009;

21  • Howard Rice Nemerovski Canady Falk & Rabkin, as special counsel, which
employment was approved on February 27, 2009,

22  • Schiff & Hardin LLP, as special real estate counsel, which employment was approved
on March 3, 2009;

23  • Olswang Solicitors, as special counsel, which employment was approved on March 3,
24  2009;

25  • Folger Levin & Khan, as special malpractice counsel, which employment was
approved on March 3, 2009;

26  • Lovitt & Hannan, Inc., as special litigation counsel, which employment was approved
27  on March 3, 2009;

28  • The Adler Law Firm, as collections counsel, which employment was approved on
April 28, 2009;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

- Cohen Milstein Sellers & Toll PLLC, as special counsel, which employment was approved on July 2, 2009 *nunc pro tunc* to April 1, 2009;

- Orrick Herrington & Sutcliffe LLP, as special counsel in a matter pertaining to Resource Investments, Inc. and Land Recovery, Inc., which employment was approved on May 13, 2009;

- Trucker Huss APC, as special employee benefits counsel, which employment was approved on August 6, 2009;

- Eichstaedt & Devereaux LLP, as Debtor's tax advisors, which employment was approved on May 16, 2009;

- Saw Meng Tee & Partners PAC, as tax advisors for the Debtor's Singapore offices, which employment was approved on September 21, 2009;

- RPC Property Tax Advisors, LLC, as tax advisors to appeal an adverse property tax assessment by the City and County of San Francisco, which employment was approved on September 21, 2009; and

- Clars Auction Gallery, as art appraiser, which employment was approved on March 31, 2009.

The Bankruptcy Court authorized the Committee to retain Felderstein, Fitzgerald, Willoughby & Pascuzzi, LLP as its legal counsel by order entered on January 30, 2009.

Finally, the Bankruptcy Court authorized the Debtor and the Committee to employ Development Specialists, Inc. as joint financial advisors to the Debtor and the Committee by order entered on March 9, 2009.

**4.     Entry of Key Employee Retention Plan Order**

On March 4, 2009, the Court authorized the Debtor to pay certain retention bonuses and incentive payments to key non-insider employees as compensation for the performance of critical functions with respect to the wind down of the Debtor's business, in such amounts agreed upon by the Debtor and the Committee.

**5.     Disposition of Unexpired Real Property Leases**

On January 28, 2009, the Court approved the Debtor's motion to reject its lease and sublease of Los Angeles office space, approved a compromise of controversy with the Los Angeles landlord and authorized the Debtor to sell certain furniture, fixtures and equipment free and clear of liens, claims, encumbrances and other interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    On May 30 and June 2, 2009, the Court authorized a three-part transaction between the

2    Debtor and its landlord, 333 Bush Associates NF L.P., pursuant to which the Debtor assigned a

3    sublease to such landlord, rejected its lease pursuant to a written stipulation, and executed a new

4    short term tenancy agreement with the landlord for reduced space.

5    On August 26, 2009, the Court authorized the Debtor to assume and assign to Winston &

6    Strawn, LLP, the Debtor's Beijing office lease and Shanghai office lease and certain executory

7    contracts and licenses.

8    The Court has also approved a compromise of controversy with a Seattle landlord and

9    authorized the Debtor to reject certain other office leases and subleases and abandon personal

10   property at some of the leased locations.

11   **6.    Client File Disposition Procedures**

12   As a result of the wind-down and prior thereto, substantially all of the Debtor's attorneys

13   became affiliated with other law firms.  In all cases, as each attorney transferred to other firms, that

14   attorney's open client files were transferred as well.  However, during the Debtor's 118-plus year

15   history, over 190,000 closed client files have been retained and stored by the Debtor, in some

16   manner, for various reasons, including compliance with applicable rules of professional

17   responsibility.  On May 7, 2009, the Court entered an order authorizing the Debtor to dispose of

18   client files pursuant to certain procedures intended to provide notice and an opportunity for the

19   Debtor's former clients to retrieve their files in accordance with applicable rules of professional

20   responsibility and to minimize cost of file storage, retrieval and destruction costs to the estate.

21   **7.    Authorization of Committee to Pursue Certain Estate Causes of Action**

22   On March 6, 2009, the Committee filed its *Motion for Order Authorizing Creditors'*

23   *Committee to Pursue Certain Estate Causes of Action* (the "Estate Representative Motion") [Docket

24   No.  232].  Pursuant to the Estate Representative Motion, the Committee sought authorization to file

25   and to pursue the following two categories of claims (the "Estate Representative Claims") on behalf

26   of the estate:

27   a.    Preference claims versus Bank of America and/or Citibank (the "Banks").  The

28   Committee sought authority to pursue any avoidable transfer actions that the Debtor may have

against the Banks for pre or post-petition avoidable transfers, including related claims for recovery or turnover of property and disallowance of claims until such recovery pursuant to 11 U.S.C. § 502(d), based upon the circumstances set forth above in Section II.A.2 of this Disclosure Statement. The Committee is concerned that each member of the Debtor's Dissolution Committee has a direct conflict of interest with respect to the insolvency element in the preference action because the date of the Debtor's insolvency is likely to also be a crucial issue in any claims to recover distributions to the partners of the Debtor and/or their respective shareholders as discussed in subparagraph b below.

b. _Jewel v. Boxer_ Claims. The Committee believes that the estate may have claims against certain former attorneys under the partnership doctrines set forth in _Jewel v. Boxer_, 156 Cal. App. 3d 171 (1984), who (i) were employed by the Debtor, (ii) substituted as attorney of record, either individually or as part of a law firm, in place of the Debtor after the Debtor adopted its Dissolution Plan as of September 26, 2008 and ceased to provide legal services to clients on matters, and (iii) collected and/or will collect fees for services performed on such matters.

On April 21, 2009, the Court entered an order authorizing the Committee to pursue the Estate Representative Claims on behalf of the estate.

**8.** **The Joint Investigation Agreement**

In addition to the Estate Representative Claims discussed above, the estate may have other causes of action requiring the investigation and evaluation of claims against third parties arising out of the facts and circumstances related to the Debtor's dissolution (the "Potential Claims").

In order to avoid the duplicate cost of having the Committee and the Debtor conduct the same claim investigations and to address the Committee's concern as to possible conflicts of interest on the part of the Debtor, on or about July 29, 2009, the Debtor and the Committee filed their _Joint Motion for Approval of Joint Investigation Agreement and Application to Expand Employment of Lovitt & Hannan, Inc. as Special Litigation Counsel_ seeking authorization to expand the retention of Lovitt & Hannan, Inc. ("L&H"), a firm that had already been retained as special litigation counsel to the Debtor and with extensive experience in bankruptcy claims investigation, professional negligence, banking and commercial law, and complex commercial litigation, to include discovery duties in connection with the Estate Representative Claims and the investigation of Potential Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

On July 17, 2009, the Court entered its order expanding the retention of L&H. The order contains further rulings addressing third party attorney-client privilege issues in connection with the Debtor's former client files.

**9.      Wind Down of the Retirement Plan**

Pursuant to the Dissolution Plan, the Dissolution Committee was appointed to, among other things, serve as the administrator of the Heller Ehrman LLP Retirement Plan (Amended and Restated Effective January 1, 2007) (the "LEO Plan"). The members of the Dissolution Committee are participants in the LEO Plan, as were certain senior employees of the Debtor. As of the Petition Date, the LEO Plan's assets had a value of approximately $45.5 million.

As part of the general wind down efforts, the Dissolution Committee seeks to facilitate the termination of the LEO Plan and the distribution of the funds therein to the plan participants. On or about July 31, 2009, the LEO Plan's assets were liquidated and, on August 18, 2009, the Court authorized the Debtor to transfer and assign the plan administrator obligations from the Dissolution Committee to Keith Betzina, an employee benefits attorney at the Davis, Wright & Tremaine law firm in San Francisco and former Heller Ehrman attorney, to avoid any potential conflicts of interest.

The Debtor has since agreed to appoint the Committee as Estate Representative for the purpose of alleging any claims the Estate may have against the LEO Plan, as are more fully described below.

**10.      Solicitation Procedures**

For purposes of soliciting votes on the Plan and the dissemination of this Disclosure Statement, the Debtor will request that the Court approve the manner and form of notice of the Plan and the procedures for obtaining confirmation of the Plan. The Bankruptcy Court's order approving the solicitation procedures motion is enclosed with this Disclosure Statement for your review.

**III.**

**DESCRIPTION OF THE PLAN**

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan which follows constitutes a summary only and should not be relied upon for voting purposes. You are urged to

read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Proponents. If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

**A.     Description Of Classes**

The Plan divides Creditors and Interest Holders into Classes. Creditors with similar Claims are placed in the same Class. There are six (6) Classes of Claims and one (1) Class of Interests under the Plan as follows:

**Class 1 Claims**. Class 1 shall consist of all Priority Employee Claims.

**Class 2 Claims**. Class 2 shall consist of the Biggers Priority Employee Claims.

**Class 3 Claims**. Class 3 shall consist of the Secured Claims of Bank of America and Citibank. Each holder of an Allowed Secured Claim in Class 3 shall be considered to be in its own separate subclass, and each subclass will be deemed to be a separate Class for purposes of the Plan.

**Class 4 Claims**. Class 4 shall consist of all Insured Malpractice Claims.

**Class 5 Claims**. Class 5 shall consist of all Unsecured Claims.

**Class 6 Claims**. Class 6 shall consist of all Subordinated Biggers Unsecured Claims.

**Class 7 Interests**. Class 7 shall consist of all Allowed Interests.

**B.     Treatment of Classified Claims and Interests**

Article IV of the Plan sets forth the treatment of classified Claims and Interests. A summary of the treatment of classified Claims and Interests is also provided in the chart set forth in Section 1.F of this Disclosure Statement. As set forth in the Plan and previously herein, all Classes under the Plan are impaired and are entitled to vote on the Plan.

**C.     Treatment Of Unclassified Claims**

Article III of the Plan provides for the treatment of unclassified claims. The Plan sets forth the treatment of Administrative Claims (including Claims for Professional Fees) and Priority Tax Claims, which are not classified under the Plan. The Plan also provides for an Administrative Claims Bar Date, which requires that all requests for payment of Administrative Claims must be filed on or before the first business date that is thirty (30) days after the Effective Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

36869-001\DOCS_SF:67493G1     DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION
20

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**D.      Implementation of the Plan**

Article V of the Plan provides the principal means for the implementation of the Plan.  The Plan shall be implemented on the Effective Date as set forth in the Plan.  The Plan also provides for, among other things, the revesting of Estate Assets in the Liquidating Debtor, the capitalization of the Liquidating Debtor with the Shareholder Settlement Payments subject to the terms of the Shareholder Liquidation Settlement, the management of the Liquidating Debtor, and sets forth the Liquidating Debtor's Retained Claims and Defenses.  Article V of the Plan contains provisions governing the allowance, distribution and payment of Claims, the establishment of the Reserved Claims Pool Account and the Claims Reserve Account and procedures governing the payment of Plan Expenses.  Article V of the Plan also provides for the establishment of the Shareholder Liquidating Trust pursuant to the Shareholders Liquidating Trust Agreement to be entered into by the Liquidating Debtor on the Effective Date, and provides for the terms and conditions of settlements with Former Shareholders in exchange for the Shareholder Settlement Payments.  Article V of the Plan also delineates the power and authority of the Committee as of the Effective Date, fixes procedures for the post-Effective Date employment and compensation of Professionals and provides for the entry of a final decree closing the Debtor's chapter 11 case following the payment (or reserve for the payment) of Claims to be paid on or after the Effective Date.

