# EXHIBIT A

Address For AboveNet Notices:
AboveNet Communications, Inc.
360 Hamilton Avenue
White Plains, New York 10601
Attn: Senior Vice President – General Counsel

# GENERAL TERMS AND CONDITIONS

## to the

## MASTER PRODUCTS AND SERVICES AGREEMENT

HELLER EHRMAN LLP ("Customer")

a _____ corporation

| Address for Customer Notices: (Please Print or Type) | Copy To: (If Customer Requires) |
|---|---|
| Heller Ehrman LLP<br>C/o Scott Kelly<br>333 Bush Street<br>San Francisco CA 94104 | Heller Ehrman LLP<br>C/o Gabriel Perez<br>333 Bush Street<br>San Francisco CA 94104 |

These General Terms and Conditions together with all Supplements. Order Form(s), Exhibits and other addenda attached hereto from time to time constitute the Master Products and Services Agreement ("Agreement") which is effective as of the last date of execution below ("Effective Date") by and between AboveNet Communications. Inc. ("AboveNet"). a Delaware corporation, and Customer. AboveNet and Customer are collectively referred to as the "Parties" or individually as a "Party".

1. **DEFINITIONS**

"Commencement Date" means the date upon which AboveNet begins to provide an ordered Product or Service as more fully described in the relevant Supplement or Order Form.

"Customer Location" refers to a location designated in an Order Form for connection to the AboveNet Network.

"AboveNet Network" means, collectively. the fiber optic network, system capacity and related facilities (including, without limitation, routers, switches and communication channels) owned or controlled by AboveNet to the extent it applies to the Product or Service.

"Order Form" refers to any. mutually executed. product order ("Product Order"). service order ("Service Order"), schedule ("Schedule"). or statement of work ("Statement of Work") to these General Terms and Conditions and respective Supplement. detailing the Products or Services, the Term, Customer charges, the estimated Commencement Date and any other relevant terms agreed upon by the Parties.

"Products or Services" means the products or services provided by AboveNet (including, without limitation, Leased Fiber, In-Building Fiber, Co-location. Bandwidth, Managed Services, Managed Wavelengths and Capacity) to Customer.

"Supplement" means a fully executed supplement to these General Terms and Conditions each containing additional terms and conditions that govern the related Products or Services provided by AboveNet.

General Terms and Conditions (August 2004)    1

"Term" means the period of time in which AboveNet provides Products or Services to Customer pursuant to an Order Form and any renewals thereto.

## 2. STRUCTURE OF AGREEMENT

From time to time, the Parties will execute one or more Supplement(s) and Order Forms for AboveNet to provide Products or Services, each of which is automatically incorporated into this Agreement and subject to these General Terms and Conditions.

## 3. INVOICING AND PAYMENT

3.1.    *Installation Charge.* If a non-recurring installation charge or setup fee ("Installation Charge") is specified in an Order Form, AboveNet will invoice Customer for the same upon the effective date of the Order Form ("Order Form Effective Date"), and unless otherwise specified in the applicable Order Form, Customer will pay such invoice upon the Order Form Effective Date.

3.2.    *Recurring Charge.* If a recurring charge ("Recurring Charge") (e.g. Monthly Charge, Quarterly Charge, Annual Charge, etc.) is specified in an Order Form. AboveNet will invoice Customer for and Customer will pay the Recurring Charge in advance for each period and within thirty (30) days from the date of such invoice.  AboveNet will begin to invoice the Recurring Charge on the Commencement Date. Invoices for partial months will be pro-rated.  Multiple types of Recurring Charge may be set forth in the Order Form.

3.3.    *Prepayment.* Any prepayment ("Prepayment") specified in an Order Form, is payable upon the Order Form Effective Date. If a Prepayment is for a portion of a Term, the amount of such Prepayment will be applied as a credit to the final Recurring Charges at the end of such Term.

3.4.    *Additional Charges.* If applicable, AboveNet will invoice Customer and Customer will pay invoices for any additional charges for Products or Services which are specified in an Order Form.

3.5.    *Applicable Taxes.* AboveNet will invoice Customer and Customer will pay any and all applicable taxes ("Applicable Taxes") as more fully described in Section 4, below, with respect to specific Customer charges.

3.6.    *Late Payments.* All invoices must be paid in accordance with their terms without setoff or deduction, and late payments will accrue interest on the unpaid sum as of the date of the invoice at the lesser of (i) the highest legal rate of interest permitted in the State of New York or (ii) one and one-half percent (1.5%) per month.

3.7.    *U.S. Dollars.* Unless otherwise specified on an Order Form, all payments must be made by Customer to AboveNet in U.S. dollars

## 4. APPLICABLE TAXES

4.1.    "Applicable Taxes" means all taxes, levies, fees, imposts, duties, charges, surcharges, assessments or withholdings of any kind or nature (collectively "Taxes") levied or imposed upon AboveNet, arising from or relating to the provision by AboveNet of the Services to Customer (including, without limitation, sales, excise taxes, universal service fees and any other FCC or state PUC fees), together with any penalties, fines or interest (resulting from Customer's failure to pay Taxes hereunder after being invoiced for such) by any U.S. federal, state, provincial or local government, public authority, including its agencies, commissions and tribunals, having jurisdiction over this transaction.  Customer shall not be responsible for and Applicable Taxes shall not include taxes on the property or income of AboveNet.

4.2.    Notwithstanding the foregoing, Customer may provide AboveNet with a certificate evidencing Customer's exemption from payment of or liability for any Applicable Taxes.

Case: 08-32514    Doc# 802-2    Filed: 12/02/09    Entered: 12/02/09 18:35:39    Page 3 of 19

## 5. TERM

5.1.    This Agreement commences on the Effective Date, and continues through the latest expiration of all Order Form Term(s) subject to this Agreement, unless earlier terminated as provided herein.

5.2.    The Term for each Order Form begins on the Commencement Date of the related Product or Service and remains in effect until the expiration of the initial period so specified. Upon expiration of the initial term, and provided that no type of Recurring Charge is fully prepaid, each Order Form will automatically renew for additional periods of one (1) ~~year~~ month unless one Party provides the other written notice that it is terminating such Order Form not less than sixty (60) days' prior to the end of the Term then in effect.

## 6. DEFAULT

The following events are "Events of Default", the occurrence of which gives the non-defaulting Party the right to terminate the affected Order Form(s), or the entire Agreement for a nonpayment default, by written notice following the expiration of any stated cure periods and pursue its remedies under the Agreement:

    a)    Customer fails to fully pay any of the payments (including Early Termination Charges) required hereunder within five (5) days after receipt of written notice of such failure; or

    b)    Except as provided in clause (a), above, the breach of any material term or condition of this Agreement (including Order Forms) and such breach remains uncured thirty (30) days after delivery to the breaching Party of written notice of such breach. If the breach is of a nature or involves circumstances reasonably requiring more than thirty (30) days to cure, the time period may be extended provided the breaching Party proceeds diligently to cure the breach;

If Customer is in default, as set forth above, then, after expiration of the cure period, AboveNet may, in addition to any other remedies that it may have under this Agreement or by law, suspend, disconnect and/or repossess any Products or Services, provided, however, that Customer will remain responsible to perform its obligations hereunder.

