Alan D. Smith, Cal. Bar No. 89112
ADSmith@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Class of 2006
Noteholders

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | CASE NO. 08-32514 |
| HELLER EHRMAN LLP, | Chapter: 11 |
| Debtor. | REPLY MEMORANDUM OF CLASS OF 2006 NOTEHOLDERS IN OPPOSITION TO CLASSIFICATION AND TREATMENT UNDER THE PLAN |
| | Hearing: |
| | Date:   July 19, 2010<br>Time:   1:30 p.m.<br>Place:  United States Bankruptcy Court<br>235 Pine Street, 22nd floor<br>San Francisco, CA<br>Judge:  Honorable Dennis Montali |

Paul Booth, John Isacson, David Laub, and Colin Sandercock (collectively, the "*Class of 2006 Noteholders*" or "*Noteholders*") hereby submit their reply memorandum in opposition to the Debtor's and Committee's ("*Debtor*" and collectively "*Plan Proponents*") proposed classification and treatment of the Noteholders under the proposed Joint Plan of Liquidation herein (the

"**Plan**").  This Reply Memorandum is based on the pleadings and files in this case, including the Declaration of John Isacson filed concurrently herewith.

Debtor's Omnibus Reply to Objections to Joint Plan of Liquidation of Heller Ehrman LLP (May 14, 2010) (Docket No. 1310) ("**Debtor's Opposition**") identifies a series of arguments that, Debtor contends, allow Debtor to put the Class of 2006 Noteholders in Class 9, separate from the other general unsecured creditors, to subordinate them, and to give them absolutely nothing as a result of their claims.  Yet the Plan Proponents also recognize over $2.5 million in Class 7 general unsecured claims of former shareholders who left in 2007 and 2008, while denying anything to the Class of 2006 Noteholders, who left when the firm was at its peak of profitability.  As will be shown below, none of the Debtor's arguments withstands analysis.

**Background**

As set forth in their Objection of Year 2006 Departed Former Shareholders to Joint Plan of Liquidation, filed herein June 17, 2010 (Docket No. 1225) (the "**Objection**"), the Noteholders are owed money as a result of their receiving promissory notes (the "**Notes**") upon their departure from Heller Ehrman in 2006 – the most profitable year in Heller's proud history.  At the time of their departure and their receipt of the Notes, Heller was without question a thriving, solvent, well capitalized entity.  No one has challenged or can challenge the propriety or enforceability of any portion of the 2006 transactions.  After their departure, the Noteholders had no interest whatsoever in the results, good or bad, from Heller's operations, other than the risk every creditor takes – that the firm would be unable to satisfy all of its debts.

It is important to note the special nature of the "equity" represented by shares of the Heller PCs held by Noteholders and others.  No one ever got rich from the capital appreciation in the stock of the Heller PCs.  Instead, it is essentially "pay to play" money.  All anyone ever gets – all anyone is ever entitled to – is a return of the initial contribution plus, in some circumstances, minimal interest[1] for the period after the shareholder is no longer employed.  Instead, by purchasing shares in a Heller PC the lawyer only benefits by being entitled to make money by working at Heller.  While that is hardly an insignificant benefit, it is limited to the time in which

---

[1] In fact, at the minimum rate needed to avoid imputation of interest.

the lawyer is actually employed by Heller. Once that status ends, the stock will automatically be

redeemed essentially at no gain,[2] and the opportunity to make money from Heller or its

operations, whether directly or indirectly, whether from services or anything else, is completely

gone.[3] The Noteholders have not had any prospect of receiving any profits derived after

March 2006.

Accordingly, none of the Class of 2006 Noteholders had anything to do with any of the

alleged 2007 "overdistribution;" they neither decided to declare any such distribution nor shared

in any of the proceeds. They have not received any salary from Heller beyond what was accrued

by March 2006. They certainly did not get any salary, profit or other payment of any kind during

the troubled times, whenever those times commenced, other than the regularly scheduled

payments on the Notes – in each case paid when due in the ordinary course.

In short, each of the Noteholders holds a conventional interest bearing promissory note, is

a general unsecured creditor, and should be treated as such under the Plan.

