# EXHIBIT 1

WILLIAM McGRANE (057761)
CHRISTOPHER D. SULLIVAN (148083)
TREPEL MCGRANE GREENFIELD LLP
150 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 283-1776
Email:         wmcgrane@tmcglaw.com
               csullivan@tmcglaw.com

GREGORY C. NUTI (151754)
KEVIN W. COLEMAN (168538)
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104
Telephone:    (415) 364-6700
Email:         gnuti@schnader.com
               kcoleman@schnader.com

JEFFREY T. MAKOFF (120004)
ELLEN RUTH FENICHEL (172142)
VALLE MAKOFF LLP
388 Market Street, Suite 1580
San Francisco, California 94111
Telephone:    (415) 986-8001
Email:         jmakoff@vallemakoff.com
               efenichel@vallemakoff.com

Co-Special Litigation Counsel for Heller Ehrman LLP, by
and through Michael Burkart, Plan Administrator

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>HELLER EHRMAN LLP,<br><br>_____ Liquidating Debtor.<br><br>HELLER EHRMAN LLP, LIQUIDATING DEBTOR,<br><br>       Plaintiff,<br><br>v.<br><br>RONALD A. KATZ TECHNOLOGY LICENSING, L.P., A2D, L.P., FIRST DATA RESOURCES, INC., A2D CORPORATION, ROBERT FRAM, ROBERT HASLAM, ALAN BLANKENHEIMER, MAUREEN BROWNE, ANDREW BYRNES, JO DALE CAROTHERS, JOHNNY CHIU, MICHAEL MARKMAN, MICHAEL PLIMACK, CHRISTINE SAUNDERS-HASKETT, STURGIS SOBIN, NITIN SUBHEDAR, LAURA UNDERWOOD-MUSCHAMP, STANLEY YOUNG AND COVINGTON & BURLING LLP.<br><br>       Defendants. | **Case No. 08-32514 DM**<br>**Chapter 11**<br><br>**Adv. Proc. No.**<br><br>**COMPLAINT FOR:**<br>**(1)-(3)  BREACH OF CONTRACT; QUANTUM MERUIT; AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST RAKTL DEFENDANTS; (4)-(6) BREACH OF CONTRACT; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND BREACH OF FIDUCIARY DUTY AGAINST IP SHAREHOLDER DEFENDANTS AND RAKTL DEFENDANTS; (7) EQUITABLE INDEMNIFICATION AGAINST IP SHAREHOLDER DEFENDANTS AND COVINGTON & BURLING;(8)-(11) AVOIDANCE OF FRAUDULENT TRANSFERS -- UNFINISHED BUSINESS AGAINST COVINGTON & BURLING [11 U.S.C. §§ 544, 548, 550; CAL. CIVIL CODE §§ 3439.04, 3439.05, 3439.07]; (12)-(13) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND INTENTIONAL INTERFERNCE WITH CONTRACTUAL RELATIONS AGAISNT GAINST COVINGTON & BURLING; (14) ACCOUNTING; (15) DECLARATORY RELIEF; AND(16) – (22)  AVOIDANCE OF FRAUDULENT TRANSFERS -- IP SHAREHOLDER  TRANSFERS [11 U.S.C. §§ 544, 548, 550; CAL. CIVIL CODE §§ 3439.04, 3439.05, 3439.07]**<br><br>**OBJECTION TO:**<br>**CLAIM NO. 709 FILED BY RONALD A. KATZ TECHNOLOGY LICENSING, L.P./A2D, L.P.** |

1      Comes now plaintiff Liquidating Debtor Heller Ehrman LLP, by and through

2 Michael Burkart, in his capacity as the duly appointed plan administrator under the Plan of

3 Liquidation confirmed in this case, and alleges as follows:

4 **INTRODUCTION**

5     1.     This adversary proceeding arises from a number of inter-related claims that

6 arise out of the prepetition actions by certain former Heller Ehrman LLP shareholders in

7 the firm's intellectual property practice group who fostered a mass exodus of IP litigators

8 from the Debtor to Covington & Burling. The actions precipitated the Debtor's

9 dissolution and deprived the Debtor of legal fees to which it was entitled. The conduct

10 also led to claims by a former Heller Ehrman LLP client that the Debtor somehow

11 breached its engagement agreement with the client. This adversary proceeding also seeks

12 to recover for pre-petition transfers by the Debtor to the same former Heller shareholders,

13 as listed below.

14     2.     Essentially, the claims made here are (a) for breach of contract, as well as

15 related claims, to recover unpaid legal fees against Ronald A. Katz Technology

16 Licensing, L.P. its related entities; (b) to recover from the former Heller IP Shareholders

17 the overdistributions to them paid by the Debtor and for the damages caused to the Debtor

18 stemming from their mass exodus during a key time for the Debtor and their involvement

19 in moving clients to Covington & Burling; and (c) to recover against Covington & Burling

20 for their encouragement, ratification, and participation in the wrongdoing of the former

21 Heller IP shareholders and the profits from the firm made on the unfinished business of

22 the Debtor's former clients under the *Jewel v. Boxer* doctrine and related law.

23 **THE PARTIES**

24     3.     Liquidating Debtor Heller Ehrman LLP ("Debtor" or "Plaintiff") is a

25 California limited liability partnership, formerly engaged in the practice of law, which

26 filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code

27 on December 28, 2008.

28     4.     On August 9, 2010, Debtor and the Official Committee of Unsecured

Creditors filed in this Court the Joint Plan of Liquidation of Heller Ehrman LLP ("Plan"). On August 16, 2010, this Court entered its order confirming the Plan, which order became effective on September 1, 2010. Under the terms of the Plan, Plaintiff succeeded to all right, title and interest of Debtor in the causes of action alleged herein.

