1  THOMAS A. WILLOUGHBY, State Bar No. 137597
   TANIA M. MOYRON, State Bar No. 235736
2  FELDERSTEIN FITZGERALD
   WILLOUGHBY & PASCUZZI LLP
3  400 Capitol Mall, Suite 1450
   Sacramento, CA 95814
4  Telephone: (916) 329-7400
   Facsimile: (916) 329-7435
5  E-mail: twilloughby@ffwplaw.com
   E-mail: tmoyron@ffwplaw.com
6
   Attorneys for the Post-Confirmation Liquidating Debtor
7
                 UNITED STATES BANKRUPTCY COURT
8
                 NORTHERN DISTRICT OF CALIFORNIA
9
                   SAN FRANCISCO DIVISION
10

11  In re:                              CASE NO.: 08-32514

12  HELLER EHRMAN LLP,                   Chapter 11

13          Liquidating Debtor.
                                         **MEMORANDUM OF POINTS AND
14                                       AUTHORITIES IN SUPPORT OF MOTION
                                         TO ESTIMATE PROOF OF CLAIM NO. 709
15                                       FILED BY RONALD A. KATZ
                                         TECHNOLOGY LICENSING, L.P. AND ITS
16                                       AFFILIATES A2D, L.P. FOR PURPOSES OF
                                         ESTABLISHING A RESERVE FOR THE
17                                       UNLIQUIDATED AND DISPUTED CLAIM
                                         NO. 709 PURSUANT TO 11 U.S.C. § 502(C)
18                                       [REDACTED]**

19                                       Date:    July 7, 2011
                                         Time:    1:30 p.m.
20                                       Crtrm:   235 Pine Street, 22nd Floor
                                                  San Francisco, California
21                                       Judge:   Honorable Dennis Montali

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    REQUESTED RELIEF ........................................................................................... 1

II.   INTRODUCTION ................................................................................................. 1

III.  STATEMENT OF FACTS ................................................................................... 3

    A.    GENERAL CASE BACKGROUND ............................................................ 3

    B.    SUMMARY OF EVENTS RELATED TO RAKTL DURING THE CHAPTER 11 CASE. ............................................................................. 4

        a.   *Background* ..................................................................................... 4

        b.   *RAKTL's Pre-Petition Allegations And Proof Of Claim* ............... 5

        c.   *The Debtor's Complaint Against RAKTL and its Affiliated Entities, Former Intellectual Property Shareholders and Covington & Burling LLP and RAKTL's Counterclaim* ....................................... 6

        d.   *The Objection to the RAKTL Claim Raised in the Complaint.* .................... 7

IV.  THE RAKTL CLAIM IS A MALPRACTICE CLAIM AND IS CAPPED IN AMOUNT BY THE PLAN AT THE AMOUNT OF HELLER'S SELF INSURED RETENTION ............................................................................... 8

    A.    THE RAKTL CLAIM IS A "MALPRACTICE CLAIM" UNDER THE PLAN. ........................................................................................... 8

    B.    CLASSES 6 AND 7 OF THE PLAN CAP MALPRACTICE CLAIMS AT THE AMOUNT OF THE SELF INSURED RETENTION WHETHER OR NOT INSURANCE ACTUALLY EXISTS TO PAY SUCH CLAIMS. ............... 9

    C.    NO PREJUDICE WILL RESULT FROM ESTIMATING THE RAKTL CLAIM AT $2,000,000.00 BECAUSE IT IS IN ACTUALITY AN INSURED MALPRACTICE CLAIM. ................................................. 11

        a.   *Debtor's Malpractice Insurance.* ................................................. 11

        b.   *The RAKTL Claim Was First Made During the Policy Period and Reported to MPC During the Extended Reporting Period* ........................ 12

V.   THE COURT HAS THE AUTHORITY TO ESTIMATE THE RAKTL CLAIM UNDER THE PLAN AND APPLICABLE LAW ........................................... 14

VI.  CONCLUSION ................................................................................................. 16

-i-

**TABLE OF AUTHORITIES**

CASES

*First City Beaumont v. Durkay* (*In re Ford*)
    967 F.2d 1047 (5th Cir. 1992)........................................................................15

*In re Chemtura Corp.*
    2011 Bankr. LEXIS 1394 *27 (Bankr. S.D.N.Y. 2011) ........................................15

*In re Kreisler*
    407 B.R. 321 (Bankr. N.D. Ill. 2009)...............................................................15

*In re Pacific Gas & Electric Company*
    295 B.R. 635 (Bankr. N.D. Cal 2003)...............................................................15

*In re Ralph Lauren Womenswear, Inc.*
    197 B.R. 771 (Bankr. S.D.N.Y. 1996)...............................................................15

*Westrec Marina Management, Inc. v. Arrowwood Indemnity Co.*
    163 Cal.App.4th 137 (2008) ..........................................................................14

STATUTES

11 U.SC. § 502(c) ..................................................................................1, 14, 15

-ii-

1    **TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY
     JUDGE; RONALD A. KATZ TECHNOLOGY LICENSING, L.P. AND ITS AFFILIATES**
2    **A2D, L.P. AND ITS COUNSEL; THE OFFICE OF THE UNITED STATES TRUSTEE;
     AND ANY PARTIES ENTITLED TO POST-EFFECTIVE DATE NOTICE:**

3

4         Pursuant to the provisions in the Joint Plan of Liquidation of Heller Ehrman LLP (August

5    9, 2010) (the "Plan")[1] and section 502(c) of title 11 of the United States Code (the "Bankruptcy

6    Code"), the liquidating debtor, Heller Ehrman LLP ("Heller," the "Debtor" or the "Post-

7    Confirmation Debtor"), hereby files its memorandum of points and authorities in support of its

8    motion (the "Motion") requesting the entry of an order estimating the "RAKTL Claim" (defined

9    below).

