# EXHIBIT 3

| UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF CALIFORNIA | AMENDED PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Heller Ehrman LLP | Case Number:<br>08-32514 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property
Ronald A. Katz Technology Licensing, L.P. and its affiliate A2D, L.P.

Name and address where notices should be sent:

**Michael S. Kogan**

ERVIN, COHEN & JESSUP LLP
9401 Wilshire Boulevard, Ninth Floor
Beverly Hills, California 90212-2974
mkogan@ecjlaw.com

Telephone number:  **(310) 273-6333**

☒ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** 709
*(If known)*
Filed on: April 24, 2009

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

1. **Amount of Claim as of Date Case Filed: $408,517.00 plus an amount estimated to exceed $50,000,000.00**

   If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

   If all or part of your claim is entitled to priority, complete item 5.

   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. **Basis for Claim:** See attachment and documents previously filed under seal on September 1, 2010 (Docket Nos. 1597 and 1598).

3. **Last four digits of any number by which creditor identifies debtor:** _____

   3a. **Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   **Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
   **Describe:**

   Value of Property:$_____  **Annual Interest Rate** _____%

   **Amount of arrearage and other charges as of time case filed included in secured claim,**

   if any: $_____    **Basis for perfection:** _____

   **Amount of Secured Claim: $**_____  **Amount Unsecured: $**_____

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5) G Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:
$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**Date:**
3/3/11

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.
/s/ Michael S. Kogan

FOR COURT USE ONLY

IDOCS:916.135:875707.3 Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Case 08-32514  Doc 1709  Filed 03/19/11  Entered 03/19/11 14:47  Page 2 of 24

**Attachment To Amended Proof Of Claim Of Ronald A. Katz Technology Licensing, L.P. and its Affiliate A2D, L.P. filed in the bankruptcy case of Heller Ehrman LLP (Case No. 08-32514) (the Amended Proof of Claim and this Attachment hereinafter collectively the "Amended Claim").**

**Parties.**

1. Debtor Heller Ehrman LLP ("Debtor" or "Heller")[1] filed its voluntary petition for relief under Chapter 11 on December 28, 2008.

2. Creditor Ronald A. Katz Technology Licensing, L.P. ("RATKL") is a California limited partnership with its principal place of business at 9229 Sunset Boulevard, Suite 850, Los Angeles, California 90069. RATKL owns a portfolio of patents (the "RAKTL Patents") that it licenses through its affiliate, A2D, L.P. (RATKL and A2D, L.P. are collectively referred herein to as "RAKTL/A2D").

3. The RAKTL Patents represent pioneering work in the field of interactive call processing and are widely used by businesses to improve the efficiency and usability of their automated call-processing services. RAKTL has successfully licensed these patents to more than 275 companies, including, among many others, Ameritrade Holding Corporation, AT&T, Avon Products, Inc., Bank of America Corporation, Capital One Services Inc., Chevron U.S.A. Inc., Countrywide Financial Corporation, Dell Inc., Delta Air Lines, Inc., Discover Financial Services, Express Scripts, General Electric Company, Hewlett-Packard Company, Hilton Hotels Corporation, Home Shopping Network Inc., International Business Machines (IBM), Merck & Co., Merrill Lynch & Co., Inc., Microsoft, Morgan Stanley, Nationwide, New York Life Insurance Company, OppenheimerFunds, Inc., Prudential Financial, Inc., Qwest Communications International Inc., QVC, Inc., Sprint Corporation, Sunoco, Inc., United Air Lines, Inc., The Vanguard Group, Inc., Verizon California Inc. and its affiliates, Walgreen Co., Wal-Mart Stores, Inc, WellPoint, Inc., Wells Fargo & Company, and West Corporation.

**Introduction.**

4. On April 24, 2009, RATKL/A2D filed its Proof of Claim, bearing Claim Number 709 (the "Original Claim"). The Original Claim and any documents filed in support of the Original Claim are incorporated herein by this reference as if fully set forth herein. Subsequent to the filing of the Original Claim, on December 23, 2010, Debtor commenced an Adversary Action entitled *Heller Ehrman LLP, Liquidating Debtor v. Ronald A. Katz Technology Licensing, L.P. et al* bearing Adversary Proceeding No. 10-03318, through the filing of its Adversary Complaint (the "Adversary Complaint").

5. As a result of information stated in the Adversary Complaint, RATKL/A2D has now discovered additional aspects of the wrongdoing on the part of Debtor and its principals that caused the harm RAKTL/A2D has suffered, and continues to suffer, as set forth in the Original Claim. Accordingly, on February 16, 2011, RATKL/A2D filed its Cross-Complaint as against the Debtor. The allegations in the Cross-

---

[1] Debtor also did business as Heller Ehrman White & McAuliffe LLP.

Case 3:08-32514 Doc# 1778-2 Filed: 05/19/03 Entered: 05/19/11 14:47:13 Page 3
Amendment of 24 Page 1 of 22

Complaint, which are set forth in detail below, are based upon the new information learned by RATKL/A2D from the Adversary Complaint and give rise to the following claims against the Debtor: (i) Breach of Contract (Legal Services Agreement), (ii) Breach of the Covenant of Good Faith and Fair Dealing, (iii) Breach of Fiduciary Duty, (iv) Fraud by Concealment, (v) Unjust Enrichment, and (vi) Breach of Contract (First Pass/Second Pass Agreement), all of which claims comprise this Amended Claim.  This Amended Claim supersedes and incorporates by reference the entirety of the Original Claim.[2]

6. The claims enumerated in the Cross-Complaint derive from the same nexus of operative facts stated in the Original Claim. RATKL/A2D, however, did not become aware of the specific events set forth in the Cross-Complaint until the filing of the Debtor's Adversary Complaint. RAKTLA2D could not previously have learned of those facts because the Debtor concealed them from RAKTL/A2D until December 23, 2010. This Amended Claim provides newly discovered particular additional details of the facts and circumstances that gave rise to RATKL/A2D's claim.

7. The Cross-Complaint is annexed hereto as Exhibit "A" and incorporated herein by reference as if fully set forth herein. To the extent that there is any conflict between the facts and/or claims stated herein and the Cross-Complaint, the Cross-Complaint shall be deemed the controlling and salient document.

