# EXHIBIT 5

1   WILLIAM McGRANE (057761)                GREGORY C. NUTI (151754)
    CHRISTOPHER D. SULLIVAN (148083)        KEVIN W. COLEMAN (168538)
2   TREPEL McGRANE GREENFIELD LLP           SCHNADER HARRISON SEGAL & LEWIS LLP
    150 California Street, 22nd Floor        One Montgomery Street, Suite 2200
3   San Francisco, California 94111         San Francisco, California 94104
    Telephone:    (415) 283-1776            Telephone:    (415) 364-6700
4   Email:        wmcgrane@tmcglaw.com      Email:        gnuti@schnader.com
                  csullivan@tmcglaw.com                   kcoleman@schnader.com
5

6   JEFFREY T. MAKOFF (120004)
    ELLEN RUTH FENICHEL (172142)
7   VALLE MAKOFF LLP
    388 Market Street, Suite 1580
8   San Francisco, California 94111
    Telephone:    (415) 986-8001
9   Email:        jmakoff@vallemakoff.com
                  efenichel@vallemakoff.com
10

11  Co-Special Litigation Counsel for Heller Ehrman LLP, by
    and through Michael Burkart, Plan Administrator
12

13                      UNITED STATES BANKRUPTCY COURT
                        NORTHERN DISTRICT OF CALIFORNIA
14
    In re:                                  Case No. 08-32514 DM
15                                          Chapter 11
    HELLER EHRMAN LLP,
16                                          Adv. Proc. No.
           Liquidating Debtor.
17  ─────────────────────────────           FIRST AMENDED COMPLAINT FOR:
    HELLER EHRMAN LLP, LIQUIDATING          (1)-(3)   BREACH OF CONTRACT; QUANTUM
18  DEBTOR,                                 MERUIT; AND BREACH OF THE IMPLIED
                                            COVENANT OF GOOD FAITH AND FAIR DEALING
19         Plaintiff,                       AGAINST RAKTL DEFENDANTS; (4)–(6)
    v.                                      BREACH OF CONTRACT; BREACH OF THE IMPLIED
20                                          COVENANT OF GOOD FAITH AND FAIR DEALING;
    RONALD A. KATZ TECHNOLOGY               AND BREACH OF FIDUCIARY DUTY AGAINST IP
    LICENSING, L.P., A2D, L.P., FIRST DATA  SHAREHOLDER DEFENDANTS AND RAKTL
21  RESOURCES, INC., A2D CORPORATION,       DEFENDANTS; (7) EQUITABLE INDEMNIFICATION
    ROBERT FRAM, ROBERT HASLAM, ALAN        AGAINST IP SHAREHOLDER DEFENDANTS AND
22  BLANKENHEIMER, MAUREEN BROWNE,          COVINGTON & BURLING; (8)-(11) AVOIDANCE OF
    ANDREW BYRNES, JO DALE CAROTHERS,       FRAUDULENT TRANSFERS -- UNFINISHED
23  JOHNNY CHIU, MICHAEL MARKMAN,           BUSINESS AGAINST COVINGTON & BURLING [11
    MICHAEL PLIMACK, CHRISTINE SAUNDERS-    U.S.C. §§ 544, 548, 550; CAL. CIVIL CODE §§ 3439.04,
24  HASKETT, STURGIS SOBIN, NITIN           3439.05, 3439.07]; (12)-(13) AIDING AND ABETTING
    SUBHEDAR, LAURA UNDERWOOD-              BREACH OF FIDUCIARY DUTY AND INTENTIONAL
25  MUSCHAMP, STANLEY YOUNG, HEIDI          INTERFERENCE WITH CONTRACTUAL RELATIONS
    GUTIERREZ, CHRIS MARTINIAK, DALE        AGAINST COVINGTON & BURLING; (14)
26  RICE, AND COVINGTON & BURLING LLP.      ACCOUNTING; (15) DECLARATORY RELIEF; AND(16)
                                            – (22)  AVOIDANCE OF FRAUDULENT TRANSFERS --
27         Defendants.                      IP SHAREHOLDER  TRANSFERS [11 U.S.C. §§ 544, 548,
                                            550; CAL. CIVIL CODE §§ 3439.04, 3439.05, 3439.07]
28
                                            FIRST AMENDED OBJECTION TO:
                                            CLAIM NO. 709 FILED BY RONALD A. KATZ
                                            TECHNOLOGY LICENSING, L.P./A2D, L.P.

Comes now plaintiff Liquidating Debtor Heller Ehrman LLP, by and through Michael Burkart, in his capacity as the duly appointed plan administrator under the Plan of Liquidation confirmed in this case, and alleges as follows:

## INTRODUCTION

1.      This adversary proceeding arises from a number of inter-related claims that arise out of the pre-petition actions by certain former Heller Ehrman LLP shareholders in the firm's intellectual property practice group who fostered a mass exodus of IP litigators from the Debtor to Covington & Burling LLP. The actions precipitated the Debtor's dissolution and deprived the Debtor of legal fees to which it was entitled. The conduct also led to claims by a former Heller Ehrman LLP client that the Debtor somehow breached its engagement agreement with the client. This adversary proceeding also seeks to recover for pre-petition transfers by the Debtor to the same former Heller shareholders, as listed below.

2.      Essentially, the claims made here are (a) for breach of contract, as well as related claims, for recovery of unpaid legal fees against Ronald A. Katz Technology Licensing, L.P. and related entities; (b) to recover from the former Heller IP Shareholders the overdistributions to them paid by the Debtor and for the damages caused to the Debtor stemming from their mass exodus during a key time for the Debtor and their involvement in moving clients to Covington & Burling; and (c) to recover against Covington & Burling for their encouragement, ratification, and participation in the wrongdoing of the former Heller IP shareholders and the profits from the firm made on the unfinished business of the Debtor's former clients under the *Jewel v. Boxer* doctrine and related law.

## THE PARTIES

3.      Liquidating Debtor Heller Ehrman LLP ("Debtor" or "Plaintiff") is a California limited liability partnership, formerly engaged in the practice of law, which filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on December 28, 2008.

4.      On August 9, 2010, Debtor and the Official Committee of Unsecured

Creditors filed in this Court the Joint Plan of Liquidation of Heller Ehrman LLP ("Plan"). On August 16, 2010, this Court entered its order confirming the Plan, which order became effective on September 1, 2010. Under the terms of the Plan, Plaintiff succeeded to all right, title and interest of Debtor in the causes of action alleged herein.

5. Michael Burkart ("Burkart") is the duly appointed administrator under the Plan ("Plan Administrator").

**RAKTL Defendants**

6. Defendant Ronald A. Katz Technology Licensing, L.P. ("RAKTL") is a California limited partnership.

7. Defendant A2D, L.P. ("A2D") is a California limited partnership. A2D is the general partner of RAKTL.

8. Defendant First Data Resources, Inc. ("First Data") is a Delaware corporation. Plaintiff is informed and believes that First Data is the sole limited partner of RAKTL.

9. Defendant A2D Corporation ("A2D Corp.") is a California corporation. A2D Corporation is the general partner of A2D.

10. RAKTL and A2D filed a proof of claim ("RAKTL Claim" or "Claim No. 709") in the Heller Ehrman LLP bankruptcy case, in which this is an adversary action.

11. The defendants named in Paragraphs 6-10 are referred to collectively herein as the "RAKTL Defendants." Due to their knowledge, relationships and concerted action, each RAKTL Defendant is jointly and severally liable for the actions of the others.

**Former Heller IP Shareholder Defendants**

12. Defendant Robert Fram ("Fram") is a former shareholder of Debtor, and until October 1, 2008, was a member of Debtor's intellectual property ("IP") Litigation Practice Group. Fram was a member of Debtor's governing Policy Committee and owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties.

13. Defendant Robert Haslam ("Haslam") is a former shareholder of Debtor,

and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Haslam was a member of Debtor's governing "Policy Committee Plus" and owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties.

14. Defendant Alan Blankenheimer ("Blankenheimer") is a former shareholder of Debtor, and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Blankenheimer was a member of Debtor's governing Policy Committee and owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties.

15. Defendant Maureen Browne ("Browne") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Browne owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

16. Defendant Andrew Byrnes ("Byrnes") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Byrnes owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

17. Defendant Jo Dale Carothers ("Carothers") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Carothers owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

18. Defendant Johnny Chiu ("Chiu") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Chiu owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants

Fram, Haslam and Blankenheimer due to their governing positions.

19.     Defendant Michael Markman ("Markman") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Markman owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

20.     Defendant Michael Plimack ("Plimack") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Plimick owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

21.     Defendant Christine Saunders-Haskett ("Haskett") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group.  Haskett owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

22.     Defendant Sturgis Sobin ("Sobin") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group.  Sobin owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

23.     Defendant Nitin Subhedar ("Subhedar") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation Practice Group. Subhedar owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

24.     Defendant Laura Underwood-Muschamp ("Muschamp") is a former shareholder of Debtor and until October 1, 2008, was a member of Debtor's IP Litigation

Practice Group.  Muschamp owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

25.     Defendant Stanley Young ("Young") is a former shareholder of Debtor and until October 1, 2008 was a member of Debtor's IP Litigation Practice Group.  Young owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

26.     Defendant Heidi Gutierrez ("Gutierrez") is a former shareholder of Debtor and until October 1, 2008 was a member of Debtor's IP Litigation Practice Group.  Gutierrez owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

27.     Defendant Chris Martiniak ("Martiniak") is a former shareholder of Debtor and until October 1, 2008 was a member of Debtor's IP Litigation Practice Group.  Martiniak owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

28.     Defendant Dale Rice ("Rice") is a former shareholder of Debtor and until October 1, 2008 was a member of Debtor's IP Litigation Practice Group.  Rice owed Debtor fiduciary duties of loyalty, care, candor, good faith and fair dealing, and other legal and contractual duties, and was aware of the special duties owed by defendants Fram, Haslam and Blankenheimer due to their governing positions.

29.     The defendants named in Paragraphs 12-28 are referred to collectively herein as the "IP Shareholder Defendants."  Due to their knowledge, relationships and concerted action, each IP Shareholder Defendant is jointly and severally liable for the actions of the others.

**Defendant Covington & Burling**

30.     Defendant Covington & Burling LLP ("Covington") is a limited liability partnership engaged in the practice of law.

31.     Covington is liable for its own breaches of duty to the Debtor in connection with the disruption of the contractual relations of RAKTL and the Debtor, and is also liable for and must return to the Debtor the value of the fraudulent transfers of business it obtained from the Debtor and properly account to the Debtor for the profits generated by its work on behalf of former clients of the Debtor.

32.     In addition to its own actions, Covington is liable for the actions of the IP Shareholder Defendants to the extent the actions of the IP Shareholder Defendants were done on Covington's behalf, as general partners, limited liability partners or agents of Covington, in concert with Covington, done in the course and scope of the IP Shareholder Defendants' positions at Covington, benefitted Covington and/or were approved, accepted or ratified by Covington.

33.     All defendants are referred to collectively herein as the "Defendants."

## JURISDICTION AND VENUE

34.     The Bankruptcy Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.

35.     This action is commenced pursuant to 11 U.S.C. §§ 541 through 550 and in accordance with the Federal Rules of Bankruptcy Procedure, Rules 3007 and 7001.

36.     The claims herein are core proceedings under 28 U.S.C. § 157(b)(2), such that the Bankruptcy Court has jurisdiction to hear and to determine this proceeding and to enter an appropriate order and judgment.  Any claims alleged herein that are not core proceedings are legally and factually related to the core proceedings, and are related to Debtor's bankruptcy case such that it is lawful, appropriate and economical to join such claims.

37.     The Court has subject matter jurisdiction to hear and enter a final judgment in this matter under 28 U.S.C. § 157(b)(1).

38.    Venue is proper in the United States Bankruptcy Court, Northern District of California under 28 U.S.C. § 1409, as the Debtor's bankruptcy case is pending in this judicial district.

## GENERAL ALLEGATIONS

**History and Structure of Heller Ehrman LLP**

39.    In business for more than 130 years before its dissolution and ultimate bankruptcy in December 2008, Debtor was a prominent international law firm with approximately 700 lawyers and offices in, inter alia, California, New York, Washington, D.C., the United Kingdom and Asia.

40.    In 2008, plaintiff is informed and believes, Debtor was organized as a limited liability partnership under the California Revised Uniform Partnership Act (RUPA [Cal. Corp. Code § 16100 *et seq.*]) under a Partnership Agreement dated as of January 1, 1994, as amended ("Partnership Agreement").

41.    Under ¶ 2.2 of the Partnership Agreement, Debtor's purpose was to engage in the practice of law.

42.    Five professional corporations originally served as Debtor's partners: Heller Ehrman (California), a professional corporation; Heller Ehrman (Washington) P.S.; Heller Ehrman White & McAuliffe (Oregon) P.C.; Heller Ehrman (Alaska) P.C; and William R. Mackey, a California professional corporation.  By subsequent amendments to the Partnership Agreement, certain additional professional corporations were admitted as partners to the partnership, in particular Heller Ehrman, P.C., a District of Columbia professional corporation; Richard L. Cassin, P.A., a Florida professional corporation; and Heller Ehrman (New York), a professional corporation (collectively, with the original partners, the "Heller PCs").

43.    Each of the Heller PCs in turn had shareholders.  These shareholders were required, under the terms of certain Shareholders Agreements, to be eligible and admitted to

practice law in one or more jurisdictions where Debtor practiced law ("Heller Shareholders").

