bases on which it made decisions about the amount or nature of services to be devoted to the Cases by Heller personnel, especially if the change would be to the short-term benefit of Heller and to the detriment of RAKTL/A2D.

354. By executing the Legal Services Agreement and representing RAKTL/A2D in the Cases, Heller acted in a professional and fiduciary capacity that required it to place the interests of RAKTL/A2D before Heller's own interests; to act with complete loyalty, due care, and a high level of candor; and to exercise good faith and fair dealing in its conduct affecting RAKTL/A2D.

355. By executing the Legal Services Agreement and representing RAKTL/A2D in the Cases, Heller was prohibited by fiduciary, professional, contract, and other legal principles from acting in a manner that would undermine Heller's stability in a manner that would harm RAKTL/A2D.

356. Heller was undergoing a serious financial crisis by at least the end of 2007. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

357. By December 2007 Heller had been drawing on its bank credit line at an unprecedented and dangerous rate, and Heller continued to do so into 2008. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

358. By December 2007 Heller's debt was out of control and rising exponentially. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

359. By December 2007 Heller was facing a foreseeable risk of losing its bank financing. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

360. By December 2007 vital Heller Shareholders (as that term is defined in paragraphs 40 through 43 of the Complaint and used hereinafter) had left the firm, others were leaving the firm, and others were openly planning to depart or discussing departure. Heller never informed RAKTL/A2D of, and RAKTL/A2D did not know, this fact in or before 2008.

54

361.    In December 2007, Heller asked RAKTL/A2D to prepay the fixed-fee payment that, under the Legal Services Agreement, was to be paid for Legal Services to be performed in 2008. Pursuant to that request, A2D made that requested payment, in the amount of approximately $8.2 million dollars, in December 2007.

362.    Heller asked RAKTL/A2D to prepay the 2008 fixed-fee payment in December 2007 to enable Heller to be able to pay 2007 "bonuses" to Heller Shareholders. In and before 2008, Heller never communicated to RAKTL/A2D, and RAKTL/A2D did not know, that Heller wanted A2D to prepay the 2008 fixed fee for that purpose, rather than to enable Heller to provide required Legal Services in a timely and otherwise appropriate manner.

363.    In December 2007, when Heller asked RAKTL/A2D to prepay the 2008 fixed-fee payment, Heller was already immersed in financial crisis and operating with unreasonably small capital. Heller failed to inform RAKTL/A2D of, and RAKTL/A2D did not know, those facts at any time in or before 2008.

364.    Heller used some or all of RAKTL/A2D's prepaid 2008 fixed-fee payment to pay, or to enable Heller to pay, a 2007 "Annual Bonus" to Heller Shareholders (the "Annual Bonus"). Heller failed to inform RAKTL/A2D of, and RAKTL/A2D did not know, those facts at any time in or before 2008.

365.    Under Heller' partnership agreement in effect in December 2007 and early 2008, distributions to the Heller shareholders were limited to, at most, the reported net income as determined by reference to Heller's "Net Profits" for that year and the "cash needs of the "Partnership."

366.    The 2007 Annual Bonus Heller paid to Heller Shareholders exceeded Heller's reported net income by nearly $10 million. In paying the 2007 Annual Bonus, Heller was gambling with other people's money, and the gamble failed. Heller failed to inform RAKTL/A2D of, and RAKTL/A2D did not know, these facts at any time in or before 2008.

367.    The effect of Heller's payment of the 2007 Annual Bonus to Heller Shareholders was disastrous. Combined with Heller's held checks, unpaid invoices, and deferral of traditionally made payments, payment of the 2007 Annual Bonus created a financial hole from

55

which Heller never emerged. Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, any of these facts in or before 2008.

368.     When Heller first ordered payment of the 2007 Annual Bonus, Heller treated it as an "excess distribution." When Heller issued its financial statements, however, Heller improperly characterized the payments as "loans" to the entities that comprised Heller. In and before 2008, Heller never informed RAKTL/A2D, and RAKTL/A2D did not know, of this improper accounting.

369.     On January 1, 2008, Heller was desperately short of capital. Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, that fact at any time in or before September 26, 2008.

370.     As alleged in paragraph 59 of the Complaint, Heller, beginning in early 2008, tried to control its staffing and contain its litigation efforts on the Cases to reduce Heller's internally projected 2008 budget deficit for the Cases. Throughout 2008, Heller concealed from RAKTL/A2D that Heller was making and had made decisions about staffing and litigation efforts on the Cases for that purpose, rather than to benefit RAKTL/A2D or to maintain the Legal Services at the same level of quality and effort that Heller had previously provided in the Cases. Instead, throughout that period, Heller led RAKTL/A2D to believe that Heller was continuing to make decisions about staffing and litigation efforts on the Cases based on the same factors on which Heller had previously based its decisions about staffing and litigation efforts on the Cases and that Heller was maintaining the Legal Services at the same level of quality and effort that Heller had previously provided in the Cases.

