**DIAMOND MCCARTHY LLP**
CHRISTOPHER D. SULLIVAN (148083)
MATTHEW S. SEPUYA (287947)
150 California Street, Suite 2200
San Francisco, CA 94111
Telephone:     (415) 692 -5200
Email:         csullivan@diamondmccarthy.com
               msepuya@diamondmccarthy.com

Special Litigation Counsel for Heller Ehrman
LLP, by and through Michael Burkart, Plan
Administrator

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 08-32514 |
| HELLER EHRMAN LLP, | Chapter 11 |
| Liquidating Debtor, | **(Claim No. 719-3)** |
| | **(Objection No. 1574)** |
| | **HELLER EHRMAN LLP'S TRIAL BRIEF** |
| | Date :     July 30, 2014 |
| | Time:      9:30 A.M. |
| | Place:     235 Pine Street, Courtroom 22 |
| |            San Francisco, CA 94104 |
| | Judge:     Hon. Dennis Montali |

515166.1

Heller Ehrman LLP's Trial Brief

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL BACKGROUND ...................................................................................... 2

    A.  Heller Governance and the Shareholder Employment Structure. ......................... 2

    B.  The 2007 Letter Agreement. .................................................................................. 3

    C.  The Fixed Income Shareholders Differed From the Retired Shareholders Who
        Formally Resigned as Shareholders But Remained Of Counsel With New
        Employment Agreements with the LLP. ................................................................. 5

    D.  The Impact of the Plan of Dissolution and the Joint Plan of Confirmation. ........... 7

III.    DISCUSSION ............................................................................................................ 8

    A.  Any Claim For Compensation The Claimant Has Is Subordinated Under The
        Confirmed Plan Of Liquidation And The Plan Of Dissolution. ............................... 9

    B.  The 2007 Letter Agreement Does Not Provide Claimant Four Years Of A
        Guaranteed Salary. ............................................................................................... 12

        1.  Claimant Remained A Shareholder. ............................................................... 12

        2.  Claimant's Shareholder Status Bars His Claims For Further Compensation
            From Heller Under The Basic Documents. ..................................................... 17

        3.  Even By Its Own Terms, The 2007 Letter Agreement Left To The Compensation
            Committee The Annual Decision As To What The Salary Would Be And
            Conditioned It On Minimum Performance Levels. ........................................... 20

        4.  In Any Event, Claimant's Employer Remained The PC, And Thus, He Has
            No Claim Against Debtor. ............................................................................... 21

        5.  Potential Disputed Facts or Additional Evidence. .......................................... 23

IV.     CONCLUSION ......................................................................................................... 24

Heller Ehrman LLP's Trial Brief

**Cases**

*Bonghi v. Metropolitan Water Dist. of So. Cal.*,
  70 Cal.App.4th 1358 (1999) ............................................................................ 24

*Dore v. Arnold Worldwide, Inc.*,
  39 Cal.4th 384 (2006) .................................................................................... 24

*Gerdlund v. Elec. Dispensers Int'l*,
  190 Cal.App.3d 263(1987) ............................................................................ 19

*Masterson v. Sine*,
  68 Cal.2d 222 (1968) ................................................................................ 18,19

*Morey v. Vannucci*,
  64 Cal.App.4th 904 (1998) ........................................................................ 12,13

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
  69 Cal.2d 33 (1968) ...................................................................................... 12

*Slvinsky v. Watkins-Johnson Co.*,
  221 Cal.App.3d 799 (1990) ............................................................................ 24

**Statutes**

11 U.S.C. § 502(b)(7) ...................................................................................... 1

Case: 08-32514   Doc# 3571   Filed: 07/09/14   Entered: 07/09/14 18:33:48   Page 3 of
27

Heller Ehrman LLP's Trial Brief

# I.     INTRODUCTION

K. William Neuman ("Claimant" or "Neuman"), a former shareholder of Heller Ehrman ("Heller" or "Debtor"), seeks to elevate himself to a better position than every other former shareholder. Claimant claims to be an unsecured creditor entitled to a claim based upon a purported guarantee that he would be paid $775,000 each year from January 1, 2007 until December 31, 2010. Claimant bases this claim entirely on a letter agreement by which Claimant became what was known at Heller as a "fixed income shareholder" and the mechanism for setting his salary by Heller was changed.

Claimant's claim for past compensation and future compensation under 11 U.S.C. § 502(b)(7) depends upon the theory that the letter agreement with Heller in 2007 completely changed his status at the firm. According to Claimant, the two page letter essentially terminated his status as a shareholder (though he never received any return of capital) and converted him to an employee not of a professional corporation, but one employed by the LLP with a guaranteed salary and in a far better position than other shareholders. Therefore, he argues, he should be classified under the confirmed plan as a terminated employee, rather than a former shareholder.

The letter agreement on which he relies, though, is one that merely changed his compensation arrangement as a shareholder from one who received a variable income based on the firm's performance to that of a "fixed income shareholder." Moreover, Claimant's "fixed income" target remained subject to Claimant meeting certain minimum billing requirements, which of course he could not meet after the dissolution. In all events, Claimant's employment was subject to the terms of the governing Basic Documents and the decisions of firm management. Mr. Neuman's status as a Heller shareholder was never terminated and he never became an employee of Heller Ehrman LLP.

Both Heller's Joint Plan of Liquidation ("Plan of Liquidation") and its Plan of Dissolution adopted a definite structure in which the general unsecured creditors would be paid before the Former Heller Shareholders. Under the Plan of Liquidation, confirmed on August 9, 2010, claims of former shareholders such as Claimant's are subordinated to general unsecured claims. Even before that, in the Plan of Dissolution, it was expressly agreed that the Heller shareholders would not be paid any further compensation until all creditors of the firm were paid--unless particular

shareholders were retained post-dissolution by the Dissolution Committee.  Mr. Neuman voted to approve the Plan of Dissolution and did not object to the Plan of Liquidation.  Both the Plan of Dissolution and Plan of Liquidation are binding and enforceable to subordinate his claim.  The treatment in both plans draws a fair and equitable distinction by not elevating claims of functional insiders and equity holders to be paid only from the firm's profits to general unsecured claims.

The objection to Mr. Neuman's claim should be sustained.

## II.     FACTUAL BACKGROUND

### A.     <u>Heller Governance and the Shareholder Employment Structure.</u>

The parties have agreed upon and filed a comprehensive set of Stipulated Facts (cited here as SF # __) and stipulated to the admission on numerous Trial Exhibits (cited here as TE # __).  Docket No. 3568.  Many are well known to this Court.  Heller was governed by a series of "Basic Documents," most importantly, an overarching Partnership Agreement (the partnership formed by a number of professional corporations ("PCs")); Shareholders Agreements between the shareholders and the PCs; and shareholder Employment Agreements.  *See* SF ## 8 – 13; TE # 1-8.

Before its dissolution, the Heller firm was managed by a "Policy Committee and by the officers of the Partnership under the Supervision of the Policy Committee."  TE # 1, pg. 11, ¶4.6.  The PCs and the shareholders agreed to be governed by the LLP management structure.  TE # 4, pg. 16, ¶5.9; TE # 8, pgs. 14-15, ¶10.9.