**E.      Executory Contracts**

Article VI of the Plan sets forth procedures governing the assumption and rejection of the Debtor's executory contracts and unexpired leases.

The Plan provides that, on the Effective Date, the Debtor will reject each of the Rejected Contracts except for the Assumed Contracts identified on Exhibit A to the Plan.  The Debtor reserves the right to make additions to Exhibit A to the Plan up to 10 days prior to the date on which objections must be filed to the Plan with respect to the Confirmation Hearing.  The Confirmation Order shall require that all Cure Obligations be paid on or before ten (10) days from the date of the entry of the order approving the assumption of the Assumed Contracts.

The Plan also provides a procedure for the rejection of Rejected Contracts.  Rejection of a contract or lease does not constitute a waiver by the Debtor or the Liquidating Debtor of the right to

36891-001\DOCS_SF:67479v6    21    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

contend that some or all of such contract or lease is not executory. Any Rejection Claim arising from the rejection of an executory contract or unexpired lease pursuant to the Plan shall be filed within thirty (30) days of entry of the Confirmation Order, provided that such deadline is not applicable to any executory contract or unexpired lease rejected prior to the Effective Date and for which a different Rejection Claim Bar Date was previously fixed by the Bankruptcy Court pursuant to Bankruptcy Rule 3002(c)(4). Any Rejection Claim not filed by the applicable Rejection Claim Bar Date shall be a Disallowed Claim and shall be forever barred as a Claim against the Debtor, the Liquidating Debtor, the Committee or any property of the Debtor and from sharing in any distribution under the Plan.

The Plan also provides a mechanism for the satisfaction of Cure Obligations with respect to the Assumed Contracts. The Liquidating Debtor shall satisfy any Cure Obligations for the Assumed Contracts by making a Cash payment equal to either the amount: (a) set forth in any other notice, motion or supplement to the Plan filed and served in connection with the Confirmation Hearing or as may be determined in an Assumption and Cure Order, or (b) agreed to in writing between the Liquidating Debtor and the non-debtor parties to such contracts or leases. Objections, if any, to the Cure Obligations must be filed fourteen (14) days prior to the Confirmation Hearing. In the event that an objection is timely filed with the Bankruptcy Court to the Cure Obligations proposed by the Debtor and served on counsel to the Debtor and counsel to the Committee, and the Bankruptcy Court, after notice and hearing, determines that the Liquidating Debtor is obligated to pay a different amount under section 365 of the Bankruptcy Code than proposed by the Debtor, then the Liquidating Debtor shall have the right within twenty (20) days after such determination to seek an order of the Bankruptcy Court rejecting such executory contract or unexpired lease. The Liquidating Debtor shall be responsible for payment of the Cure Obligations within ten (10) days from the date on which an Assumed Contract is assumed pursuant to section 365(b) of the Bankruptcy Code.

The Plan also addresses the treatment of the Debtor's postpetition executory contracts and agreements and provides for the Liquidating Debtor's assumption of the Debtor's Employee Benefit Plans.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

36689-001\DOCS_SF:67870v1                                  DISCLOSURE STATEMENT IN SUPPORT OF
                                 22                        JOINT PLAN OF LIQUIDATION

Except as otherwise provided in the Plan, all Employee Benefit Programs shall be treated as "executory contracts" and shall be assumed pursuant to sections 363 and 1123(b)(2) of the Bankruptcy Code by operation of the Plan.

**F.   Conditions to Confirmation of the Plan**

Article VII of the Plan provides a list of conditions that must occur in order for the Plan to be confirmed.  In addition, the Plan identifies conditions to the effectiveness of the Plan.

**G.   Effects of Confirmation**

Article VIII of the Plan sets forth certain effects of Confirmation of the Plan and the parties that will be bound by the Plan, once confirmed.  As noted above, the Plan provides for the revesting of Estate Assets in the Liquidating Debtor and the satisfaction, discharge and release of Claims and Interests against the Debtor on the Effective Date.  The Plan also sets forth certain injunctive provisions that will go into effect on the Effective Date and provides for the release of certain liabilities for certain parties.

**IV.**

**DISTRIBUTIONS TO HOLDERS OF SECURED CLAIMS**

The Plan creates one (1) Class of Allowed Secured Claims, which is Class 3 (Secured Claims of Bank of America and Citibank).[1]  As noted above, the Class 3 Claims are Disputed Claims.  On the Effective Date, Bank of America and Citibank shall effect a payment of the principal and interest (but not attorneys fees and costs) then claimed to be owing to them on the Class 3 Claim by applying their cash collateral thereto, and then return to the Liquidating Debtor the balance of collateral currently held by Bank of America and/or Citibank.  The Bank shall retain all of its liens and cash collateral rights until receipt of the payments required hereunder.  The Liquidating Debtor and the Bank shall make such customary arrangements and execute such customary documents, as mutually agreed upon, to effectuate a release of the Bank's security interests or liens in the Liquidating Debtor's assets upon receipt of the payments required hereunder.  The Court shall retain jurisdiction to resolve any disputes which may arise in connection with the foregoing matters.  Notwithstanding

---

[1]  MPC filed an allegedly secured claim in the Chapter 11 Case but, because no collateral exists for this Claim, the Proponents have not proposed a secured treatment therefor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the foregoing, nothing in this Plan shall affect or diminish the Debtor's Retained Claims and Defenses against Bank of America or Citibank, nor shall it affect or diminish the Debtor's rights in the Bank of America Preference Action.

## V.

## DISTRIBUTIONS TO HOLDERS OF UNSECURED CLAIMS

The Plan creates two (2) Classes of priority employees (Class 1 (Priority Employee Claims) and Class 2 (Biggers Priority Employee Claims)), two (2) Classes of non-priority unsecured claims (Class 4 (Insured Malpractice Claims) and Class 5 (Unsecured Claims)), and one (1) Class of subordinated unsecured claims (Class 6 (Subordinated Biggers Unsecured Claims)).

Priority Employee Claims are classified as Class 1 Claims under the Plan. The Debtor believes that many employee claims entitled to priority under section 507(a)(4) or (a)(5) of the Bankruptcy Code have already been paid by the Debtor pursuant to authority granted by the Bankruptcy Court in connection with relief granted pursuant to the First Date Pleadings (described in Section II of this Disclosure Statement). The Plan provides that holders of Allowed Priority Employee Claims who are not employed with the Debtor on the Effective Date shall receive full payment on account of the Allowed amount of such Claim on (or as soon as practicable after) the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining the allowance of such Claim. The Liquidating Debtor will either pay or honor in the ordinary course of business, any Allowed Class 1 Priority Claim for any employee that is employed by the Liquidating Debtor on the Effective Date.

Biggers Priority Employee Claims are classified as Class 2 Claims under the Plan. Each holder of an Allowed Biggers Priority Employee Claim that is not employed with the Debtor as of the Effective Date of the Plan shall receive full payment of the Allowed amount of such Claim from Available Cash on or as soon as practicable after the Effective Date.

Insured Malpractice Claims are classified as Class 4 Claims under the Plan. On the Effective Date, or as soon as practicable, in full satisfaction, release, and discharge of and in exchange for such Allowed Class 4 Insured Malpractice Claim, each Class 4 Insured Malpractice Claim shall be paid solely from the proceeds of any Malpractice Policy, with respect to the Insured Portion of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Claim. Any Claim, or portion of a Claim, for the Uninsured Portion of any Malpractice Claim, including Net SIR, shall be treated as a Class 5 Unsecured Claim. No holder of an Allowed Class 4 Claim shall receive any distribution from Available Cash on account of such Class 4 Claim.

The Plan also provides for the treatment of holders of Claims in Class 5 (Unsecured Claims). To date, approximately $232 million in Unsecured Claims have been filed and scheduled in this case. The Debtor currently estimates that the total amount of Unsecured Claims that may be allowed (after the court rules on objections to Claims and the Claims are reconciled to disallow duplicate and other inappropriately filed Claims), may range from $97 to $115 million, although this amount is subject to adjustment depending on the ultimate allowance of such claims by the Bankruptcy Court.

The Plan provides that holders of Allowed Class 5 Claims shall receive, in exchange for and in full and final satisfaction of such Claim, including any post-petition interest at the annual rate of five per cent (5%) per annum, a Pro Rata Share of Available Cash, net of amounts reserved for Disputed Claims or Plan Expenses. The Plan contemplates that disbursements to holders of Allowed Unsecured Claims shall be made by the Liquidating Debtor at such times as is reasonably prudent.

To the extent that all Class 5 Unsecured Claims have been paid in full, including post-petition interest on such Allowed Claim at the annual rate of five percent (5%) per annum, and funds remain in the Claims Reserves Account, such funds shall be available for disbursement to Class 6 Claims.

Subordinated Biggers Unsecured Claims are classified as Class 6 Claims. Once Allowed Class 5 Claims are satisfied in full with interest, as described above, each holder of a Biggers Unsecured Claim shall receive, in exchange for and in full and final satisfaction of such Claim, including any post-petition interest at the annual rate of five per cent (5%) per annum, a Pro Rata Share of Available Cash, net of amounts reserved for Disputed Claims or Plan Expenses. To the extent that all Class 6 Biggers Subordinated Unsecured Claims have been paid in full, including post-petition interest as set forth above, and funds remain in the Claims Reserve Account, such funds shall be used by the Liquidating Debtor to fund the expense of claims in Class 7, as described below.

On (or, where appropriate, after) the Effective Date, the Liquidating Debtor shall be vested with (a) control of reviewing, analyzing, and administering Unsecured Claims; (b) if appropriate,

objecting to Unsecured Claims on the basis of the Retained Claims and Defenses or on any other reasonable grounds; (c) resolving or handling any litigation involving Disputed Claims that are asserted as Unsecured Claims; and (d) making distributions to the holders of Allowed Unsecured Claims in accordance with the Plan. After the Effective Date, professionals for the Liquidating Debtor or the Shareholder Liquidating Trustee shall not be required to file formal applications for Bankruptcy Court approval of post-Effective Date employment or payment of post-Effective Date fees and expenses. To the extent that the Liquidating Debtor or Shareholder Liquidation Trustee require Professionals to perform services following the Effective Date, including, but not limited to transitional services to implement the transactions contemplated under this Plan, they are authorized to compensate Professionals without further order of the Bankruptcy Court with respect to fees and expenses incurred subsequent to the Effective Date.

On and after the Effective Date, the Liquidating Debtor shall continue to engage in its wind-down operations and may use, acquire and dispose of the Estate Assets without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules. The Plan Administrator shall also have the right to use the services of the Shareholder Liquidation Trustee (at the expense of the Liquidating Debtor) in connection with the estate's defense of Malpractice Claims.

## VI.

## NO DISTRIBUTIONS TO HOLDERS OF INTERESTS

On the Effective Date, the Interest Holders shall have no ability to direct or control the affairs of the Liquidating Debtor, but shall retain their status as partners of the Liquidating Debtor. There will be no distributions of any kind to the holders of Interests unless and until all Claims in Classes 1 through 6 are paid in full, including any post-petition interest at an annual rate of five per cent (5%) per annum, at which point all Available Cash, net of amounts reserved for Disputed Claims or Plan Expenses, shall be paid to the Interest Holders consistent with the extent of their Interests.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# VII.