## 7. REPRESENTATIONS AND WARRANTIES

7.1.    AboveNet warrants that any Products and Services to be provided to Customer will be at a professional level of quality conforming to generally accepted industry standards and in compliance in all material respects with all applicable laws and regulations. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, ABOVENET DOES NOT MAKE, AND HEREBY DISCLAIMS, ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY AND ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.2.    Each Party represents and warrants to the other that (i) it is duly organized, validly existing and in good standing under the laws of the state of its organization, (ii) it has all requisite power and authority to enter into and perform its obligations under this Agreement and all Order Forms, (iii) it will comply with all applicable federal, state and local laws, statutes, rules and regulations in connection with the provision and use of the Products and Services and (iv) this Agreement and all Order Forms, when executed, are the legal, valid and binding obligation of such Party.

7.3    Customer acknowledges that AboveNet has no ability to determine whether the communications traffic carried by the Products or Services utilizing the AboveNet Network is jurisdictionally interstate or intrastate. Customer represents and warrants that the communications traffic to be carried by the AboveNet Network shall be jurisdictionally interstate, pursuant to the Federal Communications Commission's mixed-use "10% Rule"(47 CFR 36.154, 4 FCC Rcd. 1352), unless Customer provides AboveNet written notice otherwise. In either case, Customer will pay all relevant FCC and state Public Utilities Commission taxes and fees.

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 4
of 19

8.    LIMITATION OF LIABILITY; INDEMNIFICATION

8.1.    THE TOTAL LIABILITY OF EITHER PARTY FOR DAMAGES ARISING OUT OF OR IN
CONNECTION WITH AN ORDER FORM (EXCLUDING EARLY TERMINATION CHARGES (AS DEFINED
IN THE RELATED SUPPLEMENT)) IS LIMITED TO AN AMOUNT EQUAL TO THE TOTAL CHARGES
PAYABLE BY CUSTOMER DURING THE TERM SET FORTH THEREIN. NOTWITHSTANDING ANY
PROVISION OF THIS AGREEMENT TO THE CONTRARY. NEITHER PARTY WILL BE LIABLE TO THE
OTHER PARTY FOR ANY SPECIAL. INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL
DAMAGES INCLUDING. WITHOUT LIMITATION, LOSS OF PROFITS. REVENUE OR LOST BUSINESS
OPPORTUNITIES (WHETHER ARISING OUT OF TRANSMISSION INTERRUPTIONS OR PROBLEMS.
ANY INTERRUPTION OR DEGRADATION OF SERVICE OR OTHERWISE), WHETHER FORESEEABLE
OR NOT, EVEN IF A PARTY HAS BEEN ADVISED BY THE OTHER PARTY OF THE POSSIBILITY OF
THE DAMAGE AND EVEN IF A PARTY ASSERTS OR ESTABLISHES A FAILURE OF ESSENTIAL
PURPOSE OF ANY LIMITED REMEDY PROVIDED IN THIS AGREEMENT. THE LIMITATIONS SET
FORTH IN THIS SECTION WILL APPLY TO CLAIMS OF CUSTOMER. WHETHER OCCASIONED BY ANY
CONSTRUCTION, INSTALLATIONS, RELOCATIONS, SERVICE, REPAIR OR MAINTENANCE
PERFORMED BY, OR FAILED TO BE PERFORMED BY ABOVENET, OR ANY OTHER CAUSE
WHATSOEVER, INCLUDING BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE. OR
STRICT LIABILITY. IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY LOSS OF DATA OR
TECHNOLOGY.

8.2.    AboveNet agrees to indemnify, defend and hold Customer, its officers, directors, employees, agents and
contractors harmless from and against all loss. damage, liability, cost and expense (including reasonable attorney's
fees and expenses) by reason of any claims or actions by third parties against Customer for (i) bodily injury or death.
and damage. loss or destruction of any real or tangible personal property, which third party claims arise out of or
relate to AboveNet's gross negligence or willful misconduct or (ii) infringement or misappropriation by AboveNet
of any intellectual property rights under this Agreement.

8.3.    Customer agrees to indemnify, defend and hold AboveNet, its officers. directors. employees, agents and
contractors harmless from and against all loss. damage, liability, cost and expense (including reasonable attorney's
fees and expenses) by reason of any claims or actions by third parties against AboveNet for (i) bodily injury or death
or damage. loss or destruction of any real or tangible personal property, which third party claims arise out of or
relate to Customer's gross negligence or willful misconduct. (ii) infringement or misappropriation by Customer of
any intellectual property rights under this Agreement, or (iii) Customer's or its customer's use of the Products or
Services, including without limitation, defamation, libel, slander, obscenity, pornography, or violation of the rights
of privacy or publicity, or spamming or any other tortious or illegal conduct.

9.    CONFIDENTIALITY; PUBLICITY

9.1.    *Confidentiality*. Each Party agrees that the terms of this Agreement and all information furnished to it by
the other Party, including maps, pricing, financial terms, network routes, design information, methodologies,
specifications, locations or other information to which it has access under this Agreement, are deemed the
confidential and proprietary information or trade secrets (collectively referred to as "Proprietary Information") of the
Disclosing Party and will remain the sole and exclusive property of the Disclosing Party (the Party furnishing the
Proprietary Information referred to as the "Disclosing Party" and the other Party referred to as the "Receiving
Party"). Each Party will treat the Proprietary Information and the contents of this Agreement in a confidential
manner and, except to the extent necessary in connection with the performance of its obligations under this
Agreement, neither Party may directly or indirectly disclose the same to anyone other than its employees on a need
to know basis and who agree to be bound by the terms of this Section. without the written consent of the Disclosing
Party. Information will not be deemed Proprietary Information if it (i) becomes publicly available other than
through the actions of the Receiving Party; (ii) is independently developed by the Receiving Party; or (iii) becomes
available to the Receiving Party without restriction from a third party. If the Receiving Party is required by a
governmental or judicial law, order, rule. regulation or permit to disclose Proprietary Information, it must give
prompt written notice to the Disclosing Party of the requirements of such disclosure and cooperate fully with the
Disclosing Party to minimize such disclosure. and disclosure after such notice shall not be a breach hereof.

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 5
of 19

9.2.    *Publicity*. Neither Party may issue any advertising or other publicity material using the other Party's name or marks or describing in any way the terms of this Agreement without first receiving the other Party's written consent as to form and content, which consent may not be unreasonably withheld, conditioned, or delayed.