**The Dissolution Agreement Cannot Possibly Affect the Rights of Class of 2006 Noteholders**

In their Objection, page 3, the Class of 2006 Noteholders argued that the Dissolution

Agreement could not affect the priority of their claims because the Noteholders "(1) were not

shareholders at the time of the Plan of Dissolution, (2) were not parties to the Plan of Dissolution,

(3) were not entitled to vote on the Plan of Dissolution, and (4) have not agreed to be bound by

the Plan of Dissolution." Debtor does not contest any of those facts, yet contends that because the

Plan of Dissolution was adopted by Heller it can affect anyone and everyone else.

What if the Plan of Dissolution had contained a provision prohibiting Heller from paying

any malpractice claimants? What if the Plan of Dissolution had required its trade creditors to pay

a pro rata share of the bank debt? Would those provisions be enforceable? It is specious to think

so.

Further, the Plan Proponents have recognized the validity of Class 7 treatment of over

$2.5 million in payments owed to former shareholders who left Heller <u>after</u> the Class of 2006, and

---

[2] See paragraphs 3.1 and 3.2 of the Shareholders Agreement.
[3] See paragraphs 9.4 and 9.5 of the Employment Agreement.

Case: 08-32514   Doc# 1326   Filed: 07/16/10   Entered: 07/16/10 09:55:31   Page 3 of
12

who clearly fit within the language of the Plan of Dissolution quoted in the Objection, p.7. See note 10 below. Apparently the Plan of Dissolution is being used as a weapon only against some of those who did not sign it.

Finally, the Plan of Dissolution on its face does not serve to subordinate the Noteholders' claims: the language quoted by Debtor, Objection p.7, concludes "Shareholders may pursue claims for . . . contractual rights arising from or related to their employment."

If the Noteholders' claims are to be subordinated, the source must be in some other document or statute.

**The Subordination Clauses in the Notes Do Not Apply**

The Class of 2006 Noteholders do not dispute the general enforceability of subordination agreements under Section 510(a). But the subordination clauses in the Notes are quite limited.

> Payment of principal of and interest on this note is subordinate to the prior payment of indebtedness of the Firm for borrowed money; provided, however, that payments hereunder shall be payable when due if at such time the Firm is not in default with respect to any such indebtedness.

Initially, the Noteholders point out that the last clause is irrelevant. It merely clarifies when payments can be made. With Heller in bankruptcy, all obligations are due and payable. "Default" under the loan documents does not change the ultimate allowability or priority of the Noteholders' claims.

More significantly, the subordination clause makes the Noteholders' claims subordinate only to borrowed money. It does NOT make the claims subordinate to those of trade creditors, nonpriority employee claims, shareholders who left after the Class of 2006, or any other general unsecured creditors. In short, it is for the benefit only of Bank of America and its co-lender Citibank (collectively "*BofA*"). Unlike the situation commonly observed in bankruptcy cases, however, BofA does not have a separate subordination agreement with any of the Noteholders.

Thus, instead of having broad waivers in a lender-friendly subordination agreement whereby the Noteholders accept the risk of the lender's conduct, here BofA must live with the consequences of its conduct – and in this case BofA has taken the actions that have caused its own problems. Had BofA not terminated the financing statement, it would without question have

1   been paid in full – indeed, it would have <u>had</u> to be paid in full before a penny went to Class 7

2   from the Debtor's prepetition assets.  There would then be no argument that the Notes were

3   subordinate to any other obligations of the Debtor besides the bank debt.  The banks were to be

4   the sole beneficiary of the subordination clause, and the banks are the sole actors who caused the

5   subordination clause even arguably to come into play.  What if BofA had agreed with Heller to

6   accept less than full payment, for whatever reason?  Would it matter if it was a $10.00 haircut or a

7   $10 million haircut?

8         The only other creditors affected by the proposed subordination are the trade and other

9   general unsecured creditors, including other former shareholders in Class 7.  But they are not

10   entitled to claim any benefit from the subordination clause in the Notes; they should expect the

11   Noteholders' claims to be paid pari passu with other general unsecured claims, just as they would

12   have been had BofA been paid in full.