5.      Michael Burkart ("Burkart") is the duly appointed administrator under the Plan ("Plan Administrator").

**RAKTL Defendants**

6.      Defendant Ronald A. Katz Technology Licensing, L.P. ("RAKTL") is a California limited partnership.

7.      Defendant A2D, L.P. ("A2D") is a California limited partnership. A2D is the general partner of RAKTL.

8.      Defendant First Data Resources, Inc. ("First Data") is a Delaware corporation. Plaintiff is informed and believes that First Data is the sole limited partner of RAKTL.

9.      Defendant A2D Corporation ("A2D Corp.") is a California corporation. A2D Corporation is the general partner of A2D.

10.      RAKTL and A2D filed a proof of claim ("RAKTL Claim" or "Claim No. 709") in the Heller Ehrman LLP bankruptcy case, in which this is an adversary action.

11.      The defendants named in Paragraphs 6-10 are referred to collectively herein as the "RAKTL Defendants." Due to their knowledge, relationships and concerted action, each RAKTL Defendant is jointly and severally liable for the actions of the others.

**Former Heller IP Shareholder Defendants**

12.      Defendant Robert Fram ("Fram") is a former shareholder of Debtor, and until October 1, 2008, was a member of Debtor's intellectual property ("IP") Litigation Practice Group. Fram was a member of Debtor's governing Policy Committee and owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties.

13.      Defendant Robert Haslam ("Haslam") is a former shareholder of Debtor,

and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Haslam was a member of Debtor's governing "Policy Committee Plus" and owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties.

14. Defendant Alan Blankenheimer ("Blankheimer") is a former shareholder of Debtor, and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Blankenheimer was a member of Debtor's governing Policy Committee and owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties.

15. Defendant Maureen Browne ("Browne") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Browne owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

16. Defendant Andrew Byrnes ("Byrnes") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Byrnes owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

17. Defendant Jo Dale Carothers ("Carothers") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Carothers owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

18. Defendant Johnny Chiu ("Chiu") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Chiu owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants

Fram, Haslam and Blankenheimer due to their governing positions.

19. Defendant Michael Markman ("Markman") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Markman owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

20. Defendant Michael Plimack ("Plimack") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Plimick owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

21. Defendant Christine Saunders-Haskett ("Haskett") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Haskett owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

22. Defendant Sturgis Sobin is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Sobin owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

23. Defendant Nitin Subhedar ("Subhedar") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Subhedar owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

24. Defendant Laura Underwood-Muschamp ("Muschamp") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation

Practice Group. Muschamp owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

25. Defendant Stanley Young ("Young") is a former shareholder of Debtor and until October 1, 2008 was a member of Debtor's IP Litigation Practice Group. Young owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

26. The defendants named in Paragraphs 12-25 are referred to collectively herein as the "IP Shareholder Defendants." Due to their knowledge, relationships and concerted action, each IP Shareholder Defendant is jointly and severally liable for the actions of the others.

**Defendant Covington & Burling**

27. Defendant Covington & Burling LLP ("Covington") is a limited liability partnership engaged in the practice and law.

28. Covington is liable for its own breaches of duty to the Debtor in connection with the disruption of the contractual relations of RAKTL and the Debtor and to return to the Debtor the value of the fraudulent transfers of business it obtained from the Debtor and properly account to the Debtor for the profits generated by its work on behalf of former clients of the Debtor.

29. In addition to its own actions, Covington is liable for the actions of the IP Shareholder Defendants to the extent the actions of the IP Shareholder Defendants were done on Covington's behalf, as general partners, limited liability partners or agents of Covington, in concert with Covington, done in the course and scope of the IP Shareholder Defendants' positions at Covington, benefitted Covington and/or were approved, accepted or ratified by Covington.

30. All defendants are referred to collectively herein as the "Defendants."

//

## JURISDICTION AND VENUE

31.     The Bankruptcy Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.

32.     This action is commenced pursuant to 11 U.S.C. §§ 541 through 550 and in accordance with the Federal Rules of Bankruptcy Procedure, Rules 3007 and 7001.

33.     The claims herein are core proceedings under 28 U.S.C. § 157(b)(2), such that the Bankruptcy Court has jurisdiction to hear and to determine this proceeding and to enter an appropriate order and judgment.  Any claims alleged herein that are not core proceedings are legally and factually related to the core proceedings, and are related to Debtor's bankruptcy case such that it is lawful, appropriate and economical to join such claims.

34.     The Court has subject matter jurisdiction to hear and enter a final judgment in this matter under 28 U.S.C. § 157(b)(1).

35.     Venue is proper in the United States Bankruptcy Court, Northern District of California under 28 U.S.C. § 1409, as the Debtor's bankruptcy case is pending in this judicial district.

## GENERAL ALLEGATIONS

### History and Structure of Heller Ehrman LLP

36.     In business for more than 130 years before its dissolution and ultimate bankruptcy in December 2008, Debtor was a prominent international law firm with approximately 700 lawyers and offices in, inter alia, California, New York, Washington, D.C., the United Kingdom and Asia.

37.     In 2008, plaintiff is informed and believes, Debtor was organized as a limited liability partnership under the California Revised Uniform Partnership Act (RUPA [Cal. Corp. Code § 16100 et seq.]) under a Partnership Agreement dated as of January 1, 1994, as amended ("Partnership Agreement").