10                                          **I.**

11                                  **REQUESTED RELIEF**

12        By way of the Motion, the Post-Confirmation Debtor respectfully requests the entry of an

13   order:

14        a.        Estimating the amount of the RAKTL Claim at the amount of Debtor's the self

15   insured retention ("SIR") of $2,000,000.00,[2] less any defense costs previously expended, for the

16   purposes of allowing the Plan Administrator to calculate the reserve for the RAKTL Claim from

17   the Initial Distribution (defined below) based on the Plan provisions respecting the treatment of

18   Malpractice Claims; and

19        b.        Granting such other relief as is just and proper.

20                                         **II.**

21                                   **INTRODUCTION**

22        1.        Pursuant to section 5.14(d) of the confirmed Plan, the Plan Administrator must

23   make a distribution to creditors within six months after the receipt by the Post-Confirmation

24   Debtor of sufficient funds (which is defined in the Plan as Net Available Cash) to make a

25   distribution to creditors. A true and correct copy of the Plan (without exhibits) is attached hereto

26   ───────────────
     [1] Unless otherwise defined, all capitalized terms herein shall have the same meaning ascribed to
27   them in the Joint Plan of Liquidation of Heller Ehrman LLP (August 9, 2010).

28   [2] *See* Declaration of James R. Haug, Jr. (the "Haug Decl."), ¶ 3; Exh. A to Haug Decl. (Lexington
     Insurance Co. Lawyers Professional Liability Policy) at p. 1 (entitled "Declarations").

                                                        MEMORANDUM OF POINTS AND AUTHORITIES
                                            -1-             IN SUPPORT OF MOTION TO ESTIMATE

as Exhibit 1 and incorporated herein by this reference (hereafter attached and incorporated exhibits are referred to as "Exh. __"). This Plan provision has recently been triggered by the settlement of the Bank of America Preference Action, which has resulted in the sum of $20,000,000.00 being paid to the Post-Confirmation Liquidating Debtor. *See* Order Approving Bank of America Preference Action, Exh. 2.

2.     The Plan Administrator intends to comply with section 5.14(d) of the Plan by making a distribution (the "Initial Distribution") in the approximate amount of $20,000,000 to unclassified priority and general unsecured claims in Class 7 of the Plan on or about September 15, 2011 (the "Projected Distribution Date").

3.     The Post-Confirmation Debtor brings this Motion to estimate the disputed, unliquidated, and contingent portion of the amended proof of claim filed by Ronald A. Katz Technology Licensing, L.P. and its Affiliates A2D, L.P. ("RAKTL"), which is denominated in the Bankruptcy Court's records as Claim No. 709, as it has been supplemented by the RAKTL Counterclaim (defined below). The Debtor disputes the amount of $408,517.00 in RAKTL's proof of claim for a vendor product called "First/SecondPass," which appears on its face to be a liquidated amount. The Plan Administrator intends to fully reserve for the purportedly liquidated amount of $408,517.00 asserted in the proof of claim. The "RAKTL Claim" is hereafter used to refer only to the disputed unliquidated and contingent portion that seeks in excess of $50,000,000.00 for various asserted acts and/or omissions by Heller and/or its Shareholders. *See* RAKTL Claim, Exh. 3.

4.     Such estimation is warranted because the RAKTL Claim is a Malpractice Claim, which is capped in both Classes 6 and 7 at the amount of the self insured retention ($2,000,000 less defense costs).

5.     The estimation is sought for the purposes of establishing the amount of reserve that must be retained by the Plan Administrator for the RAKTL Claim from the Initial Distribution.

6.     Other than RAKTL Claim and other disputed contingent and/or unliquidated claims that will be the subject of similar estimation motions, it is anticipated that on the Projected Distribution Date, the Allowed Claims and Disputed Claims in Class 7 of the Plan will be

-2-

approximately $75,000,000.[3]

7.   Based on this estimate, if the Post-Confirmation Debtor is required to fully reserve for the RAKTL Claim in an amount of $50,000,000, it would diminish the distribution to the general unsecured creditors by 40%.

8.   Such an enormous reserve for a contingent, disputed, and unliquidated claim is wholly unwarranted and is not authorized under the Plan (see below).

## III.

## STATEMENT OF FACTS

**A.   GENERAL CASE BACKGROUND.**

9.   On December 28, 2008, the Debtor filed a voluntary petition for relief under the Bankruptcy Code.

10.   The Debtor, a 118-year-old international law firm, is currently winding down its business and affairs following the adoption of a Plan of Dissolution by the shareholders of the Debtor's limited partners in September 2008. Although the Debtor is no longer engaged in the practice of law, there remain a substantial number of unperformed, yet necessary tasks relating to winding down the business, maximizing the value of the Debtor's assets for the benefit of its creditors and equity interest holders.