**Background Facts Giving Rise to RAKTL/A2D Claims' Against the Debtor.**

8. At the beginning of August 2006, Heller had a longstanding attorney-client relationship with RAKTL/A2D. RAKTL/A2D first retained Heller to represent it in a patent-infringement lawsuit in early 1999. Thereafter, Heller continued to serve as RAKTL/A2D's attorneys in various patent enforcement and licensing efforts. Until August 2006, RAKTL/A2D retained Heller on a case-by-case basis and compensated Heller on an hourly-rate basis for legal services provided by Heller.

9. On August 18, 2006, Heller and RAKTL/A2D entered into a letter agreement for certain legal services (the "August 2006 Agreement"), and amended it by letter agreements dated April 30, 2007 (the "April 2007 Amendment") and June 29, 2007 (the "June 2007 Amendment").

10. The August 2006 Agreement, as amended by the April 2007 Amendment and the June 2007 Amendment, (together, the "Legal Services Agreement"), required Heller to provide to A2D and its affiliates, including RAKTL, all legal services required by RAKTL/A2D in or in connection with specified lawsuits and other proceedings

---

[2] On April 24, 2009, RAKTL/AD2 filed its Motion to Seal Motion and Motion for Order Authorizing The Filing Under Seal of Documents Regarding Proof of Claim (Docket No. 379) ("Seal Motion"). On June 11, 2009 (Docket No. 486), the Court entered its Order granting the Seal Motion. On September 1, 2010, RATKL/A2D filed two sets of documents under seal in support of its proof of claim (Docket Nos. 1597 and 1598) ("Sealed Documents").  The Sealed Documents are incorporated herein by reference as if fully set forth herein.

against specified companies believed by RAKTL/A2D to have been infringing one or more patents owned by RAKTL (the "Cases").

11. The legal services that Heller had a contractual and fiduciary obligation to provide to RAKTL/A2D pursuant to the Legal Services Agreement (the "Legal Services") applied to Cases against approximately forty-eight different companies.

12. Although it provided for, among other things, a contingent fee, the Legal Services Agreement was far from a typical contingent-fee contract for legal services. In particular, in two respects RAKTL/A2D bore a greater share of the risk of an adverse result in the Cases than was borne by plaintiffs who retained lawyers in typical contingent-fee contracts for legal services in other lawsuits. The Legal Services Agreement not only required A2D to pay or reimburse Heller on an ongoing basis for all out-of-pocket costs and disbursements, including payments of expert witnesses, incurred in connection with the Cases (the "Costs") after August 1, 2006, but further required A2D to compensate Heller for the Legal Services in part through a series of fixed-fee payments each of which was designated as "non-refundable" and was required to be paid at the beginning of the calendar year in which the Legal Services for that year were to be performed. The Legal Services Agreement also provided for a single contingent-fee payment, except that contingent-fee payments applicable to Cases concluded after November 1, 2010, were to be made after those Cases had been concluded.

13. Heller was entitled to a contingent fee only if Heller performed the Legal Services and other conditions specified in the Legal Services Agreement were met.

14. Even if some of the Cases concluded before November 1, 2010, the Legal Services Agreement did not require payment of any contingent fee until the earlier of (a) the date on which all the Cases had concluded or (b) November 1, 2010.

15. The reason why the Legal Services Agreement provided for no contingent fee until the earlier of the date on which all the Cases had concluded or November 1, 2010, was that the parties to the Legal Services Agreement (a) recognized and acknowledged that some of the Cases were likely to settle favorably to RAKTL/A2D sooner than others and with relatively little effort by Heller attorneys and staff, while others of the Cases were likely to be vigorously opposed by the defendants in those Cases and might not be concluded until after a trial, appeals, and a final judgment; (b) recognized and acknowledged that a contingent fee for a Case settled relatively earlier and more easily should be a lower percentage of the settlement sum for that Case than a contingent fee for a Case resolved favorably to RAKTL/A2D relatively later and after greater effort by Heller; and (c) concluded that, rather than providing for different contingent-fee percentages for the various Cases or for Cases concluded at various times, it was better for the parties to provide for a series of fixed-fee payments and to postpone any contingent-fee payment until the earlier of the date when all the Cases actually had concluded or a date by which the parties believed all the Cases would be concluded.

16. When RAKTL/A2D and Heller executed the Legal Services Agreement, they believed that all the Cases would be concluded by November 1, 2010.

17. Before and when RAKTL/A2D and Heller executed the Legal Services Agreement, and until at least September 22, 2008, Heller held itself out as, and RAKTL/A2D believed that Heller was, a well-established, successful, profitable, and stable law firm on which RAKTL/A2D could and should fully rely to prosecute all the Cases to conclusion. RAKTL/A2D relied on that belief when it executed the Legal Services Agreement and until September 26, 2008.

18. When RAKTL/A2D and Heller executed the Legal Services Agreement, Heller knew that RAKTL/A2D, unless informed that it should not do so, would rely and continue to rely on Heller's continuing ability and willingness to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in providing legal services to RAKTL/A2D before the Legal Services Agreement was executed.

19. When RAKTL/A2D executed the Legal Services Agreement, RAKTL/A2D believed, and Heller knew that RAKTL/A2D believed, that, throughout the term of that agreement, Heller would continue to meet all of its contractual, fiduciary, and professional obligations in providing the Legal Services with a timeliness and level of quality consistent with what Heller had previously provided to RAKTL/A2D.

20. Heller's contractual, professional, and fiduciary obligations under the Legal Services Agreement included the obligation to inform RAKTL/A2D of, and to provide legal advice with respect to, any change in circumstances creating a significant risk that Heller would be unable or unwilling to continue to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, resources, and dedication Heller had demonstrated and provided in previously providing legal services generally, and Legal Services in particular, to RAKTL/A2D.

21. Heller's contractual, professional, and fiduciary obligations under the Legal Services Agreement included the obligation to inform RAKTL/A2D of, and to provide legal advice with respect to, any change in circumstances that would significantly increase the risk that Heller (a) would be unable to provide Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D or (b) would be unable to provide the Legal Services while one or more of the Cases was still pending.