44.    Each of the Heller Shareholders was a party to an employment agreement (the "Employment Agreement" or "Employment Agreements") with his/her PC. The Employment Agreements were in a substantially similar form and, in most cases, provided that:

> 9.51    <u>Post-Termination Obligations</u>. Notwithstanding the termination of this Agreement, Employee shall thereafter remain obligated, upon request by the Partnership or the Company, to assist with the billing of unbilled fees and costs and the collection of accounts receivable arising from legal services rendered before termination of this Agreement for clients of the Partnership as to whom Employee had billing responsibility. Employee shall also remain obligated (i) to comply with established policies and procedures relating to the orderly departure of attorneys and transfer of responsibility for pending client work and (ii) to cooperate and assist with the defense of any professional liability or other claims involving Employee, Without limiting the generality of Section 9.4 of this Agreement and Section 5.4 of the Shareholders Agreement, Employee shall not be entitled to any share of future income from client work existing at the effective date of termination of this Agreement. Employee understands and agrees that, so long as Employee remains employed by the Company, Employee's solicitation of clients to terminate their client relationship with the Partnership in whole or in part involves fiduciary principles on the part of Employee and requires the prior consent of the Company.

45.    The Heller Shareholders also were subject to a February 3, 2005, Partnership Agreement amendment, which provided "All clients for whom any Partner or Member provides legal services shall be clients of [Debtor] unless the Policy Committee determines otherwise."

46.     Each of the Heller Shareholders entered into a Shareholder's Agreement. Under Paragraph 2.3, the Heller Shareholders purchased shares over time in the Debtor through automatic deductions from the Shareholder's Total Compensation.

47.     Under Paragraph 4 of the Partnership Agreement, all decisions concerning the management of the Debtor, including, for instance, compensation, personnel decisions, and the authority to incur or pay obligations, were made by and through the Heller Shareholders via several officers, a Policy Committee, a Compensation Committee, and other committees, which membership was directly voted upon by the Heller Shareholders.

48.     The Heller Shareholders' votes for these committees, as well as other votes on various actions the Debtor proposed to take, were based on the Heller Shareholders' so-called "Attributed Percentages" of ownership of the Debtor.

49.     Each Heller Shareholder's "Attributed Percentage" was determined through a formula that divided the equity interest in the Debtor among the total number of Heller Shareholders. Heller PCs were required pursuant to Paragraph 6.1 of the Partnership Agreement to cast votes on matters affecting the Debtor exclusively in accordance with the percentage interests of the votes cast by their eligible Heller Shareholders.

50.     The committees elected by the Heller Shareholders were committees of the Debtor.

51.     Pursuant to Paragraph 4.6 of the Partnership Agreement, the Heller PCs were required under the terms of the Partnership Agreement and their respective organizational documents to adopt and implement all of the Debtor's policies and procedures.

52.     Heller Ehrman LLP was managed and controlled by and under the direction of a single Policy Committee. The Policy Committee's function was to define the strategic direction of the law firm, to approve all material strategic decisions, and to direct and support the firm's executive managers in the implementation of strategy. During 2007-2008, the Policy Committee was faced with complex financial circumstances that

required its members' loyal and careful attention.  To manage the strategic decisions that faced the Policy Committee in 2007-2008, including possible affiliations with other major law firms, the Policy Committee was expanded to include a "Policy Committee Plus."

**The Heller Ehrman LLP Intellectual Property Litigation Practice and The "RAKTL" Cases**

53.     During the 1980s, 1990s and 2000s, one of Debtor's most important business strategies was to build a world-class intellectual property litigation practice.  To this end, Debtor made a wide variety of investments to attract and retain an international group of key partner-level IP litigators, associate attorneys with specialized skills (e.g., advanced engineering degrees, biosciences degrees), paralegals and other key staff. Debtor invested in the establishment of offices in important U.S. and overseas IP markets.

54.     To build its IP litigation practice, Debtor permitted its IP litigation practice group to offer clients "alternative billing arrangements" that were friendly to major IP clients, especially patent litigation plaintiffs who often wanted to pay for at least a portion of their legal fees from successful recoveries in complex, multi-forum patent infringement cases.  Cases that involved blended hourly and contingent fees frequently required Debtor to invest substantial up-front legal/financial resources in anticipation of a future contingent fee.

55.     In 2007-2008 Debtor had a skilled, highly-regarded, well-staffed, international and valuable IP litigation practice.  Debtor's IP litigation practice handled cases for domestic and overseas clients from several of the firm's offices, with large components of the group in San Francisco, the Silicon Valley, San Diego, Washington, D.C., Seattle and China.

56.     RAKTL owns a portfolio of patents that it licenses through its affiliate, A2D.  On or about August 18, 2006, at the request of certain IP Shareholder Defendants, Debtor entered into a legal services agreement with A2D to prosecute five patent-infringement lawsuits on behalf of A2D and its affiliates against approximately 27 defendants.  A copy of the August 18, 2006 agreement (the "2006 Fee Agreement"), parts

of which are confidential, is in the possession of, or will be provided to, the parties and the Court upon request.

57.     Debtor and A2D amended the 2006 Fee Agreement by two subsequent agreements, dated April 30, 2007, and June 29, 2007 (the "4/30/07 Amendment" and the "6/29/07 Amendment"), to accommodate, among other things, RAKTL's anticipated filing of approximately 23 additional cases.   Copies of the 4/30/07 Amendment and 6/29/07 Amendment, parts of which are confidential, are in the possession of, or will be provided to, the parties and the Court upon request.  The 2006 Fee Agreement, as amended by the 4/30/07 Amendment and 6/29/07 Amendment, is referred to herein as the "RAKTL Fee Agreement."  The cases in which Debtor represented A2D and its affiliates under the RAKTL Fee Agreement are referred to herein as the "Cases."  The precise terms of the RAKTL Fee Agreement are known to, or will be provided to, the parties and the Court upon request.

58.     As of 2008, Debtor's total actual hourly billings exceeded RAKTL's total non-contingent payments under the RAKTL Fee Agreement by at least $18,500,000 – reflecting an enormous investment by Debtor in the RAKTL litigation.  This investment was made by Debtor in the expectation that the investment would be at least partially recouped in contingent fees.  Under the RAKTL Fee Agreement, a contingent fee was due and payable to Debtor on November 1, 2010 in an amount Debtor believes exceeds $10 million.

**The IP Shareholder Defendants' Secret Plan To Transfer Debtor's IP Practice, Including The RAKTL Cases (And Related Investment), To Covington and Themselves**

59.     Starting in 2007, Debtor began to consider possible mergers or other strategic transactions with other law firms.  This process was managed through the Policy Committee and, beginning in 2008, an expanded policy body called the "Policy Committee Plus."  The Policy Committee and Policy Committee Plus acted at all times in a governing fiduciary capacity, which required their members to place the interests of

Debtor and all of its stakeholders before personal interests, to act with complete loyalty, due care and a high level of candor, and to exercise good faith and fair dealing in their conduct.

60.     In addition to the duties imposed by law, the members of the Policy Committee and Policy Committee Plus expressly undertook in early-2008 to work exclusively for the benefit of Debtor and its stakeholders, not to pursue separate interests or arrangements before Debtor's future was determined and not to use Debtor's confidential information for any purpose that was inconsistent with the strategies set by Debtor's governing bodies. To the extent any shareholder of Debtor received confidential information from members of the Policy Committee, Policy Committee Plus and/or Debtor's senior management concerning Debtor, such shareholders received and held such confidential information subject to fiduciary, contractual and other duties owed by the shareholders as members of Debtor and parties to contracts with Debtor. All of Debtor's shareholders were prohibited by fiduciary, contract and other legal principles from acting collectively in a manner that would undermine Debtor's stability, appropriate Debtor's business, interfere with or divert Debtor's relationships or otherwise harm Debtor.

61.     In around January-February 2008, in the midst of Debtor's analysis of potential strategic transactions, Fram, Haslam, Blankenheimer, Sobin and one or more other IP Shareholder Defendants became aware (a) that Debtor's 2008 hourly billings in the RAKTL litigation would vastly exceed what Debtor would earn from RAKTL in 2008 fixed fees; and (b) because RAKTL had prepaid fixed fees for 2008 services in December 2007, a 2008 revenue/profitability deficit could reduce the IP Shareholders' 2008 compensation.

62.     The IP Shareholder Defendants initially tried to control staffing and contain the litigation efforts on the RAKTL matters to reduce the projected 2008 RAKTL budget deficit. By mid-2008, Fram, Haslam, Blankenheimer, Sobin and other IP Shareholder Defendants recognized that such measures would not resolve the financial deficit on the

RAKTL matters.

63. In mid-2008, despite their key roles in Debtor's governance and strategic decisions, and their fiduciary duty to act in the best interest of Debtor and all of Debtor's stakeholders, Fram, Haslam and Blankenheimer, along with one or more additional IP Shareholder Defendants, formed a plan to assemble a group of Debtor's key IP Shareholders that could be delivered en masse, with clients, to a law firm of their choice, separate and distinct from the potential strategic transactions being pursued by the Policy Committee.

64. No later than July 2008, Fram, Haslam and Blankenheimer commenced active, secret discussions with Covington about the transition en masse of a substantial portion of Debtor's IP litigation professional group and clientele to Covington. The Covington discussions were concealed from Debtor and its Policy Committee through the use of, inter alia, private e-mail addresses, private telephone numbers and code words. Before, during and after the discussions, Fram, Haslam, Blankenheimer along with one or more additional IP Shareholder Defendants, disclosed confidential information about Debtor's clients, client matters, employees (both attorneys and staff level) and firm finances.

65. From the inception of their discussions with Covington, Fram, Haslam, Blankenheimer and other IP Shareholder Defendants intended, expected and planned for most of Debtor's IP litigation business under their supervision, including all of Debtor's RAKTL business, to transfer to Covington when the IP Shareholder Defendants joined Covington. The IP Shareholder Defendants knew that if the RAKTL Cases were transferred to Covington in the way that the IP Shareholder Defendants envisioned, Covington would gain the value of Debtor's investment in the RAKTL Cases to the detriment of Debtor. In addition, the IP Shareholder Defendants further knew that Debtor was owed accrued contingent fees on Cases that had been resolved by Debtor and intended to direct such fees to Covington or pay fees to Covington in lieu of paying these contingent fees to Debtor, in order to make their own compensation claims to Covington

based on such proceeds.

66.    In all Covington interactions, the IP Shareholder Defendants were subject to fiduciary and contractual duties that prohibited the communication of confidential information to Covington about Debtor, Debtor's shareholders and employees and Debtor's clients.  The IP Shareholder Defendants were required fully and timely to disclose to Debtor facts about their contacts with Covington (including the fact that contacts were occurring) and all facts material to Debtor's finances, business operations and strategies.  The IP Shareholder Defendants also were required to fully and faithfully protect Debtor's financial interests in the RAKTL Cases and other business, clients and employees of Debtor.

67.    In mid-August 2008, Fram, Haslam and Blankenheimer resigned from the Policy Committee, failing to disclose that they were engaged in secret, advanced discussions with Covington about a plan in which the IP Shareholder Defendants would join Covington en masse, and that they intended to solicit (or had solicited) key IP Shareholders, employees and clients to leave.  This information was highly material to Debtor, its Policy Committee and the third-parties with whom Debtor was engaged in serious, advanced strategic discussions.  The IP Shareholder Defendants' failure to provide Debtor and its managers with candid, complete, and real-time information about their plans and solicitation, required Debtor to act with partial information and often to learn of material information from rumors.

68.    The lack of candid and complete communication by the IP Shareholders was not accidental.  From the beginning, a central goal of the IP Shareholders' mass exodus strategy was to create a fully-staffed IP litigation group that could leave in a "nanosecond" and take Debtor's clients to Covington with the associates and staff to serve the clients immediately.  The mass exodus plan included a detailed, targeted program (which was executed starting in around mid-August 2008) under which a critical mass of IP litigation shareholders were recruited, would commit to resign Debtor simultaneously at an opportune time (which predictably would stun the Debtor) and would embark upon a

carefully-orchestrated program to recruit all desired clients, staff and other resources to Covington.

**The IP Shareholder Defendants' Mass Exodus to Covington And The RAKTL Defendants' Termination of Debtor And Refusal To Honor The RAKTL Fee Agreement**

69.     In August 2008, and at an accelerating pace in September 2008, Fram, Haslam and Blankenheimer communicated with and recruited other IP Shareholder Defendants to join them in their mass defection to Covington and related client and employee transfers.  The IP Shareholder Defendants did not advise Debtor of the client solicitations or obtain Debtor's written consent, as required by their fiduciary obligations to Debtor and its stakeholders, and by most of the IP Shareholder Defendants' Employment Agreements.  The IP Shareholder Defendants' secrecy paved the way for a devastating mass exodus, and placed Debtor in the embarrassing position of having to respond to rumors about the status of a substantial part of its own IP litigation practice. The confusion caused a loss of credibility among Debtor's clients, shareholders and employees.

70.     On September 14, 2008, the 14 IP Shareholder Defendants simultaneously announced their intention to leave Debtor en masse and join Covington on October 1, 2008.  The IP Shareholder Defendants arranged for the RAKTL entities (and numerous other longstanding clients of Debtor's IP litigation practice) to terminate their representation by Debtor in the Cases, and to transfer representation in the RAKTL Cases to Covington.  At no time did Debtor terminate or breach its relationship with RAKTL.