371.     In 2008, while Heller was insolvent and sliding further into insolvency, it paid or caused to be paid to departing Heller Shareholders approximately $8 million. Heller characterized those payments at the time as a return of capital (the "Capital Transfers"). Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, these facts in 2008.

372.     In at least March through July of 2008, Heller drew on its bank credit line at an unprecedented and dangerous rate. Heller did not inform RAKTL/A2D of, and RAKTL/A2D did not know, that fact in 2008.

56

373. As alleged in paragraph 70 of the Complaint, on September 14, 2008, Heller Shareholders Robert Haslam ("Haslam") and Michael Plimack ("Plimack") and other Heller attorneys who had been providing Legal Services informed Heller of their intention to resign from Heller on October 1, 2008. Heller did not inform RAKTL/A2D of that fact until after September 26, 2008.

374. On September 16, 2008, RAKTL/A2D received from Haslam a telephone call in which Haslam stated that he and Plimack wanted to meet with Ronald A. Katz ("Katz") to discuss "what's happening in the press." Through Katz's assistant who received the call, Haslam scheduled a meeting with Katz for September 22, 2008, at RAKTL's offices in Los Angeles.

375. On September 22, 2008, Haslam and Plimack met with a RAKTL/A2D representative, Ronald A. Katz, and told him that they would soon be leaving Heller and joining Covington. No one representing Heller, and no one who to the knowledge of RAKTL/A2D had ever represented Heller, had previously informed RAKTL\A2D that Haslam, Plimack, and other Heller Shareholders who had been working on the Cases would, or even might, be leaving Heller to join another law firm.

376. On September 22, 2008, no one told RAKTL/A2D that, on or about September 14, 2008, or on any other date, Haslam, Plimack, or any other Heller shareholder who had been working on the Cases had already either resigned from or submitted a resignation notice to Heller.

377. At the meeting on September 22, 2008, Haslam and Plimack told RAKTL/A2D that Haslam, Plimack and some other Heller attorneys would sometime thereafter join Covington. Based on that meeting, RAKTL/A2D understood that the Heller attorneys moving to Covington could and would continue to provide the Legal Services at no extra cost to RAKTL/A2D beyond what was provided for in the Legal Services Agreement. Haslam and Plimack assured RAKTL/A2D that the transition would be "completely smooth" for all of the Cases, except for possibly one. Haslam and Plimack advised RAKTL/A2D that Covington might not be able to represent RAKTL in its case against US Cellular because of a possible conflict of interest.

57

378. Haslam and Plimack had Heller's actual authority to make the representations they made to RAKTL/A2D at the meeting on September 22, 2008.

379. Haslam and Plimack had Heller's apparent authority to make the representations they made to RAKTL/A2D at the meeting on September 22, 2008.

380. In October 2008, Heller billed RAKTL/A2D for Plimack's September 2008 work on the Cases, including his time for attending the meeting at RAKTL's offices on September 22, 2008. Heller thereby adopted and ratified the representations made to RAKTL/A2D at the meeting on September 22, 2008.

381. By no later than September 26, 2008, Heller's management had concluded that Heller was no longer in a position to continue to service its clients efficiently and had presented Heller Shareholders with a dissolution plan so stating (the "Dissolution Plan"). Heller did not inform RAKTL/A2D of those facts before 2010.

382. Heller's Dissolution Plan provided that in Heller's dissolution process, to ensure that Heller's "non-contingency/non-success fee matters only" would be attended to in the most efficient and effective manner possible, Heller (a) would waive any rights and claims under the doctrine of *Jewel v. Boxer* to seek payment of legal fees generated after the departure date of any lawyer or group of lawyers and (b) would encourage Heller lawyers to move their clients to other law firms. Heller took no similar such action to ensure that the Cases would be attended to in an efficient and effective manner.

383. Heller failed to take action to ensure that in Heller's dissolution process the Cases would be attended to in the manner required by the Legal Services Agreement.

384. Heller failed to take action to ensure that in Heller's dissolution process the Cases would be attended to in the manner required by Heller's professional and fiduciary obligations to RAKTL/A2D.

385. Heller failed to take action to ensure that in Heller's dissolution process the Cases would be attended to in the manner required by Heller's covenant of good faith and fair dealing RAKTL/A2D.

58

386.    Until September 30, 2008, RAKTL/A2D believed that Haslam, Plimack, and other Heller Shareholders who had been providing Legal Services had not yet resigned from Heller.

387.    On or before September 25, 2008, Heller's management concluded that Heller should dissolve.

388.    On or before September 25, 2008, Heller's management announced to Heller employees, including employees who were not lawyers, that Heller's dissolution was unavoidable.