Heller shareholders were to be paid only from the profits of the firm.  The compensation process was managed by the Compensation Committee, which took any Partnership Net Profits and allocated them to the PC partners based upon "the amount of each Partner's Share of Partnership Net Profits which is attributable to its Members" (the shareholders).  TE #1, pg. 4, ¶3.4; TE # 8, pgs. 3-4, ¶4.  While "the Compensation Committee . . . determine[d] a draw amount attributable to each Member" at the start of the year, the Basic Documents provided that "[t]he draw amounts attributed to Members and payable to Partners may be increased or decreased by the Compensation Committee during the Fiscal Year in accordance with the cash needs of the Partnership."  TE # 1, pgs. 3-4, ¶3.2.

Heller shareholders expressly agreed that, upon a Termination of their Employment Agreement with the PC, they "shall not be entitled to any additional compensation or any other monies from the Company" other than accrued salary, reimbursable expenses, and, in limited cases, money from the Retirement System. TE # 8, pg. 9-1, ¶9.4.

Upon termination of a shareholder's employment by the PC, the PC was obligated to repurchase the shareholder's proffered stock (capital stock). TE # 4, pg. 7, ¶3.2. Mr. Neuman never had any of his preferred shares repurchased. SF # 40. His capital reserve balance was $431,704.83 as of December 31, 2007. TE # 14.

The Basic Documents provided that a shareholder could be terminated at the discretion of the PC (which would be bound to follow the direction of the LLP) for loss of the Member's license to practice law or conviction of a felony offense (TE # 8, pg. 8, ¶9.1) or upon a vote of 85% of the Members' attributed percentages (percentage interests) if a quorum of the Members voted (Id., ¶9.2.)

### B.      The 2007 Letter Agreement.

In the spring of 2007, at the suggestion of the Compensation Committee, Mr. Neuman made a proposal to convert to a fixed income shareholder. SF # 30. Notably, Mr. Neuman's proposal was that he "would continue generally to have all the rights of an Equity Shareholder." TE # 47, ¶23. He proposed that "I would continue to have the rights of a Shareholder as may from time to time be prioritized by profit participation tiers (such as any office selection process, utilizing for such purposes the Fixed Income Amount)." TE # 47, ¶10. Heller management at this time was pursuing "a concentrated effort to address a document, regularize, if you will, the fixed income shareholder arrangement." Decl. of C. Sullivan ("Sullivan Decl.") Ex. A (Hubbell Depo.) at 17:3-9.[1]

While Mr. Neuman's proposal contemplated that he would not have a voting right (TE # 47, ¶4), the actual 2007 letter establishing his fixed income shareholder status (the "2007 Letter Agreement") expressly provided that Mr. Neuman would be "eligible for all other benefits and privileges accorded to shareholders, including . . . voting on admission on new shareholders and

---

[1] Heller also wanted, "where appropriate, by mutual agreement, to have people retire, by mutual agreement." Sullivan Decl. Ex. A (Hubbell Depo.) at 17:3-9.

Case: 08-32514   Doc# 3571   Filed: 07/09/14   Entered: 07/09/14 18:33:48   Page 6 of 27

elective committees and offices within the Firm." TE # 22.

Mr. Neuman professes under oath that, after entering into the 2007 Letter Agreement, "I assumed I could not vote" and though he admits to voting on a partnership admission, "I still cannot imagine how my vote counted." TE # 23, ¶9. In fact, Mr. Neuman voted on numerous shareholder matters after he entered into the 2007 Letter Agreement (*see* TE # 7 [numerous votes after 2007 Letter Agreement, shareholders voting listed alphabetically). At his deposition, Mr. Neuman testified, "I know that when there was some vote I got . . . a dunning e-mail saying I should vote. And so I voted." Sullivan Decl. Ex. B (Neuman Depo.) at 85:7 – 86:3.

Moreover, as Heller's former managing shareholder, Mr. Hubbell, explained, the voting percentage for fixed income shareholders was essentially as Mr. Neuman wrote at the time with respect to privileges accorded to fixed income shareholders by calculating their profit tier percentage–Mr. Neuman's "attributed percentage to vote . . . would have been his share of the profit pool as the numerator, divided by the profit pool of the denominator." Sullivan Decl. Ex. A (Hubbell Depo.) at 82:4 – 82:23; *see generally* 81:14 – 87:13. In other words, Mr. Neuman "even with his fixed compensation, he had some percentage of the profit pool." Id. at 82:7-12. Mr. Hayden, the former managing partner for Heller' San Francisco office, confirmed that such an approach was used to determine the relative shareholder rank of fixed income shareholders. *See id.* Ex. C (Hayden Depo.) at 9:14-12:12; 19:1-21.

By the terms of the 2007 Letter Agreement, Mr. Neuman's compensation "shall be reviewed and determined annually by the Compensation Committee based on the _understanding_ the amount would be $775,000, if there is not a material deviation for you for the preceding year from the hours expectations set forth." TE # 22 (emphasis added). These expectations were that Mr. Neuman "perform a minimum of 2,400 hours of service to the firm each year, a minimum of which should be billable client hours." Id.

Mr. Neuman never had any of his preferred shares repurchased. SF # 40. His capital reserve balance was $431,704.83 as of December 31, 2007. TE # 14.

Mr. Neuman retained all of the attributes of a shareholder – only his expected compensation was determined differently. He regularly voted as a shareholder. He retained his shares. SF # 40. Mr. Neuman continued to be employed by the PCs, as evidenced by his W-2s (TE ## 15 – 17) and

4
Heller Ehrman LLP's Trial Brief

his listing on the standard PC ADP payroll lists (TE ## 11 – 13). Mr. Neuman was included in the list of shareholders provided to Heller's banks with its borrowing base certificates (TE # 30), in the listing of the shareholders' monthly draws as of September 18, 2008 (TE # 31), and on a list of active shareholders as of September 23, 2008 (TE # 32).

As Mr. Hubbell summarized the 2007 Letter Agreement in his sworn testimony:

> The California P.C. was a partner of the LLP. And the Partnership Agreement between the P.C. and the LLP effectively invested in the LLP, the authority to manage certain aspects of the governance of the P.C.
>
> And, in particular, the Partnership Agreement provided that the Compensation Committee was charged with determining the attributed percentage -- I think that was the phrase -- of each of the members, a defining term, which referred to the shareholders who had employment agreements with the P.C.
>
> So to collapse all of that: There was a direct relationship between the granted authority of the Compensation Committee to determine the compensation of the shareholders of each of the individual P.C.
>
> And so, what this agreement was, was documenting the understanding between the shareholder and the LLP, which: Where the Compensation Committee resided, that in the future the Compensation Committee's authority with respect to setting that shareholder's compensation would be exercised in the manner reflected in this letter.
>
> So, as I understand it, this was an agreement as to what -- between the shareholder and the Compensation Committee as to what the Compensation Committee would do in the future. I do not see this as -- I see this as an understanding as to how the existing agreements would operate in the future.
>
> Not that this was a new agreement, or a novation, or something that superseded the other agreements. I mean, all of the other agreements remained in effect.