# OTHER PLAN PROVISIONS

**A.  Source of Plan Funding**

In addition to Available Cash, the Liquidating Debtor shall be capitalized with the Shareholder Settlement Payments.  As set forth above, Class 4 Insured Malpractice Claims shall be fully satisfied from the proceeds of any applicable Malpractice Policy.

**B.  Retained Claims and Defenses**

On and after the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, the Liquidating Debtor shall retain and may enforce the Retained Claims and Defenses with all powers and authority of a debtor in possession or trustee under the Bankruptcy Code to the extent of and consistent with its authority under the Plan.  The Liquidating Debtor may investigate Retained Claims and Defenses and may assert, settle or enforce any such claims or defenses in a manner consistent with the Plan, and use Bankruptcy Rule 2004 after the Effective Date to perform such investigations as it deems necessary and appropriate.  To the extent any Retained Claims and Defenses are already pending on the Effective Date, the Liquidating Debtor as successor to the Debtor may continue the prosecution of such Retained Claims and Defenses.  Any proceeds received from or on account of the Retained Claims and Defenses shall constitute Estate Assets and shall vest entirely in the Liquidating Debtor.

**C.  The Shareholder Liquidation Trust**

**1.  Funding of the Shareholder Liquidation Trust**

On the Effective Date, the Shareholder Liquidation Trust shall be funded with the Initial Trust Corpus.

**2.  Use of Shareholder Liquidation Trust Funds**

The funds in the Shareholder Liquidation Trust shall first be used to cover (a) the projected cost to complete the destruction and/or return of all client files in an organized manner in accordance with the requirements of applicable ethics rules, and (b) the costs of administering the Trust including compensation for the Shareholder Liquidation Trustee.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Shareholder Liquidation Trustee shall make decisions with respect to whether to expend funds to defend, settle or otherwise resolve Malpractice Claims against Settling Shareholders based on the total amount of funds available in the Shareholder Liquidation Trust and the projected costs of completing all obligations under the Shareholder Liquidation Trust Agreement.

### 3.  Management of Shareholder Liquidation Trust

So long as it does not prevent the Shareholder Liquidation Trustee from performing his duties, the Shareholder Liquidation Trustee shall be prohibited from expending any funds either directly or indirectly for the benefit of any Shareholder that is not a Settling Shareholder. Additionally, Liquidating Debtor shall make its personnel, software and systems reasonably available to the Shareholder Liquidation Trustee to the extent necessary to assist the Shareholder Liquidation Trustee in handling the records administration and disposal duties imposed upon him under the Plan and the Shareholder Liquidation Trust Agreement, at no cost to the Shareholder Liquidation Trust. The Shareholder Liquidation Trustee shall be compensated by charging a reasonable hourly rate on an interim basis by the Shareholder Liquidation Trust without further Order of the Court Bankruptcy Court, plus out of pocket costs, including the cost of appropriate E&O insurance.

Upon the completion of all duties, the Shareholder Liquidation Trustee shall file a motion to close the Shareholder Liquidation Trust, to turn over any excess funds to the Liquidating Debtor, and to be discharged as the Trustee. The Shareholder Liquidation Trustee shall file concurrently a motion seeking approval of all fees and expenses paid as compensation after the Effective Date by the Shareholder Liquidation Trust.

### D.  Identification of Litigation Claims

The Committee hereby identifies the following Retained Claims and Defenses:[2]

### 1.  The Bank of America Adversary Proceeding

The Committee filed the Bank of America Adversary Proceeding as the estate representative for the Debtor on April 23, 2009, alleging that pursuant to Section 547(b) of the Bankruptcy Code,

---

[2]  The Debtor has not conducted an independent investigation of these claims and has instead deferred to the Committee with regard to the statements proffered in this section.

36891-001\DOCS_SF:67870.7                                DISCLOSURE STATEMENT IN SUPPORT OF
28                                                       JOINT PLAN OF LIQUIDATION

approximately $56 million in payments to Bank of America and Citibank should be returned to the Estate because they were transfers made on account of an antecedent debt within the 90 days preceding the filing of the bankruptcy at a time when the Debtor was insolvent, and allowed defendants Bank of America and Citibank to receive more than they would have received in a chapter 7 case had the banks not improved their position to that of a perfected secured creditor in such 90 day period.

The Committee contends that the banks filed a statement terminating their UCC-1 security filing on or about August 3, 2007. The banks claim that the filing of the termination statement was a result of clerical error and they should be treated as secured creditors. An attempt was made to resurrect the banks security position on October 1, 2008, when the banks filed a so-called correction statement in an attempt to continue in effect the original financing statement dated January 3, 1991. Further, on October 2, 2008 a new "original" financing statement was recorded by the banks, with descriptive language in effect claiming that such document reaffirmed the 1991 filing and continued in effect.

The banks also contend that because of the structure and operation of Heller Ehrman law firm, the Heller Ehrman PCs were their true borrowers. As a result, the banks argue that the October 1 and 2 filings did not improve the banks' collateral position because the termination statement filed on August 3, 2007 related solely to the Debtor, while the perfected lien position against the Heller Ehrman PCs remained unaffected.

The parties have been engaged in extensive document discovery, primarily involving the digitally maintained records of Heller Ehrman LLP and Bank of America. It is possible that the Committee or the Liquidating Debtor may uncover facts during the course of discovery, which could lead to additional claims being filed against Bank of America (e.g. equitable subordination).

The Committee intends to aggressively litigate the Bank of America Adversary Proceeding. The outcome is uncertain, and the claim arises out of unique circumstances. Therefore, it is impossible at this stage for the Committee to estimate its overall chances of prevailing. If the Committee ultimately prevails, the banks should have to repay the sums paid during the preference

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

period, although the banks would then be entitled to status as general creditors and able to share in distributions to the same extent as other creditors, unless those claims are subordinated.

**2.** **Mediation with the Former Shareholders.**

The Committee's investigation into payments made to Heller Ehrman PCs for the benefit of the Former Shareholders has caused it to conclude that valid claims exist against the Former Shareholders and/or the Heller Ehrman PCs for receipt of payments that should be recoverable for the benefit of the estate under several different legal theories, including but not limited to that such payments are avoidable as constructive fraudulent conveyances. The payments involved include (1) the annual bonus paid to them in December 2007 in the amount of approximately $76.5 million, plus as much as $8 million paid to departing partners in 2008. In addition, the Committee seeks to recover all additional sums paid to Former Shareholders in 2008 during the time period that the Debtor was insolvent. All of these payments are believed to have been made to the Heller Ehrman PCs, each of which was then obligated to make payments, and did make payments, to the individual Former Shareholders.

The contentions of the Former Shareholders and/or the Heller Ehrman PCs regarding these claims are not presently known, however vigorous opposition is anticipated.

To date, no lawsuit has been filed with respect to these claims. However, the Debtor and the Committee have been ordered to participate in a mediation with many of these shareholders by Judge Montali, the bankruptcy judge to whom the Debtor's bankruptcy case has been assigned. The mediation is set for two days before the Chief Bankruptcy Judge of the United States Bankruptcy Court for the Northern District of California, Randall J. Newsome on October 30, 2009 and November 16, 2009.

In the event the mediation is unsuccessful as to all or any of the Former Shareholders and/or the Heller Ehrman PCs, the Committee believes that the Plan Administrator will litigate the claims against them in state or federal court. The outcome of mediation and litigation on these potential claims is uncertain at this early stage, and it is not possible at present for the Committee to estimate either the overall chances of prevailing on liability, or the range of damages.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**3.** **Intellectual Property Contingent Fee Representation of Ronald A Katz Technology Licensing LP; and A2D Licensing Technology LP ("Katz")**

The Committee has investigated the right of the Debtor to recover a contingent fee for work performed for former client Katz. On August 18, 2006 the Debtor entered into a letter agreement under which the firm agreed to represent Katz entities in a series of matters involving Katz's enforcement of intellectual property rights against a broad array of alleged infringers. The agreement (as modified) calls for a yearly payment for four years (2006, 2007, 2008 and 2009), and a contingent interest in successful recoveries that is not due until November 2010, or the conclusion of all the cases, whichever is earlier. Katz has filed a claim in the bankruptcy seeking recovery of apparently unrelated payment for a vendor product and damages caused by an alleged breach of the representation agreement when the Debtor ceased to represent Katz at the end of September 2008. This breach of contract claim is apparently based upon allegations that Katz was forced to incur additional expense, and will continue to incur such expense, in obtaining replacement legal services. Initially these services were provided by the lawyers who provided legal representation at the Debtor, and moved to Covington & Burling as described above, but it is further claimed that due to conflicts of interest Katz retained another firm, Cooley Godward Kronish LLP, and incurred additional expenses. To the extent the services may have been provided by former Heller lawyers at Covington & Burling, or Cooley Godward, the Committee believes it is entitled to recover sums arising from that representation.

The outcome on these potential claims is uncertain at this early stage, and it is not possible at present for the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

**4.** **Potential lawsuit against certain Former Shareholders who practiced in the Intellectual Property portion of the Debtor.**

The Committee's investigation into the facts and circumstances surrounding the departure of the Debtor's former intellectual property practice group has revealed that potential claims based upon breach of fiduciary duty may exist against certain lawyer members of that group. The leadership of the intellectual property practice group, particularly Robert Fram, Alan Blankenheimer

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

and Robert Haslam, were shareholders. Mr. Fram was a member of the Debtor's Policy Committee, the governing body in 2007 and 2008, and Mr. Blankenheimer was appointed to the Policy Committee on December 27, 2007. Mr. Haslam was directly involved with the leadership of the Debtor, and particularly in connection with merger negotiations with various potential merger partners, including negotiations with Mayer Brown LLP. After the heart of the intellectual property practice group announced it would not participate in a merger with Mayer Brown at the end of August 2008 (and that it was leaving to join Covington & Burling and a few other firms), the anticipated merger with Mayer Brown fell apart and Heller Ehrman LLP was forced to notify the bank lenders that it was in breach of its loan covenants. That breach was a direct result of the departure of the heart of the intellectual property practice group. At the time, Mayer Brown was very actively engaged in a growth strategy. In 2007, Mayer Brown established an alliance with Ramon & Cajal, a Spanish law firm, opened a Hong Kong office, and an office in Sao Paulo. In 2008, Mayer Brown combined with JSM, a leading Asia law firm. The collapse of the negotiations with Mayer Brown, after the announced departure of the heart of the intellectual property practice group, allegedly precipitated the failure of Heller Ehrman LLP.

The Committee's investigation to date has also revealed that potential claims may exist against certain former lawyer members of the Debtor's intellectual property practice group who interfered with the prospective business advantage of Heller Ehrman LLP in connection with the claims discussed above concerning the right of the Debtor to recover a contingent fee for work performed for former client Katz, and the claim that Katz has filed in the bankruptcy seeking recovery of damages caused by the alleged breach of the Katz representation agreement discussed above. Assuming that a breach of contract did occur, the Committee's investigation has revealed that the failure of the Debtor to carry its representation of Katz to completion may have been caused by the action of the members of the intellectual property practice group, together and in conjunction with persons from Covington & Burling, and possibly others (see discussion under Covington & Burling below) in precipitating the failure of Heller Ehrman LLP as discussed above.