## 10.    ASSIGNMENT

Neither Party will assign or this Agreement without the other Party's prior written consent, except that either Party may assign this Agreement upon notice and without the other Party's consent to a person, firm, corporation, partnership, association, trust or other entity (i) that controls, is controlled by or is under common control with the assigning Party or (ii) which purchases all or substantially all of its assets: provided that the assignee assumes all liabilities hereunder in writing prior to the effectiveness of such assignment. Any assignment or transfer without the required consent is void and is considered a material breach of this Agreement. Upon any permitted assignment, the assigning Party will remain jointly and severally responsible for the performance under this Agreement, unless released in writing by the other Party, and this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

## 11.    FORCE MAJEURE

Neither party will be considered in breach of this Agreement nor liable under this Agreement for any delays, failures to perform, damages or losses, or any consequence thereof, caused by or attributable to an event of "Force Majeure," which is defined as any cause beyond the reasonable control of the party claiming relief, including without limitation the action by a governmental authority (such as a moratorium on any activities related to this Agreement or changes in government codes, ordinances, laws, rules, regulations, or restrictions occurring after the Effective Date), third-party labor dispute, flood, earthquake, fire, lightning, epidemic, war, act of terrorism, riot, civil disturbance, act of God, sabotage, fiber cut caused by a third-party or failure of a third party to recognize a permit, authorization, right-of-way, easement, right, license or other agreement obtained by AboveNet to construct and operate its facilities or network.

## 12.    NOTICES

All notices, including but not limited to, demands, requests and other communications required or permitted hereunder (not including invoices) must be in writing and will be deemed given: (i) when delivered in person, (ii) one (1) business day after deposit with an overnight delivery service for next day delivery, or (iii) three (3) business days after deposit in the United States mail, postage prepaid, registered or certified mail, return receipt requested, and addressed to the recipient Party at the address set forth on first page hereof. In addition, AboveNet may send Customer notices, other than notices for default or termination, to Customer's email address as contained on AboveNet's customer contact list. Such email notification is deemed delivered on the day sent unless returned to sender.

## 13.    MISCELLANEOUS

13.1    *Governing Law*. This Agreement will be interpreted and construed in accordance with the internal laws of the State of New York without giving effect to its principles of conflicts of laws. This Agreement and the duties and obligations of the Parties hereunder shall be enforceable against any of the Parties in the courts of New York.

13.2    *Survival*. The Parties' respective representations, warranties, and covenants, together with obligations of indemnitication, confidentiality and limitations on liability will survive the expiration, termination or rescission of this Agreement and continue in full force and effect.

13.3    *No Third-Party Beneficiaries*. The covenants, undertakings, and agreements set forth in this Agreement are solely for the benefit of and enforceable by the Parties or their respective successors or permitted assigns.

13.4    *Relationship of the Parties*. The relationship between the Parties hereunder is not that of partners or agents for one another and nothing contained in this Agreement may not be deemed to constitute a partnership, joint venture or agency agreement between them.

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 6 of 19

13.5    *Remedies Not Exclusive.* Except as otherwise expressly provided, the rights and remedies set forth in this Agreement are in addition to, and cumulative of, all other rights and remedies at law or in equity.

13.6.    *Headings; Severability.* The headings in this Agreement are strictly for convenience and do not amplify or limit any of the terms, provisions or conditions hereof. In the event any term of this Agreement is held invalid, illegal or unenforceable, in whole or in part, neither the validity of the remaining part of such term nor the validity of the remaining terms of this Agreement will be in any way affected.

13.7.    *No Implied Waiver.* No failure to exercise and no delay in exercising, on the part of either Party, any right, power or privilege hereunder will operate as a waiver, except as expressly provided herein.

13.8.    *Execution and Counterparts.* This Agreement may be executed in counterparts, including by facsimile transmission, each of which when executed and delivered is an original, but all the counterparts together constitute the same document.

13.9.    *Order of Precedence.* If any conflict or contradiction exists between these General Terms and Conditions and a Supplement, the terms of a Supplement will control. If any conflict or contradiction exists between a Supplement and the terms of an Order Form, the terms of the Order Form will control. If any conflict or contradiction exists between these General Terms and Conditions and the terms of an Order Form, the terms of the Order Form will control.

14.    **ENTIRE AGREEMENT; AMENDMENT; EXECUTION**

This Agreement, including all Supplements, Order Forms, Exhibits and addenda attached hereto is the entire agreement between the Parties with respect to the subject matter hereof and supersedes any and all prior negotiations, understandings and agreements, whether oral or written. This Agreement may be amended only by a written instrument executed by the Parties.

The Parties have executed this Agreement as of the last date of execution below.

ABOVENET COMMUNICATIONS, INC.

By: _____ *Col Moe* _____

Print Name: _____ *Colin Moe* _____

Title: _____ *Director* _____

Date: _____ *7-6-05* _____

CUSTOMER

By: _____ *Tom Schultz* _____

Print Name: _K.M. SCHULTZ_

Title: _DIR of TECH. OPNS._

Date: _30 Jun 2005_

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 7 of 19

# eWAN SERVICE SUPPLEMENT

## to the

## Master Products And Services Agreement

_HELLER EHRMAN / SCOTT KELLY_ ("Customer")

This eWAN Service Supplement is effective as of the last date of execution below ("Supplement Effective Date") by and between AboveNet Communications, Inc. (fka Metromedia Fiber Network Services, Inc.") ("AboveNet") and Customer and is attached to and made a part of the Master Product and Services Agreement, dated _7/6/2005_ , by and between the Parties. Unless otherwise defined herein, capitalized terms in this Supplement shall have the definitions attributed thereto in the General Terms and Conditions.

### 1. ADDITIONAL DEFINITIONS

"95th Percentile Calculation" means a measurement whereby, separately, for each port, samples for average Mbps, both inbound and outbound traffic, will be collected every five (5) minutes for a month. For each five (5) minute period the higher of the two totals of the inbound and outbound traffic will be placed into a list. The list will then be ordered from highest to lowest. In each case the highest five percent (5%) of samples will be discarded, and the next highest sample will be chosen to represent the 95th percentile calculation for that month for such router interface. The 95th percentile amounts for each port, used by Customer, will be aggregated to determine the total amount of Bandwidth.

"AboveNet Equipment" means the telecommunications devices, apparatus and associated equipment at the Service Demarcation Point that enables the ordered Service.

"AboveNet POP" refers to AboveNet's point of presence at which AboveNet provides interconnectivity to its network routes and facilities.

"Bandwidth" means the amount of Mbps transferred over the AboveNet Network from and to Customer's server(s) or routers.

"Burst" Bandwidth means the amount of Bandwidth in excess of the Commitment;

"Commitment" (if applicable) refers to Customer's commitment, in a given month, to pay for a certain level of committed Bandwidth, regardless of whether such Bandwidth is used by Customer.

"Customer Location" refers to a location specified in an Order Form and connected by AboveNet provisioned metro area optical fiber or AboveNet provisioned in-building optical fiber whereby Customer connects to receive eWAN or IP Transit;

"eWAN" means a virtual private network between two or more Customer Locations carried by Bandwidth routed over core routers across the AboveNet Network;

"Fiber Distribution Point" means the termination point up to which AboveNet is responsible to install the AboveNet Network, as specified in an Order Form;

"In-Building Fiber Extension" means the combination of riser conduit, riser optical fiber strands and any other in-building facilities necessary to provide the physical connection from the Fiber Distribution Point to the Service Demarcation Point;

"IP Transit" means Internet connectivity and Bandwidth provisioned by AboveNet to Customer pursuant to an Order Form;

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 8 of 19

# eWAN SERVICE SUPPLEMENT

to the

## Master Products And Services Agreement

*HELLER EHRMAN /SCOTT KELLY* ("Customer")

This eWAN Service Supplement is effective as of the last date of execution below ("Supplement Effective Date") by and between AboveNet Communications, Inc. (fka Metromedia Fiber Network Services, Inc.") ("AboveNet") and Customer and is attached to and made a part of the Master Product and Services Agreement, dated ___1/12/07___, by and between the Parties. Unless otherwise defined herein. capitalized terms in this Supplement shall have the definitions attributed thereto in the General Terms and Conditions.