13         Further, the Committee v. BofA litigation is ongoing, notwithstanding Debtor's

14   assumption that the Committee will prevail.  If the Debtor's interpretation of the subordination

15   clause is upheld, what if BofA wins that litigation and gets paid in full?  Could the Class of 2006

16   Noteholders then reopen this case to get reclassified and paid?  And, as noted, does it matter if

17   BofA settles that litigation for a small or a large haircut?[4]

18         The Noteholders concede that the result might be different if BofA were left unpaid

19   because Heller did not have enough assets to satisfy its bank debt.  But that is not this case.  If

20   BofA does not get paid, it is because BofA caused its own underpayment.  BofA cannot take

21   advantage of that self-inflicted wound, and BofA was the only beneficiary of the subordination

22   clause.  The contractual subordination clause does not serve to subordinate the Noteholders'

23   claims.

24

25

26

27

28

---

[4] If BofA loses the litigation, of course, everyone else – most significantly Class 7 general unsecured creditors – will reap the rewards.  There is no reason to exclude only the Noteholders from that upside.

**Section 510(b) Is Inapplicable**

Debtor would have the Court simplistically repeat the misleading mantra "once a shareholder, always a shareholder" and end the inquiry into Section 510(b). That is inappropriate both under the language of Section 510(b) and under applicable Ninth Circuit law.

First, Section 510(b) on its face applies only to "damages arising from the purchase or sale of [a security of the debtor or of an affiliate of the debtor]."[5] The key word is "damages." As courts have recognized:

> The use of "damages" in § 510(b) supports this conclusion. The term connotes a recovery broader than a simple claim on an unpaid debt. *In re Wyeth Co.,* 134 B.R. at 921 (term "damages" implies some defect concerning the purchase or sale of securities); *In re Blondheim Real Estate, Inc.,* 91 B.R. 639, 640 (Bankr.D.N.H.1988) (term "damages" means more than simple recovery of an unpaid debt due on an instrument). The term "damages" implies a tortious injury, as for example, one suffered from the fraudulent issue, purchase or sale of securities. *In re Wyeth Co.,* 134 B.R. at 921; *In re Blondheim Real Estate, Inc.,* 91 B.R. at 640.

*In re Montgomery Ward Holding Corp.*, 272 B.R. 836, 842 (Bankr., D. Del. 2001) (Walsh, J.). In *Montgomery Ward*, Judge Walsh held that a claim based on a promissory note given as payment for redeemed stock was not subject to subordination under Section 510(b).

Judge Walrath reached the same result on similar facts in *In re Mobile Tool Int'l, Inc.*, 306 B.R. 778 (Bankr., D. Del. 2004):

> The fundamental concept in the cases cited by the Plaintiffs is that the nexus or causal connection required to employ section 510(b) exists where stock is retained by the claimant. When the stock is exchanged and a separate debt instrument is issued by the debtor, however, the claimant is converted from an owner of stock to a creditor. Such is the case here.
>
> . . .
>
> Here, the Defendants divested themselves of all forms of ownership when they sold the securities back to the Debtors and accepted notes in exchange. As such, they no longer enjoyed the primary benefit of ownership: the potential for unlimited profits. The Debtors' liability to the Defendants became fixed when the Debtors issued promissory notes. When the Defendants received the promissory notes, they removed the variable nature of their investment and placed themselves in the position of general creditors. Their claims are not the type which section

---

[5] The other branches of Section 510(b), rescission and reimbursement/contribution, are obviously not in issue.

Case: 08-32514    Doc# 1326    Filed: 07/16/10    Entered: 07/16/10 09:55:31    Page 6 of 12

1    510(b) mandates be subordinated.

2    *Id*. at 781, 782.

3    Judges Walrath and Walsh clearly reached the right result as a matter of statutory

4    interpretation of Section 510(b), and the Ninth Circuit is in accord.  Debtor cites *In re Betacom of*

5    *Phoenix, Inc.*, 240 F.3d 823 (9th Cir. 2001), which held Section 510(b) is not limited exclusively

6    to securities fraud claims; but *Betacom* is NOT the last word from the Ninth Circuit.  Debtor

7    essentially ignores the subsequent authority of *In re American Wagering, Inc.*, 493 F.3d 1067 (9th

8    Cir. 2007), which made it equally clear that the 510(b) inquiry was not a simplistic one limited to

9    figuring out whether stock was somewhere in the vicinity of the transaction.