38.     Under ¶ 2.2 of the Partnership Agreement, Debtor's purpose was to engage in the practice of law.

39.     Five professional corporations originally served as Debtor's partners: Heller Ehrman (California), a professional corporation; Heller Ehrman (Washington) P.S.; Heller Ehrman White & McAuliffe (Oregon) P.C.; Heller Ehrman (Alaska) P.C; and William R. Mackey, a California professional corporation.  By subsequent amendments to the Partnership Agreement, certain additional professional corporations were admitted as partners to the partnership, in particular Heller Ehrman, P.C., a District of Columbia professional corporation; Richard L. Cassin, P.A., a Florida professional corporation; and Heller Ehrman (New York), a professional corporation (collectively, with the original partners, the "Heller PCs").

40.     Each of the Heller PCs in turn had shareholders.  These shareholders were required, under the terms of certain Shareholders Agreements, to be eligible and admitted to practice law in one or more jurisdictions where Debtor practiced law ("Heller Shareholders").

41.     Each of the Heller Shareholders was a party to an employment agreement (the "Employment Agreement" or "Employment Agreements") with his/her PC.  The Employment Agreements were in a substantially similar form and, in most cases, provided that:

9.51    <u>Post-Termination Obligations</u>.  Notwithstanding the termination of this Agreement, Employee shall thereafter remain obligated, upon request by the Partnership or the Company, to assist with the billing of unbilled fees and costs and the collection of accounts receivable arising from legal services rendered before termination of this Agreement for clients of the Partnership as to whom Employee had billing responsibility.  Employee shall also remain obligated (i) to comply with established policies and procedures relating to the orderly departure of attorneys and

transfer of responsibility for pending client work and (ii) to cooperate and assist with the defense of any professional liability or other claims involving Employee, Without limiting the generality of Section 9.4 of this Agreement and Section 5.4 of the Shareholders Agreement, Employee shall not be entitled to any share of future income from client work existing at the effective date of termination of this Agreement. Employee understands and agrees that, so long as Employee remains employed by the Company, Employee's solicitation of clients to terminate their client relationship with the Partnership in whole or in part involves fiduciary principles on the part of Employee and requires the prior consent of the Company.

42.     The Heller Shareholders also were subject to a February 3, 2005, Partnership Agreement amendment, which provided "All clients for whom any Partner or Member provides legal services shall be clients of [Debtor] unless the Policy Committee determines otherwise."

43.     Each of the Heller Shareholders entered into a Shareholder's Agreement. Under Paragraph 2.3, the Heller Shareholders purchased shares over time in the Debtor through automatic deductions from the Shareholder's Total Compensation.

44.     Under Paragraph 4 of the Partnership Agreement, all decisions concerning the management of the Debtor, including, for instance, compensation, personnel decisions, and the authority to incur or pay obligations, were made by and through the Heller Shareholders via several officers, a Policy Committee, a Compensation Committee, and other committees, which membership was directly voted upon by the Heller Shareholders.

45.     The Heller Shareholders' votes for these committees, as well as other votes on various actions the Debtor proposed to take, were based on the Heller Shareholders' so-called "Attributed Percentages" of ownership of the Debtor.

46.     Each Heller Shareholder's "Attributed Percentage" was determined through a formula that divided the equity interest in the Debtor among the total number of Heller Shareholders. Heller PCs were required pursuant to Paragraph 6.1 of the Partnership

1 | Agreement to cast votes on matters affecting the Debtor exclusively in accordance with

2 | the percentage interests of the votes cast by their eligible Heller Shareholders.

3 |     47.    The committees elected by the Heller Shareholders were committees of the

4 | Debtor.

5 |     48.    Pursuant to Paragraph 4.6 of the Partnership Agreement, the Heller PCs

6 | were required under the terms of the Partnership Agreement and their respective

7 | organizational documents to adopt and implement all of the Debtor's policies and

8 | procedures.

9 |     49.    Heller Ehrman LLP was managed and controlled by and under the direction

10 | of a single Policy Committee.  The Policy Committee's function was to define the

11 | strategic direction of the law firm, to approve all material strategic decisions, and to direct

12 | and support the firm's executive managers in the implementation of strategy.  During

13 | 2007- 2008, the Policy Committee was faced with complex financial circumstances that

14 | required its members' loyal and careful attention.  To manage the strategic decisions that

15 | faced the Policy Committee in 2007-2008, including possible affiliations with other major

16 | law firms, the Policy Committee was expanded to include a "Policy Committee Plus."

17 | **The Heller Ehrman LLP Intellectual Property Litigation Practice and The "RAKTL"**

18 | **Cases**

19 |     50.    During the 1980s, 1990s and 2000s, one of Debtor's most important

20 | business strategies was to build a world-class intellectual property ("IP") litigation

21 | practice.  To this end, Debtor made a wide variety of investments to attract and retain an

22 | international group of key partner-level IP litigators, associate attorneys with specialized

23 | skills (e.g. advanced engineering degrees, biosciences degrees), paralegals and other key

24 | staff.  Debtor invested in the establishment of offices in important U.S. and overseas IP

25 | markets.

26 |     51.    To build its IP litigation practice, Debtor permitted its IP litigation practice

27 | group to offer clients "alternative billing arrangements" that were friendly to major IP

28 | clients, especially patent litigation plaintiffs who often wanted to pay for at least a portion

of their legal fees from successful recoveries in complex, multi-forum patent infringement cases. Cases that involved blended hourly and contingent fees frequently required Debtor to invest substantial up-front legal/financial resources in anticipation of a future contingent fee.

52.    In 2007-2008 Debtor had a skilled, highly-regarded, well-staffed, international and valuable IP litigation practice. Debtor's IP litigation practice handled cases for domestic and overseas clients from several of the firm's offices, with large components of the group in San Francisco, the Silicon Valley, San Diego, Washington, D.C., Seattle and China.