11.   The Official Committee of Unsecured Creditors and the Debtor jointly proposed the Plan that came on for hearing on August 9, 2010.

12.   On August 13, 2010, this Court entered its order confirming the Plan (docketed on August 16, 2010), which Confirmation Order became effective on September 1, 2010 (the "Effective Date"). *See* Order Confirming the Joint Plan of Liquidation of Heller Ehrman LLP (August 9, 2010), Exh. 4.

---

[3] The current anticipated range of potential liquidated and/or disputed unsecured claims that will be included in the projected distribution and/or reserved for is between $62,000,000.00 and $82,000,000.00. To date, the Debtor has filed claim objections and omnibus claim objections to resolve a significant number of the over 2800 filed and/or scheduled Claims. After conducting a thorough investigation of its books and records and previously filed schedules, the Debtor filed an amendment to Schedule F which reduced the amounts of approximately 175 claims. Moreover, the Debtor has resolved employee claims and entered into a vast number of settlement agreements with former shareholders.

-3-

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO ESTIMATE

13. There was no appeal to confirmation of the Plan, and the Plan is now final and non-appealable. *See* Docket No. 1446.

14. The Post-Confirmation Debtor after the Effective Date has distributed an excess of $4.9 million to pre-petition priority creditors pursuant to the Plan and the Plan has been substantially consummated. Declaration of Shelley Salinero, ¶ 6, filed concurrently herewith ("Salinero Decl.").

15. Michael Burkart is the duly appointed administrator under the Plan (the "Plan Administrator") and has been managing the Post-Confirmation Debtor since the Effective Date.

**B.** **SUMMARY OF EVENTS RELATED TO RAKTL DURING THE CHAPTER 11 CASE.**

*a.* ***Background.***

16. RAKTL owns a portfolio of patents that it licenses through its affiliate, A2D. On or about August 18, 2006, at the request of certain IP shareholders of the Debtor (the "IP Shareholder Defendants"),[4] the Debtor entered into a legal services agreement with A2D to prosecute five patent-infringement lawsuits on behalf of A2D and its affiliates against approximately 27 defendants. A copy of the August 18, 2006 agreement (the "2006 Fee Agreement"), parts of which may be privileged and/or confidential, is in the possession of, or will be provided to, the parties and the Court upon request. *See* first amended complaint (the "Complaint"), styled *Heller Erhman LLP v. Ronald A. Katz Technology Licensing, et al.*, bearing Adversary Proceeding No. 10-03318 (the "Adversary Proceeding"), ¶ 53.[5]

17. The Debtor and A2D amended the 2006 Fee Agreement by two subsequent agreements, dated April 30, 2007, and June 29, 2007 (the "4/30/07 Amendment" and the "6/29/07 Amendment"), to accommodate, among other things, RAKTL's anticipated filing of approximately 23 additional cases. Copies of the 4/30/07 Amendment and 6/29/07 Amendment, parts of which are confidential, are in the possession of, or will be provided to, the parties and the

---

[4] The IP Shareholder Defendants are defendants named in the Complaint more thoroughly discussed below in paragraph C subsection (b).

[5] The Debtor hereby adopts the facts in the Complaint and hereby incorporates them by this reference.

-4-

Court upon request. The 2006 Fee Agreement, as amended by the 4/30/07 Amendment and 6/29/07 Amendment, is referred to herein as the "RAKTL Fee Agreement." The cases in which the Debtor represented A2D and its affiliates under the RAKTL Fee Agreement are referred to herein as the "Cases." The precise terms of the RAKTL Fee Agreement are known to, or will be provided to, the parties and the Court upon request. *See* Complaint, ¶ 54.

18.    As of 2008, the Debtor's total actual hourly billings exceeded RAKTL's total non-contingent payments under the RAKTL Fee Agreement by at least $18,500,000 – reflecting an enormous investment by the Debtor in the RAKTL litigation. *See* Salinero Decl., ¶ 10. (This investment was made by the Debtor in the expectation that the investment would be at least partially recouped in contingent fees.) Under the RAKTL Fee Agreement, a contingent fee was due and payable to the Debtor on November 1, 2010 in an amount the Debtor believes exceeds $10 million. *See* Complaint, ¶ 55.