22. Heller's contractual, professional, and fiduciary obligations under the Legal Services Agreement included the obligations (a) to make decisions about the amount and nature of Legal Services provided on a consistent basis or to inform RAKTL/A2D that Heller intended to change or had changed the bases for making such decisions and (b) to provide Legal Services with a consistent level of timeliness, effort, and quality, including staffing, while one or more of the Cases was still pending.

23. As attorneys for RAKTL/A2D in the Cases, Heller's professional and fiduciary duties to RAKTL/A2D included the duty to inform and advise RAKTL/A2D if, during the course of representing RAKTL/A2D in the Cases, Heller changed or intended to change the bases on which it made decisions about the amount or nature of services to be devoted to the Cases by Heller personnel, especially if the change would be to the short-term benefit of Heller and to the detriment of RAKTL/A2D.

DOCS:916.135:1182512.1

Case:08-32514 Doc#1782-2 Filed: 05/19/03 Entered: 05/19/03 18:47:34 Page 6
Case 3:08-cv-03251 Document 17-2 Filed: 05/19/03 Entered: 05/19/03 Supplemental Basis Page 6
Amendment Page 4 of 22
of 24

24. By executing the Legal Services Agreement and representing RAKTL/A2D in the Cases, Heller acted in a professional and fiduciary capacity that required it to place the interests of RAKTL/A2D before Heller's own interests; to act with complete loyalty, due care, and a high level of candor; and to exercise good faith and fair dealing in its conduct affecting RAKTL/A2D.

25. By executing the Legal Services Agreement and representing RAKTL/A2D in the Cases, Heller was prohibited by fiduciary, professional, contract, and other legal principles from acting in a manner that would undermine Heller's stability in a manner that would harm RAKTL/A2D.

26. Heller was undergoing a serious financial crisis by at least the end of 2007. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

27. By December 2007 Heller had been drawing on its bank credit line at an unprecedented and dangerous rate, and Heller continued to do so into 2008. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

28. By December 2007 Heller's debt was out of control and rising exponentially. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

29. By December 2007 Heller was facing a foreseeable risk of losing its bank financing. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

30. By December 2007 vital Heller Shareholders had left the firm, others were leaving the firm, and others were openly planning to depart or discussing departure. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

31. In December 2007, Heller asked RAKTL/A2D to prepay the fixed-fee payment that, under the Legal Services Agreement, was to be paid for Legal Services to be performed in 2008. Pursuant to that request, A2D made that requested payment, in the amount of approximately $8.2 million dollars, in December 2007.

32. Heller asked RAKTL/A2D to prepay the 2008 fixed-fee payment in December 2007 to enable Heller to pay 2007 "bonuses" to Heller Shareholders. In and before 2008, Heller never communicated to RAKTL/A2D, and RAKTL/A2D did not know, that Heller wanted A2D to prepay the 2008 fixed fee for that purpose, rather than to enable Heller to provide required Legal Services in a timely and otherwise appropriate manner.

33. In December 2007, when Heller asked RAKTL/A2D to prepay the 2008 fixed-fee payment, Heller was already immersed in financial crisis and operating with unreasonably small capital. Heller failed to inform RAKTL/A2D of, and RAKTL/A2D did not know, those facts at any time in or before 2008.

34. Heller used some or all of RAKTL/A2D's prepaid 2008 fixed-fee payment to pay, or to enable Heller to pay, a 2007 "Annual Bonus" to Heller Shareholders (the "Annual

DOCS:916.135:1182512.1

Bonus"). Heller failed to inform RAKTL/A2D of, and RAKTL/A2D did not know, those facts at any time in or before 2008.

35. Under Heller' partnership agreement in effect in December 2007 and early 2008, distributions to the Heller shareholders were limited to, at most, the reported net income as determined by reference to Heller's "Net Profits" for that year and the "cash needs of the "Partnership."

36. The 2007 Annual Bonus Heller paid to Heller Shareholders exceeded Heller's reported net income by nearly $10 million. In paying the 2007 Annual Bonus, Heller was gambling with other people's money, and the gamble failed. Heller failed to inform RAKTL/A2D of, and RAKTL/A2D did not know, these facts at any time in or before 2008.

37. The effect of Heller's payment of the 2007 Annual Bonus to Heller Shareholders was disastrous. Combined with Heller's held checks, unpaid invoices, and deferral of traditionally made payments, payment of the 2007 Annual Bonus created a financial hole from which Heller never emerged. Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, any of these facts in or before 2008.

38. When Heller first ordered payment of the 2007 Annual Bonus, Heller treated it as an "excess distribution." When Heller issued its financial statements, however, Heller improperly characterized the payments as "loans" to the entities that comprised Heller. In and before 2008, Heller never informed RAKTL/A2D, and RAKTL/A2D did not know, of this improper accounting.

39. On January 1, 2008, Heller was desperately short of capital. Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, that fact at any time in or before September 26, 2008.

40. Beginning in early 2008, Heller tried to control its staffing and contain its litigation efforts on the Cases to reduce Heller's internally projected 2008 budget deficit for the Cases. Throughout 2008, Heller concealed from RAKTL/A2D that Heller was making and had made decisions about staffing and litigation efforts on the Cases for that purpose, rather than to benefit RAKTL/A2D or to maintain the Legal Services at the same level of quality and effort that Heller had previously provided in the Cases. Instead, throughout that period, Heller led RAKTL/A2D to believe that Heller was continuing to make decisions about staffing and litigation efforts on the Cases based on the same factors on which Heller had previously based its decisions about staffing and litigation efforts on the Cases and that Heller was maintaining the Legal Services at the same level of quality and effort that Heller had previously provided in the Cases.

41. In 2008, while Heller was insolvent and sliding further into insolvency, it paid or caused to be paid to departing Heller Shareholders approximately $8 million. Heller characterized those payments at the time as a return of capital (the "Capital Transfers"). Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, these facts in 2008.