71.     RAKTL agreed before September 26, 2008 to move the representation from Heller to Covington and made arrangements to complete the transfer of the engagement such that RAKTL left Debtor when the IP Shareholder Defendants left Debtor, as they all had planned.

72.     From the time the IP Shareholder Defendants resigned from Debtor and moved their practices to Covington, the IP Shareholders have been the principal source of

information with respect to the status of the RAKTL cases, and other client matters, and the fees accrued to Debtor on the RAKTL cases and on other pending client matters. Neither the IP Shareholder Defendants, nor Covington, nor any successor firm for the Cases, has accounted to Debtor for the amounts due and owing under the RAKTL Fee Agreement or with respect to any other business of Debtor taken by the IP Shareholder Defendants.

73. Despite a demand duly made by Debtor, no portion of the RAKTL contingent fee owed to Debtor has been paid and neither the IP Shareholder Defendants nor Covington has accounted to or paid Debtor with respect to other client matters of Debtor.

**By December Of 2007, The Debtor Was Immersed In A Financial Crisis And Operating With Unreasonably Small Capital**

74. Debtor was undergoing a serious financial crisis by at least the end of 2007.

75. Nevertheless, the Debtor distributed all or nearly all of the available cash to the Heller Shareholders at year end, through the use of an "Annual Bonus." This distribution process was commonly referred to among the Heller Shareholders as the "year-end fire drill."

76. This "year-end fire drill" typically left the Debtor with insufficient cash to meet its normal and forecast employee costs and operating expenses at the beginning of the year.

77. These operating expenses were significant. On information and belief, Plaintiff alleges that Debtor incurred at a minimum $25 to $30 million a month in operating expenses alone.

78. Thus, following the "year-end fire drill," the Debtor would supplement whatever cash was left on hand at year end with a bank line of credit to fund operations until the subsequent year's revenues caught up with outlays.

79. The significant risk created by the "year-end fire drill" had grown substantially in the Debtor's final years. From 2004 to 2007, the Debtor was forced to

borrow more and more cash to simply meet its basic operating expenses and make distributions to Heller Shareholders.  For example, in March 2004, the Debtor was forced to borrow approximately $4.3 million in working capital for operating expenses.  In comparison, in March 2007, the Debtor was forced to borrow more than seven times as much, approximately $35.6 million.

80.     From 2004 to 2007, the "tipping point" or breakeven on the Debtor's combined expenses and distributions to Heller Shareholders was pushed further and further back into the fiscal year.  In other words, the Debtor did not have enough cash and had to borrow money to meet its combined operating expenses (excluding the additional drain on capital investments) and year to date distributions to Heller Shareholders until on or around July 2004, September 2005, and August 2006.  In 2007, this "tipping point" did not occur until November.

81.     By November 2007, simply to break even and continue to operate, the Debtor had borrowed in excess of $45 million.  This was nearly double the amount of working capital the Debtor had borrowed in 2006.

82.     As shown by the following chart, by December 2007, the Debtor had been drawing on its bank credit line at an unprecedented and dangerous rate, which continued into 2008:

|  | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| March | $4.3 M | $21.8 M | $29.0M | $35.6M | $44.5M |
| May | $0 | $25.8M | $24.3M | $33.7M | $54.5M (including $10 M Term) |
| July | $0 | $8.0M | $5.0M | $10.6M | $57.1M (including $10M Term) |
| Month Bank Line Paid off (i.e., the point at which profits exceeded expenses and base salary paid to Heller | July | September | August | November | Not Paid Off In 2008 |

| Shareholders) | | | | | |
|---|---|---|---|---|---|

83. By December 2007, the average daily balance of the revolver debt of the Debtor also revealed that the Debtor's debt was out of control and rising exponentially. Between 2001 and 2004, the average daily balance on the revolver debt of the Debtor was never above $4.0 million, and had been as low as $9.8 million. In 2005, it reached $8.7 million and in 2006, $10.7 million. By the end of 2007, the daily average had climbed to almost $15.8 million.

84. At the same time that the Debtor had become increasingly reliant on expensive bank financing to simply keep its doors open, by December 2007 the Debtor was facing a foreseeable risk of losing the bank financing. One of the "events of default" contained in the Debtor's loan agreement was a threshold test: the withdrawal of members of the firm in any 12 month period comprising either 15% of the number of members or members constituting 15% of the attributed ownership of the Debtor. The problem was that, as discussed below, Heller Shareholders were beginning to leave in 2007, and this was very likely to continue in 2008.

85. By December of 2007, the Debtor was also experiencing a significant drop in actual and prospective income. This drop in prospective income was evident from a number of factors.

86. In 2007, a number of large litigation matters ended, resulting in significant loss of continuing revenue.

87. By 2007, the Debtor's revenues from its top five clients had declined each year over a five year period, from $100.3 million in 2003 to $66.8 million in 2007.

88. By 2007, the Debtor's profitability per attorney had declined from 2006.

89. By 2007, the average reported billable hours from Heller Shareholders and associates had declined from 2006.

90. By 2007, vital Heller Shareholders were already leaving the firm, with expressed doubts about its long-term viability.

91. By 2007, other Heller Shareholders were also either openly planning to

depart or openly discussing departing.

92.     By 2007, the Debtor was well aware of the drop in revenues, billable hours, and productivity.

93.     The Debtor's reported net income for 2007 was approximately $177,919,100.  This amount was approximately $10,600,000 below the Debtor's $188,500,000 projections for 2007, and the Debtor ended 2007 with a shortfall of approximately $13 million from revenue targets.

94.     This reported net income, moreover, was grossly inflated for a number of reasons.  For example, during the last calendar quarter of 2007, the Debtor began allowing vendor payments to go past due and held 118 printed checks totaling approximately $3 million until January 2008, delayed writing another $2.1 million in checks that were due in 2007, and failed to enter into the accounting system another $785,000 in invoices due in 2007.  This can be contrasted with previous years, in which the Debtor prepaid an average of $3,000,000 of certain expenses at year's end.

95.     Also, the Debtor requested a prepayment by a client of a fixed fee obligation owed as part of a contingency arrangement that was to be paid in January 2008 for 2008 fees.  The Debtor had the client pay the 2008 fee payment in December 2007, rather than January 2008 when payment was called for, and recorded the payment as part of its 2007 income.  This pre-payment was approximately $8.2 million.

96.     In sum, at the time the Debtor was determining whether to make its Annual Bonus payments to the Heller Shareholders and setting these amounts, the lawyers who caused the payments to be made were the beneficial owners of the Debtor, stood to benefit from the payments, and knew the Debtor was already immersed in financial crisis and operating with unreasonably small capital.

**Despite Its Financial Crisis, The Heller IP Shareholders Received Millions of Dollars in Overdistributions In December Of 2007 Via The "Annual Bonus"**

97.     On December 31, 2007, the Heller Shareholders who managed the Debtor met to fix the amount of the "Annual Bonus" as part of the "year end fire drill."  The

Heller management was faced with implementing a distribution below the prior projections because of what they knew about the decline in the firm's profits.

98. Under paragraphs 3.2 and 3.4 of the Partnership Agreement, distributions to Heller Shareholders, including any "Annual Bonus," could be adjusted at any time.

99. Under paragraphs 3.2 and 3.4 of the Partnership Agreement, distributions to the Heller Shareholders were limited to, at most, the reported net income as determined by reference to the Debtor's "Net Profits" for that year and the "cash needs of the Partnership."

100. Under 3.1 of the Partnership Agreement, the Debtor's management retained the right and the ability to withhold as a "reserve" "moneys otherwise distributable to, the Partners, in order to enable the Partnership to conduct its business and to discharge its obligations."

101. Nonetheless, the Debtor's management instructed the accounting group for the Debtor to distribute approximately $78,000,000 in "Annual Bonuses" to the Heller Shareholders.

102. The Annual Bonus paid to Heller Shareholders in December 2007 resulted in total Heller Shareholder distributions of more than $187,000,000.

103. As noted, the reported net income of the Debtor in 2007 was approximately $177.9 million. The 2007 Annual Bonus thus resulted in payments to the Heller Shareholders exceeding 2007 reported net income by approximately $9,561,152.64.

104. The amount of the Annual Bonus, and the fact that it exceeded the Debtor's reported net income by over $9.5 Million, was unprecedented and constituted a significant departure from the Debtor's ordinary course of business.

105. In essence, the Debtor's management was gambling that their overpayments to maintain the Debtor's "standings" would be sufficient to convince another law firm to merge with the Debtor before it failed, or provide the Heller Shareholders with a platform to move on to different firms on an individual basis. This gamble did not work. Unfortunately for the firm's creditors, this gamble was made with other people's money.

106.    The Heller Shareholders who most directly caused the overpayment via the "Annual Bonus" also sat in a position of considerable leverage and power vis-à-vis the Debtor and the Debtor's management.  The Heller Shareholders controlling the annual distribution decisions knew that if all the Heller Shareholders were not paid an "Annual Bonus" it meant that the Debtor's management could not receive one, either.

**The "Annual Bonus" Was Not A "Payment For Services," But, Rather, Was A Payment Representing The Profits Of The Firm On Account Of The Shareholder's Ownership Interest**

107.    According to the partnership documents of the Debtor, there were four components of compensation provided by the Debtor to Heller Shareholders as follows:

(a) Shareholder Base Salary" (¶¶4.1, 4.2(a) of the Shareholder Employment Agreement);

(b) the "Annual Bonus" at issue here (*id.* ¶4.2);

(c) "other bonuses" that "Heller may pay to a Shareholder from time to time, and in its sole discretion" (*id.* ¶¶4.1, 4.3); and

(d) contributions made to pension, profit sharing and other employee benefit plans (*id.* ¶4.2).

108.    The Shareholder Employment Agreement defines the "Base Salary" as the compensation paid to a Shareholder for "all services rendered by Employee under this agreement . . .," which includes all "legal services, and other services as may reasonably be requested. . . ." (*id.* ¶¶2, 4.1)

109.    The Shareholder Employment Agreement provided a number of options respecting the "Annual Bonus."  First, the Debtor could decide not to issue one at all.  (*id.* 4.2 (""The Annual Bonus, *if any,* shall be paid in December of the Fiscal Year in question. . . .")).

110.    Second, if the Debtor did award a bonus, the amount was set in the discretion of the Debtor as determined by the Compensation Committee.

111.    Paragraph 9.4 of the Shareholder Employment Agreement states:  "It is

expressly understood and agreed that, following the effective date of a termination of this Agreement, . . . Employee shall not be entitled to . . . (ii) any Annual Bonus in respect of the Fiscal year in which the termination became effective."

112.     Section VI(c) of the Debtor's Plan of Dissolution, adopted on September 28, 2008, provided that Heller Shareholders remaining at the firm after the date of dissolution that were still "performing and supervising necessary billable client work . . . will be compensated . . . an amount . . . equal to 1/52 of the Base Salary paid to persons as employees . . . ."

### The Debtor Mischaracterized The Overdistribution To The Heller Shareholders.

113.     From nearly the beginning, Heller's managing shareholders attempted to obscure the fact that the 2007 "Annual Bonus" exceeded the Debtor's reported net income by over $9.5 million.

114.     When the overdistribution was first ordered, the payment was initially treated correctly as a capital reduction or deduction from shareholder equity – an "excess distribution."  In early January 2008, however, the Heller managing shareholders caused the entry to be reclassified as a "miscellaneous receivable" from the Heller PCs.

115.     Yet, when the Debtor's Assistant Controller prepared the standard "loan confirmations" to be sent to the PCs, he was told that the Heller managing shareholders wanted to avoid such confirmations being sent.

116.     Then, when financial statements of the Debtor were issued, the payments were yet again re-characterized, this time as "loans" to the PCs.  Such treatment was improper.  The Debtor's management, however, always considered the 2007 Annual Bonus an "overdistribution" to the Heller Shareholders, and there was never an intent that these so-called "loans" would ever be repaid.

### In 2008, The Debtor Continued To Distribute Millions To The Heller Shareholders.
### The "Capital" Transfers

117.     In 2008, while the Debtor was sliding further into insolvency, the Debtor paid or caused to be paid approximately $8,000,000 to departing Heller Shareholders,

which were characterized by the Debtor at the time as a return of capital (the "Capital Transfers").

118.   At the time the Debtor made the Capital Transfers, it was insolvent.

**The "Base Salary" Transfers**

119.   In 2008, while the Debtor was sliding further into insolvency, the Debtor paid or caused to be paid approximately $65,800,000 in "base salary" to the Heller Shareholders (the "Base Salary Transfers") (collectively with the Annual Bonus Transfers and the Capital Transfers, the "Transfers").

120.   The monthly "Base Salary" paid to Heller Shareholders had previously been increased by $1 million a month in January 2007.  Although the Debtor's management could have reduced these "base salary" payments at any time, and should have in light of the Debtor's declining financial condition, they refused.

121.   The Transfers constitute transfers of an interest of the Debtor in property that were made within two years before the Petition Date.

122.   The amounts of the transfers made to the individual IP Shareholders are reflected on the attached Exhibit A, which is incorporated herein by reference.

123.   Alternatively, the Transfers constitute obligations incurred by the Debtor that were incurred within two years before the Petition Date.