389.    At approximately 7:00 a.m. PDT on September 26, 2008, RAKTL/A2D read a media story stating that on the previous day Heller had announced to "all hands" that it was dissolving "in a partnership vote today"; that a Heller partner had stated that Heller's banks had "seized control of accounts receivable, unbilled time and expenses this week"; that "the banks' decision came after the departure of 14 IP litigators, announced on Sept. 14, triggered a clause in the contract governing the firm's line of credit"; and that "2007 and 2008 were marked with a steady stream of partner departures. Last October the firm laid off 65 support staff. The firm has lost about 50 partners since January, including a group of 14 intellectual property litigators that recently left for Covington & Burling." Aside from what Haslam and Plimack told Katz at the meeting on September 22, 2008, at no time before RAKTL/A2D read that media story had anyone representing Heller with actual or apparent authority told RAKTL or A2D anything about the intended, announced, or actual departure from Heller of Haslam, Plimack, and other lawyers who had been providing Legal Services. Nor had anyone representing Heller with actual or apparent authority, other than Haslam and Plimack, told Katz that Heller was considering or taking any action to achieve dissolution.

390.    On September 26, 2008, and during Heller's dissolution process, several Cases were proceeding in litigation, with multiple time-sensitive deadlines pending, including court-ordered deadlines and deadlines in the following week.

59

391. In connection with the transfer of the Cases from Heller to Covington and other successor counsel, Heller owed professional and fiduciary duties of loyalty, care, and disclosure directly to RAKTL/A2D.

392. As alleged by Heller in paragraph 183 of the Complaint, Heller entered into the Jewel Waiver with actual intent to hinder, delay, or defraud one or more entities to which Heller was indebted or became indebted on or after the date of certain transfers. RAKTL/A2D is one of those entities.

393. At the time of the Jewel Waiver, Heller was insolvent or became insolvent.

394. Heller's dissolution pursuant to the Dissolution Plan made it impossible for Heller to continue its representation of RAKTL/A2D in the Cases.

395. Heller knew that once the Dissolution Plan was approved, Heller would be unable to complete the Legal Services for RAKTL/A2D.

396. After Heller announced that it would be dissolving, Heller never contacted RAKTL/A2D to inform RAKTL/A2D whether, either legally or practically, Heller could or could not continue providing Legal Services to RAKTL/A2D.

397. After Heller announced that it would be dissolving, Heller, other than through Haslam, Plimack, and Byrnes, never contacted RAKTL/A2D to advise RAKTL/A2D as to what RAKTL/A2D could or should do to protect itself and its interest in the Cases from harm that might result from Heller's dissolution.

## FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT
### (Legal Services Agreement)

398. RAKTL/A2D refers to, and by that reference incorporates, the allegations in paragraphs 332 through 397 above.

399. At all relevant times the Legal Services Agreement was a valid and existing contract.

400. At all relevant times RAKTL/A2D complied, and was in compliance, with its obligations under the Legal Services Agreement.

60

401.    Haslam and Plimack were still Heller Shareholders when they met with RAKTL/A2D representatives on September 22, 2008.

402.    Haslam and Plimack were acting as Heller's agents when they represented to RAKTL/A2D on September 22, 2008, that transfer of the Cases to Covington would be "completely smooth" and that Haslam, Plimack, and other Heller lawyers who had been providing Legal Services could and would continue providing Legal Services under the Legal Services Agreement. At no time on or before October 1, 2008, did Heller tell RAKTL/A2D anything to the contrary.

403.    Based on the meeting of Haslam, Plimack, and Ronald A. Katz on September 22, 2008, RAKTL/A2D believed, on that date and until sometime after early October 2008, that when Haslam, Plimack, and other lawyers who had been providing Legal Services joined Covington, they could and would continue to provide Legal Services at no greater cost to RAKTL/A2D than was specified in the Legal Services Agreement.

404.    On September 26, 2008, using a Heller email address, Andrew Byrnes ('Byrnes") sent RAKTL/A2D an email with an attached proposed letter for RAKTL/A2D to sign that would allow transfer of the Case files to Covington. Byrnes sent the email to RAKTL/A2D from his Heller email address.

405.    Byrnes was still a Heller Shareholder on September 26, 2008.

406.    Byrnes had actual authority to act on behalf of Heller in sending RAKTL/A2D the email and attached proposed letter on September 26, 2008.

407.    Byrnes had apparent authority to act on behalf of Heller in sending RAKTL/A2D the email and attached proposed letter on September 26, 2008.

408.    RAKTL/A2D revised the letter proposed by Byrnes on September 26, 2008, and RAKTL/A2D signed and sent the revised letter to Heller on September 26, 2008 (the "RAKTL/A2D September 2008 letter").

409.    At no time on September 26, 2008, or at any other time on or before October 1, 2008, did anyone representing or purporting to represent Heller communicate to RAKTL/A2D,

61

orally or in writing, that any of the facts or beliefs stated in the RAKTL/A2D September 2008 letter was erroneous.