Sullivan Decl. Ex. A (Hubbell Depo.) at 61:5 – 62:10.

### C. The Fixed Income Shareholders Differed From the Retired Shareholders Who Formally Resigned as Shareholders But Remained Of Counsel With New Employment Agreements with the LLP.

Mr. Neuman's fixed income arrangement was based on the format for similar arrangements the firm had with other fixed income shareholders. Sullivan Decl. Ex. B (Neuman Depo.) at 71:10 – 72:16; TE # 47, ¶5 (noting intent to follow custom and practice with respect to other similar arrangements). These generally were similar in that the fixed income shareholders remained as shareholders, but the compensation would be fixed subject to adjustment by the Compensation

Committee if the billable hour performance fell below expectations. *See* TE # 24 (Brett Dick agreement ["Your annual compensation for the term of this agreement shall be fixed at $1,100,000, provided that you continue to meet the performance expectations below. The Compensation Committee . . . may adjust your compensation in the event performance expectations described herein are not satisfied."]; Richard Parker agreement ["Your annual compensation will remain fixed at $525,000, provided that you continue to meet performance expectations."]; Robert Badal agreement ["During the initial one year term of this Agreement, Badal's compensation shall be fixed at $650,000 . . . . Thereafter, the Compensation Committee shall determine Badal's compensation year-to-year."]; Robert Gibney agreement ["subject to your continued performance per the standards below, annually thereafter during the term of this arrangement, your annual compensation shall be fixed at $900,000."]).

In stark contrast to the fixed income shareholders, when shareholders actually retired as shareholders, but remained with the firm as "Senior of Counsel," they formally and unequivocally terminated their PC Employment Agreement. TE # 25 (*e.g.*, Kelly agreement, ¶2; Sydral Agreement, ¶1; Snider agreement, ¶¶ 2-3.) The retired shareholder's shares were repurchased. TE # 25 (*e.g.*, Kelly agreement, ¶3; Snider agreement; ¶4, Redman agreement, ¶3.b.) The retired shareholder's employer changed from a PC to the LLP. TE # 25 (*e.g.*, Kelly agreement, ¶2 ["During the term of this Agreement, Employee shall be employed by Heller Ehrman LLP"]; Snider agreement, ¶3 [same]; Redman agreement, ¶2 [same].) Mr. Neuman's own witness, Heller's former Executive Director, confirmed these distinctions. *See* Sullivan Decl. Ex. D (Gardner Depo.) at 20:02-33:19.

The retired shareholder agreements attached as TE # 46 contained the same fundamental terms. TE # 46 (Newton agreement, ¶1-3; Tuggy agreement, ¶¶2-3.) The only difference of substance was that these retired shareholder's compensation was subject to more variation (TE # 46 [Newton agreement, ¶4; Tuggy agreement, ¶3]), which difference is not in any way material here.

The existence of fixed income shareholders was well known at Heller. The annual Shareholder Unit List, which ranked shareholders by compensation tier, did not include fixed income shareholders. As noted in TE #21, at page1, note 3, the shareholders were informed that

"[t]hose shareholders who will be paid a fixed salary will be notified separately of their . . . compensation."  As Mr. Hubbell testified, "within a nanosecond of the list being distributed each year . . . I got those phone calls immediately on the release of the list [asking] what happened to so and so?"  Sullivan Decl. Ex. A (Hubbell Depo.) at 30:4 – 22; *id.* Ex. C (Hayden Depo.) at 13:09-25 (discussing list, concluding "as the prevalence of fixed-income shareholders increased . . . I can't imagine shareholders being -- not being aware of the existence of fixed-income shareholders").

### D. <u>The Impact of the Plan of Dissolution and the Joint Plan of Confirmation.</u>

As a result of Heller's declining financial condition and a default in its covenants with its primary lenders, Heller was forced to dissolve.  Neuman was included on the firm's list of active shareholders prepared just prior to the dissolution vote.  SF # 47.

The proposed Plan of Dissolution circulated to all shareholders to consider and vote upon included a number of important provisions relevant to Mr. Neuman's claim.  TE # 33.  First, the Dissolution Committee replaced the Policy Committee as the governing body "to windup the business and affairs of the Firm and to cause the ultimate dissolution of the Firm."  TE # 33, pg. 2; Sullivan Decl. Ex. C (Hayden Depo.) at 26:14-29:17.

Second, Heller designed the plan so "the assets of the Firm are preserved and protected for the benefit of, first, the creditors of the Firm . . . and thereafter to the Shareholders of the Firm and the Former Shareholders of the Firm in accordance with the Governing Documents as their interests may appear."  TE # 33, pgs. 2-3.  To that end, the Plan of Dissolution provided that "There will  be . . . no payment of any kind made to former and/or retired shareholders until such time as all of the legal obligations of the Firm-in-Dissolution to third party creditors are satisfied, except if permitted by the Firm's senior secured lenders Shareholders may pursue claims for services rendered prior to their departure or other expense or contractual rights arising from or related to their employment."  TE # 33, Article XI.E., pg. 26.[2]

---

[2] Sullivan Decl. Ex. C (Hayden Depo.) at 40:2-15 ("So the whole -- to just ask me that -- I don't know. There are parts -- I think the goal was to take shareholders and their claims and put them at the back of the line, reserving any shareholder's right to make a pitch as to why his or her claim might be important to the dissolution process and, therefore, something that ought to, you know, get more attention. But I -- you know, my general feeling – my general understanding is what the shareholders were -- were ceding here was the recognition that the firm was in trouble, that it

Third, shareholders were encouraged to depart from Heller as soon as they could (TE # 33, Article VI.B., pg. 8) and the only provision for shareholder compensation was for those shareholders performing work at the direction of the Dissolution Committee could be compensated at the discretion of the Dissolution Committee if permitted by the banks (TE # 33, Article VI.C., pg. 9). The Dissolution Committee formally voted shortly after adoption of the plan of dissolution to suspend all shareholder draws. Sullivan Decl. Ex. C (Hayden Depo.) at 26:14-29:17. No shareholder was paid a monthly draw after the end of August of 2008. SF ## 48-49.

Mr. Neuman voted for the Plan of Dissolution, subject to his clarification that the numbers in the Statement of Estimate Assets and Liabilities were presented in thousands and not millions as stated in the asterisked note. SF #51, TE # 34.

On August 9, 2010, this Court confirmed a Plan of Liquidation. TE # 36.

The Plan of Liquidation created a class of creditors, Class 9 (Subordinated Former Shareholder Claims), which "consist[s] of all Subordinated Former Shareholders Claims. TE #36 at 4.9. The Plan of Liquidation defines Subordinated Former Shareholders, at section 1.131, as including "all Former Shareholders who did not retire, depart or withdraw from their respective Heller Ehrman PC prior to the adoption of the Plan of Dissolution on September 26, 2008." TE # 36 at 1.131. "Former Shareholders" is defined to mean "each of the individuals that held an equity interest in one of the Heller Ehrman PCs each of whom is named on **Exhibit B,** attached hereto." TE # 36, 1.71. Mr. Neuman's name appears on that list. TE # 36, Exhibit B.