1    The outcome on these potential claims is uncertain at this early stage, and it is not possible at

2    present for the Committee to estimate either the overall chances to prevail on liability, or the range

3    of damages.

4    **5.    Potential lawsuit against Covington & Burling LLP and possibly others**

5    The Committee's investigation has unearthed strong indications that the key leaders in the

6    Heller Ehrman LLP Intellectual Property Practice Group began negotiations with Covington &

7    Burling long before their announced departure at the end of August 2008.  These negotiations

8    involved Former Shareholders Haslam, Fram, Blankenheimer, and Sturge Sobin, among others.

9    During the period of the negotiations, the leaders of the intellectual property practice group were

10   prophetically told that the departure of the heart of their group would almost surely lead to the

11   failure of the Mayer Brown deal.  The intellectual property practice group was a major contributor to

12   the revenue of Heller Ehrman LLP, contributing almost $40 million in annualized revenue, and a

13   loss of that magnitude made the Debtor a much less attractive merger candidate.  On or about

14   Sunday, August 10, 2008, Fram and Blankenheimer withdrew from a telephone conference

15   involving the key members of the Heller Ehrman LLP Policy Committee, when the subject matter of

16   return of capital contributions to departing shareholders arose.  Later, they revealed they had already

17   been consulting legal counsel.  Messrs.  Fram and Blankenheimer also announced their intention to

18   resign from the select Policy Committee on or about August 10th.

19   Examinations under Bankruptcy Rule 2004 involving Mayer Brown documents and

20   witnesses (as well as Covington & Burling) are being scheduled.  However, the facts developed

21   through investigation to date lead to a strong inference that Covington & Burling in combination

22   with leaders of the Heller Ehrman LLP Intellectual Property Practice Group knowingly interfered

23   with the prospective economic advantage of Heller Ehrman LLP in regard to the imminent merger

24   with Mayer Brown and otherwise, and that this interference may have precipitated the failure of

25   Heller Ehrman LLP and been responsible for the Debtor being unable to carry out to completion its

26   representation of its former clients, including Katz as discussed above.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The outcome on these potential claims is uncertain at this early stage, and it is not possible at present for the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

### 6. Potential lawsuit against Greenberg Traurig, LLP

The Committee's investigation into the legal representation of the Debtor by Greenberg Traurig LLP has caused it to conclude that a valid claim exists against the Greenberg firm. Greenberg Traurig and the Debtor entered into a legal representation letter dated June 11, 2008 pursuant to which Greenberg was to advise "in connection with [Heller Ehrman's] current partnership agreement and matters relating to its affairs, including potential issues regarding a combination and/or restructuring." One of the first tasks a law firm, possessing ordinary skill and capacity in connection with advising on a potential combination, or restructuring, would do at the outset of representation is to conduct a security-filings search. Not later than early August 2008, the work performed by Greenberg expanded to include legal services involving dissolution. Once again those services also required a security-filings search. Greenberg utterly failed to conduct such a search. If it had done so, it would have learned, as more fully described above, that Bank of America and Citibank had terminated their security filing as to Heller Ehrman LLP in August of 2007.

Because this information was not obtained, the banks were able to attempt to resurrect their filing and to make a new filing at the first of October 2008, before Heller Ehrman learned of the termination. Armed with the knowledge of the termination, and properly advised by counsel hired in connection with combinations, restructuring and dissolution, the Committee believes that the Debtor would have been in a position to negotiate effectively with the banks and better control the fate of the firm, its finances and its clients. As things played out, the banks were able to take control of nearly all of the firm's accounts receivable and force a disorderly short term shut down of the firm that is believed to have adversely affected its ability to collect outstanding accounts receivables, as well as its ability to complete and be paid for work in progress, and to arrange for a orderly transition for its clients. To Greenberg's credit, they did advise Heller Ehrman to try to negotiate an orderly liquidation, but due to the Greenberg's negligence, neither Greenberg, nor Heller, had enough

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1 negotiating leverage to cause the banks to agree. The banks appear to have been entirely focused

2 upon obtaining repayment of their loans and cutting off expenditures, because they could foresee

3 enough money in accounts receivables to satisfy their loans once they had refilled their UCC-1

4 financing statement.

5       Furthermore, had Heller Ehrman LLP been properly advised about the termination of the

6 UCC-1 filing, it could have elected to file bankruptcy at a much earlier date at a time before the

7 banks re-filed their financing statement. That would have accomplished two objectives. First it

8 would have unquestionably put the banks in the position of general creditors, rather than secured

9 creditors. Second, it would have reduced on going expenditures and thereby created more funds in

10 the estate.

11       Much work remains to be done analysis of damages flowing from the professional

12 negligence, and further fact development is likewise required. The outcome on these potential

13 claims is uncertain at this early stage, and it is not possible at present for the Committee to estimate

14 either the overall chances to prevail on liability, or the range of damages.

15     **7.**    **Potential lawsuit against Ernst & Young**

16       The Committee believes that the Debtor was damaged by the professional negligence of its

17 auditor, Ernst & Young, in connection with the audit of the 2007 financial statement. Ernst &

18 Young was engaged to perform a "non GAAP" audit of this statement for the benefit of the Debtor.

19 Generally Accepted Accounting Principles ("GAAP") require that a company's financial statements

20 be audited in accordance with Generally Accepted Auditing Standards ("GAAS"). While non-

21 GAAP audits have become popular in recent years, in part due to the likely lower cost for small

22 businesses, and these audits require less formal and detailed work, they still require performance of

23 the audit in such a way that the client receives a reliable report and opinion on its financial

24 statements, and reasonable assurance about whether the financial statements are free of material

25 misstatement.

26       The opinion letter that the Debtor ultimately received included the following statements:

27           We have conducted our audits in accordance with auditing standards
          generally accepted in the United States. Those standards require that

28

36689-001\DOCS_SF:67479.8           35            DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

> we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

And;

> In our opinion the financial statements referred to above present fairly, in all material respects, the assets, liabilities, and partners' equity arising from cash transactions of Heller Ehrman LLP at December 31, 2007 and 2006, and its revenue collected, its expenses paid, and its cash flow for the years then ended on [a modified cash basis of accounting].

The investigation by the Committee to date leads it to conclude that the audit report is inaccurate in at least one critical respect, and likely that the opinion letter should have been qualified. First, the financial statements contain a novel entry in the "Statements of Cash Flows" not previously present. That entry under "Investing activities" in the amount of $11,074,300 is entitled "Loans to partners". Since the Heller Ehrman PCs do not have substantial assets, and in fact paid out the "loan" amount to the Former Shareholders along with the year-end profits, this loan transaction was a thinly disguised improper device used to overpay the Former Shareholders. The motivation for this overpayment appears to have been to reach a sufficiently high industry standard known as Profit Per Equity Partner ("PPEP") to keep the Debtor in the top 10 of large firms, and create the false impression the business was more successful and profitable than it was. Ernst & Young did not totally ignore this devious device in the conduct of its audit. It waffled on the treatment and on confirmation of the transactions in the audit process and the audit report. The Debtor was damaged by this conduct through both the payments to Former Shareholders in excess of its distributable net profits, and through permitting it to incur greater losses before its ultimate demise.

The Committee is further investigating whether issuance of an unqualified audit opinion was proper given not only the overpayments to shareholders, but also the relationship of bank borrowings to the past history of the Debtor. This would include an analysis of whether and in what way the audit opinion letter should have been qualified. By way of example, the Committee believes a proper analysis made in accordance with SAS 59 and AU 341 as to whether the Debtor was a going concern should have resulted in a qualification in the auditor's opinion letter

The outcome on these potential claims is uncertain at this early stage, and it is not possible at present for the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

**8.** **Potential lawsuit against the Heller Ehrman LLP Retirement Plan, Keith Betzina, as Plan Administrator, and City National Bank as Trustee**

The Committee has investigated the right of the Debtor to recover contributions made on January 15, 2008 to the Heller Ehrman LLP Retirement Plan, a defined benefit retirement plan for the former shareholders of its professional corporation partners and certain employees of the Debtor. That plan is commonly know as the LEO Plan and is referred to as such herein. The Leo Plan was terminated effective 12-31-08 for ERISA purposes. Its assets are held by City National Bank as trustee, pursuant to a trust agreement between City National Bank and the Debtor. The Plan Administrator of the LEO Plan is Keith Betzina, a former shareholder. The Committee has been in contact with counsel representing the Plan Administrator, seeking assurances that the plan assets contributed in January 15, 2008 will not be distributed to shareholders until the claims of the Debtor are resolved. To date no such assurance has been received, so the Committee has prepared a draft adversary action complaint, that it is prepared to file if necessary.

The potential lawsuit will likely include:

> (1)    a claim for avoidance of Payments as preferential transfers made to insiders within one year of the Petition date pursuant to Section 547 of the Bankruptcy Code;

> (2)    a claim for avoidance of payments as constructively fraudulent transfers made to insiders within two years of the Petition date pursuant to Section 548(a)(1)(B) of the Bankruptcy Code;

> (3)    a claim for avoidance of payments as constructively fraudulent transfers made to insiders within two years of the Petition date under employment contracts pursuant to Section 548(a)(1)(B)(ii)(IV) of the Bankruptcy Code;

> (4)    a claim for recovery of property under Section 550 of the Bankruptcy Code;

> (5)    a claim for turnover of the avoidable transfer pursuant to Section 542 of the Bankruptcy Code; and, if necessary,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(6)     a claim for injunctive relief to prevent distribution of the January 15, 2008 contribution to former shareholders pending determination of rights to those assets.

The investigation by the Committee to date leads it to conclude that the shareholders were statutory and nonstatutory insiders in control of Heller Ehrman LLP, as well as the professional corporations, and that the control of the LEO plan by Heller Ehrman LLP was so extensive that the LEO plan and its Administrator were each statutory and non-statutory insiders.  The investigation by the Committee to date also leads it to conclude that the Debtor was insolvent at the time of the $13,804,100.02 contribution to the LEO Plan on January 15, 2008 because the sum of the Debtor's debts was greater than the aggregate, at a fair valuation, of all of the Debtor's partnership property and the sum of the excess of the value of each PC's nonpartnership property over such PC's nonpartnership debts., and as a result the LEO plan received more that it would have received for the benefit of the shareholders, if this was a case under Chapter 7 of the Bankruptcy Code, thus entitling the Debtor to recover the contribution as an avoidable transfer.

It also appears to the Committee that the Debtor did not receive reasonably equivalent value for the transfer because contributions made to the LEO Plan were not part of a shareholder's Base Salary, and therefore were not made in exchange for services rendered by the Shareholders under their employment agreement, and because the source of the these contributions was part of the Annual Bonus used to distribute the profits of the Debtor to the Shareholders.