## 1. ADDITIONAL DEFINITIONS

"95th Percentile Calculation" means a measurement whereby, separately, for each port, samples for average Mbps, both inbound and outbound traffic, will be collected every five (5) minutes for a month. For each five (5) minute period the higher of the two totals of the inbound and outbound traffic will be placed into a list. The list will then be ordered from highest to lowest. In each case the highest five percent (5%) of samples will be discarded, and the next highest sample will be chosen to represent the 95th percentile calculation for that month for such router interface. The 95th percentile amounts for each port, used by Customer, will be aggregated to determine the total amount of Bandwidth.

"AboveNet Equipment" means the telecommunications devices, apparatus and associated equipment at the Service Demarcation Point that enables the ordered Service.

"AboveNet POP" refers to AboveNet's point of presence at which AboveNet provides interconnectivity to its network routes and facilities.

"Bandwidth" means the amount of Mbps transferred over the AboveNet Network from and to Customer's server(s) or routers.

"Burst" Bandwidth means the amount of Bandwidth in excess of the Commitment;

"Commitment" (if applicable) refers to Customer's commitment, in a given month, to pay for a certain level of committed Bandwidth, regardless of whether such Bandwidth is used by Customer.

"Customer Location" refers to a location specified in an Order Form and connected by AboveNet provisioned metro area optical fiber or AboveNet provisioned in-building optical fiber whereby Customer connects to receive eWAN or IP Transit;

"eWAN" means a virtual private network between two or more Customer Locations carried by Bandwidth routed over core routers across the AboveNet Network;

"Fiber Distribution Point" means the termination point up to which AboveNet is responsible to install the AboveNet Network. as specified in an Order Form;

"In-Building Fiber Extension" means the combination of riser conduit, riser optical fiber strands and any other in-building facilities necessary to provide the physical connection from the Fiber Distribution Point to the Service Demarcation Point;

"IP Transit" means Internet connectivity and Bandwidth provisioned by AboveNet to Customer pursuant to an Order Form;

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 9 of 19

"Location License" means the necessary building licenses, approvals or permissions for AboveNet to extend the AboveNet Network in the Customer Location and install and/or utilize the necessary inside plant facilities, including, without limitation, power, riser conduit and fiber optics.

"Site Environment" means the requisite space, racks, power, security and other facilities and other environmental conditions necessary to support and operate the AboveNet Equipment;

"Service Demarcation Point" means the place within the Customer Location that Customer situates its CPE (defined below) that connects with the Service.

## 2. SERVICES

2.1     *EWAN Service.* Subject to the terms and conditions contained herein, AboveNet will provide to Customer one or more types of eWAN or IP Transits specified in an Order Form for the charges set forth therein. The Order Form Term shall begin on the related Commencement Date.

2.2.     *Commencement Date.* Except as otherwise set forth in an Order Form, the "Commencement Date" shall be the earlier of (i) five (5) days after AboveNet notifies Customer that the Service is available or (ii) the date that Customer begins using the Service. Notwithstanding any notice provisions in the Agreement to the contrary, for purposes of this Section, notification will be deemed delivered on the day such notice is provided by AboveNet. If the availability date of the Service is delayed as a result of Customer's failure to fulfill its obligations under the Agreement, AboveNet will give Customer written notice to cure such failure within thirty (30) calendar days. If Customer fails to cure within such period, the delayed Service will be deemed to be available upon the expiration of such thirty (30) day period.

2.3.     *Measurement of Bandwidth.* Unless otherwise stated in an Order Form, Bandwidth shall be measured using the 95th Percentile Calculation.

2.4.     *Monthly Charges.* Customer shall pay the Monthly Charges related to the Commitment (if applicable) within thirty (30) days, from date of invoice, in advance of each month and the recurring charges related to any Burst Bandwidth (if applicable), thirty (30) days, from date of invoice, in arrears of each month. Invoicing for partial months shall be prorated by multiplying the Bandwidth charges incurred for the month by a fraction, the numerator of which will be the number of days in which service was provided and the denominator of which will be the number of calendar days in such month.

## 3. INSTALLATION AND MAINTENANCE

3.1.     Customer must procure and maintain, at its sole cost and expense, all necessary customer premise equipment or facilities ("CPE"), which are technically compatible to the Service and related AboveNet Network.

3.2.     Unless AboveNet undertakes in an Order Form to obtain the necessary Location License, Customer acknowledges and agrees that it is responsible to obtain, maintain, and pay any and all fees, recurring and/or non-recurring related to the Location License for the duration of the Order Form Term.

3.3.     Unless AboveNet undertakes to provide the In-Building Fiber Extension, or a portion thereof, as set forth in an Order Form, Customer must procure, at its sole cost and expense, all portions of the In-Building Fiber Extension which shall be technically compatible with AboveNet's optical fiber strands and related facilities (i.e. ribbon cable with non-metallic sheath and equivalent fiber type is required). The manufacturer, model number and desciption of the in-building fiber must be supplied to AboveNet prior to splicing.

3.4.     AboveNet or its agents will perform all maintenance and repairs to the AboveNet Network up to the Fiber Distribution Point at no additional charge to Customer, unless such maintenance or repair is necessary as a result of Customer's actions. Customer is not permitted to access the AboveNet Network except at the Service Demarcation Point as provided in this Agreement.

Case: 08-32514    Doc# 802-2    Filed: 12/02/09    Entered: 12/02/09 18:35:39    Page 10
of 19

3.5.    AboveNet may subcontract all or part of its performance obligations (including maintenance and installation) to a third party without consent of Customer, and AboveNet will remain liable for all such obligations.

## 4. USE OF SERVICE

4.1.    AboveNet is providing the Service for Customer's exclusive use. Customer shall have no right or interest in any optical fiber strands other than the right to use such optical fiber strands in connection with the Service during the specified Term subject to the terms of this Agreement.

4.2.    Customer may not, without the express written consent of AboveNet, perform, or contract with any third party to perform, any repairs or maintenance to the AboveNet Network or AboveNet Equipment. Customer will not install any equipment to be used with the Service that damages or interferes with the AboveNet Network or AboveNet Equipment.

4.3.    If all or part of the Service or AboveNet Network requires restoration, replacement or repair by reason of an act or omission of Customer, its employees, agents, or contractors, such repair, replacement and/or restoration may be made by AboveNet, at Customer's sole expense, in accordance with AboveNet's then current time and materials rates plus Applicable Taxes. In addition, Customer will not receive any Service Outage Credit (defined below) by reason of the foregoing.