10   In *American Wagering* the plaintiff creditor had a judgment for damages based on failure

11   to issue stock.  The Ninth Circuit held that the judgment – like the promissory notes in issue in

12   *Montgomery Ward* and *Mobile Tool* – could not be subordinated.  Yet Debtor incredibly passes

13   off *Montgomery Ward* and *Mobile Tool* as "a couple of Delaware decisions" and cites the B.A.P.

14   opinion in *American Wagering* for its criticism of those cases as "unpersuasive."  Debtor's

15   Opposition at 11, n.2.  That B.A.P. opinion was reversed by the Ninth Circuit on this precise

16   point.  Its reversal demonstrates the wisdom of the "couple of Delaware decisions."[6]

17   No more need be said.  Section 510(b) on its face, and as interpreted by the Ninth Circuit,

18   does not subordinate the Class of 2006 Noteholder claims.  But if further support is needed, one

19   can go through the analysis undertaken in *Betacom* and reach the same result.

20   In *Betacom*, the basic claim was that the plaintiff creditors' company, Betacom, had

21   merged with ABS, and plaintiffs never received the shares of ABS (or damages in lieu) to which

22   they were entitled under the merger agreement.  Betacom and ABS were the debtors.  The Ninth

23   Circuit properly noted that the plaintiffs were subject to 510(b) subordination because (a) the

24   transaction that gave rise to their claims was one in which they were expecting to reap the

25   benefits of ongoing equity ownership, and (b) creditors of the debtors, had they known the facts,

26

27   _____

28   [6] Debtor cites the *American Wagering* B.A.P. opinion as "rev'd on other grounds," Debtor's Opposition at 11, n.2.
     Noteholders look forward to hearing Debtor's "other grounds."

Case: 08-32514    Doc# 1326    Filed: 07/16/10    Entered: 07/16/10 09:55:31    Page 7 of
12

would have relied on the plaintiffs' status as shareholders (and thus junior to the other creditors) in extending credit.

Neither factor is applicable here. In *American Wagering* the plaintiff creditor was entitled to, but did not, receive some cash and considerable stock in one of the debtors for consulting services in connection with an IPO. Plaintiff obtained a judgment that bounced up and down between courts, ultimately remaining unpaid at the time of filing. The Ninth Circuit reversed the courts below and held plaintiff's claims could not be subordinated under 510(b) because the claims were based on a money judgment, and the plaintiff had never sought any equity return – only money. Accordingly, neither of the *Betacom* factors applied.

> Racusin did not sue debtors as an equity investor seeking monetary damages for fraud or breach of contract related to their mishandling of shareholders' economic investment in the company. He sued as an agent who did not receive compensation promised in an employment agreement. The money judgment awarded at the direction of our Court in its earlier opinion established a fixed, pre-petition debt due and owing Racusin as a creditor, not the risk/return position of an equity investor in the now-bankrupt corporation.

493 F.2d at 1073.

The Class of 2006 Noteholders were at one time shareholders in one of the Heller PCs. But just as in *American Wagering*, when each left, his Shareholder Agreement and Employment Agreement "established a fixed, pre-petition debt due and owing [him] as a creditor, not the risk/return position of an equity investor in the now-bankrupt" entity. And to the extent anyone suggests creditors relied on the equity of the Class of 2006 Noteholders, it is belied by the nature of law firms generally, and Heller Ehrman in particular – shareholders ("partners") come and go; some are paid in cash, some in notes; some go on the bench, some retire, some go to competitors; and others join. *American Wagering*, *Montgomery Ward* and *Mobile Tool* are directly on point. Section 510(b) does not serve to subordinate the claims of the Class of 2006 Noteholders.

**Corporations Code Section 16957 Is Equally Inapplicable**

California Corporations Code Section 16957 prohibits an LLP from making certain kinds of distributions when the LLP is insolvent, unable to pay its debts, and so forth. Debtor blithely

Case: 08-32514   Doc# 1326   Filed: 07/16/10   Entered: 07/16/10 09:55:31   Page 8 of 12

asserts the statute as a basis for subordination without a stitch of authority and without even an attempt to look at the words of the statute.

Section 16957 has a specific definition of the term "distribution":

> A distribution for purposes of this section means the transfer of money or property by a registered limited liability partnership to its partners without consideration.