53.    RAKTL owns a portfolio of patents that it licenses through its affiliate, A2D. On or about August 18, 2006, at the request of certain IP Shareholder Defendants, Debtor entered into a legal services agreement with A2D to prosecute five patent-infringement lawsuits, on behalf of A2D and its affiliates, against approximately 27 defendants. A copy of the August 18, 2006 agreement ("2006 Fee Agreement"), parts of which are confidential, is in the possession of, or will be provided to, the parties and the Court upon request.

54.    Debtor and A2D amended the 2006 Fee Agreement by two subsequent agreements, dated April 30, 2007, and June 29, 2007 (the "4/30/07 Amendment" and the "6/29/07 Amendment"), to accommodate, among other things, RAKTL's anticipated filing of approximately 23 additional cases. Copies of the 4/30/07 Amendment and 6/29/07 Amendment, parts of which are confidential, are in the possession of, or will be provided to, the parties and the Court upon request. The 2006 Fee Agreement, as amended by the 4/30/07 Amendment and 6/29/07 Amendment, is referred to herein as the "RAKTL Fee Agreement." The cases in which Debtor represented A2D and its affiliates under the RAKTL Fee Agreement are referred to herein as the "Cases." The precise terms of the RAKTL Fee Agreement are known to, or will be provided to, the parties and the Court upon request.

55.    As of 2008, Debtor's total actual hourly billings exceeded RAKTL's total

1  non-contingent payments under the RAKTL Fee Agreement by at least $18,500,000 --

2  reflecting an enormous investment by Debtor in the RAKTL litigation. This investment

3  was made by Debtor in the expectation that the investment would be at least partially

4  recouped in contingent fees. Under the RAKTL Fee Agreement, a contingent fee was due

5  and payable to Debtor on November 1, 2010 in an amount Debtor believes exceeds $10

6  million.

7  **The IP Shareholder Defendants' Secret Plan To Transfer Debtor's IP Practice,**

8  **Including The RAKTL Cases (And Related Investment), To Covington and**

9  **Themselves**

10  56.    Starting in 2007, Debtor began to consider possible mergers or other

11  strategic transactions with other law firms. This process was managed through the Policy

12  Committee and, beginning in 2008, an expanded policy body called the "Policy

13  Committee Plus." The Policy Committee and Policy Committee Plus acted at all times in

14  a governing fiduciary capacity, which required their members to place the interests of

15  Debtor and all of its stakeholders before personal interests, to act with complete loyalty,

16  due care and a high level of candor and to exercise good faith and fair dealing in their

17  conduct.

18  57.    In addition to the duties imposed by law, the members of the Policy

19  Committee and Policy Committee Plus expressly undertook in early-2008 to work

20  exclusively for the benefit of Debtor and its stakeholders, not to pursue separate interests

21  or arrangements before Debtor's future was determined and not to use Debtor's

22  confidential information for any purpose that was inconsistent with the strategies set by

23  Debtor's governing bodies. To the extent any shareholder of Debtor received confidential

24  information from members of the Policy Committee, Policy Committee Plus and/or

25  Debtor's senior management concerning Debtor, such shareholders received and held

26  such confidential information subject to fiduciary, contractual and other duties owed by

27  the shareholders as members of Debtor and parties to contracts with Debtor. All of

28  Debtor's shareholders were prohibited by fiduciary, contract and other legal principles

1  from acting collectively in a manner that would undermine Debtor's stability, appropriate

2  Debtor's business, interfere with or divert Debtor's relationships or otherwise harm

3  Debtor.

4          58.     In around January-February 2008, in the midst of Debtor's analysis of

5  potential strategic transactions, Fram, Haslam, Blankenheimer, Sobin and one or more

6  other IP Shareholder Defendants became aware (a) that Debtor's 2008 hourly billings in

7  the RAKTL litigation would vastly exceed what Debtor would earn from RAKTL in 2008

8  fixed fees; and (b) because RAKTL had prepaid fixed fees for 2008 services in December

9  2007, a 2008 revenue/profitability deficit could reduce the IP Shareholders' 2008

10  compensation.

11          59.     The IP Shareholder Defendants initially tried to control staffing and contain

12  the litigation efforts on the RAKTL matters to reduce the projected 2008 RAKTL budget

13  deficit.  By mid-2008, Fram, Haslam, Blankenheimer, Sobin and other IP Shareholder

14  Defendants recognized that such measures would not resolve the financial deficit on the

15  RAKTL matters.

16          60.     In mid-2008, despite their key roles in Debtor's governance and strategic

17  decisions, and their fiduciary duty to act in the best interest of Debtor and all of Debtor's

18  stakeholders, Fram, Haslam and Blankenheimer, along with one or more additional IP

19  Shareholder Defendants, formed a plan to assemble a group of Debtor's key IP

20  Shareholders that could be delivered en masse, with clients, to a law firm of their choice,

21  separate and distinct from the potential strategic transactions being pursued by the Policy

22  Committee.

23          61.     No later than July 2008, Fram, Haslam and Blankenheimer commenced

24  active, secret discussions with Covington about the transition en masse of a substantial

25  portion of Debtor's IP litigation professional group and clientele to Covington.  The

26  Covington discussions were concealed from Debtor and its Policy Committee through the

27  use of, inter alia, private e-mail addresses, private telephone numbers and code words.

28  Before, during and after the discussions, Fram, Haslam, Blankenheimer along with one or

1  more additional IP Shareholder Defendants, disclosed confidential information about

2  Debtor's clients, client matters, employees (both attorneys and staff level) and firm

3  finances.