### b.    *RAKTL's Pre-Petition Allegations And Proof Of Claim.*

19.    In a series of oral and written communications to Jonathan Hayden, a member of Debtor's Dissolution Committee, that commenced in October 2008 and continued through December 19, 2008, RAKTL's counsel Bertram Massing asserted Debtor breached fiduciary duties and the agreement to provide legal services by abandoning its representation of RAKTL. Mr. Massing further alleged in these communications that as a result of Debtor's abandonment of its representation, RAKTL incurred additional attorney fees and costs. *See* Haug Declaration ("Haug Decl."), ¶ 7, and Exh. D to Haug Decl. (Supplemental Claim or Incident Report and attached correspondence) at pp. 3-4, 9-11.[6]

20.    On April 24, 2009 (after the Petition Date), RAKTL filed the RAKTL Claim, which is comprised of a one-page proof of claim and an attachment thereto. *See* RAKTL Claim, Exh. 3. On September 1, 2010, RAKTL supplemented the RAKTL Claim by filing the Declaration of James Tramontana Regarding Sealed Documents in Support of Claim Number 709 of Ronald A. Katz Technology Licensing, L.P. and its affiliate A2D, L.P., and the Declaration of

---

[6] Portions of this Motion and the Haug Decl. have been redacted. The Post-Confirmation Debtor is filing concurrently herewith an application to approve the filing of unredacted documents under seal.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO ESTIMATE

1  James E. Malackowski Regarding Sealed Documents in Support of Claim Number 709 of Ronald
2  A. Katz Technology Licensing, L.P. and its affiliate A2D, L.P. *See* Documents filed under seal,
3  on file herein in support of the RAKTL Claim.

4      21.    The RAKTL Claim asserts a general unsecured claim against the Debtor in an
5  estimated contingent and unliquidated amount that exceeds $50,000,000.00. *See* RAKTL Claim,
6  p. 1.

7      22.    In the RAKTL Claim, RAKTL alleges that the Debtor breached the RAKTL Fee
8  Agreement by dissolving. As a result, RAKTL alleges, it was required to engage substitute
9  counsel (first Covington & Burling LLP then Cooley Godward Kronish LLP) to complete the
10 Cases for additional legal fees, is entitled to credit for approximately one-quarter of the non-
11 contingent payment for 2008 hourly fees. *See* Complaint, ¶ 313.

12          *c.    The Debtor's Complaint Against RAKTL and its Affiliated Entities, Former*
                   *Intellectual Property Shareholders and Covington & Burling LLP and RAKTL's*
13                 *Counterclaim.*

14     23.    On December 23, 2010, the Debtor filed a complaint against RAKTL and its
15 affiliated entities, approximately 15 former intellectual property ("IP") shareholders of the Debtor
16 (the "IP Shareholders"), and Covington & Burling LLP ("collectively, the "RAKTL
17 Defendants"). On December 27, 2010, the Debtor filed the (amended) Complaint against the
18 RAKTL Defendants. *See* Complaint, Exh. 5.[7]

19     24.    The claims alleged by the Debtor, as summarized at page 2 of the Complaint, are:
20 (a) for breach of contract, as well are related claims, for recovery of unpaid legal fees against
21 RAKTL and related entities; (b) to recover from the former Heller IP Shareholders the over
22 distribution to them paid by the Debtor and for damages caused to the Debtor stemming from
23 their mass exodus during a key time for the Debtor and their involvement in moving clients to
24 Covington & Burling LLP; and (c) to recover against Covington & Burling LLP for their
25 encouragement, ratification, and participation in the wrongdoing of the former Heller IP
26 shareholders and the profits from the firm made on the unfinished business of the Debtor's former

27  _____
[7] Concurrently herewith, the Debtor has filed a Request for Judicial Notice requesting that the
28 Court take judicial notice of the Complaint and all of the other documents filed in Adversary
    Proceeding No. 10-03318.

                              -6-          MEMORANDUM OF POINTS AND AUTHORITIES
                                           IN SUPPORT OF MOTION TO ESTIMATE

clients under the Jewel v. Boxer doctrine and related law. *See* Complaint, p. 1, ¶ 2.

25.     On February 16, 2010, RAKTL filed a counterclaim (the "RAKTL Counterclaim") against the Debtor which alleges six claims for relief: (1) breach of the RAKTL Fee Agreement; (2) breach of the covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) fraud by concealment; (5) unjust enrichment; and (6) breach of "First/Second Pass" agreement. *See* RAKTL Counterclaim, Exh. 6. The first, second, third and fourth claims for relief seek damages in the amount of "substantial additional fixed fees" and a contingency fee that RAKTL claims it is obligated to pay Cooley. The fifth claim for relief (unjust enrichment) seeks recovery of fees RAKTL paid to the Debtor for legal services the Debtor failed to perform.[8]

26.     On March 9, 2011, the Debtor filed an answer to the RAKTL Counterclaim (the "Debtor's Answer"). *See* Answer, Exh. 7. In addition to the admissions, denials and allegations in the Debtor's Answer, the Debtor raises over twenty two affirmative defenses.

### d.     *The Objection to the RAKTL Claim Raised in the Complaint.*

27.     The Debtor filed an objection (the "RAKTL Objection") to the RAKTL Claim in the Complaint. *See* Complaint, Exh. 5, pp. 53-56.

28.     As such, the RAKTL Claim is a Disputed Claim pursuant to the Plan. *See* Plan § 1.57.[9]

29.     Additionally, the RAKTL Claim is an Unliquidated Claim because it was filed in an amount that exceeds $50,000,000.00 without specifying the amount. *See* Plan §1.137, Exh. 1.[10] The RAKTL Claim concedes that ". . . it is unable at this point to provide exact calculations." *See* RAKTL Claim, Exh. 2, pg. 22, ¶ 190.