Case 3:08-03251 Doc# 178-02 Filed: 05/19/03 Entered: 05/19/09 14:47:34 Basis Page 8
Case 08-32514 Claim 178-1 Part 2 Filed 05/19/09 Desc Supplement to Basis for Amendment of Page 6 of 22

42. In at least March through July of 2008, Heller drew on its bank credit line at an unprecedented and dangerous rate. Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, that fact in 2008.

43. On September 14, 2008, Heller Shareholders Robert Haslam ("Haslam") and Michael Plimack ("Plimack") and other Heller attorneys who had been providing Legal Services informed Heller of their intention to resign from Heller on October 1, 2008. Heller did not inform RAKTL/A2D of that fact until after September 26, 2008.

44. On September 16, 2008, RAKTL/A2D received from Haslam a telephone call in which Haslam stated that he and Plimack wanted to meet with Ronald A. Katz ("Katz") to discuss "what's happening in the press." Through Katz's assistant who received the call, Haslam scheduled a meeting with Katz for September 22, 2008, at RAKTL's offices in Los Angeles.

45. On September 22, 2008, Haslam and Plimack met with a RAKTL/A2D representative, Ronald A. Katz, and told him that they would soon be leaving Heller and joining Covington. No one representing Heller, and no one who to the knowledge of RAKTL/A2D had ever represented Heller, had previously informed RAKTL\A2D that Haslam, Plimack, and other Heller Shareholders who had been working on the Cases would, or even might, be leaving Heller to join another law firm.

46. On September 22, 2008, no one told RAKTL/A2D that, on or about September 14, 2008, or on any other date, Haslam, Plimack, or any other Heller shareholder who had been working on the Cases had already either resigned from or submitted a resignation notice to Heller.

47. At the meeting on September 22, 2008, Haslam and Plimack told RAKTL/A2D that Haslam, Plimack and some other Heller attorneys would sometime thereafter join Covington. Based on that meeting, RAKTL/A2D understood that the Heller attorneys moving to Covington could and would continue to provide the Legal Services at no extra cost to RAKTL/A2D beyond what was provided for in the Legal Services Agreement. Haslam and Plimack assured RAKTL/A2D that the transition would be "completely smooth" for all of the Cases, except for possibly one. Haslam and Plimack advised RAKTL/A2D that Covington might not be able to represent RAKTL in its case against US Cellular because of a possible conflict of interest.

48. Haslam and Plimack had Heller's actual authority to make the representations they made to RAKTL/A2D at the meeting on September 22, 2008.

49. Haslam and Plimack had Heller's apparent authority to make the representations they made to RAKTL/A2D at the meeting on September 22, 2008.

50. In October 2008, Heller billed RAKTL/A2D for Plimack's September 2008 work on the Cases, including his time for attending the meeting at RAKTL's offices on September 22, 2008. Heller thereby adopted and ratified the representations made to RAKTL/A2D at the meeting on September 22, 2008.

51. By no later than September 26, 2008, Heller's management had concluded that Heller was no longer in a position to continue to service its clients efficiently and had presented Heller Shareholders with a dissolution plan so stating (the "Dissolution Plan"). Heller did not inform RAKTL/A2D of those facts before 2010.

52. Heller's Dissolution Plan provided that in Heller's dissolution process, to ensure that Heller's "non-contingency/non-success fee matters only" would be attended to in the most efficient and effective manner possible, Heller (a) would waive any rights and claims under the doctrine of *Jewel v. Boxer* to seek payment of legal fees generated after the departure date of any lawyer or group of lawyers and (b) would encourage Heller lawyers to move their clients to other law firms. Heller took no similar such action to ensure that the Cases would be attended to in an efficient and effective manner.

53. Heller failed to take action to ensure that in Heller's dissolution process the Cases would be attended to in the manner required by the Legal Services Agreement.

54. Heller failed to take action to ensure that in Heller's dissolution process the Cases would be attended to in the manner required by Heller's professional and fiduciary obligations to RAKTL/A2D.

55. Heller failed to take action to ensure that in Heller's dissolution process the Cases would be attended to in the manner required by Heller's covenant of good faith and fair dealing RAKTL/A2D.

56. Until September 30, 2008, RAKTL/A2D believed that Haslam, Plimack, and other Heller Shareholders who had been providing Legal Services had not yet resigned from Heller.

57. On or before September 25, 2008, Heller's management concluded that Heller should dissolve.

58. On or before September 25, 2008, Heller's management announced to Heller employees, including employees who were not lawyers, that Heller's dissolution was unavoidable.

59. At approximately 7:00 a.m. PDT on September 26, 2008, RAKTL/A2D read a media story stating that on the previous day Heller had announced to "all hands" that it was dissolving "in a partnership vote today"; that a Heller partner had stated that Heller's banks had "seized control of accounts receivable, unbilled time and expenses this week"; that "the banks' decision came after the departure of 14 IP litigators, announced on Sept. 14, triggered a clause in the contract governing the firm's line of credit"; and that "2007 and 2008 were marked with a steady stream of partner departures. Last October the firm laid off 65 support staff. The firm has lost about 50 partners since January, including a group of 14 intellectual property litigators that recently left for Covington & Burling." Aside from what Haslam and Plimack told Katz at the meeting on September 22, 2008, at no time before RAKTL/A2D read that media story had anyone representing Heller with actual or apparent authority told RAKTL or A2D anything about the intended, announced, or actual departure from Heller of Haslam, Plimack, and other lawyers who had been providing Legal Services. Nor had anyone representing Heller with actual or apparent authority, other than Haslam and Plimack, told Katz that Heller was considering or taking any action to achieve dissolution.

60. On September 26, 2008, and during Heller's dissolution process, several Cases were proceeding in litigation, with multiple time-sensitive deadlines pending, including court-ordered deadlines and deadlines in the following week.

61. In connection with the transfer of the Cases from Heller to Covington and other successor counsel, Heller owed professional and fiduciary duties of loyalty, care, and disclosure directly to RAKTL/A2D.

62. Heller entered into the Jewel Waiver with actual intent to hinder, delay, or defraud one or more entities to which Heller was indebted or became indebted on or after the date of certain transfers. RAKTL/A2D is one of those entities.