124.   At the time the Debtor made the Base Salary Transfers, it was insolvent.

**Debtor's Dissolution**

125.   The effect of the Debtor's "Annual Bonus" to the Heller Shareholders was disastrous.  The Debtor entered 2008:

  (a) with $18 million less available cash than on January 1st of any of the previous four years;

  (b) burdened with upwards of $23 million more than in the previous year's accounts payable, over-distributions and other current liabilities than it had in the previous four years;

  (c) with a continued reduction in its most profitable revenue stream (i.e.,

revenues from its top five clients);

(d) with declining productivity and profitability levels among Heller Shareholders and associates; and

(e) with the realization that 2008 would be a much tougher year than 2007.

126.    The Debtor placed itself in a precarious position from which it never recovered.   The Debtor's Annual Bonus distributions, combined with the Debtor's held checks, unpaid invoices, and deferral of traditionally made payments, created a financial hole for the Debtor from which it never emerged.  The cumulative effect of the $9.5 million admitted overdistribution to the Heller Shareholders and the $5,785,000 in held checks and delayed invoice payments was to shift the financial burden of almost $15 million (that in a typical year would have reduced the funds distributed to the Heller Shareholders) from 2007 to the 2008 calendar year, putting the Debtor $15 million "in the hole" on January 1, 2008, when the company was desperately short of capital, with significant lower cash balances than in previous years.

127.    This overdistribution made the Debtor even more dependent than in past years on bank financing to survive.  Indeed, by February 2008, the Debtor was forced to seek an increase in its yearly borrowing limit from $45 million to $60 million to account for already recognized anticipated cash shortfall of up to $15 million, including an additional $15 million of 5-year term debt.

128.    The Debtor was soon drawing on its bank credit line at an unprecedented and dangerous rate:  In March 2008, the Debtor had borrowed $44.5 million; in May 2008, $54.5 million (including a $10 million term); in July 2008, $57.1 million (including $10 million term).

129.    Soon thereafter, as described above, the IP Shareholder Defendants resigned en masse.  Immediately thereafter, Debtor's potential merger partner terminated discussions with Debtor.  The Debtor's inability to deliver the IP litigation practice as part of the proposed merger was a major reason.  The IP Shareholder Defendants' mass exodus from Debtor, along with key clients and other personnel, was a substantial factor in precipitating a

financial, operational and public relations crisis at Debtor in September 2008. The IP Shareholder Defendants' actions destabilized Debtor and required Debtor's management and remaining shareholders to move to dissolution on a timetable driven by the adverse impact of the IP Shareholder Defendants' scheme."

130. Starting on September 26, 2008, the Heller Shareholders were asked to vote to approve a specific, written dissolution plan ("Dissolution Plan"). By September 28, 2008, the Heller Shareholders completed the voting and Heller Shareholders holding more than 2/3 of the required number of votes elected to dissolve Debtor and adopt the Dissolution Plan.

**Unfinished Business**

131. Prior to adopting the Dissolution Plan, both the Heller PCs and the Heller Shareholders had always previously agreed with Debtor that, inter alia, neither of them had any interest in any profits or benefits derived or arising from the completion of any unfinished business of the Debtor ("Unfinished Business") that might happen to exist as of the time that any scheme of dissolution affecting Debtor were to be adopted by Heller Shareholders.

132. Prior to and following the adoption of the Dissolution Plan, both the Heller PCs and the Heller Shareholders were subject to Section 16404 of RUPA, which provides that a partner has a duty "[t]o account to [Debtor] and hold as trustee for [Debtor] any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity." Cal. Corp. Code § 16404(b)(1) (2010).

133. Prior to and following the adoption of the Dissolution Plan, both the Heller PCs and the Heller Shareholders were subject to Section 16401 of RUPA, which provides that partners are "not entitled to remuneration for services performed for the partnership,

except for reasonable compensation for services rendered in winding up the business of the partnership." Cal. Corp. Code § 16401(h) (2007).

134.    Under the Dissolution Plan, Heller retained all of its rights with respect to profits and compensation arising from the RAKTL engagement and the IP Shareholders, as well as Covington, had a duty to account to Heller for the profits for work undertaken in the winding up of the Debtor's business; stemming from the use of partnership property or information; or derived from the appropriation of a partnership opportunity.

135.    Article VI.F of the Dissolution Plan, however, provided that — to the complete exclusion of both Debtor and Heller PCs — all of Debtor's property rights in Unfinished Business were to be initially transferred to, inter alia, any entities engaged in the practice of law which might choose to allow Heller Shareholders to move their law practices to such entities ("Jewel Waiver").

136.    The Jewel Waiver stated:

> As the firm is no longer in a position to continue to service its clients efficiently and as an inducement to encourage Shareholders to move their clients to other law firms and to move Associates and Staff with them, the effect of which will be to reduce expenses to the Firm-in-Dissolution, and to assure that client matters are attended to in the most efficient and effective manner possible, and to help ensure collection of existing accounts receivable and unbilled time with respect to such clients, the Firm-in-Dissolution will waive any rights and claims under the doctrine of *Jewel v. Boxer*, 156 Cal. App. 3d 171 (1984) to seek payment of legal fees generated after the departure date of any lawyer or group of lawyers with respect to non-contingency/non-success fee matters only and the Dissolution Committee is authorized to provide appropriate assurances to law firms that Shareholders may choose to join regarding this issue …

137.    The Jewel Waiver was not contingent upon receipt of any payment or other consideration.

138.    No payment or other consideration was ever given to Debtor by anyone in exchange for the Jewel Waiver.

139. The Jewel Waiver expressly excluded the RAKTL engagement as the waiver did not encompass contingency matters as it applied "with respect to non-contingency/non-success fees only."

**Debtor's Chapter 11 Case And The RAKTL Claim**

140. Three months after the Heller Shareholders voted to dissolve Debtor, Debtor commenced its Chapter 11 case. In Debtor's Chapter 11 case, the RAKTL Defendants filed Proof of Claim No. 709 (the "RAKTL Claim") on April 24, 2009, claiming more than $50 million against Debtor's estate. The RAKTL Claim consists of the one-page proof of claim, an Attachment to Proof of Claim (the "Attachment"), and was supplemented by the Declaration of James Tramontana Regarding Sealed Documents in Support of Claim Number 709 of Ronald A. Katz Technology Licensing, L.P. and its affiliate A2D, L.P. (the "Tramontana Declaration" or "Tramontana Decl."), and the Declaration of James E. Malackowski Regarding Sealed Documents in Support of Claim Number 709 of Ronald A. Katz Technology Licensing, L.P. and its affiliate A2D, L.P. (the "Malackowski Declaration" or Malackowski Decl."), filed with the Court on September 1, 2010.

141. In the RAKTL Claim, the RAKTL Defendants allege Debtor "breached" the RAKTL Fee Agreement by dissolving, thereby allegedly becoming unable to perform. The RAKTL Defendants claim they incurred a variety of losses (totaling more than $50 million) when the RAKTL Defendants were "required" to engage substitute counsel to complete the Cases.

142. The RAKTL Claim is meritless. The RAKTL Defendants terminated their representation by Debtor – and continued to be represented by the IP Shareholder Defendants, their successor firm Covington and eventually by Cooley LLP ("Cooley") (RAKTL's choice of firms). The RAKTL Defendants engaged in secret communications with the IP Shareholder Defendants, which the RAKTL Defendants knew were hostile to the interests of Debtor and which would lead to a termination of Debtor's representation of RAKTL. The RAKTL Defendants at no time requested that Debtor seek a way to

continue to represent the RAKTL Defendants after the IP Shareholder Defendants departed.

143.    To the extent communications and other actions of the IP Shareholder Defendants caused the RAKTL Defendants to misapprehend the consequences of their termination of representation by Debtor under the RAKTL Fee Agreement, and upon the RAKTL Defendants and upon Debtor, the RAKTL Defendants knew that such communications were not made on behalf of Debtor, and were contrary to the interests of Debtor.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract**
**Against The RAKTL Defendants)**

144.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

145.    The RAKTL Fee Agreement constitutes a binding contract between Debtor and the RAKTL Defendants.

146.    Debtor performed all of its duties under the RAKTL Fee Agreement except to the extent that its performance was waived, excused or discharged by the RAKTL Defendants by, without limitation, the RAKTL Defendants' termination of Debtor's engagement as the RAKTL Defendants' counsel and transfer of the Cases to Covington and other counsel.

147.    The RAKTL Defendants breached the RAKTL Fee Agreement by, <u>inter alia</u>:

    (a) Failing and refusing, without legal order, excuse or justification, to pay Debtor the Contingent Fee due under the RAKTL Fee Agreement on November 1, 2010, estimated by Debtor to exceed $10,700,000; and

    (b) Failing and refusing to account to Debtor for its share of fees on Cases resolved after November 1, 2010, and pay such fees to Debtor as required by law.

148.    Without prejudice to Debtor's position that, by filing the RAKTL Claim, the

RAKTL Defendants have invoked the judicial process and waived any right they otherwise may have had to arbitrate this dispute, Debtor has complied with California Business and Professions Code § 6201(a), California's Mandatory Fee Arbitration Act, by serving with this Complaint a completed copy of the form required by the State Bar of California.

149.    Debtor has been damaged in an amount to be proven at trial but believed to exceed $10,700,000 as a direct and proximate result of this breach of the RAKTL Fee Agreement.

## SECOND CLAIM FOR RELIEF
### (Quantum Meruit
### Against The RAKTL Defendants)

150.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

151.    From mid-2006 through September 2008, Debtor performed valuable legal services for the RAKTL Defendants and invested more than $18,500,000 in uncompensated billable time in the Cases. Debtor's legal services involved complex matters that consumed the sustained attention of a number of Debtor's highly-qualified, skilled and specialized attorneys and staff. The RAKTL Defendants accepted Debtor's services and, under settlements negotiated by Debtor, have received more than $100 million in gross settlement proceeds.

152.    Debtor is entitled to a recovery in quantum meruit with respect to, among other things, the fair value of Debtor's services to the RAKTL Defendants prior to the termination of Debtor's engagement by the RAKTL Defendants, whether such value was enjoyed by the RAKTL Defendants before or after the RAKTL Defendants terminated Debtor.

## THIRD CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith
### And Fair Dealing Against The RAKTL Defendants)

153.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

154.    The RAKTL Fee Agreement constitutes a binding contract between Debtor and the RAKTL Defendants.  This contract contains an implied covenant of good faith and fair dealing.

155.    The RAKTL Defendants breached the implied covenant of good faith and fair dealing by, inter alia:

(a) Participating in the IP Shareholder Defendants' secret plan to transfer Debtor's RAKTL business to Covington and other firms, along with Debtor's specialized and valuable employees, and to terminate Debtor's representation on the pretext that Debtor had breached its contract; and

(b) Failing and refusing to disclose the status of the Cases (and related Net Recoveries and Contingent Fee calculations) to Debtor and to account therefor;

(c) Failing and refusing, without legal order, excuse or justification, to pay Debtor the Contingent Fee due under the RAKTL Fee Agreement on November 1, 2010, estimated by Debtor to exceed $10,700,000; and

(d) Failing and refusing to account to Debtor for its share of fees on Cases resolved after November 1, 2010, and pay such fees to Debtor as required by law.

156.    Debtor has been damaged in an amount to be proven at trial but believed to exceed $20,000,000 as a direct and proximate result of this breach of the implied covenant of good faith and fair dealing.

### FOURTH CLAIM FOR RELIEF
### (Breach of Contract Against
### The IP Shareholder Defendants)

157.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

158.    By virtue of the IP Shareholders' membership in the Debtor, the Partnership Agreement, and the related Shareholders Agreements and Employment Agreements, there

was and is a binding contract between Debtor and the IP Shareholder Defendants and/or Debtor is a third-party beneficiary of binding contracts between the IP Shareholder Defendants and the Heller PC's with power to enforce such contracts and to seek damages thereunder.

159.    Debtor performed all of its contractual duties except to the extent that its performance was waived, excused or discharged by actions of the IP Shareholder Defendants.

160.    The IP Shareholder Defendants breached its contractual duties to the Debtor, and those in the Partnership Agreement, and the related Shareholders Agreements and Employment Agreements by, <u>inter alia</u>:

    (a) Soliciting Debtor's clients to terminate their client relationships with Debtor, without informing Debtor in advance and obtaining consent from Debtor;

    (b) Receiving, retaining and failing to account for the proceeds of Unfinished Business; and

    (c) Failing to comply with their duties to account for and hold as trustee all profits derived from use of the Debtor's property or information and from all appropriations of the partnership opportunities.

161.    Debtor has been damaged in an amount to be proven at trial but believed to exceed $20,000,000 as a direct and proximate result of this breach of the Employment Agreements.

### FIFTH CLAIM FOR RELIEF
#### (Breach of the Implied Covenant of Good Faith And Fair Dealing Against The IP Shareholder Defendants)

162.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

163.    By virtue of the IP Shareholders' membership in the Debtor, the Partnership Agreement, and the related Shareholders Agreements and Employment Agreements, there was and is a binding contract between Debtor and the IP Shareholder Defendants and/or

Debtor is a third-party beneficiary of binding contracts between the IP Shareholder Defendants and the Heller PC's with power to enforce such contracts and to seek damages thereunder.

164.   Each contract between the IP Shareholders and the Debtor and/or with respect to which Debtor is a third-party beneficiary contains an implied covenant of good faith and fair dealing.