410. At no time on September 26, 2008, or at any other time thereafter, did anyone representing or purporting to represent Heller offer or give RAKTL/A2D any legal advice inconsistent in any way with any of the facts or beliefs stated in the RAKTL/A2D September 2008 letter.

411. At no time on September 26, 2008, or at any other time thereafter, did anyone representing or purporting to represent Heller tell RAKTL/A2D, orally or in writing, that Heller was able to continue providing the Legal Services, either in a winding-up mode or otherwise.

412. At no time before, on, or after September 26, 2008, did anyone representing or purporting to represent Heller tell RAKTL/A2D that Heller could, wanted to, or would consider designating any Heller Shareholders, other than those who were going to go or had gone to Covington, to continue to provide the Legal Services for Heller after Haslam, Plimack, and others resigned from or told Heller management that they were going to resign from Heller.

413. RAKTL/A2D agreed to transfer the Cases to Covington because RAKTL/A2D had been led to believe, by persons with authority to act on behalf of Heller, and believed, that Heller had consented to the transfer and that the Legal Services would be provided by lawyers at Covington under the terms of the Legal Services Agreement at no extra cost to RAKTL/A2D.

414. On September 26, 2008, RAKTL/A2D informed Heller in writing that RAKTL/A2D's understanding was that when Haslam and his team from Heller moved to Covington, they would be continuing to provide the Legal Services under the terms of the Legal Services Agreement. At no time on or before October 1, 2008, did anyone representing or purporting to represent Heller inform RAKTL/A2D that Heller disagreed with any statement in that writing.

415. The transfer of the Cases to Covington was not "completely smooth." Because of a conflict, Covington could not represent RAKTL in all of the remaining Cases. In addition, because Heller refused to reach an agreement with Covington that would enable Covington to provide all the Legal Services without the risk of being sued either by Heller in Heller's

62

winding-up actions or in connection with Heller's bankruptcy if Heller were to file for bankruptcy, Covington would not agree to provide all the Legal Services unless RAKTL/A2D would agree to make additional fixed-fee payments to Covington and to indemnify Covington against any such risk.

416. Heller breached the Legal Services Agreement by failing to perform the Legal Services in 2007 and 2008.

417. Heller breached the Legal Services Agreement by failing to timely inform, and provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and into September 2008 that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

418. Heller breached the Legal Services Agreement by failing to timely inform, and provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and into September 2008 that significantly increased the risk that Heller would be unable or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

419. Heller breached the Legal Services Agreement by failing, in late 2007 and thereafter, to make decisions about the amount and nature of Legal Services provided on a consistent basis, and by failing to timely inform and advise RAKTL/A2D that Heller intended to change and did change the bases for making such decisions, while one or more of the Cases was still pending.

420. Heller breached the Legal Services Agreement by failing, in late 2007 and thereafter, to provide the Legal Services with the consistent degree of timeliness, effort, and quality, including staffing, required by the Legal Services Agreement.

421. Heller breached the Legal Services Agreement in late 2007 and thereafter by controlling its staffing and containing its litigation efforts on the Cases not for the purpose and

63

effect of providing the amount and quality of legal services required by the Legal Services Agreement, but for the purpose and effect of reducing Heller's internally projected 2008 budget deficit for the Cases.

422. Heller breached the Legal Services Agreement on and after September 14, 2008, by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the fact that, on or about September 14, 2008, Haslam, Plimack, and other Heller attorneys and Heller Shareholders who had been providing Legal Services, informed Heller of their intention to resign from Heller.

423. Heller breached the Legal Services Agreement by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner without imposing additional costs on RAKTL/A2D.

424. Heller breached the Legal Services Agreement by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the Legal Services Agreement.

425. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Heller would dissolve, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

426. Heller breached the Legal Services Agreement by failing, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, to take the actions necessary to ensure that the Cases would be attended to an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

427. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services

64

would be leaving Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

428. Heller breached the Legal Services Agreement by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

429. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

430. Heller breached the Legal Services Agreement by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the conclusion by Heller's management that Heller was no longer in a position to continue to service its clients efficiently and about Heller's preparation of a written dissolution plan.

431. On and after September 26, 2008, as a result of Heller's breaches of the Legal Services Agreement, RAKTL/A2D immediately had to find successor legal counsel who could represent RAKTL in the then-pending Cases.

432. After deciding to dissolve, Heller breached the Legal Services Agreement by failing to take reasonable and timely actions necessary to enable Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller to continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

433. After deciding to dissolve, Heller breached the Legal Services Agreement by actively impeding RAKTL/A2D's ability to have Haslam, Plimack, and other Heller

65

Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

434. After deciding to dissolve, Heller breached the Legal Services Agreement by failing to provide, failing to arrange to provide, and failing even to attempt to provide, the Legal Services as part of Heller's winding-up process without imposing additional costs on RAKTL/A2D.

435. After Heller dissolved, Covington temporarily provided Legal Services for all Cases other than the US Cellular Case, and RAKTL/A2D retained Cooley Godward Kronish LLP ("Cooley") to represent A2D and its affiliates in the US Cellular Case.