The Plan of Liquidation also specifically attaches as Exhibit E the names of the persons identified as "Subordinated Former Shareholders." SF #56. Mr. Neuman's name appears on that list. TE # 36, Exhibit E.

Mr. Neuman did not object to the Plan of Liquidation.

## III. DISCUSSION

As discussed during the Court's trial setting conference on June 5, 2014, the judgment of Heller's counsel was not to move for a summary judgment on this claim as a matter of law. The

needed to satisfy its creditors, and that shareholders were going to be the last in line after that; and, moreover, that we were all in the same boat.

Heller Ehrman LLP's Trial Brief

decision was driven by tactics and what was perceived as the overall efficiency—not a belief that a ruling as a matter of law in its favor was not warranted. In particular, Heller believes that it is entitled first to a ruling that, as a matter of law, even if Mr. Neuman's claim is allowed, it is subordinated to all general unsecured claims as provided in the Plan of Liquidation.

Moreover, as argued further below, Heller does believe that this Court can rule based on the undisputed evidence set forth in the stipulated facts and trial exhibits described above that, as a matter of law, Mr. Neuman's shareholder relationship was governed by the Basic Documents and his claim is foreclosed by the terms of those documents and the Plan of Dissolution. Heller also believes that the Court could rule as a matter of law that the 2007 Letter Agreement did not guarantee Mr. Neuman a salary even if the firm were to dissolve and go bankrupt.

However, as argued further below, Heller also strongly contends that Claimant's strained interpretation of the agreement cannot be adopted without a full opportunity for the Estate to present its evidence and address any possible disputed facts raised by Claimant. The Estate has not prepared full affirmative declarations containing the complete testimony of its witnesses and reserves its rights to do so if necessary at trial.

A. **Any Claim For Compensation The Claimant Has Is Subordinated Under The Confirmed Plan Of Liquidation And The Plan Of Dissolution.**

As discussed below, the 2007 Letter Agreement does not give rise to a claim by Claimant for lost compensation. Even if it did, any such claim would be subordinated under the express terms of the Plan of Liquidation and the Plan of Dissolution.

The Plan of Liquidation subordinates all claims by any person or entity who was a Heller PC Shareholder at the time of the Plan of Dissolution. *See* Plan of Liquidation, Section 1.131(b) (applying to "all Former Shareholders who did not retire, depart or withdraw from their respective Heller Ehrman PCs prior to the adoption of the Plan of Dissolution…."). Claimant was a Heller PC Shareholder at the time of the Plan of Dissolution. His claims thus fall within the plain meaning of the terms of the Plan of Liquidation.

Claimant argues that Plan of Liquidation's treatment of Class 9 Claims only acted to subordinate claims by former shareholders for a return of capital and claims arising under the

Subordinated Former Shareholders Notes, but not employment-related claims. This contention is contradicted by two aspects of the plain language of the Plan of Liquidation. First, sections 1.131(a) and (c) specifically relate to those shareholders holding Subordinated Former Shareholder Notes and claims based on a return of capital. Section 1.131(b), in contrast, expressly refers to "all Former Shareholders who did not retire, depart or withdraw from their respective Heller Ehrman PC prior to the adoption of the Plan of Dissolution…." If Claimant's interpretation of the Plan of Liquidation were adopted, Section 1.131(b) would be extraneous. Second, Section 4.9 provides that all claims subordinated under the Plan of Dissolution are subordinated via the Plan of Liquidation. Section 4.9 of the Plan of Liquidation reproduces the language from the Plan of Dissolution subordinating the claims of former shareholders, which subordinated "payment of any kind to former and/or retired Shareholders." Such broad language is inconsistent with Claimant's strained attempt to narrowly interpret the similarly broad language in section 1.131(b).

In fact, the plain meaning and intent of subsection (b) was to ensure that all claims by shareholders present at the time of dissolution were subject to Class 9 treatment. This is further supported by the Plan of Liquidation's description of Class 9 Claims at section 4.9.

Subordination of such claims is also fair and consistent with settled liquidation priorities for partnerships such as Heller. Mr. Neuman is seeking to recover additional shareholder compensation that, as spelled out in the Heller Basic Documents, was to be paid only from the profits of the firm. *See* TE #1 (providing for compensation to Heller PC shareholders was to be set by the Compensation Committee, which took any Partnership Net Profits and allocated them to the PC partners based upon "the amount of each Partner's Share of Partnership Net Profits which is attributable to its Members"). This restriction—that Heller PC shareholders were to be paid out of "Partnership <u>Net</u> Profits"—is consistent with the treatment of Class 9 Claims provided under section 4.9 of the Plan of Liquidation and the Plan of Dissolution, which provides: "There will be no return of capital to any Shareholder, recently departed Shareholder, or former or retired share holder and no payment of any kind made to former and/or retired Shareholders until such time as all the legal obligations of the [Debtor] to third party creditors have been satisfied, except if permitted by the [Debtor'] senior secured lenders, Shareholders may pursue claims for

Case: 08-32514    Doc# 3571    Filed: 07/09/14    Entered: 07/09/14 18:33:48    Page 13
of 27

compensation for services rendered prior to their departure or other expenses of contractual rights arising from or related to their employment."

Claimant contends that shareholder "employment" claims were somehow meant to be excluded from this exception, but offers no evidence aside from his own self-serving statements to support this contention. The key language, which Claimant simply ignores, is "…**no payment of any kind made to former and/or retired Shareholders until such time as all the legal obligations of the [Debtor] to third party creditors have been satisfied…**" This language is clear and unambiguous, and operates to subordinate the claim being asserted here under both the Plan of Dissolution and the Plan of Liquidation.

Claimant seeks to avoid the consequences of this language, asserting that the Plan of Dissolution actually creates shareholder claims in to two categories: (1) claims for return of capital, not to be paid until all third party creditors are satisfied, and (2) claims for compensation for services, expense or other contractual rights, which may be paid if permitted by the senior secured lenders. Claimant has no persuasive evidence to support this argument, however. The plain language of the Plan of Dissolution does not provide for any such exception. The broadly-worded language makes clear that absent the stated condition being met ("all legal obligations . . . to third party creditors have been satisfied") both contract claims and claims based on a return of capital are subordinated.

In any event, even if one were to adopt Claimant's proposed exception, it does not apply. Claimant erroneously contends that the senior secured lenders, Bank of America, N.A. and Citibank N.A. (collectively the "Banks"), have been paid in full. In fact, the Banks have not and will not receive full repayment of the claims they asserted against the Debtor. Rather, in exchange for the dismissal of an adversary proceeding before this Court, Adv. Proc. No. 09-03071, and a mutual release of claims, they entered into a settlement agreement dated, March 25, 2011, by which the Banks paid the Debtor twenty million dollars ($20,000,000.00). More fundamentally, the exception contained in the Plan of Dissolution is contingent on receiving the **permission** of the Banks to bring a claim, not the satisfaction of the debt owed to them. Claimant has never shown (nor even alleged) that he sought, much less received, such permission, and certainly not prior to

filing a proof of claim.

Thus, Claimant's claim falls directly under the class of claims subordinated under the Plan of Dissolution and by the Plan of Liquidation as a Class 9 Subordinated Former Shareholder Claim.