Finally, it appears that the contribution was not made in the ordinary course of business because due to the Debtor's insolvency or unreasonably small capital cushion at the time of the transfers, the transferred subjected the Debtor's creditors to economic risks of a nature different than those that were accepted by the creditors when they initially extended credit to the Debtor, and the 2007 Annual Bonus to Shareholders, the source of the funds transferred to the Leo Plan in January 2008, was an abnormal transaction in that more than $18 million of its funds were in excess of 2007's profits, or were generated by deferring 2007 expenses into 2008, and were made not in conformity with the usual practice of the Debtor that the payment of the Annual Bonus not result in the payment of amounts to the Shareholders in excess of the Debtor's profits for the year.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The outcome on these potential claims is uncertain at this early stage, and it is not possible at present for the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

**9.    Claims to profits from unfinished business and business opportunities**

The Committee believes that valid claims exist to recover profits recognized by former Heller Ehrman LLP lawyers with respect to unfinished business and business opportunities pertaining to former clients of the firm.  These claims arise under the holding in the California Court of Appeal decision in *Jewel v. Boxer,* 156 Cal.App.3d 171 (1984).  The Jewel decision stands for the proposition that unfinished business of a dissolving law partnership remains the property of the partnership in the absence of absence of a contrary agreement.  Furthermore, Section 1604(b)(1) of the Revised Uniform Partnership Act ("RUPA") supports the same conclusion.  Effective as of September 26, 2008, Heller Ehrman LLP adopted a Plan of Dissolution for its self and affiliated entities that provided for a waiver (without mention of RUPA) of rights and claims under the doctrine of Jewell to seek payment of legal fees generated after the departure date of any lawyer or group of lawyers with respect to non-contingency/nonsuccess fee matters only.

Were it not for this waiver, at a minimum, profits from unfinished business subsequently completed by former Heller lawyers and entities they associated with that subsequently profited from this business ("Successor Entities") would be owing to the Debtor.  The validity of this Jewell waiver will be a contested matter in any action brought by the Debtor against these lawyers and Successor Entities.  Even if the waiver is upheld, the Debtor will possess claims to recover profits from unfinished business completed by former Heller lawyers on a contingent fee basis.  In addition, the Committee believes it is entitled to claim entitlement to recover for business opportunities arising from these prior clients.

Even if the Jewel waiver were to be otherwise upheld, the Committee believes it is entitled to recover from the Debtor's former lawyers because the waiver was an actual or constructive fraudulent conveyance that is avoidable under Sections 542, 544(b)(1) and 550(a) of the Bankruptcy Act, as well as California Civil Code Section 3439.07.

To the extent these claims are made against shareholders, they may be included in the mediation process referred to above. To the extent they may involve shareholder members of the Intellectual Property Practice Group, and successor firms, including Covington & Burling, and Cooley Godward, these claims will likely be pursued separately form the shareholder mediation.

The outcome on these potential claims is uncertain at this early stage, and it is not possible at present for the Committee to estimate either the overall chances to prevail on liability, or the range of damages.

### 10. Preservation of Other Causes of Action

As of the Effective Date, each and every claim, right, cause of action, claim for relief, right to set-off and other entitlement held by the Debtor whether arising under §§ 502, 506, 510, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552 or 553 of the Code, or otherwise, other than those waived or released by express terms of the Plan or the Confirmation Order, shall be deemed fully preserved and vested in the Liquidating Debtor. Without limiting the generality of the foregoing, any and all claims and causes of action held by the Debtor against the Debtor in Possession and/or the Committee prior to the Effective Date against any person or entity, including but not limited to the Heller Ehrman PCs, the Former Shareholders, any affiliates of the Debtor, and/or any officer, director, professional, or employee of the Debtor, shall be retained by the Liquidating Debtor. Such claims shall include but not be limited to any claims based on the facts and circumstances related in any way to the dissolution of the Debtor, and all avoidance actions for transfers made by the Debtors or any affiliates, including all claims, rights to recovery, or transfers disclosed in the statement financial affairs filed with the Court by the Debtor. Confirmation of the Plan effects no settlement, compromise, waiver, or release of any cause of action unless the Plan or Confirmation Order specifically and unambiguously so provides. The nondisclosure or nondiscussion of any particular cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of such cause of action.

The Debtor and Liquidating Debtor also reserve the right to object to any of the Claims (regardless of whether the Claim was actually filed and classified as a Priority or Secured Claim) improperly asserted against the Debtor and its estate. As stated above, however, under the Plan all

Retained Claims and Defenses (among other things) shall revest in the Liquidating Debtor on the Effective Date, including Avoidance Actions.

**E.     Management of Liquidating Debtor**

Upon the Effective Date, the Plan of Dissolution shall be deemed amended pursuant to the New Plan Documents to replace the Dissolution Committee with the Plan Administrator, and the Dissolution Committee shall be relieved of its responsibilities for the Debtor.  Nothing contained herein shall affect the Dissolution Committee's responsibility to administer the affairs of the Heller Ehrman PCs or their successors and assigns, which shall maintain their separate existence for all purposes under the Plan.  The Liquidating Debtor shall be authorized to execute such other documents as are necessary and appropriate to carry out the provisions of the Plan, without the necessity of filing such documents with the Bankruptcy Court.

On and after the Effective Date, subject to the terms and conditions of the New Plan Documents, the management, control and operation of the Liquidating Debtor shall become the general responsibility of the Plan Administrator in accordance with the New Plan Documents. Nothing contained herein shall give the Plan Administrator authority over the affairs of the LEO Plan, which shall be unaffected by the Plan.  No later than ten (10) days prior to the date set by the Bankruptcy Court for objections to Confirmation, the Proponents shall file with the Bankruptcy Court a statement setting forth the identity and affiliations of the Plan Administrator, as required by Bankruptcy Code section 1129(a)(5)(A)(i).  Upon closure of this case, Michael Burkart shall be discharged from any further duties with respect to the Debtor's liquidation and/or any obligations under the Plan, and the Liquidating Debtor shall be vested with all the powers of the Plan Administrator under the Plan to the extent that there are any further obligations under the Plan.

**F.     The Biggers Adversary and Biggers Settlement**

**1.     Introduction**

There is currently pending in the United States Bankruptcy Court for the Northern District of California against the Debtor the Biggers Adversary which is a class action for alleged failure to pay wages, including the value of accrued, vested and unused vacation under various state laws, wages owed pursuant to contract, the federal Worker Adjustment and Retraining Notification Act, 29

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 08-32514   Doc# 681   Filed: 10/09/09   Entered: 10/09/09 00:22:24   Page 45 of
65

36689-001\DOCS_SF:67479.4                          41                 DISCLOSURE STATEMENT IN SUPPORT OF
                                                                     JOINT PLAN OF LIQUIDATION

U.S.C. §§ 2101 *et seq*., and the California Worker Adjustment and Retraining Notification Act, California Labor Code §§ 1400 et seq (together the "WARN Act"). The Biggers Adversary also seeks statutory penalties and damages for the alleged failure to timely pay wages. The Plaintiff Class Representatives on the one hand, and the Debtor; Non-Debtor Defendants and Defendant Shareholder Class and the Committee, on the other hand, have reached a proposed Settlement Agreement with respect to the Biggers Adversary under which the benefits described below will be provided to the Plaintiff Class Representatives and to the Plaintiff Class Members listed on Exhibit A to the Biggers Settlement Agreement upon the occurrence of the various conditions to the agreement which include the entry of a final order by the Bankruptcy Court approving the proposed Biggers Settlement Agreement and confirmation of the Plan..

### 2. Description Of The Class Action

On or about April 3, 2009, the Plaintiff Class Representatives filed with the Bankruptcy Court a class-action complaint commencing the Biggers Adversary against the Debtor. The Plaintiff Class Representatives filed a First Amended Complaint ("Amended Complaint") on April 23, 2009 alleging that the Debtor, along with the Non-Debtor Defendants and Defendant Shareholder Class: (1) violated the WARN Act; (2) failed to pay accrued, vested and unused vacation in violation of California law; (4) failed to pay wages under Washington law; (5) breached written contracts with employees in Washington and New York; (6) failed to pay wages under Washington, D.C. and New York law; (7) committed unfair business practices under California law; and (8) owed penalties as a result of the alleged failure to pay wages. The Amended Complaint was filed on behalf of the Class Representatives and all others similarly situated.

As a result of Debtor's alleged failure to pay accrued, vested and unused vacation at the time of layoff, the affected employees have a priority claim pursuant to § 507(a)(4) of the Bankruptcy Code against the Debtor consisting of their vacation pay accrued during the one hundred eighty days (180) prior to October 31, 2008, the date the Debtor ceased doing business, up to $10,950.00 per individual, inclusive of all other priority claims. As a result of Debtor's alleged violation of the WARN Act by ordering plant closings and/or mass layoffs without providing sixty (60) days of advance notice thereof, the affected employees have an alleged priority claim pursuant to § 507(a)(4)

36689-001\DOCS_SF:67379.9    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

of the Bankruptcy Code against the Debtor consisting of their total wages and benefits for the sixty (60) day violation period, up to $10,950.00 per individual (the "Priority Wage Cap"), inclusive of all other priority claims. As a result of Debtor's alleged failure to pay wages pursuant to contract, the affected employees have an alleged priority claim pursuant to § 507(a)(4) of the Bankruptcy Code against the Debtor consisting of their unpaid wages other than vacation during the one hundred eighty days (180) prior to October 31, 2008, the date the Debtor ceased doing business, up to $10,950.00 per individual, inclusive of all other priority claims.

The Debtor and Non-Debtor Defendants deny the material allegations of the Amended Complaint and have asserted multiple affirmative defenses during the course of negotiations with Class Counsel, including the "unforeseeable business circumstances," the "faltering company," and the "good faith" defenses. The Debtor raised the following issues in discussions with Class Counsel, among others: (a) whether the Debtor provided adequate notice to the Plaintiff Class Members; (b) whether such notice was defective; (c) whether the Debtor was entitled to give less than sixty (60) days' notice because of reasonably unforeseeable business circumstances; (d) whether the Debtor was entitled to give less than sixty (60) days' notice because, at the time notice would have otherwise been required, it was seeking new capital or business that it reasonably believed, if obtained, would have obviated or substantially postponed the plant closing or mass layoff; (e) whether such search for new capital or business was commercially reasonable under the circumstances; (f) whether the Debtor has other defenses to the application of the WARN Act; (g) whether the employment losses suffered by the aggrieved employees were caused by the Debtor's failure to obtain capital or business; (h) whether the Debtor gave "as much notice as is practicable"; (i) whether the Debtor is entitled to a defense of "good faith"; (j) the computation of the amount of damages; (k) whether the Debtor is entitled to set-offs against damages for sums paid pre-petition and post-petition to employees; (l) whether attorneys' fees are to be awarded to the Plaintiff Class Representatives and the Plaintiff Class Members if they prevail and whether such fees are entitled to administrative priority; and (m) whether the damages are entitled to administrative priority under § 503(b)(1)(A), wage or benefit priority under §§ 507(a)(4) or (5), or are to be treated as general unsecured claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Pursuant to the Biggers Settlement Agreement, the parties to the Biggers Settlement Agreement will file a motion with the Bankruptcy Court, seeking among other things, approval of the Biggers Settlement Agreement and class certification for settlement purposes only. The Biggers Settlement Agreement and the order sought from the Bankruptcy Court would provide for the creation of three distinct subclasses among the Plaintiff Class Members:

1.      The first subclass (the "WARN Classes") is made up of all employees of the Debtor who the Debtor terminated on, or within 30 days of, October 10, 2008 pursuant to the dissolution and mass layoff, and who did not receive 60 days of notice prior to their termination. The WARN Classes includes all of the Debtor's employees (secretaries, paralegals, associates, and administrative personnel) so terminated other than employees who are not entitled to participate in this Settlement because: (i) they voluntarily resigned from their employment with the Debtor or were terminated for cause or good reason; or (ii) they released the Debtor from any and all claims arising out of their employment other than in connection with the Biggers Settlement Agreement or the Plan; or (iii) they did not work in a Heller Ehrman LLP office that employed at least 50 full-time employees; or (iv) they suffered no economic WARN damages as a result of their termination. The WARN Classes do not include any employees of the Debtor who held the title "Of Counsel" or "Senior Of Counsel," unless otherwise identified on Exhibit A of the Biggers Settlement Agreement.