4.4.    At times, actions or inactions caused by third parties ("Third Party Actions") (e.g. denial of service attacks) can produce situations in which Customer connections to the Internet (or portions thereof) may be impaired or disrupted. AboveNet cannot guarantee that such situations will not occur and, accordingly, AboveNet disclaims any and all liability resulting from or related to such events. In the event that Customer's use of the Service or interaction with the Internet or such third parties is causing harm to or threatens to cause harm to the AboveNet Network or its operations, AboveNet shall have the right to suspend the Service. AboveNet shall restore Service at such time as it reasonably deems that there is no further harm or threat of harm to the AboveNet Network or its operations.

## 5. ABOVENET EQUIPMENT

5.1.    All AboveNet Equipment remains the sole and exclusive property of AboveNet or its supplier and nothing contained herein shall give or convey to Customer any right, title, or interest whatsoever in such AboveNet Equipment and AboveNet Network, which may never be deemed a fixture or real property. Customer may not adjust, align, encumber or attempt to repair the AboveNet Equipment, and may not remove or relocate the AboveNet Equipment without the prior written consent of AboveNet. Customer may not cause any liens to be placed on the AboveNet Equipment or AboveNet Network and will cause any such liens to be removed within thirty (30) days of Customer's knowledge thereof.  Customer is liable to AboveNet for any loss or damage to the AboveNet Equipment.

5.2.    Unless otherwise specified in an Order Form, during the Order Form Term, Customer must procure, at its sole cost and expense, the Site Environment at the Service Demarcation Point(s). The Site Environment shall meet AboveNet's specifications, specified in the Order Form, to support the AboveNet Equipment where applicable.

5.3.    If applicable, Customer agrees to provide all reasonable assistance to AboveNet in procuring, and installing or activating necessary telecommunication circuits and facilities as necessary to provide telemetry from the Customer Locations to AboveNet's monitoring center(s). Except for costs associated with local telephone lines, other monthly telecommunication costs and any reasonable installation costs will be paid by AboveNet.

## 6.    MAINTENANCE

6.1.    AboveNet or its agents will perform all maintenance and repairs to the (i) AboveNet Equipment and (ii) AboveNet Network up to the Fiber Demarcation Point (or the Service Demarcation Point, in cases where AboveNet installs the In-Building Fiber Extension), at no additional charge to Customer, except as provided in Section 4.3.

6.2. Customer shall devise a reasonable means for AboveNet to access the Customer Location for installation, repair, maintenance, inspection or removal of AboveNet Equipment and/or AboveNet Network. Customer shall be

Case: 08-32514    Doc# 802-2    Filed: 12/02/09    Entered: 12/02/09 18:35:39    Page 11
of 19

responsible for arranging rights-of-entry from owners or managers of any Customer Locations to which Customer has rights of access, and for obtaining any permits or licenses related to such premises

6.3.     If all or part of the AboveNet Equipment or AboveNet Network requires restoration, replacement or repair by reason of an act or omission of Customer or its End-User, or their respective employees, agents, or contractors, such repair, replacement and/or restoration may be made by AboveNet, at Customer's sole expense, in accordance with AboveNet's then current time and materials rates plus Applicable Taxes. In addition, Customer will not receive any Service Outage Credit (defined in Section 7) by reason of the foregoing.

7.     SERVICE LEVEL AGREEMENT ("SLA")

7.1.     *Monitoring.* AboveNet monitors the aggregate packet loss and transmission latency between its routers on the AboveNet Network. Customer may notify AboveNet's Client Service Center ("CSC") of problems by telephone at (888) (636-2778), or by such other means as the Parties may agree. After discovering or being notified by Customer, AboveNet will use commercially reasonable efforts to determine the source of such Service Outage and correct such problem to the extent that the source of the problem is on the AboveNet Network.

7.2     *Service Outage.* A "Service Outage" is defined as either of the following, provided it is not caused by or resulting from (i) Force Majeure; (ii) an act or omission of Customer, its employees, agents or contractors; (iii) the use or failure of any CPE or Customer procured in-building facilities, used in connection with the Service; or (iv) planned outages for maintenance or repair that are scheduled in advance:

    (i)     complete interruption of communications on the Service ("Downtime");
    (ii)    packet loss in excess of (i) fifty percent (50%) or (ii) one-half percent (0.5%) continuing for a period of two (2) or more hours after AboveNet discovers or Customer notifies AboveNet of such packet loss (collectively, "Excess Packet Loss"); or
    (iii)   transmission latency based on AboveNet's measurements in excess of (i) in the case of eWAN, the applicable level set forth in the attached Exhibit A or (ii) in the case of IP Transit one of the following: 45 milliseconds average round-trip for the continental United States portion of the AboveNet Network, 15 milliseconds average round-trip for the European portion of the AboveNet Network, 80 milliseconds average round-trip for the trans-Atlantic portion of the AboveNet Network, or 120 milliseconds average round-trip for the trans-Pacific portion of the AboveNet Network (collectively, "Latency"), continuing for a period of two (2) or more hours after AboveNet discovers or Customer notifies AboveNet of such Latency.

7.3.     *Credits.* In the event that the aggregate Service Outages in a calendar month results in less than 99.999% service availability, Customer is entitled to a Service Outage credit ("Service Outage Credit") determined as follows:

| Service Availability | % of MRC for affected Service |
|---|---|
| 99.998 to 99.943 | 5% |
| 99.942 to 98.880 | 10% |
| 98.879 to 98.320 | 15% |
| 98.319 to 97.770 | 25% |
| 97.769 to 97.210 | 35% |
| < 97.209 | 50% |

7.4.     *Customer Request Credit.* Customer must notify AboveNet within ten (10) business days from the time Customer becomes eligible to receive a credit. Failure to comply with this requirement will forfeit Customer's right to receive a credit. All Service Outage Credits will be credited on the next recurring invoice for the affected Service after receipt of Customer's request for credit.

Case: 08-32514    Doc# 802-2    Filed: 12/02/09    Entered: 12/02/09 18:35:39    Page 12 of 19

7.5.   *Limitation on Remedies.* If Customer is entitled to multiple Service Outage Credits under Section 7.2, arising from the same Service Outages, such credits shall not be cumulative. AboveNet's suspension or modification of Bandwidth in accordance with the terms of this Agreement shall not be deemed to be a failure of AboveNet to provide adequate service levels under this Agreement. The Service Outage Credit and Customer's right to terminate under Section 7.6 are AboveNet's sole and exclusive liability and Customer's sole and exclusive remedy for any failure by AboveNet to provide Service or adequate service levels, including but not limited to any Service Outages or AboveNet Network congestion, and under no circumstances shall a Service Outage be deemed a breach of this Agreement by AboveNet. In no event shall Customer be entitled to any credit to the extent that the Service Outage is caused by Customer attempting to exceed the maximum Bandwidth of Customer's port connection to the AboveNet Network or otherwise violating the terms of this Agreement. Service Outage Credits will not be credited or payable for any period of time during which AboveNet personnel or contractors are denied access to Customer Locations to remedy a Service Outage. Service Outage Credits will not be credited or payable for any period of time during which Customer does not make technically knowledgeable personnel available to work with the AboveNet NOC to resolve issues.

7.6.   *Termination Rights.* Unless otherwise specified, if a Service Outage lasts longer than five (5) days, then at any time thereafter, unless and until such Service Outage is corrected, Customer may terminate this Order Form by written notice of termination delivered to the other Party.