Section 16957 on its face does not apply. It applies to transfers by an LLP <u>to its partners</u>. The partners in Heller Ehrman LLP were the separate PCs. The Noteholders were NOT partners in the LLP; they had no interest in the LLP;[7] they were merely minority shareholders in a partner. The inquiry can end there.

Further, at the time of the 2006 transaction in which the Notes were issued, Heller was having the best year in its history. No one has contended that Heller was anywhere close to insolvency at that time. If that was a "distribution" (which the Noteholders dispute), it does not meet the "insolvency" test of Section 16957(a) and cannot be challenged.

Debtor does not appear to dispute any of that. Instead, it is challenging the priority of the remaining payments due on the Notes. However, at the time of any of such payments, including the ones forming the basis of the Noteholders' claims, the Noteholders were and are most certainly not partners of the Debtor. They never were, and since 2006 they have not even been shareholders of a partner. Debtor does not even attempt to argue otherwise. The Noteholders' claims simply do not fit within the language of the statute.

Further, payments on the Notes are NOT "without consideration" within the meaning of Section 16957 or within any other meaning. When payments were thereafter made on the Notes, each payment reduced the amount owed, thus reducing Heller's liabilities and thereby providing consideration to Heller. It is essentially the same analysis one undertakes in fraudulent transfer litigation, for which purpose "value" includes "satisfaction . . . of a present or antecedent debt." Section 548(d)(2)(A). If a transaction is legitimate when undertaken – as the 2006 transactions unquestionably were – subsequent adverse developments do not affect the enforceability of those transactions.

---

[7] See paragraph 10.4 of the Employment Agreement and paragraph 5.4 of the Shareholders Agreement.

Case: 08-32514    Doc# 1326    Filed: 07/16/10    Entered: 07/16/10 09:55:31    Page 9 of 12

1    This case does not involve shareholders bailing out at a time when the debtor was shaky,

2    which is what Section 16957 is designed to address.  In 2006, Heller was thriving.  Boiled down,

3    Debtor's argument is the same simplistic one that was rejected in *American Wagering*:  "once a

4    shareholder, always a shareholder" sounds good, but it is not the law.  Payments on the Notes are

5    not without consideration, and there is no other purported justification for subordination under

6    Section 16957.[8]

7    **The Plan Violates All Three Elements of a Cramdown**

8        Debtor argues in its Opposition, pp. 4-5, that the Plan can be crammed down over the

9    objections of Class 9, into which the Noteholders were placed.  Class 9 has not accepted the Plan.

10   As the Court is well aware, cramdown can be accomplished only if (a) the Plan satisfies all other

11   elements of Section 1129(a), and the treatment of each dissenting impaired classis (b) is fair and

12   equitable and (c) does not discriminate unfairly.  Section 1129(b).  Debtor concludes, of course,

13   that the Plan satisfies all three elements, but its conclusion on each of the three points is

14   dependent entirely on Debtor's assumption that the Noteholder claims are properly subordinated

15   on one or more grounds.  If that is not the case – and Noteholders believe they have demonstrated

16   in the previous sections of this Reply that all asserted grounds for subordination are without merit

17   – then the proposed cramdown fails all three tests.

18       If the Noteholders are subordinated when other general unsecured creditors are not, that is

19   hardly "fair" or "equitable."  The issue is not classification; Noteholders concede that separate

20   classification would not matter under these circumstances were they treated the same as the other

21   general unsecured creditors.  But the Debtor cannot justify separate classification when it is

22   accompanied by unjustified disparate treatment.

23       Noteholders observe another ground on which the Plan is not fair or equitable.  There are

24   a number of Class 7 claimants who are former partners/shareholders of Heller Ehrman and whose

25   claims are not being subordinated.  Indeed, those individuals hold some of the largest Class 7

---

[8] Certainly nothing in Debtor's citations in that section of the Opposition provides any support for subordination or anything else relevant to this case.