4        62.    From the inception of their discussions with Covington, Fram, Haslam,

5  Blankenheimer and other IP Shareholder Defendants intended, expected and planned for

6  most of Debtor's IP litigation business under their supervision, including all of Debtor's

7  RAKTL business, to transfer to Covington when the IP Shareholder Defendants joined

8  Covington. The IP Shareholder Defendants knew that if the RAKTL Cases were

9  transferred to Covington in the way that the IP Shareholder Defendants envisioned,

10  Covington would gain the value of Debtor's investment in the RAKTL Cases to the

11  detriment of Debtor. In addition, the IP Shareholder Defendants further knew that Debtor

12  was owed accrued contingent fees on Cases that had been resolved by Debtor and

13  intended to direct such fees to Covington or pay fees to Covington in lieu of paying these

14  contingent fees to Debtor, in order to make their own compensation claims to Covington

15  based on such proceeds.

16        63.    In all Covington interactions, the IP Shareholder Defendants were subject to

17  fiduciary and contractual duties that prohibited the communication of confidential

18  information to Covington about Debtor, Debtor's shareholders and employees and

19  Debtor's clients. The IP Shareholder Defendants were required fully and timely to

20  disclose to Debtor facts about their contacts with Covington (including the fact that

21  contacts were occurring) and all facts material to Debtor's finances, business operations

22  and strategies. The IP Shareholder Defendants also were required to fully and faithfully

23  protect Debtor's financial interests in the RAKTL Cases and other business, clients and

24  employees of Debtor.

25        64.    In mid-August 2008, Fram, Haslam and Blankenheimer resigned from the

26  Policy Committee, failing to disclose that they were engaged in secret, advanced

27  discussions with Covington about a plan in which the IP Shareholder Defendants would

28  join Covington en masse, and that they intended to solicit (or had solicited) key IP

1  Shareholders, employees and clients to leave.  This information was highly material to

2  Debtor, its Policy Committee and the third-parties with whom Debtor was engaged in

3  serious, advanced strategic discussions.  The IP Shareholder Defendants' failure to

4  provide Debtor and its managers with candid, complete, and real-time information about

5  their plans and solicitation, required Debtor to act with partial information and often to

6  learn of material information from rumors.

7         65.    The lack of candid and complete communication by the IP Shareholders was

8  not accidental.  From the beginning, a central goal of the IP Shareholders' mass exodus

9  strategy was to create a fully-staffed IP litigation group that could leave in a "nanosecond"

10  and take Debtor's clients to Covington with the associates and staff to serve the clients

11  immediately.  The mass exodus plan included a detailed, targeted program (which was

12  executed starting in around mid-August 2008) under which a critical mass of IP litigation

13  shareholders were recruited, would commit to resign Debtor simultaneously at an

14  opportune time (which predictably would stun the Debtor) and would embark upon a

15  carefully-orchestrated program to recruit all desired clients, staff and other resources to

16  Covington.

17  **The IP Shareholder Defendants' Mass Exodus to Covington And The RAKTL**

18  **Defendants' Termination of Debtor And Refusal To Honor The RAKTL Fee**

19  **Agreement**

20         66.    In August 2008, and at an accelerating pace in September 2008, Fram,

21  Haslam and Blankenheimer communicated with and recruited other IP Shareholder

22  Defendants to join them in their mass defection to Covington and related client and

23  employee transfers.  The IP Shareholder Defendants did not advise Debtor of the client

24  solicitations or obtain Debtor's written consent, as required by their fiduciary obligations

25  to Debtor and its stakeholders, and by most of the IP Shareholder Defendants'

26  Employment Agreements.  The IP Shareholder Defendants' secrecy paved the way for a

27  devastating mass exodus, and placed Debtor in the embarrassing position of having to

28  respond to rumors about the status of a substantial part of its own IP litigation practice.

1  The confusion caused a loss of credibility among Debtor's clients, shareholders and
2  employees.

3       67.    On September 14, 2008, the 14 IP Shareholder Defendants simultaneously
4  announced their intention to leave Debtor en masse and join Covington on October 1,
5  2008.  The IP Shareholder Defendants arranged for the RAKTL entities (and numerous
6  other longstanding clients of Debtor's IP litigation practice) to terminate their
7  representation by Debtor in the Cases, and to transfer representation in the RAKTL Cases
8  to Covington.  At no time did Debtor terminate or breach its relationship with RAKTL.

9       68.    RAKTL agreed before September 26, 2008 to move the representation from
10 Heller to Covington and made arrangements to complete the transfer of the engagement
11 such that RAKTL left Debtor when the IP Shareholder Defendants left Debtor, as they all
12 had planned.

13      69.    From the time the IP Shareholder Defendants resigned from Debtor and
14 moved their practices to Covington, the IP Shareholders have been the principal source of
15 information with respect to the status of the RAKTL cases, and other client matters, and
16 the fees accrued to Debtor on the RAKTL cases and on other pending client matters.
17 Neither the IP Shareholder Defendants, nor Covington, nor any successor firm for the
18 Cases, has accounted to Debtor for the amounts due and owing under the RAKTL Fee
19 Agreement or with respect to any other business of Debtor taken by the IP Shareholder
20 Defendants.

21      70.    Despite a demand duly made by Debtor, no portion of the RAKTL
22 contingent fee owed to Debtor has been paid and neither the IP Shareholder Defendants
23 nor Covington has accounted to or paid Debtor with respect to other client matters of
24 Debtor.

25 **By December Of 2007, The Debtor Was Immersed In A Financial Crisis And**
26 **Operating With Unreasonably Small Capital.**

27      71.    The Debtor was undergoing a serious financial crisis by at least the end of
28 2007.

72.     Nevertheless, the Debtor distributed nearly all or nearly all of the available cash to the Heller Shareholders at year end, through the use of an "Annual Bonus." This distribution process was commonly referred to among the Heller Shareholders as the "year-end fire drill."