30.     Finally, the RAKTL Claim is a contingent claim because the amount is based on additional attorneys' fees and costs that in the future may or may not exceed what would have

---

[8] The sixth claim for relief, which is not asked to be estimated pursuant to this Motion, seeks restitution of $408,517 – the balance of an advance payment that RAKTL made to the Debtor in connection with services under the "First/Second Pass" agreement.

[9] Disputed Claims include "any Claim [ … ] to which an objection" has been filed and not finally resolved. *See* Plan § 1.57

[10] Unliquidated Claims include "any Claim for which a proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain [.]" *See* Plan §1.137.

-7-

1   been paid to Heller under the RAKTL Fee Agreement.

2                                    IV.

3   **THE RAKTL CLAIM IS A MALPRACTICE CLAIM AND IS CAPPED IN AMOUNT BY**
    **THE PLAN AT THE AMOUNT OF HELLER'S SELF INSURED RETENTION**
4

5   **A.      THE RAKTL CLAIM IS A "MALPRACTICE CLAIM" UNDER THE PLAN.**

6           31.     Section 1.87 of the Plan provides that:

7                   **"Malpractice Claim"** shall mean any unsecured non-priority claim
                    against the Debtor or any Former Shareholder, or any former
8                   employee of the Debtor arising out of alleged acts, errors, or
                    omissions in connection with the rendering or failing to render
9                   professional legal services by the Debtor or other potential or actual
                    liability or costs arising in connection therewith, whether or not
10                  covered by a Malpractice Policy.
11

12          32.     Below is a table that correlates the more specific allegations of the Katz

13  Counterclaim with the applicable language from the Plan definition of Malpractice Claim:

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

                                    -8-                  MEMORANDUM OF POINTS AND AUTHORITIES
                                                         IN SUPPORT OF MOTION TO ESTIMATE

| RAKTL Counterclaim Cause of Action | Language of Plan definition of Malpractice Claim Applicable to Cause of Action |
|---|---|
| Count 1: Breach of Legal Service Agreement:<br><br>[*See* RAKTL Counterclaim, pp. 60-66, ¶¶ 398-437] | ". . . failing to render professional legal services by the Debtor . . . whether or not covered by a Malpractice Policy." |
| Count 2: Breach of Covenant of Good Faith And Fair Dealing<br><br>[*See* RAKTL Counterclaim, pp. 66-71, ¶¶ 438-464] | ". . . alleged acts, errors, . . . in connection with the rendering or failing to render professional legal services by the Debtor . . . whether or not covered by a Malpractice Policy." |
| Count 3: Breach of Fiduciary Duty<br><br>[*See* RAKTL Counterclaim, pp. 71-76, ¶¶ 465-493] | ". . . alleged acts, errors, . . . in connection with the rendering or failing to render professional legal services by the Debtor . . . whether or not covered by a Malpractice Policy." |
| Count 4: Fraud by Concealment<br><br>[*See* RAKTL Counterclaim, pp. 76-78, ¶¶ 494-510] | " . . . omissions in connection with the rendering or failing to render professional legal services or other potential or actual liability or costs arising in connection therewith, . . . whether or not covered by a Malpractice Policy." |
| Count 5: Unjust Enrichment<br><br>[*See* RAKTL Counterclaim, p. 78, ¶¶ 511-516] | " . . . failing to render professional legal services by the Debtor . . . whether or not covered by a Malpractice Policy." |

33.     The allegations contained in counts 1-5, are clearly within the definition of Malpractice Claim as defined by the Plan. These five counts seek contingent unliquidated and disputed claims in excess of $50,000,000.

**B.    CLASSES 6 AND 7 OF THE PLAN CAP MALPRACTICE CLAIMS AT THE AMOUNT OF THE SELF INSURED RETENTION WHETHER OR NOT INSURANCE ACTUALLY EXISTS TO PAY SUCH CLAIMS.**

34.     To the extent that RAKTL asserts that the RAKTL Claim is a Class 7 general unsecured claim, the Plan explicitly caps the amount of the RAKTL Claim at the SIR as follows:

a.     Section 4.7 of the Plan provides that "In no event shall a Malpractice Claim treated

-9-

as a Class 7 General Unsecured claim be allowed in an amount in excess of the SIR."

b.     Section V(C)(2)(e) of the approved Disclosure Statement in Support of Joint Plan of Liquidation of Heller Ehrman LLP (May 14, 2010), which was distributed as part of the Plan solicitation package (the "Disclosure Statement") contains the identical prohibition on Malpractice Claims exceeding the SIR. *See* Disclosure Statement (without exhibits), Exh. 8.

35.     To the extent that RAKTL asserts that the RAKTL Claim is a Class 6 Insured Malpractice Claim, it is also capped at the amount of the SIR pursuant to the Plan for the following reasons:

a.     Section 4.6 of the Plan provides that

> "If any portion of the Allowed amount of a Malpractice Claim is greater than the SIR, the Claim will be bifurcated and treated in two different classes as follows: (a) *the amount of the Allowed Claim that is greater than the SIR will be a Class 6 Insured Malpractice Claim*; and (b) the amount of the Allowed Claim that is less than or equal to the SIR Amount will be a Class 7 General Unsecured Claim." (emphasis added)

b.     The Disclosure Statement makes clear that this treatment applies whether or not malpractice insurance is actually available to pay the amount allowed of the Insured Malpractice Claim as follows:

> "There is no guarantee that the applicable insurer(s) will provide the insurance coverage necessary to create a recovery on an Allowed Class 6 Claim. It is possible that the applicable insurer(s) will deny coverage or that the insurer will otherwise be unable or unwilling to satisfy an Allowed Class 6 Claim. Nevertheless, Creditors with Class 6 Claims shall have no recourse to Class 7 for amounts unpaid on account of an Allowed Class 6 Claim."