63. At the time of the Jewel Waiver, Heller was insolvent or became insolvent.

64. Heller's dissolution pursuant to the Dissolution Plan made it impossible for Heller to continue its representation of RAKTL/A2D in the Cases.

65. Heller knew that once the Dissolution Plan was approved, Heller would be unable to complete the Legal Services for RAKTL/A2D.

66. After Heller announced that it would be dissolving, Heller never contacted RAKTL/A2D to inform RAKTL/A2D whether, either legally or practically, Heller could or could not continue providing Legal Services to RAKTL/A2D.

67. After Heller announced that it would be dissolving, Heller, other than through Haslam, Plimack, and Byrnes, never contacted RAKTL/A2D to advise RAKTL/A2D as to what RAKTL/A2D could or should do to protect itself and its interest in the Cases from harm that might result from Heller's dissolution.

**Debtor Breached the Legal Services Agreement.**

68. At all relevant times the Legal Services Agreement was a valid and existing contract.

69. At all relevant times RAKTL/A2D complied, and was in compliance, with its obligations under the Legal Services Agreement.

70. Haslam and Plimack were still Heller Shareholders when they met with RAKTL/A2D representatives on September 22, 2008.

71. Haslam and Plimack were acting as Heller's agents when they represented to RAKTL/A2D on September 22, 2008, that transfer of the Cases to Covington would be "completely smooth" and that Haslam, Plimack, and other Heller lawyers who had been providing Legal Services could and would continue providing Legal Services under the Legal Services Agreement. At no time on or before October 1, 2008, did Heller tell RAKTL/A2D anything to the contrary.

72. Based on the meeting of Haslam, Plimack, and Ronald A. Katz on September 22, 2008, RAKTL/A2D believed, on that date and until sometime after early October 2008, that when Haslam, Plimack, and other lawyers who had been providing Legal Services joined Covington, they could and would continue to provide Legal Services at no greater cost to RAKTL/A2D than was specified in the Legal Services Agreement.

DOCS:916.135:1182512.1

-9-

Case 08-32514 Doc 2173-2 Part 2 Filed 09/03/13 Entered 09/14/13 14:13:10 Desc Supplemental Basis for Amendment 11 of Page 9 of 22

73. On September 26, 2008, using a Heller email address, Andrew Byrnes ('Byrnes") sent RAKTL/A2D an email with an attached proposed letter for RAKTL/A2D to sign that would allow transfer of the Case files to Covington. Byrnes sent the email to RAKTL/A2D from his Heller email address.

74. Byrnes was still a Heller Shareholder on September 26, 2008.

75. Byrnes had actual authority to act on behalf of Heller in sending RAKTL/A2D the email and attached proposed letter on September 26, 2008.

76. Byrnes had apparent authority to act on behalf of Heller in sending RAKTL/A2D the email and attached proposed letter on September 26, 2008.

77. RAKTL/A2D revised the letter proposed by Byrnes on September 26, 2008, and RAKTL/A2D signed and sent the revised letter to Heller on September 26, 2008 (the "RAKTL/A2D September 2008 letter").

78. At no time on September 26, 2008, or at any other time on or before October 1, 2008, did anyone representing or purporting to represent Heller communicate to RAKTL/A2D, orally or in writing, that any of the facts or beliefs stated in the RAKTL/A2D September 2008 letter was erroneous.

79. At no time on September 26, 2008, or at any other time thereafter, did anyone representing or purporting to represent Heller offer or give RAKTL/A2D any legal advice inconsistent in any way with any of the facts or beliefs stated in the RAKTL/A2D September 2008 letter.

80. At no time on September 26, 2008, or at any other time thereafter, did anyone representing or purporting to represent Heller tell RAKTL/A2D, orally or in writing, that Heller was able to continue providing the Legal Services, either in a winding-up mode or otherwise.

81. At no time before, on, or after September 26, 2008, did anyone representing or purporting to represent Heller tell RAKTL/A2D that Heller could, wanted to, or would consider designating any Heller Shareholders, other than those who were going to go or had gone to Covington, to continue to provide the Legal Services for Heller after Haslam, Plimack, and others resigned from or told Heller management that they were going to resign from Heller.

82. RAKTL/A2D agreed to transfer the Cases to Covington because RAKTL/A2D had been led to believe, by persons with authority to act on behalf of Heller, and believed, that Heller had consented to the transfer and that the Legal Services would be provided by lawyers at Covington under the terms of the Legal Services Agreement at no extra cost to RAKTL/A2D.

83. On September 26, 2008, RAKTL/A2D informed Heller in writing that RAKTL/A2D's understanding was that when Haslam and his team from Heller moved to Covington, they would be continuing to provide the Legal Services under the terms of the Legal Services Agreement. At no time on or before October 1, 2008, did anyone representing or purporting to represent Heller inform RAKTL/A2D that Heller disagreed with any statement in that writing.

DOCS:916.135:1182512.1

-10-

Case 08-32514 Doc 2179-2 Part 2 Filed 05/03/13 Entered 05/03/13 14:13:15 Page 12 of 24

Case 08-32514 Doc 1773-2 Part 2 Filed 03/03/13 Entered 03/03/13 14:13:15 Desc Supplemental Basis for Amendment Page 10 of 22

84. The transfer of the Cases to Covington was not "completely smooth." Because of a conflict, Covington could not represent RAKTL in all of the remaining Cases. In addition, because Heller refused to reach an agreement with Covington that would enable Covington to provide all the Legal Services without the risk of being sued either by Heller in Heller's winding-up actions or in connection with Heller's bankruptcy if Heller were to file for bankruptcy, Covington would not agree to provide all the Legal Services unless RAKTL/A2D would agree to make additional fixed-fee payments to Covington and to indemnify Covington against any such risk.

85. Heller breached the Legal Services Agreement by failing to perform the Legal Services in 2007 and 2008.

86. Heller breached the Legal Services Agreement by failing to timely inform, and provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and into September 2008 that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

87. Heller breached the Legal Services Agreement by failing to timely inform, and provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and into September 2008 that significantly increased the risk that Heller would be unable or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

88. Heller breached the Legal Services Agreement by failing, in late 2007 and thereafter, to make decisions about the amount and nature of Legal Services provided on a consistent basis, and by failing to timely inform and advise RAKTL/A2D that Heller intended to change and did change the bases for making such decisions, while one or more of the Cases was still pending.