165.   The IP Shareholder Defendants breached the implied covenant of good faith and fair dealing by, inter alia:

(a) Participating in a joint plan to solicit and transfer Debtor's IP litigation clientele to Covington and other firms, and to solicit Debtor's attorneys, clients and staff employees;

(b) Failing timely to disclose their joint plan to depart from Debtor en masse under circumstances in which such information was material to Debtor's ability to manage Debtor's financial circumstances and avoid severe financial losses;

(c) Failing and refusing to disclose the status of unfinished business of Debtor, including but not limited to the RAKTL Cases (and related Net Recoveries and Contingent Fee calculations), and to account for any fees that are due to Debtor;

(d) Failing to comply with their duties to account for and hold as trustee all profits derived from use of the Debtor's property or information and from all appropriations of the partnership opportunities; and

(e) Devising and participating in a secret plan to transfer Debtor's RAKTL business to Covington and other firms, along with Debtor's specialized and valuable employees, and to terminate Debtor's representation of the RAKTL Defendants on the pretext that Debtor had breached its contract.

166.   Debtor has been damaged in an amount to be proven at trial but believed to exceed $20,000,000 as a direct and proximate result of this breach of the implied covenant

of good faith and fair dealing.

### SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against The
### IP Shareholder Defendants)

167.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

168.    The IP Shareholder Defendants violated their fiduciary duties to Debtor by, _inter alia_:

(a) Participating in a joint plan to solicit and transfer Debtor's IP litigation clientele to Covington and other firms, and to solicit Debtor's attorneys, clients and staff employees;

(b) Failing timely to disclose their joint plan to depart from Debtor en masse under circumstances in which such information was material to Debtor's ability to manage Debtor's financial circumstances and avoid severe financial losses;

(c) Failing and refusing to disclose the status of unfinished business of Debtor, including but not limited to the RAKTL Cases (and related Net Recoveries and Contingent Fee calculations), and to account for any fees that are due to Debtor;

(d) Failing to comply with their duties to account for and hold as trustee all profits derived from use of the Debtor's property or information and from all appropriations of the partnership opportunities;.

(e) Devising and participating in a secret plan to transfer Debtor's RAKTL business to Covington and other firms, along with Debtor's specialized and valuable employees, and to terminate Debtor's representation of the RAKTL Defendants on the pretext that Debtor had breached its contract; and

(f) Failing to compete reasonably for business against Covington during the period in which the IP Shareholder Defendants were planning to move to Covington.

169.    Debtor has been damaged in an amount to be proven at trial but believed to exceed $20,000,000 as a direct and proximate result of this breach of their fiduciary duties.

**SEVENTH CLAIM FOR RELIEF**
**(Equitable Indemnification Against**
**The IP Shareholder Defendants and Covington)**

170.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

171.    The RAKTL Claim seeks more than $50 million from Debtor based upon circumstances surrounding of the transition of the RAKTL Cases from Debtor's representation to Covington and other counsel.  This transition was orchestrated by the IP Shareholder Defendants (who, in this transition, the RAKTL Defendants knew were not acting for Debtor's benefit) and Covington, who are responsible for all disclosures made to the RAKTL Defendants, the timing and mechanics of the transition, the negotiation of fee agreements or other arrangements with the RAKTL Defendants and their successor law firms.

172.    In connection with the transition of the RAKTL Cases from Debtor's representation to Covington and other successor counsel, the IP Shareholder Defendants owed professional duties of loyalty, care and disclosure directly to the RAKTL Defendants.

173.    In connection with the transition of the RAKTL Cases from Debtor's representation to Covington and other successor counsel, Covington as a successor law firm owed professional duties of loyalty, care and disclosure directly to the RAKTL Defendants.

174.    If the RAKTL Defendants were injured in the transition of the RAKTL Cases from Debtor's representation to Covington and other successor counsel, as the RAKTL Defendants allege in the RAKTL Claim, such injuries were actually and proximately caused, in whole or in part, by breaches of the duties owed by the IP Shareholder Defendants and/or by Covington to the RAKTL Defendants in the transition,

not by Debtor.

175.    Debtor is entitled to equitable indemnification from the IP Shareholder Defendants and Covington for any damages incurred by the RAKTL Defendants, as alleged in the RAKTL Claim.  Debtor also is entitled to recover the attorneys' fees and costs incurred by Debtor in Debtor's defense against the RAKTL Claim and related proceedings.

### EIGHTH CLAIM FOR RELIEF
#### (To Avoid and Recover Intentional Fraudulent Transfers – 11 U.S.C. §§ 548(a)(1)(A) and 550 Against Covington)

176.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

177.    The Jewel Waiver constituted one or more transfers of an interest in property of the Debtor.  Prior to the adoption of the Dissolution Plan, Debtor had an exclusive property interest in all profits and/or benefits derived or arising from the completion of any Unfinished Business existing at the time of the adoption of the Dissolution Plan.

178.    Defendant Covington was the entity for whose benefit the transfers were made and/or the immediate or mediate transferee of the initial transferees of such transfers.

179.    Covington allowed the IP Shareholder Defendants to move their law practices to Covington.

180.    By its own express terms, and following Covington's hiring of the IP Shareholder Defendants, the Jewel Waiver initially transferred certain Unfinished Business, including, but not limited to, those "non-contingency/non-success" matters listed in Exhibit B to the Complaint, to Covington ("Covington Captured Unfinished Business"), which

initial transfer of Covington Captured Unfinished Business occurred within two years prior to the Petition Date of December 28, 2008.[1]

181.   The Jewel Waiver was not granted in exchange for anything of value from Covington because no provision of the Dissolution Plan conditioned anyone's right to enjoy the benefits of the Jewel Waiver in exchange for the payment of any consideration of any kind to the Debtor.

182.   Debtor received no value or less than a reasonably equivalent value in exchange for the Jewel Waiver.

183.   Debtor entered into the Jewel Waiver with actual intent to hinder, delay, or defraud one or more entities to which Debtor was indebted or became indebted on or after the date of such transfers.

184.   Plaintiff is informed and believes and based thereon alleges that, to the extent the Debtor did receive consideration of any kind from Covington, or anyone else, in exchange for the Jewel Waiver, the value of such consideration did not have a value that was reasonably equivalent to the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington.

185.   At the time of the Jewel Waiver, Debtor was insolvent or became insolvent as a result of the loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington.

186.   At the time of the Jewel Waiver, Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the property remaining with Debtor following its loss of the value of the Covington Captured Unfinished

---

[1] The Unfinished Business matters listed in Exhibit B are identified using the matter numbers used by the Debtor prior to the transfer of these matters to Defendant. The Jewel Waiver, by its own terms, applied only to "non-contingency/non-success" matters. By listing a matter number in Exhibit B, Plaintiff is not conceding that the matter falls within this definition, or that the Jewel Waiver applies to it. Plaintiff is also not conceding that the matters identified in Exhibit B are a complete list of all matters transferred to Defendant Covington.

Business initially transferred by virtue of the Jewel Waiver to Covington, was an unreasonably small capital.

187. At the time of the loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington, Debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

188. Plaintiff may avoid the initial transfer of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington under Section 548(a)(1)(A) and recover the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington pursuant to Section 550.

### NINTH CLAIM FOR RELIEF
### (To Avoid and Recover Constructive Fraudulent Transfers –
### 11 U.S.C. §§ 548(a)(1)(B) and 550 Against Covington)

189. Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

190. The Jewel Waiver constituted one or more transfers of an interest in property of the Debtor.

191. Defendant was the entity for whose benefit the transfers were made and/or the immediate or mediate transferee of the initial transferees of such transfers.

192. By its own express terms, and following Covington's hiring the IP Shareholder Defendants, the Jewel Waiver initially transferred Covington Captured Unfinished Business, which initial transfer of Covington Captured Unfinished Business occurred within two years prior to the Petition Date of December 28, 2008.

193. The Jewel Waiver was not granted in exchange for anything of value from Covington because no provision of the Dissolution Plan conditioned anyone's right to enjoy the benefits of the Jewel Waiver in exchange for the payment of any consideration of any kind to Debtor.

194. Debtor received no value or less than a reasonably equivalent value in exchange for the Jewel Waiver.

195. At the time of the Jewel Waiver, Debtor was insolvent or became insolvent as a result of the loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington.

196. At the time of the loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington, Debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

197. Plaintiff may avoid the initial transfer of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington under Section 548(a)(1)(B) and recover the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington pursuant to Section 550.

### TENTH CLAIM FOR RELIEF
**(To Avoid and Recover Actual and Constructive Fraudulent Transfers – Cal. Civ. Code §§ 3439.04 and 3439.07 and 11 U.S.C. §§ 544 and 550 Against Covington)**

198. Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

199. Plaintiff is informed and believes, and thereon alleges, that there is a creditor that holds an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

200. The Jewel Waiver constituted one or more transfers of an interest in property of the Debtor. Prior to the adoption of the Dissolution Plan, Debtor had an exclusive property interest in all profits and/or benefits derived or arising from the completion of any Unfinished Business existing at the time of the adoption of the Dissolution Plan.

201. Defendant was the entity for whose benefit the transfers were made and/or the immediate or mediate transferee of the initial transferees of such transfers.

202. By its own express terms, and following Covington's hiring the IP Shareholder Defendants, the Jewel Waiver initially transferred Covington Captured Unfinished Business, which initial transfer of Covington Captured Unfinished Business occurred within four years prior to the Petition Date of December 28, 2008.

203. The Jewel Waiver was not granted in exchange for anything of value from Covington because no provision of the Dissolution Plan conditioned anyone's right to enjoy the benefits of the Jewel Waiver in exchange for the payment of any consideration of any kind to the Debtor.

204. Debtor received no value or less than a reasonably equivalent value in exchange for the Jewel Waiver.

205. Debtor entered into the Jewel Waiver with actual intent to hinder, delay, or defraud one or more creditors of Debtor.

206. Plaintiff is informed and believes and based thereon alleges that, to the extent Debtor did receive consideration of any kind from Covington, or anyone else, in exchange for the Jewel Waiver, the value of such consideration did not have a value that was reasonably equivalent to the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington.

207. At the time of the Jewel Waiver, Debtor was insolvent or became insolvent as a result of the loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington.

208. At the time of the Jewel Waiver, Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the property remaining with Debtor following its loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington, was an unreasonably small capital.

209.    At the time of the loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington, Debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

210.    Plaintiff may avoid the initial transfer of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington under California Civil Code Sections 3439.04, 3439.07, and Bankruptcy Code Section 544 and recover the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington pursuant to Section 550.

## ELEVENTH CLAIM FOR RELIEF
### (To Avoid and Recover Constructive Fraudulent Transfers – Cal. Civ. Code § 3439.05 and 3439.07 and 11 U.S.C. §§ 544, 550 Against Covington)

211.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

212.    Plaintiff is informed and believes, and thereon alleges, that there is a creditor that holds an unsecured claim arising on or before the Petition Date that is allowable under Section 502 of the Bankruptcy Code.

213.    The Jewel Waiver constituted one or more transfers of an interest in property of the Debtor.  Prior to the adoption of the Dissolution Plan, Debtor had an exclusive property interest in all profits and/or benefits derived or arising from the completion of any Unfinished Business existing at the time of the adoption of the Dissolution Plan.

214.    Covington was the entity for whose benefit the transfers were made and/or the immediate or mediate transferee of the initial transferees of such transfers.

215.    By its own express terms, and following Covington's hiring the IP Shareholder Defendants, the Jewel Waiver initially transferred Covington Captured

Unfinished Business, which initial transfer of Covington Captured Unfinished Business occurred within four years prior to the Petition Date of December 28, 2008.

216.   The Jewel Waiver was not granted in exchange for anything of value from Covington because no provision of the Dissolution Plan conditioned anyone's right to enjoy the benefits of the Jewel Waiver in exchange for the payment of any consideration of any kind to Debtor.

217.   Debtor received no value or less than a reasonably equivalent value in exchange for the Jewel Waiver.

218.   Plaintiff is informed and believes and based thereon alleges that, to the extent Debtor did receive consideration of any kind from Covington, or anyone else, in exchange for the Jewel Waiver, the value of such consideration did not have a value that was reasonably equivalent to the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington.

219.   At the time of the Jewel Waiver, Debtor was insolvent or became insolvent as a result of the loss of the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington.

220.   Plaintiff may avoid the initial transfer of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington under California Civil Code Sections 3439.05, 3439.07, and Bankruptcy Code Section 544 and recover the value of the Covington Captured Unfinished Business initially transferred by virtue of the Jewel Waiver to Covington pursuant to Section 550.

## TWELFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty
### Against Covington)

221. Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

222. Covington was aware at all relevant times that the IP Shareholder Defendants owed fiduciary duties of loyalty, care, candor and good faith and fair dealing to Debtor and that such duties precluded the IP Shareholder Defendants, and each of them, from, inter alia:

> (a) Participating in a joint plan to solicit and transfer Debtor's IP litigation clientele to Covington and other firms, and to solicit Debtor's attorneys, clients and staff employees;

> (b) Failing timely to disclose their joint plan to depart from Debtor en masse under circumstances in which such information was material to Debtor's ability to manage Debtor's financial circumstances and avoid severe financial losses;

> (c) Failing and refusing to disclose the status of unfinished business of Debtor, including but not limited to the RAKTL Cases (and related Net Recoveries and Contingent Fee calculations), and to account for any fees that are due to Debtor; and

> (d) Devising and participating in a secret plan to transfer Debtor's RAKTL business to Covington and other firms, along with Debtor's specialized and valuable employees, and to terminate Debtor's representation of the RAKTL Defendants on the pretext that Debtor had breached its contract.