436. As a result of Heller's acts and omissions described above, RAKTL/A2D ultimately had to retain Cooley in February 2009 to represent A2D and its affiliates in all but one of the Cases that had been pending when Heller dissolved. To do so, RAKTL/A2D had to pay Cooley substantial additional fixed fees that RAKTL/A2D would not have had to pay had Heller not breached the Legal Services Agreement, and RAKTL/A2D had to agree to pay Cooley a contingent fee that RAKTL/A2D would not have had to agree to pay had Heller not breached the Legal Services Agreement.

437. As a result of Heller's breaches of the Legal Services Agreement, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

## SECOND CLAIM FOR RELIEF: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

438. RAKTL/A2D refers to, and by that reference incorporates in this paragraph, the allegations in the foregoing paragraphs 332 through 437.

439. Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timley provide legal advice to, RAKTL/A2D about the changes in

66

circumstances in 2007 and 2008 that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

440.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and 2008 that significantly increased the risk that Heller would be unable or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

441.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to make decisions about the amount and nature of Legal Services provided on a consistent basis, and by failing to timely inform and advise RAKTL/A2D that Heller intended to change and did change the bases for making such decisions, while one or more of the Cases was still pending.

442.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to provide the Legal Services with the consistent degree of timeliness, effort, and quality, including staffing, required by the covenant of good faith and fair dealing with RAKTL/A2D.

443.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by controlling its staffing and containing its litigation efforts on the Cases not for the purpose and effect of providing the amount and quality of legal services required by the covenant of good faith and fair dealing with RAKTL/A2D, but for the purpose and effect of reducing Heller's internally projected 2008 budget deficit for the Cases.

444.    Heller breached its covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timley provide legal advice to, RAKTL/A2D about the fact that, in about mid-August 2008, Heller attorneys, including Heller attorneys providing the Legal

67

Services, began executing a detailed program under which a critical mass of Heller's attorneys with intellectual-property expertise would commit to resign from Heller.

445. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the fact that, on or about September 14, 2008, Haslam, Plimack, and other Heller attorneys and Heller Shareholders who had been providing Legal Services, resigned, or informed Heller of their intention to resign, from Heller.

446. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner and without imposing additional costs on RAKTL/A2D.

447. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

448. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the Legal Services Agreement.

449. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Heller would dissolve, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

450. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Heller realized there was a significant risk that Haslam, Plimack, and other

68

Heller lawyers who had been providing the Legal Services would be leaving Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

451.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

452.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

453.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

454.    Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and provide legal advice to, RAKTL/A2D, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by

69

the covenant of good faith and fair dealing with RAKTL/A2D and without imposing additional costs on RAKTL/A2D.

455. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the conclusion by Heller's management that Heller was no longer in a position to continue to service its clients efficiently and about Heller's preparation of a written dissolution plan.

456. Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to timely inform RAKTL/A2D that Haslam, Plimack, and other attorneys who had been providing Legal Services had resigned, or announced their resignation, from Heller on September 14, 2008.

457. On and after September 26, 2008, as a result of Heller's breaches of the covenant of good faith and fair dealing with RAKTL/A2D, RAKTL/A2D immediately had to find successor legal counsel who could represent RAKTL in the then-pending Cases.

458. RAKTL/A2D retained Cooley Godward Kronish LLP ("Cooley") to represent A2D and its affiliates in all but one of the pending Cases. To do so, RAKTL/A2D had to pay Cooley substantial additional fixed fees that RAKTL/A2D would not have had to pay had Heller not breached the covenant of good faith and fair dealing with RAKTL/A2D, and RAKTL/A2D had to agree to pay Cooley a contingent fee that RAKTL/A2D would not have had to agree to pay had Heller not breached the covenant of good faith and fair dealing with RAKTL/A2D.

459. After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to take reasonable actions necessary to enable Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller to continue providing the Legal Services at Covington or elsewhere without imposing additional costs on RAKTL/A2D.

460. After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by actively impeding RAKTL/A2D's ability to have Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the

70

Legal Services while at Heller continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

461.     After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by failing to provide, failing to arrange to provide, and failing even to attempt to provide, the Legal Services as part of Heller's winding-up process.

462.     After deciding to dissolve, Heller breached the covenant of good faith and fair dealing with RAKTL/A2D by entering into the Jewel Waiver and thereby providing to certain Heller clients other than RAKTL/A2D preferential treatment, including opportunities to obtain legal representation without incurring extra costs caused by Heller's dissolution, and by failing to communicate these facts to RAKTL/A2D.

463.     As a result of Heller's breaches of the covenant of good faith and fair dealing with RAKTL/A2D, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

464.     By the foregoing breaches of the covenant of good faith and fair dealing, Heller wrongfully and unfairly interfered with RAKTL/A2D's right to receive the benefits of the Legal Services Agreement.