**B.**     **The 2007 Letter Agreement Does Not Provide Claimant Four Years Of A Guaranteed Salary.**

    **1.**     **Claimant Remained A Shareholder.**

It should not be open to serious debate that Mr. Neuman remained a Heller PC Shareholder after the 2007 Letter Agreement was executed. The terms of the Letter Agreement expressly refer to him continuing as a shareholder. Nothing in the agreement purports to change his basic status as a shareholder. *See* TE # 22. Under California law, "the intention of the parties as expressed in the contract is the source of contractual rights and duties." *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33 (1968). The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. *Morey v. Vannucci,* 64 Cal.App.4th 904, 912 (1998).

Here, the text of the 2007 Letter Agreement repeatedly refers to Claimant as a shareholder. It states Claimant would continue to participate in the Firm's "retirement plans for **shareholders***"* and would "continue to be eligible for all other benefits and privileges accorded to **shareholders**, including . . . receipt of financial information, voting on admission of new **shareholders** and elective committees and offices within the Firm and the bonus pool program for **shareholders** who timely submit their time in DTE." TE # 22 (emphasis added).

This language is significant, because it directly contradicts Claimant's claim that the 2007 Letter Agreement terminated his shareholder status. While Claimant argues that this language served only to maintain "shareholder" status as an "honorific" for fixed income shareholders, there is no evidence to support this argument. Rather, as Robert Hubbell, a member of Heller's

Compensation Committee and signatory to the 2007 Letter Agreement explained, the language was expressly included to assure fixed income shareholders that their status was <u>not changing</u>.[3] Indeed, "fixed income" shareholders were not treated as "honorific" shareholders—they were treated the same as all other shareholders in voting on firm matters.[4]

Moreover, in addition to the plain language of the contract, the parties' practices following the 2007 Letter Agreement are also relevant and dispositive. "Extrinsic evidence is [] admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible." *Morey, supra,* 64 Cal.App.4th at 912. Even where a contract appears unambiguous on its face, "it is reversible error for a trial court to refuse to consider [] extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face." *Id.*

Here, the extrinsic evidence here is overwhelmingly against Claimant and contradicts his assertion that the 2007 Letter Agreement intended to end his status as a shareholder. Following the 2007 Letter Agreement, Claimant did not seek nor receive a letter terminating his employment with the California PC (a required event if he ceased to be a shareholder employee of the California PC as Claimant claims). Section 2 of Claimants Employment Agreement provides that "[t]his Agreement and Employee's employment shall continue until this Agreement is terminated in accordance with its Section 9." By Claimant's own testimony, this did not occur after the 2007

---

[3] Sullivan Decl. Ex. A (Hubbell Depo.) at 46:4-17 ("And, at some point, as a way of assuring people that -- you know, that they were still "partners" or "shareholders" -- we sometimes use the words interchangeably -- you know, that they were still shareholders, that they would have the attributes of being a shareholder. And somewhere along the line somebody, for want of a better phrase, didn't trust us and said, "I want it spelled out that I can still do this, this, this, and this," all of which they were entitled to under the Shareholder Agreement, the Employment Agreement. Q. So your sense is, that it was in order to satisfy concerns asserted by fixed income shareholders? A. Yes.")

[4] Sullivan Decl. Ex. C (Hayden Depo.) at 17:23-18:10 ("Q. And so the significance of this is that without knowing who was on fixed income and who was not on fixed income, you treated them all the same; you asked them all to vote the same way? A. Yeah. I -- I understood I was being, yeah, asked -- I understood they were all -- they all had a vote. They all had some -- you know, there was some way in which they all had -- they were all important enough to compel them to cast a vote. So -- and there was no distinction on the list about who was fixed income and who wasn't.")

Letter Agreement; rather, just was with the other shareholders, he remained an active through

October of 2008, after the Plan of Dissolution was adopted.[5]

Similarly, following the 2007 Letter Agreement, Claimant did not seek and did not

receive payment for his preferred stock in the California PC—another required event if he

ceased to be a shareholder. Section 3.2 of Claimant's Shareholder Agreement provides that

"upon termination of Shareholder's employment by the Company, the Company shall

repurchase from the Shareholder…all of that Shareholder's Preferred Stock held on the date

of termination." Claimant admits that his preferred stock was never repurchased.[6]

The fact that the 2007 Letter Agreement does not address these and other issues is

significant, because when Heller intended to terminate an attorney's shareholder status and retain

their employment with the LLP, it expressly did so in writing. As discussed above, some

shareholders, upon electing to retire, where hired directly by the Debtor as "Senior of Counsel."

---

[5] Sullivan Decl. Ex. B (Neuman Depo.) at 54:13-22 ("Q. On page 9, Mr. Neuman, it indicates, "Termination under this Section 9.1 shall be effective upon the delivery by the company to employee of a written notice to that effect. "Do you see that? A. Yes. Q. Are you aware of any written notice that was sent by the California PC to you in accordance with that provision? A. No."]; *id.* at 55:4-56:15 ["Q. Under section 9.2 in 2006 did you know what --under what conditions the company or the partnership could terminate your employment agreement through an affirmative vote of the members of the partnership as a whole? A. I knew there was a voting mechanism to terminate a partner. I also knew -- terminate a shareholder. I also knew that it was not being followed. Q. Do you know whether or not you ever received notice of a termination with respect to a decision by the partnership as a whole? A. I treated my employment letter as a termination of the relationship with the professional corporation. Q. Did anybody at Heller Ehrman LLP ever tell you that the September 7 -- September 2007 letter would formally terminate your employment agreement with the California PC? A. No. Q. Did anybody ever -- at Heller Ehrman LLP ever discuss with you anything related to the subject of whether that letter would effect a formal or informal termination of your employment agreement with the California PC? A. I had no discussion with anybody about it. Q. Did you ever give written notice to terminate -- that you were terminating your employment agreement with the California PC? A. When I finally left in October of 2008, I believe I sent an e-mail which would have said I'm leaving the firm. It would not have singled out the California professional corporation. Q. And nothing before that? A. Nothing before that.").

[6] Sullivan Decl. Ex. B (Neuman Depo.) at 63:16-64:6 ("Q. In 2006 were you aware of whether or not people who terminated their employment as shareholders would get money back from selling their preferred shares back to Heller Ehrman? A. From having their interest in preferred shares they would over some period of time -- Q. Get money back? A. -- be entitled to money back. Whether they got it back or not, I can't say, towards that time frame. Q. Did you ever get money back for your shares? A. No, I did not. Q. Did anybody ever tell you you were entitled to? A. Again, I've said I had no discussions with regard to it.").

14

Heller Ehrman LLP's Trial Brief

*See supra,* Part II.C.  These retired shareholders were employed by Heller Ehrman LLP pursuant to employment agreements ("Senior of Counsel Agreements").  *See* TE # 25 & 46 (retired shareholder agreements).  Although there is some variation in the terms of the Senior of Counsel Agreements, they all invariably contained provisions (1) clearly indicating the termination of shareholder status, (2) providing for the repurchase of preferred stock, (3) stating that future employment would be with Heller Ehrman LLP, and (4) stating that the agreement supersedes all previous agreements between the parties.  *See id.*  All four of these factors are absent from the 2007 Letter Agreement and the other fixed income shareholder agreements.  *See* TE # 22.