2.      The second subclass (the "Vacation Classes") is made up of all of the employees of the Debtor who the Debtor terminated after September 26, 2008 pursuant to the dissolution and mass layoff that took place on or about October 10, 2008 and thereafter, and who are owed monies in accordance with accrued, vested and unused vacation at the time of termination. The Vacation Classes include all of the Debtor's employees (secretaries, paralegals, associates, and administrative personnel) terminated in connection therewith other than employees who are not entitled to participate in this Settlement because (i) they released the Debtor from any and all claims arising out of their employment other than in connection with the Biggers Settlement Agreement or the Plan; or (ii) they had no accrued vacation at the time of their termination. The Vacation Classes do not include any employees of the Debtor who held the title "Of Counsel" or "Senior Of Counsel," unless otherwise identified on Exhibit A of the Biggers Settlement Agreement.

3.      The third subclass (the "Unpaid Wages Class") is made up of all of the employees of the Debtor who the Debtor terminated after September 26, 2008 pursuant to the dissolution and mass layoff, and who are owed monies in accordance with wage and/or non-discretionary bonus contracts. The Unpaid Wages Class includes all of the Debtor's employees (secretaries, paralegals, associates, and administrative personnel) terminated in connection therewith other than employees who are not entitled to participate in this Settlement because (i) they released the Debtor from any and all claims arising out of their employment other than in connection with the Biggers Settlement Agreement or the Plan; (ii) they had no contract with the Debtor for wages; or (iii) they had no contract with the Debtor for payment of a non-discretionary bonus, or had not satisfied the conditions precedent of such a contract. The Unpaid Wages Class does not include any employees of the Debtor who held the title "Of

13689-001\DOCS_SF:67379.6                        44                       DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Counsel" or "Senior Of Counsel," unless otherwise identified on Exhibit A of the Biggers Settlement Agreement.

The Biggers Settlement Agreement and the order sought from the Bankruptcy Court also provides for (i) the appointment of the Plaintiff Class Representatives and (ii) the designation of Blum Collins LLP as counsel to the Plaintiff Class Members.

Those Plaintiff Class Members who do not opt out of the Biggers Settlement Agreement are eligible to participate in the settlement..

The order sought by the parties to the Biggers Settlement Agreement also seeks certification of the Defendant Shareholder Class.

### 3.   **The Proposed Settlement**

The following description of the proposed Settlement is only a summary.  In the event of any difference between this summary and the terms of the Biggers Settlement Agreement, the terms of the Biggers Settlement Agreement shall control:

1.   The Terms of the Settlement

Plaintiff Class Members will receive the following treatment upon the Effective Date (as defined in the Biggers Settlement Agreement :

(a)   Vacation Claims:

An aggregate total priority wage claim of $3,011,035.62 (Three Million**,** Eleven Thousand, Thirty-Five Dollars and Sixty-Two cents) as allowed priority claims pursuant to section 507(a) (4) of the Bankruptcy Code with each Plaintiff Class Member having an individual allowed priority claim under section 507)(a)(4) of the Bankruptcy Code pursuant to the schedule attached as Exhibit A on account of accrued, vested and unused vacation claims earned between May 4 and October 31, 2008, up to the lesser of (i) $10,950 (the "Priority Wage Cap"; or (ii) the Plaintiff Class Member's scheduled claim for accrued, vested and unused vacation as set forth in the Debtor's schedules.

An aggregate total general unsecured claim of $4,174,392.20 (Four Million, One-Hundred Seventy-Four Thousand, Three-Hundred Ninety-Two Dollars and Twenty Cents) with each Plaintiff Class Member having an individual allowed general unsecured claim in the amounts set forth in the schedule attached as Exhibit A**,** on account of allowed accrued, vested and unused vacation claims,

57689-001\DOCS_SF:67479GG

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

to be paid as and when the claims of other general unsecured creditors are paid, if so paid, pursuant to the Plan.

Plaintiff Class Members will receive their allowed claims as set forth in Exhibit A to the Biggers Settlement Agreement based on accrued, vested and unused vacation whether or not the Biggers Settlement is approved and whether or not they opt-out of the Biggers Settlement as long as the Plan is confirmed.

(b)    WARN Claims:

An aggregate total priority wage claim of $1,500,000 (One Million, Five-Hundred Thousand Dollars) as allowed priority claims pursuant to section 507(a)(4) of the Bankruptcy Code with each Plaintiff Class Member having an individual allowed priority claim under section 507(a)(4) of the Bankruptcy Code pursuant to the schedule attached as Exhibit A on account of alleged WARN Damages.

An aggregate total allowed general unsecured claim of $2,350,000 (Two Million, Three-Hundred Fifty Thousand Dollars) with each Plaintiff Class Member having an individual allowed general unsecured claim in the amounts set forth in the schedule attached as Exhibit A, on account of alleged WARN Damages, to be paid as and when the claims of other general unsecured creditors are paid, if so paid, pursuant to the Plan.

(c)    Unpaid Wage Claims (Other Than Vacation):

An aggregate total priority wage claim of $71,543.90 (Seventy-One Thousand, Five Hundred Forty Three Dollars and Ninety Cents) as allowed priority claims pursuant to section 507(a)(4) of the Bankruptcy Code with each Plaintiff Class Member having an individual allowed priority claim under section 507(a)(4) of the Bankruptcy Code pursuant to the schedule attached as Exhibit A, on account of alleged unpaid wages (other than vacation).

An aggregate total allowed general unsecured claim of $890,515.89 (Eight-Hundred Ninety Thousand, Five-Hundred Fifteen Dollars and Eighty Nine Cents) with each Plaintiff Class Member having an individual allowed general unsecured claim in the amounts set forth in the schedule attached as Exhibit A, on account of alleged unpaid wages (other than vacation) to be paid as and when the claims of other general unsecured creditors are paid pursuant to the Plan of Liquidation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   Plaintiff Class Members will receive their allowed claims as set forth in Exhibit A based on

2   unpaid wage claims other than vacation whether or not the Biggers Settlement is approved and

3   whether or not they opt-out of the Biggers Settlement as long as the Plan is confirmed.

4   (d)    Waiting Time Penalties/Damages

5   An aggregate total allowed subordinated general unsecured claim of $7,000,000 (Seven

6   Million Dollars) with each Plaintiff Class Member having an individual allowed subordinated

7   general unsecured claim in the amounts set forth in the schedule attached as Exhibit A, on account of

8   alleged waiting time penalties.

9   The payment, if any, of these allowed subordinated general unsecured claims shall be in

10  accordance with the terms set forth in the Plan of Liquidation, but in no event shall these allowed

11  subordinated general unsecured claims be paid before all other allowed claims of creditors of the

12  Debtor are paid in full.

13  (e)    Attorneys' Fees

14  An administrative claim of  Seven Hundred Thousand Dollars and Zero Cents ($700,000.00)

15  to Class Counsel in satisfaction of attorneys' fees and costs to Class Counsel and as a "substantial

16  contribution" pursuant to section 503(b)(3)(D)(4) of the Bankruptcy Code;

17  An additional administrative claim of Two Hundred Fifty Thousand Dollars and Zero Cents

18  ($250,000.00) to Class Counsel as a "substantial contribution" pursuant to section 503(b)(3)(D)(4) of

19  the Bankruptcy Code so long as the number of Plaintiff Class Members who exercise their right to

20  opt-out of the Settlement does not equal or exceed the percentage specified in Exhibit C to the

21  Settlement Agreement.

22  Any amounts received by the Plaintiff Class Members pursuant to the settlement shall

23  reduce, dollar for dollar, the priority portion of each Plaintiff Class Members' allowed claim, if any,

24  for unpaid wages or wage equivalents, commissions, unpaid vacation, sick leave, paid time off,

25  failure to provide sufficient state or federal WARN notice, or any other wage equivalent or related

26  claims.  Each Plaintiff Class Member will receive a notice that sets forth the specific amounts of

27  their allowed claims.  The information pertaining to the allowed claims accurately reflects the

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  contents of the Debtor's books and records to the best of Debtor's knowledge, information and

2  belief.

3      The Settlement will not become effective if the Court does not approve it or if the number of

4  Plaintiff Class Members that opt-out of the Class equals or exceeds the percentage specified in

5  Exhibit C to the Biggers Settlement Agreement and the Debtor, upon consultation with the

6  Committee, exercises the option to terminate the Biggers Settlement. Agreement or if the Court

7  does not confirm the Plan. If the number of Plaintiff Class Members opting out of the Biggers

8  Settlement equals or exceeds the percentage specified on Exhibit C to the Biggers Settlement

9  Agreement, the Debtor may, upon consultation with the Committee, terminate the Biggers

10  Settlement Agreement , within twenty (20) days after the expiration of the right of Plaintiff Class

11  Members to Opt-Out of the Class, as set forth below.

12      In the event that any Plaintiff Class Member opts-out, such opting out Plaintiff Class

13  Member shall not be entitled to any rights or benefits under the Biggers Settlement Agreement and

14  shall not be bound by the terms thereof and shall retain all rights, if any against the Debtor, the Non-

15  Debtor Defendants and the Defendant Shareholder Class; *provided however that they will receive the*

16  *allowed claims for accrued, vested and unused vacation and unpaid wage claims other than*

17  *vacation, as set forth in Exhibit A to the Biggers Settlement Agreement even if they opt out, as long*

18  *as the Plan is confirmed.*

19  **4.    Release of All Claims Related to Termination Employment and Effect of**

20  **Approval of Settlement Agreement**

21      Upon final approval by the Court, the Settlement will result in the dismissal of the Biggers

22  Adversary on the merits and with prejudice to all Plaintiff Class Members who do not Opt-Out of the

23  Biggers Settlement Agreement, and shall constitute a release by each such Plaintiff Class Member of

24  all claims against the Debtor, the Non-Debtor Defendants, the Defendant Shareholder Class, and

25  their respective estates which relate to or are based on: (i) all claims asserted or that could have been

26  asserted in the Biggers Adversary; (ii) claims based on the federal and/or California WARN Acts;

27  (iii) waiting time penalties and damages; (iv) claims for accrued, vested and unused vacation (iv) any

28  other claims for back or severance pay or wages or benefits based on or arising out of any federal,

36689-001\DOCS_SF:67479v3                    DISCLOSURE STATEMENT IN SUPPORT OF
48                              JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

state, or local statute, ordinance or regulation, including any individual proofs of claim filed in the Debtor's bankruptcy case that set forth claims that are released herein; provided that the following claims are not released by the Biggers Settlement Agreement: (i) claims and/or rights as against Bank of America, N.A. or its related companies, and as against Citibank, N.A. or its related companies; (ii) any obligation created by or arising out of the Biggers Settlement; and (iii) rights, if any, arising under or related to any employee's Supplemental Profit Sharing Contributions pursuant to Heller Ehrman LLP's 401k Retirement Savings and Profit Sharing Plan.