## 8. RESTRICTIONS

8.1.   *Acceptable Use; SPAM.* Customer will at all times comply with and conform its use of the Service to AboveNet's Acceptable Use Guidelines and Anti-SPAM Policy (collectively, "AboveNet Policies") set forth at the AboveNet website, as updated from time to time, subject to notice to Customer of any material changes. In the event Customer violates the AboveNet Policies where AboveNet determines in its reasonable discretion that there is potential harm to its Network or business, AboveNet shall have the right to immediately suspend Service. In other cases of violation of the AboveNet Policies, AboveNet will provide notice and opportunity to cure, to the extent AboveNet deems reasonably appropriate, depending on the nature of the violation and the potential harm to the AboveNet Network. AboveNet, in its reasonable discretion, shall re-enable the Service upon satisfaction that all violations have ceased and with adequate assurance that such violations will not occur in the future.

8.2.   *Illegal Use.* Customer will cooperate in any investigation of Customer's alleged illegal use of AboveNet's facilities or other networks accessed through the AboveNet Network. If Customer fails to cooperate with any such investigation, AboveNet may suspend Customer's Service. Additionally, AboveNet may modify or suspend Customer's Service in the event of illegal use of the AboveNet Network or as necessary to comply with any law or regulation, including the Digital Millennium Copyright Act of 1998, 17 U.S.C. 512, as reasonably determined by AboveNet.

8.3.   *Other Networks.* Customer is responsible for paying any fees, obtaining any required approvals and complying with any laws or usage policies applicable to transmitting data beyond the AboveNet Network and/or through other public and private networks. AboveNet is not responsible or liable for performance or non-performance of such networks or their inter-connection points

The Parties have executed this Supplement as of the last date of execution below.

| ABOVENET COMMUNICATIONS, INC. | CUSTOMER |
|---|---|
| By: _____ | By: _Scott Kelly_____ |
| Print Name: James Pappas | Print Name: _SCOTT KELLY_ |
| ~~Manager, Business Analysis~~ | Title: _MANAGER OF NETWORK OPERATIONS_ |
| Title: _____ | |
| Date: _1/31/2007_ | Date: _1/12/07_ |

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 13 of 19

# LEASED FIBER SUPPLEMENT

## to the

## Master Products and Services Agreement

Heller Ehrman LLP ("Customer")

      This Leased Fiber Supplement is effective on the last date of execution below ("Supplement Effective Date") by and between AboveNet Communications, Inc. (f/k/a Metromedia Fiber Network Services, Inc.) ("AboveNet") and Customer and is attached to and made a part of the Master Products and Services Agreement, dated 30 June 2005. by and between the Parties. Unless otherwise defined herein, capitalized terms in this Supplement shall have the definitions attributed thereto in the General Terms and Conditions.

## 1.    ADDITIONAL DEFINITIONS

"Customer Location" refers to a location specified in an Order Form and connected by Leased Fiber or AboveNet provisioned in-building optical fiber;

"Deliver" or "Delivery" means AboveNet's turnover to Customer of Leased Fiber and testing results demonstrating compliance with the Leased Fiber Specifications;

"Demarcation Point" means the termination point up to which AboveNet is responsible to install Leased Fiber and related facilities, as more fully described in Section 4.1;

"Leased Fiber" means all dark optical fiber strands in a particular network configuration leased by AboveNet to Customer pursuant to an Order Form;

"Leased Fiber Specifications" are those specifications set forth in *Exhibit A*, attached hereto;

"Location Access" refers to Customer's use of the Leased Fiber from the AboveNet Network backbone to the relevant Demarcation Point at a Customer Location;

## 2.    LEASED FIBER & ACCEPTANCE

2.1.    Subject to the terms and conditions contained herein. AboveNet will lease to Customer the Leased Fiber pursuant to an Order Form. After completing installation. AboveNet will Deliver the Leased Fiber. If the Parties agree, AboveNet may Deliver and Customer may accept and utilize a portion of the Leased Fiber prior to Delivery of Customer's entire network. Upon partial Delivery. AboveNet may begin invoicing and Customer agrees to pay for the portion of the Leased Fiber actually Delivered notwithstanding the fact that AboveNet may not provide complete testing results for the entire ordered network prior to full Delivery.

2.2.    *Commencement Date.* The Commencement Date for each Order Form is the date that the Leased Fiber is accepted. Unless AboveNet is notified within ten (10) business days after Delivery of any deficiencies, the Leased Fiber is deemed accepted by Customer at the time of Delivery. If Customer has identified deficiencies, then the Commencement Date will be the first date upon which the Leased Fiber conforms in all material respects with the Specifications. Notwithstanding anything contained in this Agreement to the contrary, if Delivery is delayed as a result of Customer's failure to obtain the necessary Location License(s) (defined in Section 5, below) or provide AboveNet the means to enter the Customer Location or install a termination panel(s), the Commencement Date shall be the date that AboveNet terminates Leased Fiber to the last serving manhole(s) of those Customer Locations for which AboveNet does not gain access to complete Delivery.

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 14 of 19

3. **ADDITIONAL INVOICING AND PAYMENT TERMS FOR LEASED FIBER**

3.1. *Location Access Charges.* If specified in an Order Form, Customer agrees to pay a Recurring Charge for Location Access for those Customer Locations designated by AboveNet as "On-Network Location(s)".

3.2. *Installation Charges for Lateral Extensions.* Unless otherwise set forth in an Order Form, with respect to a Customer Location that is not designated by AboveNet as an On-Network Location, Customer will pay, a charge for AboveNet to extend the AboveNet Network from the AboveNet Network backbone to the Customer Location ("Lateral Extension") in the manner set forth in the Order Form.

4 **INSTALLATION AND MAINTENANCE OF LEASED FIBER**

4.1. AboveNet or its agents will install the Leased Fiber to the agreed upon Demarcation Point at each Customer Location. Unless otherwise specified in the Order Form, the Demarcation Point is a splice enclosure or fiber termination panel located (i) in the basement or at the AboveNet point of presence within a building, (ii) at the AboveNet termination point within a central office, (iii) in the zero or last serving manhole serving a building for cases where AboveNet does not gain access into such building; or (iv) as set forth in Section 4.2.

4.2. Customer must procure, at its sole cost and expense, all necessary riser conduit, optical fiber strands and any other necessary inside plant facilities ("In-Building Facilities"), within each Customer Location, to access and interconnect its own facilities with the Leased Fiber. All Customer-supplied in-building fiber must be technically compatible with AboveNet fiber optic cable in every respect (i.e. ribbon cable with non-metallic sheath and equivalent fiber type is required). The manufacturer, model number and desciption of the in-building fiber must be supplied to AboveNet prior to splicing. In the event that the Parties agree that AboveNet will extend the Leased Fiber to a Demarcation Point beyond those described in Section 4.1(i) through (iii). AboveNet will (i) perform a feasibility study ("Feasibility Study"), (ii) engineer and (iii) install the necessary In-Building Facilities (collectively ("In-Building Work")), for at least AboveNet's actual costs plus twenty percent (20%), which shall be separately invoiced.