Case: 08-32514    Doc# 1326    Filed: 07/16/10    Entered: 07/16/10 09:55:31    Page 10 of 12

claims.[9] Debtor will no doubt try to show that those individuals' rights are different from those of the Noteholders – but many of those other individuals in fact left their status as shareholders <u>after</u> the Noteholders did, when Heller was closer to (if not in) its current distressed state; and unlike the Noteholders some of them continued to be employed by Heller and to enjoy the high incomes and other benefits that flowed from their status as former shareholders.  It is neither fair nor equitable to repeat the "once a shareholder, always a shareholder" mantra for some and not others.

Second, if as the Noteholders contend their claims are entitled to the same treatment as those of other general unsecured creditors, then any plan that treats them worse than those other creditors obviously discriminates unfairly against the Noteholders.

Finally, if as the Noteholders contend they are entitled to recover pari passu with other general unsecured creditors, the Plan violates the best interests of creditors test, Section 1129(a)(7), one of the other provisions of Section 1129.  Noteholders are getting less under the Plan than they would in a liquidation.

**<u>The Appropriate Remedy Is Reclassification of the Class of 2006 Noteholders As Class 7 General Unsecured Creditors</u>**

Noteholders acknowledge, Objection, page 7, that the Plan is a commendable effort to deal with a number of difficult issues (and a number of difficult parties!).  The Noteholders have no desire to derail the confirmation or otherwise disrupt the process.  But they do have a desire to be treated fairly, meaning treated as the general unsecured creditors that they are.  As written, the Plan is in fact unconfirmable; but the remedy does not necessarily mean everyone must go home and start all over.  The remedy can be as simple as reclassifying the Noteholders into Class 7 so they share with the other general unsecured creditors.  That will not affect any other confirmation

---

[9] See, e.g., the claims of the following members of Class 7, all of whom are former shareholders, voted on the Plan in Class 7, are listed as "Class 7 Entitled to Vote," and had their votes counted in support of the Plan: Robert Borton, Claim Nos. 135, 718 ($619,867.42); Curtis Caton, Claim No. 136 ($341,934.64); Robert Epsen, Claim No. 681 ($392,233.44); Weyman Lundquist, Claim No. 609 ($695,728.64); Larry Popofsky, Claim No. 140 ($482,763.46). Ballot Tabulation Regarding Votes Cast on Joint Plan of Liquidation of Heller Ehrman LLP (May 24, 2010); Declaration of Kyle Everett in Support Thereof (Docket No. 1232).  Each of those individuals was at one point a shareholder in a Heller PC and fits the <u>definition</u> of "Former Shareholder" found at Section 1.66 of the Plan, but inexplicably does not appear in the list of "Former Shareholders" found as Exhibit E to the Plan or in the list of shareholders as of August 11, 2008, found as Exhibit B to the Settlement Agreement (Exhibit D to the Plan).

Case: 08-32514    Doc# 1326    Filed: 07/16/10    Entered: 07/16/10 09:55:31    Page 11 of 12

1 | issue and indeed will have almost no discernible economic effect on anyone else given the

2 | relative size of the numerous claims in this case.

3 |       There is no need to change treatment of any other creditor, be they in Class 9 or anywhere

4 | else. The Class of 2006 Noteholders speak only for themselves. The analysis above includes a

5 | number of fact-based issues, some of which may apply to certain other Class 9 members, others

6 | of which do not. If a creditor did not object and demonstrate the invalidity of Debtor's arguments

7 | as applied to them, they cannot complain of being left where Debtor put them – in subordinated

8 | Class 9.

9 | **Conclusion**

10 |       Debtor apparently believes its dispute with the Class of 2006 Noteholders can be resolved

11 | by reliance, without careful analysis, on the Noteholders' status as former shareholders in Heller

12 | PCs. But such a careful analysis, conducted above, in fact demonstrates that Debtor's simplistic

13 | reliance on former status is misplaced. None of the asserted grounds for subordination is a valid

14 | one. In order to be confirmed, the Plan must be modified to treat the Class of 2006 Noteholders

15 | like the general unsecured creditors that they are.

16 |

17 | DATED: July 16, 2010             **PERKINS COIE** LLP

18 |

19 |          By:   /s/ Alan D. Smith

20 |            Alan D. Smith, Cal. Bar No. 89112
           ADSmith@perkinscoie.com

21 |          Attorneys for Class of 2006 Noteholders

22 |

23 |

24 |

25 |

26 |

27 |

28 |