73.     This "year-end fire drill" typically left the Debtor with insufficient cash to meet its normal and forecast employee costs and operating expenses at the beginning of the year.

74.     These operating expenses were significant. On information and belief, Plaintiff alleges that Debtor incurred at a minimum $25 to $30 Million a month in operating expenses alone.

75.     Thus, following the "year-end fire drill," the Debtor would supplement whatever cash was left on hand at year end with a bank line of credit to fund operations until the subsequent year's revenues caught up with outlays.

76.     The significant risk created by the "year-end fire drill" had grown substantially in the Debtor's final years. From 2004 to 2007, the Debtor was forced to borrow more and more cash to simply meet its basic operating expenses and make distributions to Heller Shareholders. For example, in March of 2004, the Debtor was forced to borrow approximately $4.3 Million in working capital for operating expenses. In comparison, in March of 2007, the Debtor was forced to borrow more than seven times as much, approximately $35.6 Million.

77.     From 2004 to 2007, the "tipping point" or breakeven on the Debtor's combined expenses and distributions to Heller Shareholders was pushed further and further back into the fiscal year. In other words, the Debtor did not have enough cash and had to borrow money to meet its combined operating expenses (excluding the additional drain on capital investments) and year to date distributions to Heller Shareholders until on or around July of 2004, September of 2005, and August of 2006. In 2007, this "tipping point" did not occur under November.

78.     By November of 2007, simply to break even and continue to operate, the

1 Debtor had borrowed in excess of $45 million. This was nearly double the amount of
2 working capital the Debtor had borrowed in 2006.

3     79.    As shown by the following chart, by December of 2007, the Debtor had
4 been drawing on its bank credit line at an unprecedented and dangerous rate, which
5 continued into 2008:

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| March | $4.3 M | $21.8 M | $29.0M | $35.6M | $44.5M |
| May | $0 | $25.8M | $24.3M | $33.7M | $54.5M (including $10 M Term) |
| July | $0 | $8.0M | $5.0M | $10.6M | $57.1M (including $10M Term) |
| Month Bank Line Paid off (i.e., the point at which profits exceeded expenses and base salary paid to Heller Shareholders) | July | September | August | November | Not Paid Off In 2008 |

18     80.    By December 2007, the average daily balance of the revolver debt of the
19 Debtor also revealed that the Debtor's debt was out of control and rising exponentially.
20 Between 2001 and 2004, the average daily balance on the revolver debt of the Debtor was
21 never above $4.0 million, and had been as low as $9.8 million. In 2005, it reached $8.7
22 million and in 2006, $10.7 million. By the end of 2007, the daily average had climbed to
23 almost $15.8 million.

24     81.    At the same time that the Debtor had become increasingly reliant on
25 expensive bank financing to simply keep its doors open. By December 2007 the Debtor
26 was facing a foreseeable risk of losing the bank financing. One of the "events of default"
27 contained in the Debtor's loan agreement was a threshold test: the withdrawal of
28 members of the firm in any 12 month period comprising either 15% of the number of

members or members constituting 15% of the attributed ownership of the Firm. The problem was that, as discussed below, Heller Shareholders were beginning to leave in 2007, and this was very likely to continue in 2008.

82.     By December of 2007, the Debtor was also experiencing a significant drop in actual and prospective income. This drop in prospective income was evident from a number of factors.

83.     In 2007, a number of large litigation matters ended, resulting in significant loss of continuing revenue.

84.     By 2007, the Debtor's revenues from its top five clients had declined each year over a five year period, from $100.3 million in 2003 to $66.8 million in 2007.

85.     By 2007, the Debtor's profitability per attorney had declined from 2006.

86.     By 2007, the average reported billable hours from Heller Shareholders and associates had declined from 2006.

87.     By 2007, vital Heller Shareholders were already leaving the firm, with expressed doubts about its long-term viability.

88.     By 2007, other Heller Shareholders were also either openly planning to depart or openly discussing departing.

89.     By 2007, the Debtor was well aware of the drop in revenues, billable hours, and productivity.

90.     The Debtor's reported net income for 2007 was approximately $177,919,100. This amount was approximately $10,600,000 below the Debtor's $188,500,000 projections for 2007, and the Debtor ended 2007 with a shortfall of approximately $13 million from revenue targets.

91.     This reported net income, moreover, was grossly inflated for a number of reasons. For example, during the last calendar quarter of 2007, the firm began allowing vendor payments to go past due and held 118 printed checks totaling approximately $3 million until January of 2008, delayed writing another $2.1 million in checks that were due in 2007, and failed to enter into the accounting system another $785,000 in invoices

due in 2007. This can be contrasted in previous years, in which the Debtor prepaid an average of $3,000,000 of certain expenses at year's end.

92. Also, the Debtor requested a prepayment by a client of a fixed fee obligation owed as part of a contingency arrangement that was to be paid in January of 2008 for 2008 fees. The Debtor had the client pay the 2008 fee payment in December of 2007, rather than January of 2008 when payment was called for, and recorded the payment as part of its 2007 income. This pre-prepayment was approximately $8.2 million.

93. In sum, at the time the Debtor was determining whether to make its Annual Bonus payments to the Heller Shareholders and setting these amounts, the lawyers who caused the payments to be made were the beneficial owners of the Debtor, stood to benefit from the payments, and knew the Debtor was already immersed in financial crisis and operating with unreasonably small capital.