*See* Disclosure Statement, p. 63 (page 68 as stamped by the Court clerk), lines 6-10.[11]

---

[11] Indeed, the treatment of malpractice claims was discussed at length at the hearing on the Disclosure Statement as evidenced by the transcript from the hearing:

Mr. Fiero: [...] With regard to insured malpractice claims, what the plan provides for is a bifurcation of malpractice claims, which limits the ability of malpractice claimants to draw against the assets of the debtor. In other words, malpractice claims which are otherwise subject to insurance are bifurcated into two pieces. And the size of the piece that remains the debtor's responsibility is measured by what is called the self-insured retention. Some people might call it a deductible, but I think insurance lawyers view it differently. So under – under our plan, what happens is that to the extent that malpractice claim expenses are incurred, defense costs, those are deducted from the $2 million of self-insured retention. And the most that a malpractice claimant could claim from the estate is the difference between the $2

-10-

36. The RAKTL Claim is a Malpractice Claim as defined in the Plan, and as such, the Plan mandates that the RAKTL Claim is capped at the SIR, or $2,000,000.00, less any defense costs expended to date.

**C. NO PREJUDICE WILL RESULT FROM ESTIMATING THE RAKTL CLAIM AT $2,000,000.00 BECAUSE IT IS IN ACTUALITY AN INSURED MALPRACTICE CLAIM.**

37. As described above, whether or not insurance is available to pay any portion of the RAKTL Claim is irrelevant. However, the Post-Confirmation Debtor respectfully submits that even in the extremely unlikely event that RAKTL is able to assess Heller with any liability for the acts and/or omissions asserted in the first five counts of the RAKTL Claim and/or the Katz Counterclaim, any damages resulting therefrom would be Malpractice Insured Claims for which insurance is available.

*a.* *Debtor's Malpractice Insurance.*

38. MPC Insurance Company, LTD (MPC) administers claims for primary and excess insurers who provide malpractice insurance to several law firms, including Heller Ehrman, LLP in 2008-2009. James R. Haug, Jr. was claims counsel for MPC at all times referred to herein. Haug Decl., ¶¶ 1-2.

39. During the policy period from April 15, 2008 to April 15, 2009, Lexington Insurance Company (Lexington) provided malpractice insurance for Heller in excess of the SIR of $2 million, with a per claim and aggregate limit of $10 million. Haug Decl., ¶ 3; Exh. A to

---

million and the malpractice claim expenses; and that amount in the – in the plan is called SIR amount.
THE COURT: Right.
MR. FIERO: Everything over that, over the $2 million –
THE COURT: Goes on that.
MR. FIERO: – *goes over into a pot for which insurance only is available.* There is no claim available against the debtor. And – and the disclosure statement, in its most recent revision, makes very clear that if for some reason insurance coverage is not available, for instance, the insurer ultimately elects to deny the claim, or the insurance company goes into receivership and can't pay, there is no ability for the malpractice claimant to come back into the general unsecured pool. In other words, the claim is truly cleaved into two pieces and the piece – and never the twain shall meet. [ … ]
MR. FIERO: That's right. That's – that's the treatment that we're proposing. If the estate spends $2 million defending a claim, such that net SIR, which we've changed the SIR amount, goes to zero, that's the end of the estate's involvement in that claim.
[ … ]

*See* Transcript from Hearing on: (1) Disclosure Statement; and (2) Motion for an Order Authorizing the Official Committee of Unsecured Creditors to Settle Certain Claims Without Further Hearing or Notice pursuant to Federal Rule of Bankruptcy Procedure 9019(b), p. 83:11 – 85:9; p. 97:8 - 19; p. 98: 1-6 (emphasis added).

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO ESTIMATE

Haug Decl. (Lexington policy). During the same policy period (04/15/2008 to 04/15/2009) Lexington and other insurers provided Heller with malpractice insurance in excess of $10 million with a total per claim and aggregate limit of $190 million. Haug Decl., ¶ 4; Exh. B to Haug Decl. (Schedule of Debtor's excess insurance in effect from 04/15/2008 to 04/15/2009). Each excess insurer provided coverage under the same terms and conditions set forth in the Lexington policy, except for policy limits. Haug Decl., ¶ 5.