89. Heller breached the Legal Services Agreement by failing, in late 2007 and thereafter, to provide the Legal Services with the consistent degree of timeliness, effort, and quality, including staffing, required by the Legal Services Agreement.

90. Heller breached the Legal Services Agreement in late 2007 and thereafter by controlling its staffing and containing its litigation efforts on the Cases not for the purpose and effect of providing the amount and quality of legal services required by the Legal Services Agreement, but for the purpose and effect of reducing Heller's internally projected 2008 budget deficit for the Cases.

91. Heller breached the Legal Services Agreement on and after September 14, 2008, by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the fact that, on or about September 14, 2008, Haslam, Plimack, and other Heller attorneys and Heller Shareholders who had been providing Legal Services, informed Heller of their intention to resign from Heller.

92. Heller breached the Legal Services Agreement by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to

DOCS:916.135:1182512.1

-11-

Case 08-32514 Doc 2173-2 Part 2 Filed 05/03/13 Entered 05/03/13 Entered 05/03/13 14:43:19 Desc Supplemental Basis for Amendment 3 of 24 Page 11 of 22

ensure that the Cases would be attended to in an efficient and effective manner without imposing additional costs on RAKTL/A2D.

93. Heller breached the Legal Services Agreement by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the Legal Services Agreement.

94. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Heller would dissolve, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

95. Heller breached the Legal Services Agreement by failing, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, to take the actions necessary to ensure that the Cases would be attended to an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

96. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

97. Heller breached the Legal Services Agreement by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

98. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

99. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the conclusion by Heller's management that Heller was no longer in a position to continue to service its clients efficiently and about Heller's preparation of a written dissolution plan.

DOCS:916.135:1182512.1

-12-

Case 08-32514 Doc 2177-9 Part 6 Filed 06/03/11 Entered 06/03/11 14:13:09 Page 12 of 22
Case 3:08-32514 Doc 21-9 Part 6 Filed 05/10/14 Desc Supplemental Basis for Amendment 4 of 24 Page 12 of 22

100.    On and after September 26, 2008, as a result of Heller's breaches of the Legal Services Agreement, RAKTL/A2D immediately had to find successor legal counsel who could represent RAKTL in the then-pending Cases.

101.    After deciding to dissolve, Heller breached the Legal Services Agreement by failing to take reasonable and timely actions necessary to enable Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller to continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

102.    After deciding to dissolve, Heller breached the Legal Services Agreement by actively impeding RAKTL/A2D's ability to have Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

103.    After deciding to dissolve, Heller breached the Legal Services Agreement by failing to provide, failing to arrange to provide, and failing even to attempt to provide, the Legal Services as part of Heller's winding-up process without imposing additional costs on RAKTL/A2D.

104.    After Heller dissolved, Covington temporarily provided Legal Services for all Cases other than the US Cellular Case, and RAKTL/A2D retained Cooley Godward Kronish LLP ("Cooley") to represent A2D and its affiliates in the US Cellular Case.

105.    As a result of Heller's acts and omissions described above, RAKTL/A2D ultimately had to retain Cooley in February 2009 to represent A2D and its affiliates in all but one of the Cases that had been pending when Heller dissolved. To do so, RAKTL/A2D had to pay Cooley substantial additional fixed fees that RAKTL/A2D would not have had to pay had Heller not breached the Legal Services Agreement, and RAKTL/A2D had to agree to pay Cooley a contingent fee that RAKTL/A2D would not have had to agree to pay had Heller not breached the Legal Services Agreement.

106.    As a result of Heller's breaches of the Legal Services Agreement, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

**Heller Breach the Covenant of Good Faith and Fair Dealing with RAKTL/A2D.**

107.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and 2008 that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

108.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and 2008 that significantly increased the risk that

Heller would be unable or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

109.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to make decisions about the amount and nature of Legal Services provided on a consistent basis, and by failing to timely inform and advise RAKTL/A2D that Heller intended to change and did change the bases for making such decisions, while one or more of the Cases was still pending.

110.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to provide the Legal Services with the consistent degree of timeliness, effort, and quality, including staffing, required by the covenant of good faith and fair dealing with RAKTL/A2D.

111.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by controlling its staffing and containing its litigation efforts on the Cases not for the purpose and effect of providing the amount and quality of legal services required by the covenant of good faith and fair dealing with RAKTL/A2D, but for the purpose and effect of reducing Heller's internally projected 2008 budget deficit for the Cases.

112.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the fact that, in about mid-August 2008, Heller attorneys, including Heller attorneys providing the Legal Services, began executing a detailed program under which a critical mass of Heller's attorneys with intellectual-property expertise would commit to resign from Heller.

113.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the fact that, on or about September 14, 2008, Haslam, Plimack, and other Heller attorneys and Heller Shareholders who had been providing Legal Services, resigned, or informed Heller of their intention to resign, from Heller.

114.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner and without imposing additional costs on RAKTL/A2D.

115.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

116.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the Legal Services Agreement.

117.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Heller would dissolve, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

118.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

119.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

120.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

121.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

122.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and provide legal advice to, RAKTL/A2D, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

123.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the conclusion by Heller's management that Heller was no longer in a position to

continue to service its clients efficiently and about Heller's preparation of a written dissolution plan.

124.     Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform RAKTL/A2D that Haslam, Plimack, and other attorneys who had been providing Legal Services had resigned, or announced their resignation, from Heller on September 14, 2008.

125.     On and after September 26, 2008, as a result of Heller's breaches of the covenant of good faith and fair dealing with RAKTL/A2D, RAKTL/A2D immediately had to find successor legal counsel who could represent RAKTL in the then-pending Cases.