223. Covington aided, abetted and participated in the IP Shareholder Defendants' breach of fiduciary duty by, inter alia:

> (a) Arranging, hosting, paying and participating in surreptitious meetings with representatives of the IP Shareholder Defendants, in which plans were made to ensure that Covington would secure the benefits of an en masse departure of a substantial portion of Debtor's IP litigation practice and its clients;

> (b) Requesting, receiving and using confidential information about Debtor,

Debtor's clients and Debtor's employees, including but not limited to confidential employee information, compensation information and information with respect to Debtor's financial status and strategic plans;

(c) Offering the IP Shareholder Defendants financial inducements to solicit each other, key employees and key clients to leave Debtor and transfer their business to Covington; and

(d) Assisting the IP Shareholder Defendants to complete, bill for and receive payment for the RAKTL Cases while refusing to account to Debtor for Debtor's financial interest in the Cases.

224.    Debtor has been damaged in an amount to be proven at trial but believed to exceed $20,000,000 as a direct and proximate result of Covington's aiding and abetting breach of fiduciary duty.

### THIRTEENTH CLAIM FOR RELIEF
### (Intentional Interference With Contractual Relations)

225.    Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

226.    There was an existing contract between the RAKTL defendants and Debtor, which contract forms the basis for the unsecured claim filed by RAKTL as described further below.

227.    Covington was aware of the contract between RAKTL and the Debtor.

228.    Covington engaged in a series of acts that were designed to induce a breach or disruption of the contract.

229.    There was an actual breach by RAKTL of the contract and/or a disruption of the contractual relationship.

230.    The Debtor has been damaged by at least $10.7 million and in an amount to be proven at trial.

### FOURTEENTH CLAIM FOR RELIEF
### Accounting Against All Defendants)

231.    Plaintiff incorporates herein by reference the allegations set forth in

Paragraphs 1 through 143, inclusive, as though fully set forth herein.

232. Debtor demands a full and complete accounting by the IP Shareholder Defendants, the RAKTL Defendants and Covington, setting forth in detail the following items:

(a) With respect to each Case resolved as of November 1, 2010, (i) the amount of any Net Recovery by the IP Shareholder Defendants, whether by settlement, judgment or otherwise, and (ii) the amount of the Contingent Fee payable to Debtor on that Net Recovery, calculated in accordance with the Fee Agreement, showing in detail the calculation of the Net Recovery and the Contingent Fee.

(b) With respect to each Case resolved after November 1, 2010, (i) the amount of any Net Recovery by the IP Shareholder Defendants, and (ii) the amount of the Contingent Fee that would be payable to the Debtor on that Net Recovery, if the Case had stayed with the Debtor, showing in detail the calculation of the Net Recovery and the Contingent Fee.

(c) The status of each Case that remains unresolved, including the timing of any expected settlement or trial and the amount, and a detailed calculation of the anticipated Net Recovery and the Contingent Fee payable thereon.

233. To the extent that the Accounting shows that Debtor is entitled to a contractual Contingent Fee and/or a fee in quantum meruit payable immediately or in the future, Debtor requests that the Court enter judgment for Debtor in the full amount thereof.

## FIFTEENTH CLAIM FOR RELIEF
### (Declaratory Relief Against All Defendants)

234. Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1 through 143, inclusive, as though fully set forth herein.

235. Debtor and A2D entered into the RAKTL Fee Agreement (the 2006 Fee Agreement, the 4/30/07 Amendment and the 6/29/07 Amendment). The RAKTL Fee Agreement required A2D to pay a Contingent Fee to Debtor on "Net Recoveries" in the

Cases.

236.    A number of the Cases were resolved prior to October 1, 2008 and the accrued Contingent Fee on the Net Recoveries was at least $10.7 million, payable in full on November 1, 2010.  With respect to Cases that had not been resolved as of October 1, 2008 Debtor has a quantum meruit interest in any recoveries obtained by RAKTL.

237.    Despite a demand duly made by Debtor, no portion of the RAKTL Contingent Fee owed to Debtor has been paid.  The amount presently due and owing is at least $10.7 million.

238.    An actual dispute has arisen and is in need of judicial resolution with respect to the Cases that have settled prior to October 1, 2008 concerning the amount of fees for legal services to which Debtor is entitled under the terms of the RAKTL Fee Agreement.

239.    An actual dispute has arisen and is in need of judicial resolution with respect to the Cases that have settled on or after October 1, 2008, concerning the amount of fees for legal services to which Debtor is entitled under principles of quantum meruit.

240.    Debtor seeks a judicial declaration as follows:

241.    That the RAKTL Defendants, the IP Shareholder Defendants and Covington are required to make full disclosure of all past settlements of the Cases and of future settlements as and when such settlements occur, including a full accounting to Debtor of all settlement proceeds and other facts and circumstances that could bear on the amount of fees for legal services to which Debtor is entitled under the RAKTL Fee Agreement and/or quantum meruit;

242.    That with respect to the Cases that have settled prior to October 1, 2008, Debtor is entitled to fees for legal services under the terms of the RAKTL Fee Agreement; and

243.    That with respect to the Cases that have settled on or after October 1, 2008, Debtor is entitled to fees for legal services under quantum meruit principles.

244.    Debtor further requests that the Court retain jurisdiction to resolve disputes related to the calculation of Debtor's fees for legal services under the RAKTL Fee

Agreement or under quantum meruit principles with respect to Cases not settled at the time of trial.

245. Debtor further requests that the RAKTL Defendants, the IP Shareholder Defendants and Covington be temporarily, preliminarily and permanently enjoined against any conduct that is inconsistent with Debtor's financial interest under the RAKTL Fee Agreement and its quantum meruit rights, including but not limited to a failure to account to Debtor and the disposition or dissipation of monies due and payable to Debtor.

## SIXTEENTH CLAIM FOR RELIEF
### (To Avoid and Recover Intentional Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550) Against IP Shareholder Defendants)

246. The allegations of Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

247. Plaintiff is informed and believes, and thereon alleges, that there is a creditor of the Debtor that holds an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

248. The Annual Bonus, the Capital Transfers, and the Base Salary Transfers (collectively referred to as "the Transfers") constituted one or more transfers of property of the Debtor.

249. The Debtor made such transfers on or within two years prior to the Petition Date of December 28, 2008.

250. Plaintiff alleges on information and belief that the Debtor made the Transfers to the Heller Shareholders with the express intent to hinder, delay, or defraud one or more entities to which Debtor was indebted or became indebted on or after the date of such Transfers.

251. The Debtor made such Transfers without receiving anything of value, or, alternatively, to the extent the Debtor did receive consideration of any kind from anyone in exchange for any of the Transfers, the value of such consideration did not have a value that was reasonably equivalent to the value of the Transfer in question.

252. At the time of the Transfers, the Debtor was insolvent or became insolvent as a result of the Transfers.

253. At the time of the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

254. At the time of the Transfers, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

255. The Heller Shareholders, including IP Shareholder Defendants, were the initial transferees of the Transfers and/or the entities for whose benefit the Transfers were made.

256. Alternatively, the Heller Shareholders, including IP Shareholder Defendants, were the entities for whose benefit the Transfers were made and/or the immediate or mediate transferees of the initial transferees of such Transfers.

257. Plaintiff may avoid the Transfers under 11 U.S.C. § 548(b) and recover the value of the Transfers made to IP Shareholder Defendants pursuant to 11 U.S.C. § 550.

WHEREFORE, Plaintiff prays for judgment as set forth below.

### SEVENTEENTH CLAIM FOR RELIEF
### (To Avoid and Recover Constructive Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550 Against IP Shareholder Defendants)

258. The allegations of Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

259. Plaintiff is informed and believes, and thereon alleges, that there is a creditor of the Debtor that holds an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

260. The Transfers constituted one or more transfers of property of the Debtor.

261. The Debtor made such transfers on or within two years prior to the Petition Date of December 28, 2008.

262. The Debtor made such Transfers without receiving anything of value, or, alternatively, to the extent the Debtor did receive consideration of any kind from anyone in exchange for any of the Transfers, the value of such consideration did not have a value that was reasonably equivalent to the value of the Transfer in question.

263. At the time of the Transfers, the Debtor was insolvent or became insolvent as a result of the Transfers.

264. At the time of the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

265. At the time of the Transfers, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

266. The Heller Shareholders, including IP Shareholder Defendants, were the initial transferees of the Transfers and/or the entities for whose benefit the Transfers were made.

267. Alternatively, the Heller Shareholders, including IP Shareholder Defendants, were the entities for whose benefit the Transfers were made and/or the immediate or mediate transferees of the initial transferees of such Transfers.

268. Plaintiff may avoid the Transfers under 11 U.S.C. § 548(b) and recover the value of the Transfers made to IP Shareholder Defendants pursuant to 11 U.S.C. § 550.

WHEREFORE, Plaintiff prays for judgment as set forth below.

### EIGHTEENTH CLAIM FOR RELIEF
### (To Avoid and Recover Constructive Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B)(ii)(IV) and 550 Against IP Shareholder Defendants)

269. The allegations of Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

270. Plaintiff alleges on information and belief that the Debtor made the

Transfers to or for the benefit of the Heller Shareholders, including IP Shareholder Defendants, each of whom was an insider, under an employment contract and not in the ordinary course of business.

271.    Plaintiff may avoid the Transfers under 11 U.S.C. § 548(b), and recover the value of the Transfers made to IP Shareholder Defendants pursuant to 11 U.S.C. § 550.

WHEREFORE, Plaintiff prays for judgment as set forth below.

### NINETEENTH CLAIM FOR RELIEF
### (To Avoid and Recover Constructive Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(b) and 550 Against IP Shareholder Defendants)

272.    The allegations of Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

273.    At all times relevant to the claims asserted herein, the Debtor was a partnership.

274.    The Transfers were made to the Heller Shareholders, including IP Shareholder Defendants

275.    The Debtor did not receive fair consideration for any of the Transfers to the Heller Shareholders, including IP Shareholder Defendants.

276.    Plaintiff alleges on information and belief that from the time of the first Transfers, the Debtor was insolvent or the Debtor became insolvent as a result of the Transfers.

277.    Plaintiff may avoid the Transfers under 11 U.S.C. § 548(b), and recover the value of the Transfers made to IP Shareholder Defendants pursuant to 11 U.S.C. § 550.

WHEREFORE, Plaintiff prays for judgment as set forth below.

### TWENTIETH CLAIM FOR RELIEF
### (To Avoid and Recover Actual And Constructive Fraudulent Transfers Pursuant to Cal. Civ. Code §§ 3439.04(a)(1) and (2) and 3439.07(a) and 11 U.S.C. §§ 544 and 550 Against IP Shareholder Defendants)

278.    The allegations of Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

279. Plaintiff is informed and believes, and thereon alleges, that there is a creditor of the Debtor that holds an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

280. The Transfers constituted one or more transfers of property of the Debtor.

281. The Debtor made such transfers on or within two years prior to the Petition Date of December 28, 2008.

282. Plaintiff alleges on information and belief that the Debtor made the Transfers to the Heller Shareholders, including IP Shareholder Defendants, with the express intent to hinder, delay, or defraud one or more entities to which Debtor was indebted or became indebted on or after the date of such Transfers.

283. The Debtor made such Transfers without receiving anything of value, or, alternatively, to the extent the Debtor did receive consideration of any kind from anyone in exchange for any of the Transfers, the value of such consideration did not have a value that was reasonably equivalent to the value of the Transfer in question.

284. At the time of the Transfers, the Debtor was insolvent or became insolvent as a result of the Transfers.

285. At the time of the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

286. At the time of the Transfers, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

287. The Heller Shareholders, including IP Shareholder Defendants, were the initial transferees of the Transfers and/or the entities for whose benefit the Transfers were made.

288. Alternatively, the Heller Shareholders, including IP Shareholder Defendants, were the entities for whose benefit the Transfers were made and/or the immediate or mediate transferees of the initial transferees of such Transfers.

289.     Plaintiff may avoid the Transfers under California Civil Code Sections 3439.04 and 3439.07 and Bankruptcy Code Section 544 and recover the value of the Transfers made to IP Shareholder Defendants under Bankruptcy Code Section 550(a).

WHEREFORE, Plaintiff prays for judgment as set forth below.

## TWENTY-FIRST CLAIM FOR RELIEF
### (To Avoid and Recover Constructive Fraudulent Transfers Pursuant to Cal. Civ. Code §§ 3439.05 and 3439.07(a) and 11 U.S.C. §§ 544 and 550 Against IP Shareholder Defendants)

290.     The allegations of Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

291.     Plaintiff is informed and believes, and thereon alleges, that there is a creditor of the Debtor that holds an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

292.     The Transfers constituted one or more transfers of property of the Debtor.

293.     The Debtor made such transfers on or within two years prior to the Petition Date of December 28, 2008.

294.     Plaintiff alleges on information and belief that the Debtor made the Transfers to the Heller Shareholders, including IP Shareholder Defendants, with the express intent to hinder, delay, or defraud one or more entities to which Debtor was indebted or became indebted on or after the date of such Transfers.

295.     The Debtor made such Transfers without receiving anything of value, or, alternatively, to the extent the Debtor did receive consideration of any kind from anyone in exchange for any of the Transfers, the value of such consideration did not have a value that was reasonably equivalent to the value of the Transfer in question.