### THIRD CLAIM FOR RELIEF: BREACH OF FIDUCIARY DUTY

465.     RAKTL/A2D refers to, and by that reference incorporates in this paragraph, the allegations in the foregoing paragraphs 332 through 464.

466.     Heller owed fiduciary duties to RAKTL/A2D, including the duties of loyalty, competence, and communication about significant developments relating to Heller's representation of, or employment by, RAKTL/A2D in the Cases.

467.     Heller breached its fiduciary duty of communication to RAKTL/A2D by failing to inform RAKTL/A2D of significant developments relating to Heller's representation of or employment by RAKTL/A2D in the Cases.

71

468. Heller breached its fiduciary duty of loyalty to RAKTL/A2D by refusing to enter into an agreement with Covington concerning division of the contingent fee that would enable RAKTL/A2D to continue to obtain the Legal Services without incurring costs beyond those specified in the Legal Services Agreement.

469. Heller also owed fiduciary duties to promptly refund any portion of a fee paid in advance that was not earned, and not to charge or attempt to collect a fee that had not been earned.

470. Heller did not perform the required Legal Services in the last quarter of 2008. Heller collected approximately $2 million for Legal Services that it did not perform, and Heller has not repaid those fees. Heller breached its fiduciary duties to RAKTL/A2D by failing to refund those fees promptly. Heller further breached its fiduciary duties to RAKTL/A2D by failing to refund those fees at all.

471. Heller has not promptly refunded, and has not refunded at all, other fixed fees that RAKTL/A2D paid it under the Legal Services Agreement, that Heller did not earn and that Heller, by dissolving as it did before all the Cases had been fully resolved, made itself unable to earn.

472. Heller breached its fiduciary duties by taking action to collect a contingent fee that, because Heller failed to complete the Legal Services and because the Cases still are not fully resolved, Heller did not earn, has not earned, and cannot earn.

473. Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and 2008 that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

474. Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the changes in circumstances in 2007 and 2008 that significantly increased the risk that Heller would be unable

72

or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

475.    Heller breached its fiduciary duty of communication and loyalty by failing to make decisions about the amount and nature of Legal Services provided on a consistent basis, and by failing to timely inform and advise RAKTL/A2D that Heller intended to change and did change the bases for making such decisions, while one or more of the Cases was still pending.

476.    Heller breached its fiduciary duty of loyalty by failing to provide the Legal Services with the consistent degree of timeliness, effort, and quality, including staffing, needed to provide effective legal services.

477.    Heller breached its fiduciary duty of loyalty by controlling its staffing and containing its litigation efforts on the Cases not for the purpose and effect of providing the amount and quality of legal services needed to provide effective legal services, but for the purpose and effect of reducing Heller's internally projected 2008 budget deficit for the Cases.

478.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the fact that, on or about September 14, 2008, Haslam, Plimack, and other Heller attorneys and Heller Shareholders who had been providing Legal Services, resigned, or informed Heller of their intention to resign, from Heller.

479.    Heller breached its fiduciary duty of communication and loyalty by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner without imposing additional costs on RAKTL/A2D.

480.    Heller breached its fiduciary duty of communication and loyalty by failing, once Heller realized there was a significant risk that Heller would dissolve, to take the actions necessary to ensure that the Cases would be attended to in the manner required by the Legal Services Agreement without imposing additional costs on RAKTL/A2D.

73

481. Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Heller would dissolve, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

482. Heller breached its fiduciary duty of communication and loyalty by failing, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, to take the actions necessary to ensure that the Cases would be attended to an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

483. Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Heller realized there was a significant risk that Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services would be leaving Heller, about what actions RAKTL/A2D could or should take to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

484. Heller breached its fiduciary duty of communication and loyalty by failing, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, to take the actions necessary to ensure that the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

485. Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D, once Haslam, Plimack, and other Heller lawyers who had been providing the Legal Services had announced their resignations from Heller, about what actions RAKTL/A2D could or should take to ensure that

74

the Cases would be attended to in an efficient and effective manner or in the manner required by the Legal Services Agreement and without imposing additional costs on RAKTL/A2D.

486.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform, and timely provide legal advice to, RAKTL/A2D about the conclusion by Heller's management that Heller was no longer in a position to continue to service its clients efficiently and about Heller's preparation of a written dissolution plan.

487.    Heller breached its fiduciary duty of communication and loyalty by failing to timely inform RAKTL/A2D that Haslam, Plimack, and other attorneys who had been providing Legal Services had resigned, or announced their resignation, from Heller on September 14, 2008.

488.    After deciding to dissolve, Heller breached its fiduciary duty of communication and loyalty by failing to take reasonable actions necessary to enable Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller to continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

489.    After deciding to dissolve, Heller breached its fiduciary duty of loyalty by actively impeding RAKTL/A2D's ability to have Haslam, Plimack, and other Heller Shareholders or former Heller Shareholders who had provided the Legal Services while at Heller continue providing the Legal Services at Covington without imposing additional costs on RAKTL/A2D.