Following the 2007 Letter Agreement, moreover, Claimant continued to participate as a shareholder in shareholder meetings and events, and continued to vote as a shareholder.  *See* TE # 23, ¶9; Sullivan Decl. Ex. B (Neuman Depo.) at 84:17-22 ("Q. Were you -- did you fully participate to the best that you can recall in all shareholder meetings and retreats and the like after January 1, 2007?  Up and until the day that they were discussing dissolution when I was out of state."); *id.* at 85:04-88:13 ("Q. Did you vote on **every single matter** that was submitted to a vote of the partnership -- of the Heller Ehrman LLP shareholders between January 1, 2007 and the date of dissolution?  A. I don't know if there was a dissolution vote that preceded my return to the office. Other than that I would have assumed yes, I would have voted.") (emphasis added); *id.* at 85:07-86:03 (admitting that after the 2007 Letter Agreement, "I know that when there was some vote I got . . . a dunning e-mail saying I should vote.  And so I voted.");  TE # 7 (listing numerous partnership votes after 2007 Letter Agreement, with shareholders voting listed alphabetically).  The fact that Claimant continued to vote is significant evidence that he was a shareholder. Shareholders' votes were "counted" by Heller through a system in which their "attributed percentage" in their respective PCs determined the strength of their votes.  *See* Sullivan Decl. Ex. B (Neuman Depo.) at 84:04-88:13 (discussing TE # 7, a document titled "Shareholder membership voting Nick Seddon," dated February 2008, indicating that Mr. Neuman voted yes on the admission of Nick Seddon, with Mr. Neuman's membership percentage listed as .423).  For fixed income shareholders the attributed percentage simply was based upon what percentage the fixed income shareholder's compensation was of the total profit pool budgeted to be paid to all

Case: 08-32514   Doc# 3571   Filed: 07/09/14   Entered: 07/09/14 18:33:48   Page 18 of 27

shareholders. *See* Sullivan Decl. Ex. A (Hubbell Depo.) at 82:4 – 82:23 (explaining how fixed income shareholders' attributed percentage was set); *id.* at 81:14-87:13 (discussing fixed income shareholders' attributed percentage).

Moreover, following the 2007 Letter Agreement, Claimant was listed as a shareholder in statements to third parties, such as Heller's banks, along with a description of his attributed percentage of his partnership interest in the California PC in which he was a shareholder. For example, Mr. Neuman was listed as a shareholder in Heller's borrowing-based certificate to Bank of America dated September 17, 2008, which listed Mr. Neuman as a Heller shareholder with a membership attributed percentage of .518 percent. *See* Sullivan Decl. Ex. B (Neuman Depo.) at 92:11-94:25. When asked why he would be on such a list, Mr. Neuman testified that he could not offer "any explanation." *See id.*

In fact, Claimant was even listed as a shareholder at the time of the Plan of Dissolution, offered a vote on the Plan of Dissolution—and voted in favor of it. *See id.* at 98:07-99:03 (admitting that he voted in favor of the Plan of Dissolution with the other shareholders); SF # 47 (admitting that just prior to the Plan of Dissolution, he was included in a list of shareholders); TE # 36, Exhibit B (including Neuman in list of shareholders).

This evidence is overwhelming and dispositive on the issue of whether Claimant was a shareholder. Claimant's only evidence that he was no longer a shareholder, by contrast, is limited to his own self-serving statements about his own beliefs. Claimant has admitted that he was at no point told that the 2007 Letter Agreement would terminate his employment with the California PC.[7] Claimant has admitted that following the 2007 Letter Agreement, he did not know whether he was paid by the Heller PC or by the Heller LLP, but assumed that he was still paid by the Heller PC.[8] Claimant has admitted that he received no other promises from anyone at Heller concerning

---

[7] Sullivan Decl. Ex. B (Neuman Depo.) at 55:23-56:8 ("Q. Did anybody at Heller Ehrman LLP ever tell you that the September 7 -- September 2007 letter would formally terminate your employment agreement with the California PC? A. No. Q. Did anybody ever -- at Heller Ehrman LLP ever discuss with you anything related to the subject of whether that letter would effect a formal or informal termination of your employment agreement with the California PC? A. I had no discussion with anybody about it.")

[8] Sullivan Decl. Ex. B (Neuman Depo.) at 59:19-60:20 ("Q. Well, let me ask you this: Do you know

his shareholder status other than what was in the 2007 Letter Agreement.[9]

Claimant's evidence is insufficient as a matter of law to create an ambiguity in the 2007 Letter Agreement. First and foremost, a party's belief in the meaning of the terms of a contract must be *reasonable*.[10] The reasonableness of a belief turns on the circumstances involved, including the ordinary terms of the words in the contract and the parties' practices before and after the contract. Under the circumstances, Claimant's inability to point to anything other than his own mistaken belief is not only telling as to the actual merits of his claim—it should be dispositive as a matter of law.

To the extent that Mr. Neuman is successful in introducing any viable ambiguity on this point, Heller is entitled to introduce evidence as to the custom and practice and intent in entering into the 2007 Letter Agreement to explain the meaning of the terms of the agreement, as well as evidence going to the other salient factors of contractual interpretation.

### 2. Claimant's Shareholder Status Bars His Claims For Further Compensation From Heller Under The Basic Documents.

Claimant's status as a shareholder forecloses his claim in several, independent respects. First, as a shareholder, he remained bound by the Basic Documents, the Plan of Dissolution, and the decisions of the Dissolution Committee. In 2008, the Dissolution Committee made the

---

whether or not the compensation that you were paid was paid by the California PC? A. I do not know whether it was paid by the California PC. Q. Okay. Do you know one way or the other whether it was?…A: I assume so but don't know. Q. You have no personal facts one way or the other? A. No.")

[9] Sullivan Decl. Ex. B (Neuman Depo.) at 72:17-73:05 ("Q. Did you have any oral discussions with Mr. Hubbell about the terms of the proposed agreement? A. No. Q. Did you have any oral discussions of the terms of the proposed agreement with anybody at Heller Ehrman? A. No. Q. Was anything promised to you in connection with the terms of this agreement that are not reflected in the written document? A. Other -- well, it references the retirement letter that I got from the firm. And that obviously it was a promise from the firm. But other than that, no. Q. That's reflected in the written document? A. It's referenced towards the end.").

[10] Claimant's relies on Civil Code § 1649 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.") for this proposition. The plain language of the statute indicates that it is not the promisee's expectations to which the Court should look, but that the Court should look to what **the promisor** believed that the promisee understood.

determination to not pay shareholders any more draws. Claimant remains bound by this decision. The Dissolution Committee's decision—applicable to all shareholders—forecloses his claim in its entirety.

Second, as a shareholder, under the terms of the Basic Documents, Mr. Neuman was entitled only to compensation from the "net profits" of the firm. Following the Plan of Dissolution, there *were* no "net profits" from which to pay him. Claimant, as a Shareholder, remained bound by this simple, reasonable limitation, which also forecloses his claim in its entirety.