Any individual proofs of claim filed by any Plaintiff Class Member that asserts claims that are released by the Biggers Settlement will be deemed withdrawn and disallowed and will not receive any further distribution or payment. Additionally, the Plaintiff Class Proof of Claim will be deemed withdrawn and disallowed and will not receive any further distribution or payment. A Plaintiff Class Member who timely opts-out out of the Biggers Settlement Agreement shall have the right to file an individual proof of claim setting forth, on an individual basis, the same claims as were set forth in the Class Proof of Claim. Such individual proof of Claim shall be deemed timely filed only if it is filed no later than thirty (30) days after entry of the Final Judgment.

### G. Priority Tax Claims

The Debtor anticipates that the estate will be obligated to satisfy certain tax claims entitled to priority under section 507(a)(8) of the Bankruptcy Code. Any remaining Allowed Claims entitled to priority will be paid in full under the Plan.

### H. Administrative Claims

#### 1. Non-Professional Administrative Claims.

The Plan contemplates that Allowed Administrative Claims shall be paid in full by the Liquidating Debtor. All requests for payment of Administrative Claims must be filed by the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Debtor or the Liquidating Debtor or from sharing in any distribution under the Plan. Holders of Administrative Claims based on liabilities incurred in the ordinary course of the Debtor's business following the Petition Date shall not be required to comply with the Administrative Claim Bar Date, *provided that*, (i) such holders have otherwise submitted an

invoice, billing statement or other evidence of indebtedness to the Debtor in the ordinary course of business, and (ii) such Claims are not past due according to their terms.

**2.** **Services By and Fees of Professionals Prior to the Effective Date.**

As set forth above, each party seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Administrative Claims Bar Date; and (b) if the Bankruptcy Court grants such an award, each such party will be paid in full in Cash by the Liquidating Debtor in such amounts as are allowed by the Bankruptcy Court as soon thereafter as practicable. All final applications for allowance and disbursement of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order. Below is a chart that lists the estimated amounts incurred by the estate's professionals as of _____, 2009.

| NAME | ROLE | TOTAL EST. AMOUNT INCURRED | AMOUNT UNPAID | TREATMENT UNDER PLAN |
|---|---|---|---|---|
| Pachulski Stang Ziehl & Jones LLP | Debtor's general bankruptcy counsel | $1,605,019 | $480,000 | Payment in full, subject to Bankruptcy Court Approval |
| Greenberg Traurig LLP | Debtor's general bankruptcy co-counsel | $731,497 | $6,000 | Payment in full, subject to Bankruptcy Court Approval |
| Manatt, Phelps & Phillips, LLP | Debtor's special employment litigation counsel | $471,482 | $20,000 | Payment in full, subject to Bankruptcy Court Approval |
| Howard Rice Nemerovski Canady Falk & Rabkin, A Professional Corporation | Debtor's special counsel | $0 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Schiff & Hardin, LLP | Debtor's special real estate counsel | $146,724 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Olswang Solicitors | Debtor's special counsel | $18,254 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Folger Levin & Khan | Debtor's special malpractice counsel | $21,554 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| The Adler Law Firm | Debtor's collections counsel | $59,374 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Lovitt & Hannan, Inc. | Debtor's special litigation counsel | $914,458 | $372,000 | Payment in full, subject to Bankruptcy Court Approval |
| Cohen Milstein Sellers & Toll PLLC | Debtor's expert witness | $0 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Orrick Herrington & Sutcliffe LLP | Debtor's special counsel in matter pertaining to Resource Investments, Inc. and Land Recovery, Inc. | $0 | $0 | Payment in full, subject to Bankruptcy Court Approval |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| NAME | ROLE | TOTAL EST. AMOUNT INCURRED | AMOUNT UNPAID | TREATMENT UNDER PLAN |
|---|---|---|---|---|
| Trucker Huss, APC | Debtor's special employee benefits counsel | $42,094 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| BMC Group, Inc. | Debtor's noticing, claims, balloting and administrative agent | $0 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Eichstaedt & Devereaux LLP | Debtor's tax advisors | $40,224 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Saw Meng Tee & Partners PAC | Tax advisors to Debtor's Singapore offices | $3,815 | $4,650 | Payment in full, subject to Bankruptcy Court Approval |
| RPC Property Tax Advisors, LLC | Tax advisors | $295 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Clars Auction Gallery | Debtor's art appraisers | $1,800 | $0 | Payment in full, subject to Bankruptcy Court Approval |
| Felderstein, Fitzgerald, Willoughby & Pascuzzi, LLP | Committee's legal counsel | $917,596 | $240,000 | Payment in full, subject to Bankruptcy Court Approval |
| Development Specialists, Inc. | Debtor's and Committee's financial advisors | $1,140,326 | $459,325 | Payment in full, subject to Bankruptcy Court Approval |

### 3. Services by Professionals and Certain Parties After the Effective Date

After the Effective Date, Professionals for the Debtor shall take only those actions as are authorized by the Liquidating Debtor. Professionals shall not be required to file formal applications with the Bankruptcy Court for approval of Post-Effective Date fees and expenses. To the extent that the Liquidating Debtor requires Professionals to perform services following the Effective Date, including but not limited to transitional services to implement the transactions contemplated under the Plan, the Liquidating Debtor is authorized to compensate Professionals without further order of the Bankruptcy Court with respect to fees and expenses incurred subsequent to the Effective Date.

### VIII.

### TAX DISCLOSURE

Implementation of the Plan may have federal, state, local and foreign tax consequences to the Debtor, Creditors and Interest Holders. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure (the "Tax Disclosure") does not constitute and is not intended to constitute either a tax opinion or tax advice to any person. Rather, the Tax Disclosure is provided for informational purposes only.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1　　　Moreover, the Tax Disclosure summarizes only certain of the federal income tax

2　consequences under the Internal Revenue Code of 1986, as amended ("IRC") associated with the

3　Plan's implementation, and does not attempt to comment on all such aspects of the Plan's

4　implementation.  In addition, certain of the federal income tax consequences described in the Tax

5　Disclosure are dependent on factual determinations that are subject to uncertainties.  Similarly, the

6　Tax Disclosure does not attempt to consider any facts or limitations applicable to any particular

7　creditor or interest holder which may modify or alter the consequences described below.  The Tax

8　Disclosure also does not address state, local, or foreign tax consequences or the consequences of any

9　federal tax other than the federal income tax.  No assurance can be given that legislative, judicial, or

10　administrative changes will not be forthcoming that would affect the accuracy of the discussion

11　below.  Any such changes could be material and could be retroactive with respect to the transactions

12　entered into or completed prior to the enactment or promulgation thereof.  Finally, the tax

13　consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority

14　and may be subject to judicial or administrative interpretations that differ from the discussion below.

15　The discussion contained in this Tax Disclosure is not binding on the IRS or  any other

16　governmental tax authority.

17　　　Creditors, therefore, are advised to consult with their own tax advisors regarding the tax

18　consequences to them of the transactions contemplated by the Plan, including federal, state, local,

19　and foreign tax consequences.

20　**A.**　　**Tax Consequences to the Liquidating Debtor**

21　　　As noted above, on the Effective Date, the Heller Ehrman PCs will own the Liquidating

22　Debtor through the retention of their Interests in the Debtor, and all Estate Assets shall vest in the

23　Liquidating Debtor free and clear of all Liens, Claims and Interests.  The Liquidating Debtor shall

24　comply with its tax reporting and filing obligations with governmental authorities, as appropriate and

25　proper under various tax laws and regulations to which it is subject.  The Heller Ehrman PCs may

26　recognize income or loss from the operations of the Liquidated Debtor, including income or loss

27　passed through from the Shareholder Liquidation Trust as described below.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Generally, if the Allowed Claims are not paid in full under the Plan, the Liquidating Debtor will recognize cancellation of indebtedness ("COD") income. Section 108 contains provisions that allow COD income to be excluded from the debtor's gross income under certain circumstances. Section 108(e)(2) allows the debtor to exclude from gross income any COD income generated from a debt that is cancelled if payment of such debt would have given rise to a deduction. The Liquidating Debtor is a cash basis taxpayer. Thus, it is expected that most of the COD income generated will be excluded under §108(e)(2). Any COD income not excluded under this provision may be excludible under the bankruptcy or insolvency exceptions described below.

Most debtors under a Chapter 11 case are able to exclude the COD income from their gross income due to the bankruptcy exception contained in IRC §108(a). However, because the Debtor is a partnership for tax purposes, the COD income generated under the Plan will flow through to the Heller Ehrman PCs as IRC §108 applies the bankruptcy and insolvency exception at the partner level. Thus, the Heller Ehrman PCs may recognize COD income as a result of the Plan. The Heller Ehrman PCs will determine based upon their individual circumstances whether they will be required to include the COD income in their gross income. If a Heller Ehrman PC is insolvent at the time the COD income is recognized, such Heller Ehrman PC may be able to exclude some or all of the COD income under the insolvency exception contained in IRC §108. If a Heller Ehrman PC is able to use the insolvency exception, such Heller Ehrman PC will be required to reduce its tax attributes including net operating losses, capital losses, loss carryovers, certain tax credits and, subject to certain limitations, the tax basis of property. In consequence, the Heller Ehrman PCs may lose certain tax attributes as a result of COD income generated under the Plan.

The Shareholder Liquidation Trust will be structured as a "grantor" trust (i.e. a pass-through entity) for federal income tax purposes with the Liquidating Debtor treated as the "grantor". As a grantor trust, the Shareholder Liquidation Trust will not be a separate taxable entity. Instead, the income, gain, loss, credits and deductions recognized or incurred by the Shareholder Liquidation Trust will pass through to the Liquidating Debtor. Consequently, any gain recognized from the liquidation of the MPC Equity interest, other income, losses, credits and deductions will pass through to the Liquidating Debtor and ultimately to the Heller Ehrman PCs. The Liquidating

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtor's federal income tax reporting obligation is not dependent upon the Shareholder Liquidating Trust distributing any cash or other proceeds. Therefore, the Heller Ehrman PCs (as a pass-through from the Liquidating Debtor) may incur a federal income tax liability regardless of the fact that the Shareholder Liquidating Trust has not made, or will not make, any concurrent distribution to the Liquidating Debtor. If the Liquidating Debtor/Heller Ehrman PCs incur a federal tax liability but do not receive distributions commensurate with the taxable income allocated to them from the Shareholder Liquidating Trust, the Liquidating Debtor/Heller Ehrman PCs may be entitled to a subsequent loss. In general, the distribution of cash from the Shareholder Liquidating Trust will not be taxed.

No ruling has been requested from the IRS concerning the tax status of the Shareholder Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Shareholder Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Shareholder Liquidating Trust, the Liquidating Debtor, and the Heller Ehrman PCs could vary from those discussed herein (including the potential for an entity-level tax). The Shareholder Liquidating Trustee will file with the IRS returns for the Shareholder Liquidating Trust as a grantor trust pursuant to the applicable Treasury Regulations under IRC §671. The Shareholder Liquidating Trustee will send to the Liquidating Debtor a statement setting forth the Liquidating Debtor's items of income, gain, loss, deduction and credit and will instruct it to report such items on its federal income tax return.