4.3. AboveNet or its agents will perform all maintenance and repairs to the Leased Fiber up to the Demarcation Point at no additional charge to Customer, unless such maintenance or repair is necessary as a result of Customer's actions. Customer is not permitted to access the Leased Fiber or AboveNet Network except at Customer's side of the Demarcation Point as provided in this Agreement.

4.4. AboveNet may subcontract all or part of its performance obligations (including maintenance and installation) to a third party without consent of Customer, and AboveNet will remain liable for all such obligations.

5. **ACCESS AND APPROVALS OBTAINED BY CUSTOMER**

5.1. Customer acknowledges and agrees that it is responsible to obtain and maintain, for the duration of the related Order Form Term any necessary third party licenses, approvals or permissions ("Location License(s)") for AboveNet to connect the Leased Fiber from the public rights-of-way to the Customer Location and install and/or utilize the necessary inside plant facilities, including, without limitation, power, riser conduit and fiber optics. Such Location License(s) must extend to the installation, maintainance and retrieval of the Leased Fiber and any AboveNet equipment. Customer agrees to pay any and all fees, (i) associated with obtaining and maintaining such rights, and (ii) assessed by any building owner, landlord or other third party for the necessary license, approval and/or permission to install and maintain Leased Fiber to a Customer Location. Alternatively, the Parties may agree that AboveNet will arrange to obtain, on Customer's behalf, all or a portion of the necessary Location License(s) in consideration for Customer paying AboveNet a license fee ("Location License Fee") as a Recurring Charge.

5.2. *Central Offices (if applicable).* Customer must arrange for its own cage space, manhole assignments, and installation approval for AboveNet to install Leased Fiber to a central office. Customer must provide AboveNet with written notice of completion of LEC approval and an executed copy of the "Method of Procedure".

Case: 08-32514    Doc# 802-2    Filed: 12/02/09    Entered: 12/02/09 18:35:39    Page 15 of 19

6. AUTHORIZATIONS OBTAINED BY ABOVENET

Except as set forth in Section 5, prior to Delivery of Leased Fiber, AboveNet will obtain all material and applicable authorizations. leases. licenses. easements, rights of way, franchises, approvals, permits, orders. consents, and all other rights required for AboveNet to operate and maintain the AboveNet Network and provide the Leased Fiber to Customer (collectively the "Authorizations"). and will use commercially reasonable efforts to maintain or renew all such Authorizations throughout the term of the Order Form. If any Authorizations are modified or terminated, threatening to cause or causing material financial harm to AboveNet, or preventing or materially interfering with AboveNet's control, possession and/or use of the AboveNet Network, then AboveNet, in its sole discretion will: (i) provide Customer with a comparable product using alternate portions or facilities of AboveNet's then existing AboveNet Network or on networks or facilities of third parties, or (ii) terminate this Agreement with respect to the affected Order Form without further obligation or liability to Customer. The foregoing is AboveNet's sole and exclusive liability and Customer's sole and exclusive remedy with respect to termination as a result of the loss of an Authorization.

7. NETWORK RELOCATION

7.1.    AboveNet may relocate all or any portion of the AboveNet Network segments or any of the facilities required to provide Customer with the Leased Fiber: (i) if a third party with legal authority orders or threatens to order such relocation (e.g., through eminent domain, nationalization, or expropriation), (ii) in order to comply with applicable laws, (iii) to reduce governmental fees or taxes assessed against it or Customer, or (iv) for bona fide operational reasons. AboveNet agrees to provide Customer fourteen (14) calendar days prior notice of a relocation, if reasonably feasible. AboveNet has the right to direct such relocation, including the right to determine the extent of, the timing of, and methods to be used for such relocation, provided that any relocation:

    a)    is constructed and tested in accordance with the Specifications:
    b)    does not result in a materially adverse change to the operations, performance, or connection points with the network of Customer; and
    c)    does not unreasonably interrupt service on the Leased Fiber.

7.2.    AboveNet will use its commercially reasonable efforts to secure an agreement for reimbursement from any third party requiring a relocation. Customer agrees to reimburse AboveNet for Customer's pro rata share of AboveNet's costs of any relocation pursuant to Section 7.1 (i), (ii) or (iii) for which AboveNet is not reimbursed.

8. USE OF LEASED FIBER

8.1.    AboveNet is providing the Leased Fiber for Customer's exclusive use. Except as provided in this Section, Customer may not sublease, swap. assign, license, sublicense. sell or share the Leased Fiber.

8.2.    Customer may use the Leased Fiber for any lawful purpose, including for the provision of telecommunications services. information services and capacity to its customers, provided it may not sell, lease or grant any rights of use in the Leased Fiber as "dark fiber". as such term is commonly understood in the telecommunications industry.

8.3.    Customer is solely responsible for obtaining, at its sole cost and expense, any and all necessary franchises, authorizations or permits specifically required as a result of Customer's, as opposed to AboveNet's, use, operation, access or interconnection of the Leased Fiber and its operation, maintenance. repair, and replacement of all Customer equipment associated therewith.

8.4.    AboveNet may inspect Customer's use of the Leased Fiber at any time during normal business hours and upon at least 24 hours prior notice by AboveNet. AboveNet may make such inspection on less than 24 hours notice in cases of an emergency.

8.5.    Customer may not, without the express written consent of AboveNet, perform, or contract with any third party to perform, any repairs or maintenance to any Leased Fiber or other ancillary AboveNet equipment. Customer

Case: 08-32514    Doc# 802-2    Filed: 12/02/09    Entered: 12/02/09 18:35:39    Page 16 of 19

will not install any equipment to be used with the Leased Fiber that damages or interferes with the AboveNet Network.

8.6.     If all or part of the Leased Fiber or other ancillary AboveNet equipment requires restoration, replacement or repair by reason of an act or omission of Customer, its employees, agents, or contractors, such repair, replacement and/or restoration may be made by AboveNet, at Customer's sole expense, in accordance with AboveNet's then current time and materials rates plus Applicable Taxes. In addition, Customer will not receive any Fiber Outage Credit by reason of the foregoing.

## 9.     OUTAGES; SERVICE LEVEL AGREEMENT ("SLA") FOR LEASED FIBER

9.1.     AboveNet provides continuous remote monitoring of the AboveNet Network backbone. Customer may notify AboveNet's Network Management Center ("NMC") of problems by telephone at (877) – ABOVENET (226-8363), or by such other means as the Parties may agree. AboveNet will respond and commence work within two (2) hours after notification or discovery of a Fiber Outage and will restore effective use of the Leased Fiber within four (4) hours after such notice or discovery. A "Fiber Outage" is defined as the complete loss of fiber connectivity or material degradation between two Customer Locations.

9.2     Customer is entitled to a credit for each continuous four (4) hour period of a Fiber Outage (a "Fiber Outage Period") provided the Fiber Outage is not caused by or resulting from (i) Force Majeure; (ii) an act or omission of Customer, its employees, agents or contractors: (iii) the use or failure of any Customer equipment or facilities used in connection with the Leased Fiber; or (iv) planned outages for maintenance or repair that are scheduled in advance by Customer.