**Despite Its Financial Crisis, The Heller IP Shareholders Received Milltions of Dollars in Overdistributions In December Of 2007 Via The "Annual Bonus."**

94. On December 31, 2007, the Heller Shareholders who managed the Debtor met to fix the amount of the "Annual Bonus" as part of the "year end fire drill." The Heller management was faced with implementing a distribution below the prior projections because of what they knew about the decline in the firm's profits.

95. Under paragraphs 3.2 and 3.4 of the Partnership Agreement, distributions to Heller Shareholders, including any "Annual Bonus," could be adjusted at any time.

96. Under paragraphs 3.2 and 3.4 of the Partnership Agreement, distributions to the Heller Shareholders were limited to, at most, the reported net income as determined by reference to the Debtor's "Net Profits" for that year and the "cash needs of the Partnership."

97. Under 3.1 of the Partnership Agreement, the Debtor's management retained the right and the ability to withhold as a "reserve" "moneys otherwise distributable to, the Partners, in order to enable the Partnership to conduct its business and to discharge its obligations."

98.     Nonetheless, the Debtor's management instructed the accounting group for the Debtor to distribute approximately $78,000,000 in "Annual Bonuses" to the Heller Shareholders.

99.     The Annual Bonus paid to Heller Shareholders in December of 2007 resulted in total Heller Shareholder distributions of more than $187,000,000.

100.     As noted, the reported net income of the Debtor in 2007 was approximately $177.9 million.  The 2007 Annual Bonus thus resulted in payments to the Heller Shareholders exceeding 2007 reported net income by approximately $9,561,152.64.

101.     The amount of the Annual Bonus, and the fact that it exceeded the Debtor's reported net income by over $9.5 Million, was unprecedented and constituted a significant departure from the Debtor's ordinary course of business.

102.     In essence, the Debtor's management was gambling that their overpayments to maintain the Debtor's "standings" would be sufficient to convince another law firm to merge with the Debtor before it failed, or provide the Heller Shareholders with a platform to move on to different firms on an individual basis.  This gamble did not work.  Unfortunately for the firm's creditors, this gamble was made with other people's money.

103.     The Heller Shareholders who most directly caused the overpayment via the "Annual Bonus" also sat in a position of considerable leverage and power vis-à-vis the Debtor and the Debtor's management.  The Heller Shareholders controlling the annual distribution decisions knew that if all the Heller Shareholders were not paid an "Annual Bonus" it meant that the Debtor's management could not receive one, either.

**The "Annual Bonus" Was Not A "Payment For Services," But, Rather, Was A Payment Representing The Profits Of The Firm On Account Of The Shareholder's Ownership Interst.**

104.     According to the partnership documents of the Debtor, there were four components of compensation provided by the Debtor to Heller Shareholders as follows:

    a.    Shareholder Base Salary" (¶¶ 4.1, 4.2(a) of the Shareholder Employment Agreement);

b.  the "Annual Bonus" at issue here (*id.* ¶4.2);

c.  "other bonuses" that "Heller may pay to a Shareholder from time to time, and in its sole discretion" (*id.* ¶¶4.1, 4.3); and

d.  Contributions made to pension, profit sharing and other employee benefit plans (*id.* ¶ 4.2).

105.  The Shareholder Employment Agreement defines the "Base Salary" as the compensation paid to a Shareholder for "all services rendered by Employee under this agreement . . .," which includes all "legal services, and other services as may reasonably be requested. . . ." (*Id.* ¶¶2, 4.1)

106.  The Shareholder Employment Agreement provided a number of options respecting the "Annual Bonus."  First, the Debtor could decide not to issue one at all.  (*Id.* 4.2 (""The Annual Bonus, *if any,* shall be paid in December of the Fiscal Year in question. . . .")).

107.  Second, if the Debtor did award a bonus, the amount was set in the discretion of the Debtor as determined by the Compensation Committee.

108.  Paragraph 9.4 of the Shareholder Employment Agreement states:  "It is expressly understood and agreed that, following the effective date of a termination of this Agreement, . . . Employee shall not be entitled to . . . (ii) any Annual Bonus in respect of the Fiscal year in which the termination became effective."

109.  Section VI(c) of the Debtor's Plan of Dissolution, adopted on September 28, 2008, provided that Heller Shareholders remaining at the firm after the date of dissolution that were still "performing and supervising necessary billable client work . . . will be compensated . . . an amount . . . equal to 1/52 of the Base Salary paid to persons as employees . . . ."

**The Debtor Mischaracterized The Overdistribution To The Heller Shareholders.**

110.  From nearly the beginning, Heller's managing shareholders attempted to obscure the fact that the 2007 "Annual Bonus" exceeded the Debtor's reported net income by over $9.5 million.

111. When the overdistribution was first ordered, the payment was initially treated correctly as a capital reduction or deduction from shareholder equity – an "excess distribution." In early January of 2008, however, the Heller managing shareholders caused the entry to be reclassified as a "miscellaneous receivable" from the Heller PCs.

112. Yet, when the Debtor's Assistant Controller prepared the standard "loan confirmations" to be sent to the PCs, he was told that the Heller managing shareholders wanted to avoid such confirmations being sent.

113. Then, when financial statements of the Debtor were issued, the payments were yet again re-characterized, this time as "loans" to the PCs. Such treatment was improper. The Debtor's management, however, always considered the 2007 Annual Bonus an "overdistribution" to the Heller Shareholders, and there was never an intent that these so-called "loans" would ever be repaid.

**In 2008, The Debtor Continued To Distribute Millions To The Heller Shareholders.**

**The "Capital" Transfers**

114. In 2008, while the Debtor was sliding further into insolvency, the Debtor paid or caused to be paid approximately $8,000,000 to departing Heller Shareholders, which were characterized by the Debtor at the time as a return of capital (the "Capital Transfers").