40.     The Insuring Agreements in the Lexington policy provide in relevant part that Lexington "will pay on behalf of the **Insured** [Debtor] all sums in excess of the self insured retention stated in the Declarations which the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** on account of **claims first made** against the **Insured** during the **Policy Period**, and reported to [Lexington] during the **Policy Period** *or within sixty (60) days thereafter*: [¶] (**A**) By reason of any act, error or omission in professional…services rendered, or that should have been rendered, by the **Insured** or by any person for whose acts the **Insured** is responsible, and arising out of the conduct of the **Insured's** profession as a lawyer [.]"[12] (Italics added.) Exh. A. to Haug Decl., p. 23. Condition XVII of the policy states:  "Any notices, reports, documents and other matters pertaining to **claims** under this Insurance shall be deemed sufficiently given or delivered to (Lexington) when mailed or delivered to…James R. Haug." Exh. A to Haug Decl., at p. 35. A report of a "Claim or Incident" to MPC in care of Mr. Haug satisfies the reporting requirements in each excess policy as well as the Lexington policy. Haug Decl., ¶ 5.

        ***b.***     ***The RAKTL Claim Was First Made During the Policy Period and Reported to MPC During the Extended Reporting Period.***

41.     As discussed above (¶ 19), in October-December 2008 RAKTL's counsel Bertram Massing asserted in communications to Jonathan Hayden (a member of Debtor's Dissolution Committee) that as a result of Debtor's breach of fiduciary duties and breach of the agreement to provide legal services, RAKTL incurred additional attorney fees and costs. These allegations are

---

[12] The term "claim," as defined in the Lexington policy, "means a demand received by the **Insured** for money or services [.]" *See* Exh. A to Haug Decl. at p. 26. The terms "**damages**," "**claim expenses**," and "**claims first made**" are also defined at p. 26 of Exh. A to Haug Decl.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO ESTIMATE

included in the proof of claim RAKTL filed on April 24, 2009, and also alleged in the counterclaim RAKTL filed on February 16, 2010.

42.     On May 18, 2009, within the 60 day extended reporting period after the Lexington and excess policies expired on April 15, 2009, Dissolution Committee Member Paul Sugarman sent to Mr. Haug a "Claim or Incident Report" concerning the RAKTL claim. *See* Haug Decl., ¶ 6, Exh. C to Haug Decl. On May 28, 2009, (also within the extended reporting period) Mr. Sugarman sent to Mr. Haug a supplemental Claim or Incident Report, which provided the information summarized in paragraph 19 *ante*. *See* Haug Decl., ¶ 7; Exh. D to Haug Decl.

43.     Mr. Haug acknowledged receipt of the original report of the RAKTL Claim or Incident (i.e., the 05/18/2009 report) by letter to Mr. Sugarman dated June 4, 2009. In another letter, dated June 9, 2009, 

"[13] Haug Decl., ¶ 9; Exh. F to Haug Decl.

44.     Mr. Haug sent the ████████████ letter to Mr. Sugarman before he reviewed the supplemental report concerning the RAKTL Claim. Since the supplemental report and attached correspondence (Exh. D to Haug Decl.) provided the specific information that was omitted from the original report and confirmed that RAKTL had made a **claim** against the Debtor during the policy period, Mr. Haug withdrew the ████████████ after he read the supplemental report. Haug Decl., ¶ 10.

45.     On March 18, 2011, Mr. Haug received a copy of the counterclaim RAKTL filed against the Debtor in Case No. 08-32514 pending in this Court. The claims alleged against the

---

[13] Condition IV states: "If during the Policy Period or the extended reporting period purchased hereunder, the **Insured** give written to the Company of a specific act, error, omission…which occurred prior to expiration of the **Policy Period** and which could reasonably be expected to give rise to a **claim** against the **Insured** under this **Policy**, any claim which subsequently arises out of such act, error, omission, event, condition…shall be considered a **claim first made** against the **Insured** during the **Policy Period** or the extended reporting period purchased hereunder."

-13-

Debtor in RAKTL's counterclaim are covered under the Lexington policy and the Debtor's excess policies, because they seek damages by reason of an "act, error or omission in professional services rendered, or that should have been rendered," the claims were first made during the policy period and were reported to MPC in care of Mr. Haug within 60 days after the policy period expired. Haug Decl., ¶¶ 11-12. The fact the correspondence between Bertram Massing and Jonathan Hayden (pp. 7-11 of Exh. D to Haug Decl.) reflects negotiations to settle conflicting claims for attorney fees is irrelevant, since Massing's letter (pp. 9-11 of Exh. D to Haug Decl.) makes clear that RAKTL claims it incurred damages in the form of fees paid to other attorneys for services Heller was obligated to perform. *See Westrec Marina Management, Inc. v. Arrowwood Indemnity Co.*, 163 Cal.App.4th 137, 1393 (2008) (holding that letter from plaintiff's attorney to defendant employer, offering to forego lawsuit for sex discrimination if employer corrected discriminatory treatment of plaintiff by male supervisors, was a "written demand for civil damages or other relief" notwithstanding letter did not expressly demand payment or refer to any specific amount).[14]

## V.

## THE COURT HAS THE AUTHORITY TO ESTIMATE THE RAKTL CLAIM UNDER THE PLAN AND APPLICABLE LAW

The Plan and the Bankruptcy Code provide the Court with authority to estimate the RAKTL Claim. Section 5.22 (iii) of the Plan provides:

> "For the purposes of effectuating the provisions of this Article 5.21, the Bankruptcy Court may estimate the amount of any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, which provides, "There shall be estimated for the purpose of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or (2) any right to payment arising from a right to an equitable remedy for breach of performance." The amounts so fixed or liquidated by the Bankruptcy Court shall be deemed to be Allowed Claims for purposes of distribution under this Plan, or alternatively, until such time as the Claim becomes Allowed, the amount so fixed by the Bankruptcy Court shall serve as the basis to calculate the appropriate Disputed Claim reserve [.]"