126.     RAKTL/A2D retained Cooley Godward Kronish LLP ("Cooley") to represent A2D and its affiliates in all but one of the pending Cases. To do so, RAKTL/A2D had to pay Cooley substantial additional fixed fees that RAKTL/A2D would not have had to pay had Heller not breached the covenant of good faith and fair dealing with RAKTL/A2D, and RAKTL/A2D had to agree to pay Cooley a contingent fee that RAKTL/A2D would not have had to agree to pay had Heller not breached the covenant of good faith and fair dealing with RAKTL/A2D.

127.     After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to take reasonable actions necessary to enable Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller to continue providing the Legal Services at Covington or elsewhere without imposing additional costs on RAKTL/A2D.

128.     After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by actively impeding RAKTL/A2D's ability to have Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

129.     After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to provide, failing to arrange to provide, and failing even to attempt to provide, the Legal Services as part of Heller's winding-up process.

130.     After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by entering into the Jewel Waiver and thereby providing to certain Heller clients other than RAKTL/A2D preferential treatment, including opportunities to obtain legal representation without incurring extra costs caused by Heller's dissolution, and by failing to communicate these facts to RAKTL/A2D.

131.     As a result of Heller's breaches of the covenant of good faith and fair dealing with RAKTL/A2D, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

132.    By the foregoing breaches of the covenant of good faith and fair dealing, Heller wrongfully and unfairly interfered with RAKTL/A2D's right to receive the benefits of the Legal Services Agreement.

### Debtor Breached Its Fiduciary Duties to RAKTL/A2D.

133.    Heller owed fiduciary duties to RAKTL/A2D, including the duties of loyalty, competence, and communication about significant developments relating to Heller's representation of, or employment by, RAKTL/A2D in the Cases.

134.    Heller breached its fiduciary duty of communication to RAKTL/A2D by failing to inform RAKTL/A2D of significant developments relating to Heller's representation of or employment by RAKTL/A2D in the Cases.

135.    Heller breached its fiduciary duty of loyalty to RAKTL/A2D by refusing to enter into an agreement with Covington concerning division of the contingent fee that would enable RAKTL/A2D to continue to obtain the Legal Services without incurring costs beyond those specified in the Legal Services Agreement.

136.    Heller also owed fiduciary duties to promptly refund any portion of a fee paid in advance that was not earned, and not to charge or attempt to collect a fee that had not been earned.

137.    Heller did not perform the required Legal Services in the last quarter of 2008. Heller collected approximately $2 million for Legal Services that it did not perform, and Heller has not repaid those fees. Heller breached its fiduciary duties to RAKTL/A2D by failing to refund those fees promptly. Heller further breached its fiduciary duties to RAKTL/A2D by failing to refund those fees at all.

138.    Heller has not promptly refunded, and has not refunded at all, other fixed fees that RAKTL/A2D paid it under the Legal Services Agreement, that Heller did not earn and that Heller, by dissolving as it did before all the Cases had been fully resolved, made itself unable to earn.

139.    Heller breached its fiduciary duties by taking action to collect a contingent fee that, because Heller failed to complete the Legal Services and because the Cases still are not fully resolved, Heller did not earn, has not earned, and cannot earn.

140.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and 2008 that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

141.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and 2008 that significantly increased the risk that Heller would be unable or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

142.    Heller breached its fiduciary duty of communication and loyalty by failing to make decisions about the amount and nature of Legal Services provided on a consistent basis, and by failing to timely inform and advise RAKTL/A2D that Heller intended to change and did change the bases for making such decisions, while one or more of the Cases was still pending.

143.    Heller breached its fiduciary duty of loyalty by failing to provide the Legal Services with the consistent degree of timeliness, effort, and quality, including staffing, needed to provide effective legal services.

144.    Heller breached its fiduciary duty of loyalty by controlling its staffing and containing its litigation efforts on the Cases not for the purpose and effect of providing the amount and quality of legal services needed to provide effective legal services, but for the purpose and effect of reducing Heller's internally projected 2008 budget deficit for the Cases.

145.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the fact that, on or about September 14, 2008, Haslam, Plimack, and other Heller attorneys and Heller Shareholders who had been providing Legal Services, resigned, or informed Heller of their intention to resign, from Heller.

146.    Heller breached its fiduciary duty of communication and loyalty by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner without imposing additional costs on RAKTL/A2D.

147.    Heller breached its fiduciary duty of communication and loyalty by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the Legal Services Agreement without imposing additional costs on RAKTL/A2D.

148.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Heller would dissolve, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

149.    Heller breached its fiduciary duty of communication and loyalty by failing, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, to take the actions necessary to ensure that the Cases would be attended to an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

150.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, about what actions

Case 3:08-25-25514-DC-lam17-3092 Part Filed:Filed 93/03/1 Entered:o Supplemen4 Basis for Page
Amendmen20 of Page 18 of 22

RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

151.    Heller breached its fiduciary duty of communication and loyalty by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

152.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

153.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the conclusion by Heller's management that Heller was no longer in a position to continue to service its clients efficiently and about Heller's preparation of a written dissolution plan.

154.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform RAKTL/A2D that Haslam, Plimack, and other attorneys who had been providing Legal Services had resigned, or announced their resignation, from Heller on September 14, 2008.

155.    After deciding to dissolve, Heller breached its fiduciary duty of communication and loyalty by failing to take reasonable actions necessary to enable Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller to continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

156.    After deciding to dissolve, Heller breached its fiduciary duty of loyalty by actively impeding RAKTL/A2D's ability to have Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

157.    After deciding to dissolve, Heller breached its fiduciary duty of loyalty by failing to provide, failing to arrange to provide, and failing even to attempt to provide, the Legal Services as part of Heller's winding-up process .

158.    After deciding to dissolve, Heller breached its fiduciary duty to RAKTL/A2D by entering into the Jewel Waiver and thereby providing to certain Heller clients other than RAKTL/A2D preferential treatment, including opportunities to obtain legal representation without incurring extra costs caused by Heller's dissolution, and by failing to communicate these facts to RAKTL/A2D.