296.     At the time of the Transfers, the Debtor was insolvent or became insolvent as a result of the Transfers.

297.     At the time of the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which the remaining

assets of the Debtor were unreasonably small in relation to the business or transaction.

298. At the time of the Transfers, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

299. The Heller Shareholders, including the IP Shareholder Defendants, were the initial transferees of the Transfers and/or the entities for whose benefit the Transfers were made.

300. Alternatively, the Heller Shareholders, including IP Shareholder Defendants, were the entities for whose benefit the Transfers were made and/or the immediate or mediate transferees of the initial transferees of such Transfers.

301. Plaintiff may avoid the Transfers under California Civil Code Sections 3439.05 and 3439.07 and Bankruptcy Code Section 544 and recover the value of the Transfers made to IP Shareholder Defendants under Bankruptcy Code Section 550(a).

WHEREFORE, Plaintiff prays for judgment as set forth below.

### TWENTY-SECOND CLAIM FOR RELIEF
### (To Avoid and Recover Preferential Transfers
### Pursuant to 11 U.S.C. §§ 547 and 550 Against IP Shareholder Defendants)

302. The allegations of Paragraphs 1 through 143 of this Complaint are incorporated herein by reference.

303. Plaintiff alleges on information and belief that the Heller Shareholders, including IP Shareholder Defendants, were "insiders" within the meaning of 11 U.S.C. § 101(31)(C).

304. The Transfers constituted one or more transfers of property of the Debtor.

305. The Debtor made the Transfers within one year before the Petition Date.

306. Pursuant to Section 101(10)(A) of the Bankruptcy Code, the Heller Shareholders, including IP Shareholder Defendants, were creditors because at the time of the Transfers, the Heller Shareholders, including IP Shareholder Defendants, had a claim against the Debtor that arose at the time of or before the order for relief concerning the

Debtor for, as applicable, payment of the Transfers.

307. The Transfers were made on account of an antecedent debt owed by Debtor to the Heller Shareholders, including IP Shareholder Defendants, before such Transfers were made.

308. The Transfers were made while the Debtor was insolvent. The Debtor was insolvent under §§101(32)(A) and 547(b)(3) of the Bankruptcy Code at all relevant times because the sum of the Debtor's debts were greater than all of the Debtor's property, at a fair evaluation, during the one-year preceding the Petition Date.

309. The Transfers enabled the Heller Shareholders, including IP Shareholder Defendants, to receive more on account of their claims than they would have received if the Transfers had not been made and the Heller Shareholders, including IP Shareholder Defendants, had received payment of such debts pursuant to the provisions of chapter 7 of the Bankruptcy Code.

310. Based on the foregoing, Plaintiff is entitled to avoid and recover from IP Shareholder Defendants the Transfers or the value of the Transfers for the benefit of the estate pursuant to the provisions of 11 U.S.C. §§547(b) and 550(a).

WHEREFORE, Plaintiff prays for judgment as set forth below.

## OBJECTION TO THE RAKTL CLAIM

311. The RAKTL Claim consists of the one-page proof of claim, an Attachment to Proof of Claim (the "Attachment"), the Declaration of James Tramontana Regarding Sealed Documents in Support of Claim Number 709 of Ronald A. Katz Technology Licensing, L.P. and its affiliate A2D, L.P., dated August 20, 2010 (the "Tramontana Declaration" or "Tramontana Decl."), and the Declaration of James E. Malackowski Regarding Sealed Documents in Support of Claim Number 709 of Ronald A. Katz Technology Licensing, L.P. and its Affiliate A2D, L.P. (the Malackowski Declaration" or Malackowski Decl."). In accordance with this Court's order, the Attachment and the Tramontana and Malackowski Declarations have been filed under seal.

312. The RAKTL Fee Agreement is between Debtor and A2D. In the RAKTL

Claim, RAKTL does not distinguish between RAKTL (Katz Technology and A2D, collectively) and A2D. This objection refers to RAKTL similarly, except to indicate where A2D acted alone.

313. RAKTL alleges that Debtor breached the RAKTL Fee Agreement by dissolving. As a result, RAKTL alleges, it was required to engage substitute counsel (first Covington then Cooley) to complete the Cases for additional legal fees, is entitled to credit for approximately one-quarter of the non-contingent payment for 2008 hourly fees and an amount allegedly paid by RAKTL to an outside vendor for services in connection with the Cases.

314. Each of these claims is meritless, for the reasons set forth below.

315. <u>Additional Legal Fees</u>. Debtor did not breach the RAKTL Fee Agreement. RAKTL terminated the RAKTL Fee Agreement when it elected to transfer the Cases to Covington and elsewhere.

316. Certain of the IP Shareholder Defendants were responsible for Debtor's performance of the RAKTL Fee Agreement. Because their departure for another firm, with RAKTL's knowledge and approval, made it impossible for Debtor to continue the representation of RAKTL, any duty of Debtor to further perform was discharged, waived and/or excused.

317. <u>2008 Non-Contingent Fee</u>. In December 2007, RAKTL paid Debtor a non-contingent fixed fee for Debtor's services in 2008. Each of these payments was fully earned and non-refundable on receipt.

318.

319. Debtor estimates that its actual time charges for 2008 exceeded $21,000,000.

320. RAKTL is not entitled to any refund of the lesser, fixed prepayment for 2008 hourly fees.

321. <u>Vendor Payment</u>. Under the RAKTL Fee Agreement, Debtor is not obligated to reimburse RAKTL for its payment to the outside litigation vendor because

A2D was obligated to make it.

322.    In addition, Debtor generally objects to the RAKTL Claim under Bankruptcy Code section 502(b)(1), on the following grounds:

(a) The RAKTL Claim is barred because RAKTL has failed to state a claim for relief.

(b) Debtor did not breach the RAKTL Fee Agreement.

(c) RAKTL terminated, repudiated and/or breached the RAKTL Fee Agreement.

(d) The RAKTL Claim is barred because performance of the RAKTL Fee Agreement was made impossible by RAKTL.

(e) The RAKTL Claim is barred by the equitable doctrine of unclean hands.

(f) The RAKTL Claim is barred by the equitable doctrine of waiver.

(g) The RAKTL Claim is barred by the equitable doctrine of estoppel.

(h) The RAKTL Claim is barred by the equitable doctrine of unjust enrichment.

(i) The RAKTL Defendants suffered no damages from Debtor's actions.

(j) Any alleged damages suffered by the RAKTL Defendants are not documented or are speculative.

(k) Any alleged damages suffered by RAKTL are a result of its own conduct or the conduct of third parties.

(l) Any alleged damages suffered by RAKTL must be reduced by RAKTL's own proportionate fault and that of its agents and third parties.

(m) The RAKTL Claim is barred due to RAKTL's failure to perform a condition precedent to Debtor's obligations under the RAKTL Fee Agreement.

(n) RAKTL failed to mitigate any alleged damages that it suffered.

(o) The conduct of Debtor at all times was privileged and justified in the lawful conduct of its business.

(p) If the RAKTL Claim is allowed in whole or in part (notwithstanding this

Objection), any allowed amount is subject to complete offset or recoupment against amounts owed by RAKTL to Debtor, based on Debtor's claims against RAKTL.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendants as follows:

1. As to the First Claim for Relief for Breach of Contract Against the RAKTL Defendants, Debtor is entitled to:

 (a) Judgment against the RAKTL Defendants, jointly and severally, for damages in an amount to be proven at trial;

 (b) Prejudgment and post-judgment interest to the extent allowed by law;

 (c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

 (d) For such other and further relief as this Court deems just and appropriate.

2. As to the Second Claim for Relief for Quantum Meruit Against the RAKTL Defendants, Debtor is entitled to:

 (a) Judgment against the IP Shareholder Defendants, and each of them, for damages in an amount to be proven at trial;

 (b) Prejudgment and post-judgment interest to the extent allowed by law;

 (c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

 (d) For such other and further relief as this Court deems just and appropriate.

3. As to the Third Claim for Relief for Breach of the Implied Covenant of Good Faith and Fair Dealing Against the RAKTL Defendants, Debtor is entitled to:

 (a) Judgment against the RAKTL Defendants, jointly and severally, for damages in an amount to be proven at trial;

 (b) Prejudgment and post-judgment interest to the extent allowed by law;

 (c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

 (d) For such other and further relief as this Court deems just and appropriate.

4. As to the Fourth Claim for Relief for Breach of Contract Against the IP Shareholder Defendants, Debtor is entitled to:

    (a) A recovery in quantum meruit with respect to, among other things, the fair value of Debtor's services to the RAKTL Defendants prior to the termination of Debtor's engagement by the RAKTL Defendants, whether such value was enjoyed by the RAKTL Defendants before or after the RAKTL Defendants terminated Debtor;

    (b) Prejudgment and post-judgment interest to the extent allowed by law;

    (c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

    (d) For such other and further relief as this Court deems just and appropriate.

5. As to the Fifth Claim for Relief for Breach of the Implied Covenant of Good Faith and Fair Dealing Against the IP Shareholder Defendants, Debtor is entitled to:

    (a) Judgment against the IP Shareholder Defendants, jointly and severally, for damages in an amount to be proven at trial;

    (b) Prejudgment and post-judgment interest to the extent allowed by law;

    (c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

    (d) For such other and further relief as this Court deems just and appropriate.

6. As to the Sixth Claim for Relief for Breach of Fiduciary Duty Against the IP Shareholder Defendants, Debtor is entitled to:

    (a) Judgment against the IP Shareholder Defendants, jointly and severally, for damages in an amount to be proven at trial;

    (b) Prejudgment and post-judgment interest to the extent allowed by law;

    (c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

    (d) For such other and further relief as this Court deems just and appropriate

7. As to the Seventh Claim for Relief for Equitable Indemnification Against the IP Shareholder Defendants and Covington, Debtor is entitled to:

    (a) A Judgment for equitable indemnification from the IP Shareholder Defendants and Covington for all damages incurred by the RAKTL Defendants, as

reflected in the RAKTL Claim;

(b) Prejudgment and post-judgment interest to the extent allowed by law;

(c) Attorneys' fees and costs of suit incurred by Debtor in the defense of the RAKTL Claim; and

(d) For such other and further relief as this Court deems just and appropriate.

8.      As to the Eighth through Eleventh Claims for Relief, for the Recovery of Fraudulent Transfers, Debtor is entitled to:

(a) Avoid the Jewel Waiver as constituting one or more fraudulent transfers pursuant to 11 U.S.C. Sections 548 and 550, as well as California Civil Code Sections 3439.04, 3439.05, 3439.07 and 11 U.S.C. Section 544; and

(b) An order that requires the return of such transfers or the value thereof;

(c)  Prejudgment and post-judgment interest to the extent allowed by law;

(d) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

(e) For such other and further relief as this Court deems just and appropriate.

9.      As to the Twelfth Claim for Relief for Aiding and Abetting Breach of Fiduciary Duty Against Covington, Debtor is entitled to:

(a) Judgment against Covington for damages in an amount to be proven at trial;

(b) Prejudgment and post-judgment interest to the extent allowed by law;

(c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

(d) For such other and further relief as this Court deems just and appropriate.

10.      As to the Thirteenth Claim for Relief for Intentional Interference With Contractual Relations, Debtor is entitled to:

(a) Judgment against Covington for damages in an amount to be proven at trial;

(b) Prejudgment and post-judgment interest to the extent allowed by law;

(c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

(d) For such other and further relief as this Court deems just and appropriate.

11.      As to the Fourteenth Claim for Relief for Accounting Against All Defendants, Debtor is entitled to:

(a) Judgment for a full and complete accounting by the IP Shareholder Defendants, the RAKTL Defendants and Covington of (i) with respect to each Case resolved as of November 1, 2010, (the amount of any Net Recovery by the IP Shareholder Defendants, whether by settlement, judgment or otherwise, and the amount of the Contingent Fee payable to Debtor on that Net Recovery), calculated in accordance with the RAKTL Fee Agreement, showing in detail the calculation of the Net Recovery and the Contingent Fee; and (ii) with respect to each Case resolved after November 1, 2010, the amount of any Net Recovery by the IP Shareholder Defendants, and the amount of the Contingent Fee that would be payable to the Debtor on that Net Recovery, if the Case had stayed with Debtor, showing in detail the calculation of the Net Recovery and the Contingent Fee.

(b) Judgment for a full and complete accounting by the IP Shareholder Defendants, the RAKTL Defendants and Covington of the status of each Case that remains unresolved, including the timing of any expected settlement or trial and the amount, and a detailed calculation of the anticipated Net Recovery and the Contingent Fee payable thereon;

(c) To the extent the Accounting shows Debtor is entitled to a Contingent Fee, Debtor requests that the Court enter judgment for Debtor in the amount thereof;

(d) Prejudgment and post-judgment interest to the extent allowed by law;

(e) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

(f) For such other and further relief as this Court deems just and appropriate.

12. As to the Fifteenth Claim for Relief for Declaratory Relief Against All Defendants, Debtor is entitled to:

(a) A judicial declaration that the RAKTL Defendants, the IP Shareholder Defendants and Covington are required to make full disclosure of all past

settlements of the Cases and of future settlements as and when such settlements occur, including a full accounting to Debtor of all settlement proceeds and other facts and circumstances that could bear on the amount of fees for legal services to which Debtor is entitled under the RAKTL Fee Agreement and/or quantum meruit;

(b) A judicial declaration that with respect to the Cases that have settled prior to October 1, 2008, Debtor is entitled to fees for legal services under the terms of the RAKTL Fee Agreement;

(c) A judicial declaration that with respect to the Cases that have settled on or after October 1, 2008, Debtor is entitled to fees for legal services under quantum meruit principles; an order disallowing the RAKTL Claim in full;

(d) Prejudgment and post-judgment interest to the extent allowed by law;

(e) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

(f) For such other and further relief as this Court deems just and appropriate.