490.    After deciding to dissolve, Heller breached its fiduciary duty of loyalty by failing to provide, failing to arrange to provide, and failing even to attempt to provide, the Legal Services as part of Heller's winding-up process .

491.    After deciding to dissolve, Heller breached its fiduciary duty to RAKTL/A2D by entering into the Jewel Waiver and thereby providing to certain Heller clients other than RAKTL/A2D preferential treatment, including opportunities to obtain legal representation without incurring extra costs caused by Heller's dissolution, and by failing to communicate these facts to RAKTL/A2D.

75

492.    As a result of Heller's breaches of its fiduciary duty of communication and loyalty, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

493.    By the foregoing breaches of its fiduciary duty of communication and loyalty, Heller wrongfully and unfairly interfered with RAKTL/A2D's right to receive the benefits of the Legal Services Agreement.

## FOURTH CLAIM FOR RELIEF: FRAUD BY CONCEALMENT

494.    RAKTL/A2D refers to, and by that reference incorporates in this paragraph, the allegations in the foregoing paragraphs 332 through 493.

495.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D that Heller was controlling its staffing and containing its litigation efforts on the Cases to reduce Heller's internally projected 2008 budget deficit for the Cases.

496.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D the significant and growing risk that Heller would be unable or unwilling to continue to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, resources, and dedication Heller had demonstrated and provided in previously providing legal services generally, and Legal Services in particular, to RAKTL/A2D.

497.    In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D that Heller had changed or intended to change the bases on which it made decisions about the amount or nature of services to be devoted to the Cases by Heller personnel.

498.    On September 14, 2008, and for more than two weeks thereafter, Heller intentionally withheld from RAKTL/A2D that on September 14, 2008, Haslam, Plimack, and other Heller attorneys who had been providing Legal Services informed Heller of their intention to resign from Heller as of October 1, 2008.

499.    After Heller's management determined that dissolution of Heller was unavoidable, Heller intentionally withheld that information from RAKTL/A2D.

76

500. On September 25, 2008, Heller's management intentionally withheld from RAKTL/A2D that earlier that day Heller had announced to Heller employees, including employees who were not lawyers, that Heller's dissolution was unavoidable.

501. In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D the changes in circumstances that created a significant risk that Heller would be unable or unwilling to continue throughout 2008 to prosecute all the Cases to conclusion with at least the same degree of loyalty, effort, and dedication Heller had demonstrated in previously providing legal services to RAKTL/A2D.

502. In late 2007 and 2008, Heller intentionally withheld from RAKTL/A2D the changes in circumstances that significantly increased the risk that Heller would be unable or unwilling to continue throughout 2008 to provide the Legal Services with the timeliness, effort, and quality with which Heller had previously provided Legal Services to RAKTL/A2D and to provide the Legal Services throughout the period when one or more of the Cases was still pending.

503. Heller intentionally withheld from RAKTL/A2D the conclusion by Heller's management that Heller was no longer in a position to continue to service its clients efficiently.

504. Heller knew that by failing to fully inform RAKTL/A2D of Heller's dire and worsening financial circumstances in 2007 and 2008, Heller's insolvency in early 2008 and thereafter, the likely departure of key Heller Shareholders, the tendered resignations and resignations of key Heller Shareholders, the conclusion by Heller management that dissolution of Heller was unavoidable, Heller's inability to provide the Legal Services after the departure of Haslam, Plimack, and other Heller Shareholders who had provided Legal Services, and Heller's plans for dissolution, Heller was portraying to RAKTL/A2D a false and misleading picture about Heller's ability to continue providing Legal Services in and after the last quarter of 2008.

505. Heller intentionally withheld from RAKTL/A2D that, after deciding to dissolve, Heller entered into the Jewel Waiver and thereby provided to certain Heller clients other than RAKTL/A2D preferential treatment, including opportunities to obtain legal representation without incurring extra costs caused by Heller's dissolution.

506. Heller concealed the foregoing information with the intent that RAKTL/A2D would rely on Heller's deception.

507. RAKTL/A2D justifiably relied on the representations made to it by Heller and did not know that Heller had withheld information material to those representations as described in the foregoing paragraphs.

508. RAKLT/A2D justifiably believed, and acted on its belief, that Heller would not engage in conduct that would put Heller's interest above the interest of RAKTL/A2D and would communicate to RAKTL/A2D information that created a significant risk that Heller would be unwilling or unable to provide the Legal Services.

509. Heller's wrongful concealment of information as described above was a substantial factor in causing RAKTL/A2D harm by causing RAKTL/A2D to have to pay additional attorney fees and causing RAKTL/A2D to have to enter into an additional contingent-fee agreement.