At bottom the 2007 Letter Agreement was just like any other "fixed income" shareholder agreement. As Mr. Hubbell explained, the 2007 Letter Agreement was not an entirely new agreement that substituted for the governing Basic Documents. Sullivan Decl., Ex __ (Hubbell Depo.) at 61:5 – 62:10.[11] Claimant contends that even if he was a shareholder, the Basic Documents no longer applied to him, and that evidence concerning the parties' practices following the 2007 Letter Agreement is inadmissible under the parole evidence rule. These arguments are contradicted by the law and the facts.

Claimant relies on *Masterson v. Sine*, 68 Cal.2d 222 (1968) for the proposition "[t]he instrument itself may help to resolve that issue. It may state, for example, that 'there are no previous understandings or agreements not contained in the writing,' thus express the parties' 'intention to nullify antecedent understandings or agreements.'" The integration clause contained in the 2007 Letter Agreement does not, by its terms purport to "nullify antecedent understandings or agreements." Rather, it states that it "will constitute the complete understanding of our agreement **as to the matters covered herein**." The language utilized in the integration clause itself reflects that there are matters not contained "herein" to which it does not apply.

Further, as the court in *Masterson* made clear, extrinsic evidence is admissible to determine whether the agreement **is** fully integrated. "Any such collateral agreement itself must be examined,

---

[11] Although Mr. Hubbell did not negotiate Claimant's agreement, as part of Mr. Hubbell's duties as a member of the Compensation Committee did negotiate fixed income shareholder agreements with other shareholders. As noted by Claimant, the fixed income agreements all shared a standard template. Based on these factors, and the fact that Mr. Hubbell signed the 2007 Letter Agreement, his understanding of the Debtor's intent in entering the Agreement is relevant.

Case: 08-32514    Doc# 3571    Filed: 07/09/14    Entered: 07/09/14 18:33:48    Page 21 of 27

however, to determine whether the parties intended to be included in, excluded from, or otherwise affected by the writing." *Id.* at 226. "Circumstances at the time of the writing may also aid in the determination of such integration." *Id.* As the *Masterson* Court noted, " "[e]ven under the rule that the writing alone is to be consulted, it was found necessary to examine the alleged collateral agreement before concluding proof of it was precluded by the writing alone." *Id.*; *see also Gerdlund v. Elec. Dispensers Int'l*, 190 Cal.App.3d 263, 270 (1987) ("A determination of admissibility under the parole evidence rule requires that the court attempt to place itself in the same situation in which the parties found themselves at the time of contracting. [Citation] In order to do this it must provisionally receive all evidence offered to prove the intention of the parties, including evidence as to the circumstances surrounding the making of the agreement, and evidence with respect to the proffered collateral agreement itself.").

Finally, the parole evidence rule "prohibits the introduction of extrinsic evidence to vary or contradict the terms of an integrated written instrument." *Gerdlund*, 190 Cal. App. 3d at 270. Debtor does not seek to introduce extrinsic evidence to vary or contradict the terms of the 2007 Letter Agreement. The Debtor only seeks to introduce extrinsic evidence relevant to the interpretation of the agreement. This evidence shows that from 2007 until the Plan of Dissolution, Claimant was paid like a shareholder, was treated like a shareholder, voted like a shareholder, was called a shareholder, and even voted in favor of the Plan of Dissolution, in which he was again listed as a shareholder.

In the face of this evidence, Claimant's contention that he was either not a shareholder (or existed in a special class all his own in which none of the basic restrictions in the Basic Documents applied to him) is untenable. There is simply no credible evidence that supports this interpretation of the 2007 Letter Agreement. In contrast, there is a mountain of evidence against it, not to mention a healthy dose of common sense. Claimant's claim thus fails. An unreasonable, self-serving post-claim assertion that is contradicted by the parties' course of conduct is not sufficient to create a question of either contractual ambiguity or fact as to whether Claimant was a shareholder. And, if the Court were to conclude that it is, Heller will be able to offer detailed evidence showing that Claimant was without question a shareholder and that this precludes his

claim here.

### 3. Even By Its Own Terms, The 2007 Letter Agreement Left To The Compensation Committee The Annual Decision As To What The Salary Would Be And Conditioned It On Minimum Performance Levels.

Putting aside Claimant's status as a shareholder, the express terms of the 2007 Letter Agreement also foreclose his claim for any additional compensation. It cannot be seriously contended that Claimant, following the Letter Agreement, was free to sit back, do nothing, and simply collect checks, with Heller powerless to stop paying him. In fact, the 2007 Letter Agreement provides:

> [after 2007 Mr. Newman's compensation] shall be reviewed and determined annually by the Compensation Committee based on the understanding that the annual compensation would remain fixed at $775,000 if there is not a material negative derivation by you for the preceding year from the hour expectations set forth in the previous paragraph [1550 billable hours and 2400 total hours].

TE # 22. By its express terms, the agreement conditioned his compensation on the discretion of the Compensation Committee and minimum performance levels. This is not akin to contract for a highly compensated executive (or baseball player) where there is a guaranteed salary for a set number of years.

In fact, Claimant has recognized this. He has repeatedly admitted that under the 2007 Letter Agreement, the Compensation Committee had the discretion to change his compensation if there was a negative change in performance. *See* Sullivan Decl. Ex. B (Neuman Depo.) at 80:22-81:06 ("Q. Let me ask you this: . . . under what circumstances, Mr. Neuman, could Heller Ehrman LLP have terminated this agreement and not been obligated to pay you a continuing salary? A. They had no right to terminate this letter agreement. **They had the right through the compensation committee to reduce my compensation if I wasn't performing**.") (emphasis added).

Further, Claimant agreed that events that would prevent him from performing—such as a loss of his bar license—would constitute grounds for the Compensation Committee to reduce his compensation. *See id.* at 81:07-16 ("Q. Are you contending that after September 6, 2007, Mr. Neuman, no matter what the circumstances, you were entitled to be paid $775,000 annually through the end of 2010? A. If there is not a negative deviation. Obviously there are -- I would

Heller Ehrman LLP's Trial Brief

assume if I lost my bar license, that would have somehow trumped this.  Q. Why do you assume that?  **A. Because I could not have practiced and billed 1,550 billable hours.**").

Mr. Neuman further agreed that there had to be read into the letter agreement an implied termination for cause. *See id.* at 81:21-84:08.

The existence of these conditions forecloses Claimant's claim for any compensation for 2008 forward for at least two independent reasons.  First, the Compensation Committee, through the Dissolution Committee, made its decision:  Claimant—along with all shareholders—was not to receive further distributions.  This discretionary decision (certainly reasonable under the circumstances) forecloses Claimant's claim.

Second, the minimum performance levels set forth in the 2007 Letter Agreement were not met following Heller's dissolution.  Claimant worked no hours in 2009 and 2010.  The firm ceased operating as a practicing law firm after October 28, 2008.  Claimant has no right to be compensated for any period thereafter.