**B.** **Tax Consequences To Creditors**

Pursuant to the Plan, holders of allowed claims will receive distributions of cash in exchange for their allowed claims. Whether and the extent to which such a payment to a creditor holding an allowed claim is includible in the holder's gross income will be determined by reference to the claim in respect of which the distribution is made. The holder may recognize ordinary income in respect of such payment if the claim is in respect of an item generating ordinary income, such as wages, to such holder. Similarly, if a claim is held as part of a trade or business, the holder of such claim may recognize ordinary loss to the extent that such holder's adjusted basis in the claim exceeds the

36869-001\DOCS_SF:67279v1

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

amount received by such holder with respect to such claim. If a claim is held in respect of a capital asset, the holder may recognize a capital gain or loss. However, any distribution attributable to accrued but unpaid interest may be treated as ordinary income, regardless of whether the origin of the claim is capital in nature or whether gain or loss is otherwise recognized on the Claim.

EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE CONSEQUENCES FOR SUCH CREDITOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**C.    Tax Consequences to Holders of Interests**

Pursuant to the Plan, Interests will be retained on the Effective Date. However, it is anticipated that each holder of Interests shall receive no distribution or any other consideration on account of such Interests. In general, assuming that a holder has not previously treated the Interests as worthless for tax purposes, the holder should recognize loss equal to the difference between the amount of consideration received by such holder (in this case, none) and the adjusted tax basis in the Interests of such holder.

As discussed above, each holder of an Interest may recognize pass-through income from the Liquidating Debtor, including COD income and income from the Shareholder Liquidation Trust, without any cash distribution. Such income may cause the holder of an Interest to incur a federal income tax, state income tax and/or alternative minimum tax liability.

EACH HOLDER OF AN INTEREST IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR

2  REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX

3  CONSEQUENCES UNDER THE PLAN.

## IX.

## LIQUIDATION ANALYSIS

6       Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the

7  Plan by an impaired Class, the Proponents must demonstrate, and the Bankruptcy Court must

8  determine, with respect to such Class, each holder of a Claim or Interest will receive property of a

9  value, as of the Effective Date of the Plan that is not less than the amount that such holder would

10  receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date

11  of the Plan.  This requirement is commonly referred to as the "Best Interests Test."  For the reasons

12  set forth below, the Proponents submit that they easily satisfies the "Best Interests Test" and

13  therefore should be approved.

14       The primary reason for the reduced recovery in a Chapter 7 liquidation is that, even in the

15  unlikely event that a chapter 7 trustee could realize recoveries from the estate's claims against

16  Former Shareholders and other cause of action, the Chapter 7 trustee would be entitled to seek a

17  sliding scale commission of up to 3% of the funds distributed by such trustee to creditors.  Thus,

18  even if a chapter 7 trustee were able to achieve the same results, Creditors would probably recover

19  less because the trustee would be entitled to a portion of the proceeds as a commission.  Although

20  under Bankruptcy Code section 326, the trustee's compensation is capped by this sliding scale, and

21  the trustee should be required to demonstrate the reasonableness of his or her commissions in

22  relation to work actually performed or results obtained, the Debtor cannot predict whether the trustee

23  would seek or obtain a straight commission based solely on distributions or some lesser amount.

24       In addition, the trustee will likely employ legal counsel and accountants which would add

25  additional administrative expenses that would be paid ahead of Creditors.  The Debtor and the

26  Committee already have legal counsel with extensive knowledge of the complexities of this case.

27  The learning curve for the trustee, new counsel, and perhaps new staff would simply increase

28  expense and reduce the recoveries to Creditors.

Because the Plan implements the priorities set forth in the Bankruptcy Code, each Creditor will receive under the Plan proposed by the Debtor property of a value that is not less than the amount such Creditor would receive in a chapter 7 case. The Plan proposed by the Debtor presents a better alternative to Creditors than a chapter 7 liquidation because the Plan provides a substantial (and potentially full) recovery of Unsecured Claims.

**X.**

**RISK ANALYSIS**

The Plan is conditioned on the Liquidating Debtor's fulfillment of its responsibilities under the Plan and the Bankruptcy Court's confirmation of the Plan. Although the Debtor currently expects that all of the transactions required under the Plan shall be consummated, there is always a risk that an unforeseen development could affect either the confirmation or the implementation of the Plan or affect the transactions contemplated under the Plan after confirmation. In addition, the Plan contains several conditions precedent to the confirmation of the Plan and it is possible that one or more of these conditions may not be satisfied. Finally, while the Debtor believes that the Plan satisfies all of the confirmation requirements under section 1129 of the Bankruptcy Code, there is no guarantee that the Bankruptcy Court will concur with this analysis and necessarily confirm the Plan.

In addition, recovery by Creditors is tied, in part, to the Debtor's recovery from the Former Shareholders pursuant to the Shareholder Liquidation Settlement, as well as to the proceeds of Retained Claims and Defenses and Avoidance Actions, which amounts are presently unknown. Thus, the recovery by Creditors may vary based upon the collections to be used to fund payments to Creditors under the Plan.

**XI.**

**CONFIRMATION OF THE PLAN**

The Proponents will seek confirmation of the Plan at the Confirmation Hearing, pursuant to applicable provisions of the Bankruptcy Code.

**A.     Confirmation Hearing**

The Bankruptcy Court will hold a hearing on _____, 2009 to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  confirmation of the Plan have been satisfied.  The hearing on confirmation will be held at the United

2  States Bankruptcy Court, 235 Pine Street, 22nd Floor, San Francisco, California, 94104.

3         Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to

4  confirmation of the Plan.  Any objection to confirmation of the Plan must be made in writing and

5  specify the legal grounds for such objection, the nature and amount of the Claim or Interest held by

6  such party, and must be filed with the Bankruptcy Court, together with proof of service, and served

7  on all required parties by the objection deadline set by the Bankruptcy Court.  UNLESS AN

8  OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE

9  CONSIDERED BY THE BANKRUPTCY COURT.

10 **B.     Requirements For Confirmation**

11        At the Confirmation Hearing, the Bankruptcy Court will determine whether the provisions of

12 section 1129 of the Bankruptcy Code have been satisfied.   If all of the provisions of section 1129 of

13 the Bankruptcy Code are met, the Bankruptcy Court may enter an order confirming the Plan.  The

14 Debtor believes that all of the requirements of section 1129 of the Bankruptcy Code will be satisfied.

15 Among other things, the Debtor believes that the Plan will be accepted by the requisite number of

16 votes and satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code.  The

17 Proponents submit that they have complied or will have complied with all of the requirements of

18 chapter 11, and that the Plan has been proposed and is made in good faith.  In addition, the Debtor

19 submits that the Plan satisfies the "best interest" of Creditors and is not likely to be followed by

20 liquidation or the need for further reorganization.

21 **C.     Classification of Claims and Interests**

22        The Bankruptcy Code requires that a plan of reorganization place each creditor's claim and

23 each equity interest in a class with other claims or interests that are "substantially similar."  The Plan

24 establishes seven (7) Classes of Claims and Interests.  Under the Plan, Claims which are secured or

25 entitled to priority are placed in separate Classes from Unsecured Claims.  Article II of the Plan sets

26 forth the description of the Classes of Claims and Interests.

27        The Debtor believes that the Plan's classification of Claims and Interests fully complies with

28 the requirements of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    **D.    Acceptance**

2         As a condition to Confirmation, the Bankruptcy Code requires that each class of holders of

3    claims or interests accept the plan, except as otherwise described in this Disclosure Statement.  The

4    Bankruptcy Code defines acceptance by a class of holders of claims as acceptance by holders of two-

5    thirds in dollar amount and a majority in number of claims of that class, but for this purpose counts

6    only those who actually vote to accept or reject the plan.  Holders of claims who fail to vote are not

7    counted as either accepting or rejecting the plan.

8         Classes of claims and interest that are not "impaired" under a plan are deemed to have

9    accepted the plan.  A class is generally "impaired" if the legal, equitable, or contractual rights

10   attaching to the claims or interests of that class are modified, other than by curing defaults and

11   reinstating maturities or by payment in full in cash.  A class that receives nothing under a plan is

12   deemed to reject such plan.

13        IN THIS CASE, ALL OF THE CLASSES ARE IMPAIRED UNDER THE PLAN.  THUS,

14   CLASSES 1, 2, 3, 4, 5, 6, AND 7 ARE ENTITLED TO VOTE ON THE PLAN.

15   **E.    Best Interests of Creditors**

16        As addressed above, the Debtor believes that confirmation of the Plan is in the best interests

17   of the holders of Claims because it provides to holders of Impaired Claims distributions having a

18   present value as of the Effective Date of not less than the value such holders would likely receive if

19   the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

20        In sum, as reflected by the Liquidation Analysis discussed above, the Debtor believes that the

21   holders of Claims would only realize a fraction of the value available under the Plan and that

22   unsecured creditors would receive less in a chapter 7 liquidation primarily due to the additional layer

23   of administrative expenses that would be incurred by the trustee.  Consequently, the Debtor believes

24   that the Plan is in the best interests of the holders of Claims and Interests in this case.

25        At the Confirmation Hearing, the Bankruptcy Court will determine whether the holders of

26   Claims and Interests in any Impaired Class that has not voted to accept the Plan would receive a

27   distribution under the Plan that is at least as great as the distribution that such holders would receive

28   upon a liquidation of the Debtor pursuant to chapter 7 of the Bankruptcy Code.

**F.  Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Plan proposed by the Proponents satisfies these requirements and is "feasible."

**G.  Cramdown**

A court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that the court find that a plan is "fair and equitable" and does not "discriminate unfairly" with respect to each non-accepting impaired class of unsecured claims or interests. With respect to a dissenting class of unsecured claims, the "fair and equitable" standard requires, among other things, that a plan contain one of two elements. It must provide either that each holder of an unsecured claim in such class receive or retain property having a value, as of the effective date of a plan, equal to the allowed amount of its claim, or that no holder of allowed claims or interests in any junior class receive or retain any property on account of such claims or interests. With respect to a dissenting class of interests, the "fair and equitable" standard requires that the plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the Effective Date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests, or (ii) that no holder of an interest in any junior class receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive a distribution is known as the "absolute priority rule."

The Debtor shall request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or modify the Plan in accordance with the terms thereof.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

36689-001\DOCS_SF:67479v3

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

60

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1 **H.** **Alternatives to Confirmation of Plan**

2         If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives

3 include (i) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code; or

4 (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code.

5         If the Plan is not confirmed, the Proponents will decide which alternative to pursue by

6 weighing each of the available options and choosing the alternative or alternatives that are in the best

7 interests of the Debtor, its Creditors and other parties in interest. However, the Proponents believe

8 that the Plan, as proposed, provides the greatest possible return currently available for the holders of

9 Claims in this chapter 11 case.

10 **XII.**

11 **RECOMMENDATION AND CONCLUSION**

12         Based on the foregoing, the Proponents believe that the Plan is in the best interests of

13 Creditors and urge Creditors to vote to accept the Plan.

14 Dated: October 8, 2009               PACHULSKI STANG ZIEHL & JONES LLP

15

16                            By    */s/ John D. Fiero*
                                John D. Fiero

17                                 Attorneys for Heller Ehrman LLP,
                                Debtor and Debtor in Possession

18 Dated:    October 8, 2009           FELDERSTEIN, FITZGERALD, WILLOUGHBY

19                                & PASCUZZI, LLP

20                            By    */s/ Thomas Willoughby*

21                                   Thomas Willoughby, Esq.
                                Counsel to the Official Committee of

22                                   Unsecured Creditors

23

24

25

26

27

28