9.3.     For each Fiber Outage Period on a diverse ring of Leased Fiber, Customer is entitled to a credit (the "Fiber Outage Credit") calculated at five percent (5%) of the monthly Recurring Charge(s) related to the affected network configuration determined in the following manner:

(a)  Recurring Charge ÷ number of Customer Locations in affected network configuration = "X";
(b)  X ÷ total number of Leased Fiber strands on affected network configuration = monthly charge per fiber strand;
(c)  monthly charge per fiber strand multiplied by the number of affected Leased Fiber strands multiplied by the number of affected Customer Locations multiplied by five percent (5%) multiplied by the number of Fiber Outage Periods = Fiber Outage Credit.

If the Recurring Charge relates to period which is greater than one (1) month, then for purposes of calculating the Fiber Outage Credit, such charge shall be adjusted to reflect a rate based on a monthly charge ("Adjusted Recurring Charge(s)").

9.4.     Fiber Outage Credits will not be credited or payable for any period of time during which AboveNet personnel or contractors are denied access to Customer Locations to remedy an outage.

9.5.     All Outage Credits will be credited on the next recurring invoice for the affected Leased Fiber after receipt of Customer's request for credit. The maximum Fiber Outage Credit payable in any calendar month shall not exceed the Adjusted Recurring Charge payable by Customer to AboveNet for that same month for the affected Leased Fiber.

9.6.     Unless otherwise specified, if a Fiber Outage lasts longer than fifteen (15) days for any reason other than Force Majeure, then at any time thereafter, unless and until such Fiber Outage is corrected, either Party may terminate this Agreement with respect to the affected Leased Fiber by written notice of termination delivered to the other Party.

9.7.     Customer must notify AboveNet within ten (10) business days from the time Customer becomes eligible to receive a credit. Failure to comply with this requirement will forfeit Customer's right to receive a credit.

Case: 08-32514   Doc# 802-2   Filed: 12/02/09   Entered: 12/02/09 18:35:39   Page 17 of 19

9.8.    The Fiber Outage Credit and Customer's right to terminate under this section are AboveNet's sole and exclusive liability and Customer's sole and exclusive remedy for a Fiber Outage, and under no circumstances shall a Fiber Outage be deemed a breach of this Agreement by AboveNet.

9.9.    In the event that AboveNet dispatches personnel for a Leased Fiber Outage or problems caused by Customer equipment or personnel. AboveNet will invoice and Customer agrees to pay AboveNet's actual costs for time and travel associated with the dispatch.

## 10.    EARLY TERMINATION CHARGE

10.1.    If an Order Form is terminated prior to expiration by reason of: (i) Customer termination for convenience ("Termination for Convenience"). if such termination is not an exercise of Customer's rights or remedies under the Agreement, or (ii) a Customer Event of Default for failure to pay any payment, as provided herein, then, *in addition to all other charges then due and owing*, Customer agrees to immediately pay an "Early Termination Charge" to AboveNet. The Early Termination Charge is a sum equal to the net present value of the respective remaining Recurring Charges under the terminated Order Form, determined by using a seven percent (7%) per annum discount rate ("Net Present Value"). In no event will Customer be entitled to a refund of any prepaid Recurring Charges.

10.2.    Customer acknowledges and agrees that the Early Termination Charge reflects a reasonable estimate of the damages incurred by AboveNet as a result of an early termination, and is not a penalty. Notwithstanding the foregoing, AboveNet may seek all other available remedies at law and in equity in the case of Customer's default resulting for reasons other than those set forth in Section 10.1.

The Parties have executed this Supplement as of the last date below.

ABOVENET COMMUNICATIONS, INC.

By: _____

Print Name: ___Colin Moe___

Title: ___Director___

Date: ___7-6-05___

CUSTOMER

By: ___Tom Schultz___

Print Name: ___K.M. SCHULTZ___

Title: ___DIR of TECH OPNS___

Date: ___30 June 05___

Case: 08-32514    Doc# 802-2    Filed: 12/02/09    Entered: 12/02/09 18:35:39    Page 18 of 19

Leased Fiber Specifications
and
Fiber Optic Cable Splicing, Testing and Acceptance Standards


AboveNet will perform fiber testing, as described below, on each Leased Fiber and will provide documentation of these test results to the Customer via e-mail. Each "span" will be defined in documentation included in the Customer's package. Acceptance of a span by Customer will be an acknowledgement by the Customer that all Leased Fiber complies with all performance criteria contained herein.

1) Power testing: This end-to-end loss measurement will be conducted for each Leased Fiber in the span and from both directions using an industry-accepted laser source and power meter. The bi-directional average will be used to determine the end-to-end loss of the span at each appropriate wavelength. This test will be conducted at both 1310 nm and 1550 nm for Standard Single Mode Fiber; Dispersion Shifted Fiber (True Wave™, LEAF™, etc.) will be tested at 1550 nm only. In the event that a span consists of both Standard Single Mode and Dispersion Shifted fiber types, only 1550 nm testing will be conducted. This power testing will ensure fiber continuity and the absence of crossed fibers in the span. Power testing will only be conducted where the Leased Fiber is terminated by AboveNet in fiber distribution panels at both ends of the span.

2) OTDR testing: This testing will be conducted at both 1310 nm and 1550 nm wavelengths when the Leased Fiber consists of Standard Single Mode Fiber, but will be done at 1550 nm only if the Leased Fiber consists of either Dispersion Shifted Fiber (True-Wave™, LEAF™, etc.) or a combination of Single Mode and Dispersion Shifted fiber types.

OTDR testing will be conducted on a bi-directional basis for each Leased Fiber in each span at the appropriate wavelengths for the Leased Fiber described above. However, if due to length or attenuation reasons that the Leased Fiber span exceeds the dynamic range of an OTDR, a portion or the entire span may be tested on a unidirectional basis only. Alternatively, the Leased Fiber span may be divided into shorter testing spans, to the extent reasonably possible, in order to obtain bi-directional analysis. Also, in instances where a Customer intends to accept Leased Fiber that is not terminated at one end by AboveNet in a fiber distribution panel (such as in a manhole or handhole) only unidirectional testing will be performed.

The turnover documentation package delivered to Customer will contain the actual traces that detail the testing parameters (including pulse width, averaging and range). The average bi-directional splice loss for all splices within each span will be of 0.15 dB or less while each connector pair (such as at a FDP) will have an average bi-directional loss of 0.5 dB or less. (Note that the front and end connector of the span can only be measured uni-directionally and will also have a loss equal to or less than 0.5 dB). In the event that OTDR acceptance testing must be done on a unidirectional basis (for reasons described above), an average per span splice loss will be 0.30 dB.

If the average bi-directional splice loss of each span exceeds 0.15 dB (or 0.30 dB uni-directionally), AboveNet will provide upon the Customer's request documentation of at least three attempts to reduce this value to below 0.15 dB (0.30 dB uni-directionally). The only exception to this will be in the instance of a splice between two different fiber types (Standard Single-mode to Dispersion Shifted, Depressed-Clad to Matched Clad, fibers with different mode-field diameters).

Customer should also note that the loss and/or reflectance of the front-end connector (as measured using a launch cord) is only an indicator of a problem such as a defective port, bulkhead, or the like. Since a different patch cord will be used by Customer (that connects to their equipment, for example) to mate to this connector, a different loss and/or reflectance may occur.