115. At the time the Debtor made the Capital Transfers, it was insolvent.

**The "Base Salary" Transfers**

116. In 2008, while the Debtor was sliding further into insolvency, the Debtor paid or caused to be paid approximately $65,800,000 in "base salary" to the Heller Shareholders (the "Base Salary Transfers") (collectively with the Annual Bonus Transfers and the Capital Transfers, the "Transfers"). Of these "base salary" payments.

117. The monthly "Base Salary" paid to Heller Shareholders had previously been increased by $1 million a month in January 2007. Although the Debtor's management could have reduced these "base salary" payments at any time, and should have in light of the Debtor's declining financial condition, they refused.

118.    The Transfers constitute transfers of an interest of the Debtor in property that were made within two (2) years before the Petition Date.

119.    The amounts of the transfers made to the individual IP Shareholders are reflected on the attached Exhibit A, which is incorporated herein by reference.

120.    Alternatively, the Transfers constitute obligations incurred by the Debtor that were incurred within two (2) years before the Petition Date.

121.    At the time the Debtor made the Base Salary Transfers, it was insolvent.

**Debtor's Dissolution**

122.    The effect of the Debtor's "Annual Bonus" to the Heller Shareholders was disastrous.  The Debtor entered 2008:

    a.  with $18 Million less available cash than on January 1st of any of the previous four years;

    b.  burdened with upwards of $23 Million more in the previous year's accounts payable, over-distributions and other current liabilities than it had in the previous four years;

    c.  with a continued reduction in its most profitable revenue stream (i.e., revenues from its top five clients);

    d.  with declining productivity and profitability levels among Heller Shareholders and associates; and

    e.  with the realization that 2008 would be much tougher year than 2007.

123.    The Debtor placed itself in a precarious position from which it never recovered.  The Debtor's Annual Bonus distributions, combined with the Debtor's held checks, unpaid invoices, and deferral of traditionally made payments, created a financial hole for the Debtor from which it never emerged.  The cumulative effect of the $9.5 Million admitted overdistribution to the Heller Shareholders and the $5,785,000 in held checks and delayed invoice payments was to shift the financial burden of almost $15 million (that in a typical year would have reduced the funds distributed to the Heller Shareholders) from 2007 to the 2008 calendar year, putting the Debtor $15 million "in the

hole" on January 1, 2008, when the company was desperately short of capital, with significant lower cash balances than in previous years.

124. This overdistribution made the Debtor even more dependent than in past years on bank financing to survive. Indeed, by February 2008, the Debtor was forced to seek an increase in its yearly borrowing limit from $45 million to $60 million to account for already recognized anticipated cash shortfall of up to $15 million, including an additional $15 million of 5-year term debt.

125. The Debtor was soon drawing on its bank credit line at an unprecedented and dangerous rate: In March, the Debtor had borrowed $44.5 Million; in May, $54.5 Million (including a $10 Million Term); in July $57.1 Million (including $10 Million Term).

126. Soon thereafter, as described above, the IP Shareholder Defendants resigned en masse. Immediately thereafter, Debtor's potential merger partner terminated discussions with Debtor and indicated that Debtor's inability to deliver the IP litigation practice as part of the proposed merger was a major reason. The IP Shareholder Defendants' mass exodus from Debtor, along with key clients and other personnel, was a substantial factor in precipitating a financial, operational and public relations crisis at Debtor in September 2008. The IP Shareholder Defendants' actions destabilized Debtor and required Debtor's management and remaining shareholders to move to dissolution on a timetable driven by the adverse impact of the IP Shareholder Defendants' scheme.

127. Starting on September 26, 2008, the Heller Shareholders were asked to vote to approve a specific, written dissolution plan ("Dissolution Plan"). By September 28, 2008, the Heller Shareholders completed the voting and Heller Shareholders holding more than 2/3 of the required number of votes elected to dissolve Debtor and adopt the Dissolution Plan.

Unfinished Business

128. Prior to adopting the Dissolution Plan, both the Heller PCs and the Heller Shareholders had always previously agreed with Debtor that, inter alia, neither of them had

24

any interest in any profits or benefits derived or arising from the completion of any unfinished business of the Debtor ("Unfinished Business") that might happen to exist as of the time that any scheme of dissolution affecting Debtor were to be adopted by Heller Shareholders.

129. Prior to and following the adoption of the Dissolution Plan, both the Heller PCs and the Heller Shareholders were subject to Section 16404 of RUPA, which provides that a partner has a duty "[t]o account to [Debtor] and hold as trustee for [Debtor] any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity." Cal. Corp. Code § 16404(b)(1) (2010).

130. Prior to and following the adoption of the Dissolution Plan, both the Heller PCs and the Heller Shareholders were subject to Section 16401 of RUPA, which provides that partners are "not entitled to remuneration for services performed for the partnership, except for reasonable compensation for services rendered in winding up the business of the partnership." Cal. Corp. Code § 16401(h) (2007).

131. Pursuant to the Dissolution Plan, Heller retained all of its rights with respect to profits and compensation arising from the RAKTL engagement and the IP Shareholders, as well as Covington, had a duty to account to Heller for the profits for work undertaken in the winding up of THE Debtor's business; stemming from the use of partnership property or information; or derived from the appropriation of a partnership opportunity.

132. Article VI.F of the Dissolution Plan, however, provided that—to the complete exclusion of both Debtor and Heller PCs—all of Debtor's property rights in Unfinished Business were to be initially transferred to, inter alia, any entities engaged in the practice of law which might chose to allow Heller Shareholders to move their law practices to such entities ("Jewel Waiver").

Case 08-32514 Doc# 2864 Filed: 12/28/10 Entered: 12/28/10 22:47:20 Page 27
of 27
25