---

[14] The Lexington policy expressly provides that it is "governed by and construed in accordance with California law," with the sole exception of matters relating to punitive and exemplary damages. *See* Exh. A to Haug Decl. at p. 34.

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO ESTIMATE

*See* Plan, Section 5.22(iii), Exh. 1.

Section 502(c) of the Bankruptcy Code requires the court to estimate "for purpose of allowance" any contingent or unliquidated claim, "the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case [.]" 11 U.S.C. § 502(c)(1). Section 502(c) additionally requires the court to estimate (for purposes of allowance) "any right to payment arising from a right to an equitable remedy for breach of performance." 11 U.S.C. § 502(c)(2). This section of the Bankruptcy Code serves at least two purposes. *In re Kreisler*, 407 B.R. 321, 328 (Bankr. N.D. Ill. 2009) (*citing First City Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047, 1053 (5th Cir. 1992)). First, it avoids the need to await the resolution of pending lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of theses actions. *Id.* Second, it promotes a fair distribution to creditors through a realistic assessment of uncertain claims. *Id.*

An estimation under section 502(c) may be for broad or narrow purposes. *In re Pacific Gas & Electric Company*, 295 B.R. 635, 642 (Bankr. N.D. Cal 2003). Claims estimation can be used for a variety of purposes, including determining voting rights on a reorganization plan, gauging plan feasibility, determining the likely aggregate amount of a related series of claims, setting claim distribution reserves, or (though this is less commonly wise) allowing claims. *In re Chemtura Corp.*, 2011 Bankr. LEXIS 1394 *27 (Bankr. S.D.N.Y. 2011). Neither the Bankruptcy Code nor the Bankruptcy Rules set forth a procedure for estimating claims; instead, the court may use "whatever method is best suited to the particular contingencies at issue." *In re Pacific Gas & Electric Company*, 295 B.R. at 642 (*citing In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) ("Neither the Code nor the Rules prescribe any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, which should employ what-ever method is best suited to the circumstances of the case.")). *Id.*

The Post-Confirmation Debtor respectfully requests that the Court estimate the RAKTL Claim at the amount of the SIR of $2,000,000.00, less any defense costs previously expended. As discussed above in section IV, the RAKTL Claim is a malpractice claim under the Plan and is capped in amount by the Plan at the amount of the SIR. *See* Plan, Section 1.87; *see also* Section

-15-

IV, *supra*. To the extent that the RAKTL Claim is treated as a Class 7 general unsecured claim, the Plan explicitly caps the amount of the RAKTL Claim at the SIR. *See* Plan, Section 4.7. To the extent that the RAKTL Claim is treated as a Class 6 Insured Malpractice Claim, it is also capped at the SIR. *See* Plan, Section 4.6. Moreover, there will not be any prejudice that would result from estimating the RAKTL Claim at $2,000,000.00 because it is actually covered by insurance as discussed above in section IV(c). If the Court does not estimate the RAKTL Claim, the Post-Confirmation Debtor will have to reserve for the full amount of the RAKTL Claim, and the Plan Administrator will only be able make a nominal distribution to general unsecured creditors until resolution of the RAKTL Claim. As set forth above, if the Post-Confirmation Debtor is required to fully reserve for the RAKTL Claim in an amount of $50,000,000, it would diminish the distribution to the general unsecured creditors by 40%. This case has been pending for nearly two and one half years and a meaningful distribution to creditors should not be delayed by the unmeritorious RAKTL Claim speculatively estimated at $50,000,000.00.

## VI.

## CONCLUSION

The RAKTL Claim filed in an amount in excess of $50,000,000.00 blocks meaningful distributions to creditors. This excessive amount exceeds any other claim in this case by approximately five fold. The number is presented without analysis or reduction for the amounts due Heller under the RAKTL Fee Agreement. For example, even the hourly and fixed fees described in the materials filed under seal in support of the RAKTL Claim as having been incurred are a fraction of the approximately $10,000,000.00 RAKTL presently owes Heller under the RAKTL Fee Agreement.

It cannot be disputed, however, that the potential future damage amounts are extremely speculative, and even if the RAKTL Claim has any merit, there are at least three alternative sources of recovery available to RAKTL: (1) its right to insurance available under Class 6 of the Plan; (2) its rights against the IP Shareholders who allegedly committed the wrongful acts as detailed at length in the Katz Counterclaim; and (3) its rights against the Covington firm who at first assumed the obligations to complete the work under the RAKTL Fee Agreement and then

-16-

wrongfully and without cause refused to complete the engagement.

The Post-Confirmation Debtor respectfully requests that the Court enter an order granting the relief requested herein.

Dated: May 19, 2011

FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP

By:    */s/ Thomas A. Willoughby*
     THOMAS A. WILLOUGHBY
     Attorneys for the Post-Confirmation
     Liquidating Debtor

-17-