Case 3:08-bk-32514 Doc 2179-2 Part 2 Filed 06/03/13 Entered 06/03/13 14:11:15 Desc Supplemental Basis for Amendment Page 19 of 22

159.    As a result of Heller's breaches of its fiduciary duty of communication and loyalty, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

160.    By the foregoing breaches of its fiduciary duty of communication and loyalty, Heller wrongfully and unfairly interfered with RAKTL/A2D's right to receive the benefits of the Legal Services Agreement.

**Debtor Fraudulently Concealed Information from RAKTL/A2D.**

161.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D that Heller was controlling its staffing and containing its litigation efforts on the Cases to reduce Heller's internally projected 2008 budget deficit for the Cases.

162.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D the significant and growing risk that Heller would be unable or unwilling to continue to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, resources, and dedication Heller had demonstrated and provided in previously providing legal services generally, and Legal Services in particular, to RAKTL/A2D.

163.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D that Heller had changed or intended to change the bases on which it made decisions about the amount or nature of services to be devoted to the Cases by Heller personnel.

164.    On September 14, 2008, and for more than two weeks thereafter, Heller intentionally withheld from RAKTL/A2D that on September 14, 2008, Haslam, Plimack, and other Heller attorneys who had been providing Legal Services  informed Heller of their intention to resign from Heller as of October 1, 2008.

165.    After Heller's management determined that dissolution of Heller was unavoidable, Heller intentionally withheld that information from RAKTL/A2D.

166.    On September 25, 2008, Heller's management intentionally withheld from RAKTL/A2D that earlier that day Heller had announced to Heller employees, including employees who were not lawyers, that Heller's dissolution was unavoidable.

167.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D the changes in circumstances that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

168.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D the changes in circumstances that significantly increased the risk that Heller would be unable or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

169.     Heller intentionally withheld from RAKTL/A2D the conclusion by Heller's management that Heller was no longer in a position to continue to service its clients efficiently.

170.     Heller knew that by failing to fully inform RAKTL/A2D of Heller's dire and worsening financial circumstances in 2007 and 2008, Heller's insolvency in early 2008 and thereafter, the likely departure of key Heller Shareholders, the tendered resignations and resignations of key Heller Shareholders, the conclusion by Heller management that dissolution of Heller was unavoidable, Heller's inability to provide the Legal Services after the departure of Haslam, Plimack, and other Heller Shareholders who had provided Legal Services, and Heller's plans for dissolution, Heller was portraying to RAKTL/A2D a false and misleading picture about Heller's ability to continue providing Legal Services in and after the last quarter of 2008.

171.     Heller intentionally withheld from RAKTL/A2D that, after deciding to dissolve, Heller entered into the Jewel Waiver and thereby provided to certain Heller clients other than RAKTL/A2D preferential treatment, including opportunities to obtain legal representation without incurring extra costs caused by Heller's dissolution.

172.     Heller concealed the foregoing information with the intent that RAKTL/A2D would rely on Heller's deception.

173.     RAKTL/A2D justifiably relied on the representations made to it by Heller and did not know that Heller had withheld information material to those representations as described in the foregoing paragraphs.

174.     RAKLT/A2D justifiably believed, and acted on its belief, that Heller would not engage in conduct that would put Heller's interest above the interest of RAKTL/A2D and would communicate to RAKTL/A2D information that created a significant risk that Heller would be unwilling or unable to provide the Legal Services.

175.     Heller's wrongful concealment of information as described above was a substantial factor in causing RAKTL/A2D harm by causing RAKTL/A2D to have to pay additional attorney fees and causing RAKTL/A2D to have to enter into an additional contingent-fee agreement.

176.     As a result of Heller's wrongful concealment of information as described above, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

**Debtor Was Unjustly Enriched by Payments Received from RAKTL/A2D.**

177.     Heller received legal fees for Legal Services it failed to perform and now cannot possibly perform.

178.     Heller is not entitled to keep the legal fees it received.

179.     Heller failed to refund the legal fees to which it was not entitled.

180.     Heller has been unjustly enriched.

181. As a result of Heller's conduct, RAKTL/A2D has been damaged in the amount of the fees RAKTL/A2D paid to Heller.

## Debtor Breach Its First/Second Pass Agreement with RAKTL/A2D

182. Heller entered into an agreement with RAKTL/A2D regarding payment for a vendor product called "First/Second Pass." By that agreement (the "First/Second Pass Agreement"), RAKTL/A2D agreed to made an advance payment to Berry & Associates, PC on Heller's behalf to enable Heller to use First/Second Pass, and Heller agreed to repay RAKTL/A2D.

183. Heller wanted to try First/Second Pass because First/Second Pass provided a potential saving for Heller of attorney time for which RAKTL/A2D had already paid under the Legal Services Agreement.

184. Pursuant to the First/Second Pass Agreement, RAKTL/A2D made the promised advance payment and fulfilled all of RAKTL/A2D's obligations under that agreement. The amount RAKTL/A2D so advanced was $1,023,069.43.

185. Heller issued credits to RAKTL/A2D for only a portion of the advance payment made by RAKTL/A2D, did not issue all of the credits due, and did not repay RAKTL/A2D as required by the First/Second Pass Agreement.

186. Heller still owes RAKTL/A2D $408,517.00 for the payment that RAKTL/A2D advanced on Heller's behalf to enable Heller to use First/Second Pass.

187. Heller breached the Legal Services Agreement by failing to pay RAKTL/A2D the amount due and owing to RAKTL/A2D by Heller under that agreement.

188. Heller breached the First/Second Pass Agreement by failing to pay RAKTL/A2D the amount due and owing to RAKTL/A2D by Heller under that agreement.

189. As a result of Heller's breach of the Legal Services Agreement and the First/Second Pass Agreement, RAKTL/A2D is entitled to damages in the amount of $408, 517.00.

## RAKTL/A2D Is Entitled to Damages as a Result of Debtor's Conduct.

190. In light of the foregoing Amended Claim, RAKTL/A2D believes its damages may exceed its initial expectations, but it is unable at this point to provide exact calculations. It is for this reason that RAKTL/A2D hereby amends the Original Claim. Therefore, RAKTL/A2D's Amended Claim is for $408,517.00 (i.e., the remaining balance of the amount owed to RAKTL as described above) plus an amount presently estimated to exceed $50,000,000.00.