13.     As to the Sixteenth through Twenty-Second Claims for Relief, for the Recovery of Fraudulent Transfers, Debtor is entitled to:

(a) Avoid the Jewel Waiver as constituting one or more fraudulent transfers pursuant to 11 U.S.C. Sections 548 and 550, as well as California Civil Code Sections 3439.04, 3439.05, 3439.07 and 11 U.S.C. Section 544;

(b) An order that requires the return of such transfers or the value thereof;

(c) Prejudgment and post-judgment interest to the extent allowed by law;

(d) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

(e) For such other and further relief as this Court deems just and appropriate.

14.     As to the Objection to Claim No. 709 filed by the RAKTL Defendants, the Debtor is entitled to:

(a) an order disallowing the claim in its entirety;

(b) Prejudgment and post-judgment interest to the extent allowed by law;

(c) Reasonable attorneys' fees and costs of suit to the extent allowed by law; and

1
        (d) For such other and further relief as this Court deems just and appropriate.

2
DATED:  December 27, 2010

3
                               TREPEL MCGRANE GREENFIELD LLP

4

5
                           By:   \s\Christopher D. Sullivan

6
                                  Christopher D. Sullivan

7
                         Special Litigation Counsel for Liquidating
                         Debtor, Heller Ehrman LLP

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Exhibit A

Robert Fram

IP Shareholder Defendant Robert Fram was paid $772,830 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Robert Frahm was paid in excess of $59,225 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $385,755 in "base salary" to Defendant Robert Fram.

Robert Haslam

IP Shareholder Defendant Robert Haslam was paid $1,035,077 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Robert Haslam was paid in excess of $174,654 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $725,943 in "base salary" to Defendant Robert Haslam.

Sturgis Sobin

IP Shareholder Defendant Sturgis Sobin was paid $336,349 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Sturgis Sobin was paid in excess of $86,603 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $337,312 in "base salary" to Defendant Sturgis Sobin.

Johnny Chiu

IP Shareholder Defendant Johnny Chiu was paid $98,198 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $320,868 in "base salary" to Defendant Johnny Chiu.

Alan Blankenheimer

IP Shareholder Defendant Alan Blankenheimer was paid $310,179 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Alan Blankenheimer was paid in excess of $158,417 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $396,535 in "base salary" to Defendant Alan Blankenheimer.

Heidi Gutierrez

IP Shareholder Defendant Heidi Gutierrez was paid $3,897 as part of the Annual Bonus paid to Heller Shareholders in December of 200.

IP Shareholder Defendant Heidi Gutierrez was paid in excess of $27,427 as her LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $178,782 in "base salary" to Defendant Heidi Gutierrez.

//

## Michael Markman

IP Shareholder Defendant Michael Markman was paid $33,827 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Michael Markman was paid in excess of $15,350 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $245,319 in "base salary" to Defendant Michael Markman.

## Michael Plimack

IP Shareholder Defendant Michael Plimack was paid $306,956 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Michael Plimack was paid in excess of $30,744 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $292,564 in "base salary" to Defendant Michael Plimack.

## Stanley Young

IP Shareholder Defendant Stanley Young was paid $246,157 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Stanley Young was paid in excess of $36,755 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $260,412 in "base salary" to Defendant Stanley Young.

//

### Nitin Subhedar

IP Shareholder Defendant Nitin Subhedar was paid $124,128 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Nitin Suhedar was paid in excess of $18,658 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $199,752 in "base salary" to Defendant Stanley Young.

### Chris Martiniak

IP Shareholder Defendant Chris Martiniak was paid $355 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Chris Martiniak was paid in excess of $151,216 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $207,012 in "base salary" to Defendant Chris Martiniak.

### Laura Underwood-Muschamp

IP Shareholder Defendant Laura Underwood-Muschamp was paid $24,446 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Laura Underwood-Muschamp was paid in excess of $16,117 as her LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $203,533 in "base salary" to Defendant Laura Underwood-Muschamp.

//

## Dale Rice

IP Shareholder Defendant Dale Rice was paid $33,154 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Dale Rice was paid in excess of $40,217 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $286,113 in "base salary" to Defendant Dale Rice.

## Christine Haskett

IP Shareholder Defendant Christine Haskett was paid $10,290 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Christine Haskett was paid in excess of $18,052 as her LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $210,029 in "base salary" to Defendant Christine Haskett.

## Maureen Browne

IP Shareholder Defendant Maureen Browne was paid $43,772 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $195,967 in "base salary" to Defendant Maureen Browne.

## Andrew Byrnes

IP Shareholder Defendant Andrew Byrnes was paid $7,071 as part of the Annual Bonus paid to Heller Shareholders in December of 2007.

IP Shareholder Defendant Andrew Byrnes was paid in excess of $15,845 as his LEO Contribution in addition to other pension related benefits.

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $206,794 in "base salary" to Defendant Andrew Byrnes.

<u>Jo Dale Carothers</u>

In 2008, while the Debtor was sliding further into insolvency, the Debtor paid $179,079 in "base salary" to Defendant Jo Dale Carothers.

# EXHIBIT B

# Exhibt B

| | Client Name | Heller Client Number |
|---|---|---|
| Covington | I███████ | 0012 |
| | | |
| | | |
| | A████ T██████ C█, L██ | 0001 |
| | | 0002 |
| | | 0007 |
| | A████ G████ C██████ | 0001 |
| | | 0002 |
| | | 0004 |
| | | 0009 |
| | | 0041 |
| | | 0051 |
| | | 0063 |
| | | 0060 |
| | | 0064 |
| | | 0065 |
| | A███ I███ | 0002 |
| | | 0003 |
| | | 0089 |
| | | 0094 |
| | A███ I██ | 0008 |
| | | 0009 |
| | A██████ | 0001 |
| | A████ I██ | 0001 |
| | B████ P████ I████ S███ | 0001 |
| | B███ I████ T████ C█ L██ | 0001 |
| | | 0002 |
| | | 0003 |
| | | 0004 |
| | | 0005 |
| | C█ I██ | 0072 |
| | C████ P████ R████ C██ | 0002 |
| | | 0003 |
| | | 0005 |
| | | 0012 |
| | | 0013 |
| | | 0014 |
| | C█████ S███ | 0001 |
| | | 0005 |
| | D███ S███████ | 0001 |
| | D█████ I██ | 0033 |
| | | 0047 |

| | Client Name | Heller Client Number |
|---|---|---|
| | | No Total |
| | D███ ██ | 0025 |
| | | |
| | E████████ S████████ R██ ██████ | 0001 |
| | | |
| | F███ M████ D████ G████ | 0001 |
| | | 0002 |
| | | 0003 |
| | | 0004 |
| | | 0006 |
| | | 0008 |
| | | 0009 |
| | | 0010 |
| | | 0011 |
| | | 0012 |
| | | 0013 |
| | | |
| | G███ R█ J██ C██ D██ E██ M██████ | 0001 |
| | | |
| | H███ N██ I██ | 0005 |
| | | |
| | | 0004 |
| | | |
| | H████████ C██████ | 0017 |
| | | |
| | I████████ | 0004 |
| | | |
| | I████████ G████ S███ L██ | 0001 |
| | | |
| | I████ C█████ | 0001 |
| | | 0002 |
| | | |
| | L███ T██ L█ | 0002 |
| | | |
| | L███ E█████████ L███ | 0001 |
| | | |
| | L█████ I██ | 0011 |
| | | |
| | M██ I████████ P████ I█ | 0010 |
| | | 0012 |
| | | 0014 |
| | | 0034 |
| | | 0039 |
| | | 0040 |
| | | 0046 |
| | | 0048 |
| | | 0051 |
| | | 0052 |
| | | 0053 |
| | | 0054 |
| | | 0055 |
| | | 0058 |
| | | 0059 |
| | | |
| | M████ I█ | 0001 |
| | | |
| | M███ C██████ | 0005 |

| | Client Name | Heller Client Number |
|---|---|---|
| | M█ S█ | |
| | | No Total |
| | M█ T█, I█ | 0001 |
| | | 0011 |
| | | 0013 |
| | | 0014 |
| | | 0017 |
| | | 0018 |
| | | 0019 |
| | | 0021 |
| | | 0022 |
| | | 0023 |
| | | 0024 |
| | M█ L█ | 0002 |
| | N█ P█ | 0008 |
| | O█ S█ I█ | 0053 |
| | P█ I█ | 0013 |
| | | 0014 |
| | | 0015 |
| | | 0016 |
| | | 0017 |
| | | 0018 |
| | | 0019 |
| | | 0020 |
| | | 0021 |
| | Q█ I█ | 0071 |
| | R█ E█ █ | 0001 |
| | R█ K█ T█ L█ L█ | 0003 |
| | | 0011 |
| | | 0017 |
| | | 0018 |
| | | 0020 |
| | S█ E█ C█ L█ | 0002 |
| | | 0003 |
| | | 0041 |
| | S█ A█ | 0003 |
| | S█ T█ L█ - a█ - S█ T | 0009 |
| | | 0014 |
| | | 0013 |
| | S█ S█ | 0033 |
| | T█ B█ a█ C█ I█ F█ | 0001 |
| | T█ T█ A█ I█ | 0001 |
| | T█ M█ I█ | 0001 |

| Client Name | Heller Client Number |
|---|---|
| T████ I█████████ I██ | 0001 |
| T████ I█ | 0002 |
| | 0003 |
| | 0004 |
| | 0006 |
| U███ M███████ C██████ (U███ | 0005 |
| V██ I█ | 0465 |
| W████████████ | 1482 |
| A█████, W██ | 0001 |
| B████ E███████████ & H████ | 0001 |
| | 0003 |
| C██████ U██ M███ C█ | 0001 |
| C█████ F██████ o█C█ | 0001 |
| H██, A███ | 0001 |
| L███ A█ S████ o█S██ M█ | 0010 |
| M██ o█M█ D███████ | 0001 |
| S██ P████ I█ | 0001 |
| A█████ G████ C██████ | 0015 |
| | 0029 |
| | 0036 |
| | 0050 |
| | 0052 |
| | 0053 |
| | 0054 |
| | 0057 |
| | 0059 |
| | 0061 |
| A███ I█ | 0090 |
| | 0091 |
| | 0093 |
| | 0095 |
| A██ S████ | 0001 |
| | 0002 |
| B█ | 0061 |
| | 0062 |
| | 0063 |

| | Client Name | Heller Client Number |
|---|---|---|
| | | 0118 |
| | | |
| | C████ P███ R█████ I██ | 0001 |
| | | 0004 |
| | | 0007 |
| | | 0008 |
| | | 0009 |
| | | 0010 |
| | | 0011 |
| | | |
| | C████ S████ & C███████ I███ | 0046 |
| | | |
| | C█████ S█████ | 0010 |
| | | |
| | D███ S██████████ | 0003 |
| | | |
| | D█████ H████ C█, L█ | 0001 |
| | | |
| | G██████ I██ | 0011 |
| | | |
| | H████ N█, I█ | 0001 |
| | | 0002 |
| | | 0003 |
| | | |
| | H█████████ C█████ | 0001 |
| | | 0004 |
| | | 0007 |
| | | |
| | I█████ | 0003 |
| | | 0006 |
| | | 0007 |
| | | 0008 |
| | | 0009 |
| | | 0010 |
| | | 0011 |
| | | |
| | I███ C█████ | 0003 |
| | | 0005 |
| | | 0006 |
| | | |
| | L████ B███ I█████ | 0001 |
| | | 0002 |
| | | |
| | M████ I██████ P████ I██ | 0015 |
| | | 0018 |
| | | 0021 |
| | | 0028 |
| | | 0032 |
| | | 0035 |
| | | 0036 |
| | | 0037 |
| | | 0038 |
| | | 0042 |
| | | 0043 |
| | | 0044 |
| | | 0045 |
| | | 0047 |
| | | 0049 |

| Client Name | Heller Client Number |
|---|---|
| | 0050 |
| | 0057 |
| | |
| M███ T████ I██ | 0003 |
| | 0006 |
| | 0009 |
| | 0010 |
| | 0012 |
| | 0015 |
| | 0016 |
| | 0020 |
| | |
| N███ S██████ C████ | 0004 |
| | |
| P██ C████ | 0004 |
| | |
| P█ M████ ████ C█ | 0001 |
| | 0005 |
| | |
| R████ K█ T████ L███ L█ | 0010 |
| | 0012 |
| | 0013 |
| | 0014 |
| | 0015 |
| | 0016 |
| | 0019 |
| | |
| R██ S███ I█ | 0013 |
| | |
| S███ E████ C█, L█ | 0039 |
| | 0040 |
| | |
| S█ A██ | 0001 |
| | |
| U█ M██████ C████ (U█ | 0003 |
| | 0004 |
| | 0006 |
| | |
| V█ ██ | 0504 |
| | |
| W███ E██ | 0001 |
| | 0002 |
| | |
| Y███ I██ | 0150 |
| | 0151 |
| | 0152 |
| | |
| | |
| P███ G█ & E████ C███ | 0096 |
| | |
| | |
| C███, Z███ | 0001 |
| | |