510. As a result of Heller's wrongful concealment of information as described above, RAKTL/A2D has suffered damages by having had to pay, and having paid, additional fixed legal fees and costs and by having had to agree, and having agreed, to pay Cooley a contingent fee; and RAKTL/A2D will continue to suffer damages in the form of additional attorney fees paid to Cooley.

## FIFTH CLAIM FOR RELIEF: UNJUST ENRICHMENT

511. RAKTL/A2D refers to, and by that reference incorporates in this paragraph, the allegations in the foregoing paragraphs 332 through 510.

512. Heller received legal fees for Legal Services it failed to perform and now cannot possibly perform.

513. Heller is not entitled to keep the legal fees it received.

514. Heller failed to refund the legal fees to which it was not entitled.

515. Heller has been unjustly enriched.

516. As a result of Heller's conduct, RAKTL/A2D has been damaged in the amount of the fees RAKTL/A2D paid to Heller.

78

## SIXTH CLAIM FOR RELIEF: BREACH OF CONTRACT
### (First/Second Pass Agreement)

517.    RAKTL/A2D refers to, and by that reference incorporates in this paragraph, the allegations in the foregoing paragraphs 332 through 516.

518.    Heller entered into an agreement with RAKTL/A2D regarding payment for a vendor product called "First/Second Pass." By that agreement (the "First/Second Pass Agreement"), RAKTL/A2D agreed to made an advance payment to Berry & Associates, PC on Heller's behalf to enable Heller to use First/Second Pass, and Heller agreed to repay RAKTL/A2D.

519.    Heller wanted to try First/Second Pass because First/Second Pass provided a potential saving for Heller of attorney time for which RAKTL/A2D had already paid under the Legal Services Agreement.

520.    Pursuant to the First/Second Pass Agreement, RAKTL/A2D made the promised advance payment and fulfilled all of RAKTL/A2D's obligations under that agreement. The amount RAKTL/A2D so advanced was $1,023,069.43.

521.    Heller issued credits to RAKTL/A2D for only a portion of the advance payment made by RAKTL/A2D, did not issue all of the credits due, and did not repay RAKTL/A2D as required by the First/Second Pass Agreement.

522.    Heller still owes RAKTL/A2D $408,517.00 for the payment that RAKTL/A2D advanced on Heller's behalf to enable Heller to use First/Second Pass.

523.    Heller breached the Legal Services Agreement by failing to pay RAKTL/A2D the amount due and owing to RAKTL/A2D by Heller under that agreement.

524.    Heller breached the First/Second Pass Agreement by failing to pay RAKTL/A2D the amount due and owing to RAKTL/A2D by Heller under that agreement.

525.    As a result of Heller's breach of the Legal Services Agreement and the First/Second Pass Agreement, RAKTL/A2D is entitled to damages in the amount of $408,517.00.

Case: 08-32514   Doc# 3978-1   Filed: 05/19/16   Entered: 05/19/16 14:49:19   Page 26 of 28

## **PRAYER**

WHEREFORE, the RAKTL-related entities pray that this Court enter judgment in favor of the RAKTL-related entities and enter judgment against Debtor as follows:

A.     Finding that Debtor breached the Legal Services Agreement, including the covenant of good faith and fair dealing, and awarding RAKTL/A2D damages therefor in an amount provable at trial, but not less than $408,517.00;

B.     Finding that Debtor breached the fiduciary duties it owed to RAKTL/A2D, and awarding RAKTL/A2D damages therefor in an amount provable at trial;

C.     Finding that Debtor was unjustly enriched by the legal fees paid to Heller by RAKTL/A2D, and ordering that Debtor disgorge those fees to RAKTL/A2D;

D.     Finding that RAKTL/A2D is entitled to, and awarding RAKTL/A2D, prejudgment interest on legal fees Debtor failed to return to RAKTL/A2D;

E.     Finding that Debtor engaged in fraud, and awarding RAKTL/A2D damages therefor in an amount provable at trial;

F.     Finding that Debtor breached the First/Second Contract, and awarding RAKTL/A2D therefor in an amount of $408,517.00;

G.     Finding RAKTL/A2D entitled to, and awarding to RAKTL/A2D, post-judgment interest on all of its counterclaims to the extent allowed by law;

H.     Finding the RAKTL-related entities entitled to, and awarding to RAKTL/A2D, reasonable attorney fees to the extent allowed by law;

I.     Finding and awarding Debtor nothing on any of its alleged claims for relief against any of the RAKTL-related entities;

J.     Finding the RAKTL-related entities entitled to, and awarding them, their costs of the suit; and

K.     Awarding to the RAKTL-related entities such further equitable and legal relief as the Court may deem proper and just.

## **JURY TRIAL DEMAND**

The RAKTL-related entities demand a trial by jury for all issues so triable.

80

Dated this 16th day of February 2011.

Respectfully submitted,

Ervin, Cohen & Jessup, LLP


/s/Michael S. Kogan
Michael S. Kogan
Attorneys for RAKTL-related entities

81