### 4.  In Any Event, Claimant's Employer Remained The PC, And Thus, He Has No Claim Against Debtor.

Finally, Claimant's claim also fails for another independent reason:  he has no claim against the Debtor.  Claimant's claim rests on a mistaken premise:  that he became an employee of the Debtor by virtue of the September 6, 2007 letter agreement.  But the language of the letter, the Debtor's ordinary custom and practice of continuing to treat fixed income shareholders as employees of the PCs, and Claimant's own continued treatment as shareholder of the California PC following the 2007 Agreement, are dispositive.  There is no credible evidence that the letter's purpose or effect was to terminate his employment by the PC.  Rather, all the evidence reflects an intent to simply modify Claimant's status from an ordinary shareholder (who receives variable compensation and makes capital contributions through the purchase of preferred stock in the California PC), to a "fixed income shareholder" (who continues to hold preferred and common stock in the California PC but is not required to make further capital contributions). Nothing in the letter provides that Claimant's status as a shareholder of the California PC would terminate or that he would thereafter be an employee of Heller.  Indeed, the only time any form of the word

Case: 08-32514   Doc# 3571   Filed: 07/09/14   Entered: 07/09/14 18:33:48   Page 24 of 27

"employ" is used in the 2007 Letter Agreement is in reference to potential future employment of Claimant by the firm upon his retirement.

Moreover, the undisputed facts concerning the parties' practice following the 2007 Letter Agreement confirms that Claimant remained employed by the PC, and that the Debtor was simply agreeing to alter the formula by which it would fund Claimant's shareholder compensation from variable compensation to fixed income. Claimant continued to be paid by the California PC, not Heller, as evidenced by the W-2 he received from the California PC. Further, Claimant continued to act as a shareholder by voting on new shareholder admissions and voting on elective committees and offices within the firm. Following the 2007 Letter Agreement, Claimant did not enter into any new agreement with the Heller LLP. He was never paid by the Heller LLP. In fact, it was not until after the Plan of Dissolution was agreed to that anything changed—at which time Claimant entered into a separate employment agreement with Heller for which he was paid on an hourly basis for his services.

Claimant's basis for asserting that the Debtor became his employer is that fact that the 2007 Letter Agreement states that it is "with Heller Ehrman LLP" as opposed to with the California PC. This proves nothing. Debtor does not dispute that the 2007 Letter Agreement was between Claimant and the management of the Debtor. This is consistent with the Debtor's interpretation of the agreement's effect, the Debtor's practices with other fixed income shareholders, and with the Debtor's two-tiered structure. The LLP management controlled and managed the PCs. To the extent the 2007 Letter Agreement altered how Claimant's annual compensation was to be set, the California PC itself did not have the authority to do so under the Basic Documents. All compensation decisions were made by the Debtor's Compensation Committee. Therefore, the proper party to an agreement relating to the setting of Claimant's compensation was the Debtor.

The Debtor's intent and understanding of the 2007 Letter Agreement was stated succinctly at deposition by Robert Hubbell, a former member of the Debtor's Executive and Compensation Committees, and the individual who signed the 2007 Letter Agreement on behalf of the Debtor. When questioned by Claimant's counsel why the 2007 Letter Agreement stated it was with Heller Ehrman LLP, Mr. Hubbell explained that the Letter Agreement was not intended to do anything

other than address "how the Compensation Committee would exercise its authority under the existing governance documents." Sullivan Decl. Ex. A (Hubbell Depo.) at 60:23-62:13.

Finally, as noted above, where the parties intended that a shareholder resign, cease employment with a PC, and begin a direct employment relationship with the LLP, the parties expressly stated that this was their intent and provided for this to occur. *See, e.g.,* TE # 25 ("retired" shareholder agreements) (Kelly agreement, ¶¶2-3; Sydral Agreement, ¶¶1-4; Snider agreement, ¶¶ 2-4.). In these agreements, the retired shareholder's employer changed from a PC to the LLP. TE # 25 (*e.g.*, Kelly agreement, ¶2 ["During the term of this Agreement, Employee shall be employed by Heller Ehrman LLP]"; Snider agreement, ¶3 [same]; Redman agreement, ¶2 [same].) There was no such provision in the 2007 Letter Agreement. Claimant's claim fails for this reason as well.

### 5. **Potential Disputed Facts or Additional Evidence.**

As discussed above, the judgment of Heller's counsel in approaching this claim objection was that it would be more efficient to prepare the matter for trial than to assemble all the material to support a summary judgment motion, file the motion, and have the hearing, only to potentially face a trial in the end. At this stage, Heller does contend that Claimant has no material facts or evidence sufficient to sustain his contractual constructions upon which his claim depends.

To the extent that Claimant identifies certain facts as in dispute (Claimant's Statement of Disputed Facts, Docket No. 3569-1), Heller does dispute the identified "facts" or ultimate legal contentions they embrace. These are outlined in the accompanying Response to Claimant's Statement of Disputed Facts and Statement of Additional Disputed Facts and Additional Evidence ("Response"). It may be that the Court does not believe that Claimant's proffered disputed facts are material or in genuine dispute. Thus, they may very well not prevent the Court from sustaining Heller's objection without the need for a trial.

Heller does contend, however, to the extent the Court finds that Claimant has offered any evidence that is sufficient to give rise to an ambiguity in the contract that could support his claim, Heller has full and affirmative evidence to offer to rebut Claimant's contractual construction as further outlined in the accompany Response. If Respondent concedes that these points are

undisputed than they would be considered as part of this Court's ultimately legal decision in interpreting the contract.

In this context, Heller again notes that Claimant's view of when extrinsic evidence is available to interpret a contract is too narrow. In addition, to the law cited above, there are many California cases noting that if the language in a contract (whether fully integrated or not) is ambiguous, extrinsic evidence is admissible to explain the meaning of the terms and to reveal the intention of the parties. *Slvinsky v. Watkins-Johnson Co.*, 221 Cal.App.3d 799, 805 (1990); *see also* Cal. Civ. Code sections 1637, 1647. Even evidence of prior agreements is admissible to explain the meaning of fully integrated, but ambiguous, contract language. *Dore v. Arnold Worldwide, Inc.*, 39 Cal.4th 384, 391 (2006). Moreover, even if a contract is *unambiguous* on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the contract is reasonably susceptible. *Id.*; *Bonghi v. Metropolitan Water Dist. of So. Cal.*, 70 Cal.App.4th 1358, 1364-65 (1999).

## IV. CONCLUSION

Mr. Neuman's claims are based on an assertion that he should be treated differently than every other Heller Shareholder, and be accorded a guaranteed compensation of over $700,000 per year regardless of Heller's bankruptcy, Heller's Dissolution Committee's decisions regarding shareholder compensation, and the impossibility of this having met the performance requirements. Mr. Neuman landed softer than many other former Heller lawyers – he was employed post-dissolution by Heller (SF # 49) and then secured a position at Schiff Hardin with an annual salary of $450,000. Neither law or equity supports Mr. Neuman's claim and, whether after trial or now as a matter of law, the Estate's objection should be sustained.

Dated: July 9, 2014
                                                  DIAMOND MCCARTHY LLP

                                    By:   */s/ Christopher D. Sullivan*
                                       Christopher Sullivan
                                       Attorneys for Plaintiff
                                       HELLER EHRMAN LLP, Liquidating Debtor