**Entered on Docket**
**March 02, 2020**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



**Signed and Filed: March 2, 2020**

_____
**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | ) Case No. 08-32514 DM |
| | ) |
| HELLER EHRMAN LLP, | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| _____ | ) |

### MEMORANDUM DECISION AFTER REMAND

On May 4, 2018, the Court of Appeals for the Ninth Circuit (the "Ninth Circuit") issued an amended decision[1] that reversed this court's order granting of summary judgment in favor of Debtor Heller Ehrman LLP and disallowing Paravue Corporation's proof of claim no. 1019 (the "Claim").[2] The Ninth Circuit concluded that genuine issues of material fact existed regarding when the attorney-client relationship between Heller and Paravue terminated, which dictated whether the Claim was barred by the statute of limitations. Following remand, the

---

[1] Dkt. 3959 (the "Ninth Circuit Decision") (amending Memorandum issued March 5, 2018 [Dkt. 3924]).

[2] Dkt. 3579 (the "Summary Judgment Order").

court[3] conducted a trial on December 9 and 10, 2019, and thereafter took the matter under advisement.

This memorandum decision constitutes the court's findings of fact and conclusions of law as required by Civil Rule 52(a)(1),[4] as made applicable by Bankruptcy Rule 7052.

**A. Jurisdiction**

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and General Order 24 of the United States District Court for the Northern District of California. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). Venue is proper under 28 U.S.C. § 1409(a).

**B. Background**

On Monday, July 14, 2008, Paravue and Heller executed an agreement to toll the statute of limitations governing Paravue's claims against Heller.[5] The Tolling Agreement expressly excluded claims time-barred as of the July 14, 2008 effective date.

On December 28, 2008, Heller filed a Chapter 11 petition in this court.[6] On April 27, 2009, Paravue filed the Claim in which it asserted an unsecured nonpriority claim in the amount of $20 million based on Heller's alleged malpractice in

---

[3] Judge Hannah L. Blumenstiel presiding.

[4] Unless otherwise indicated, all references to "Civil Rules" shall refer to the Federal Rules of Civil Procedures and all references to "Bankruptcy Rules" shall refer to the Federal Rules of Bankruptcy Procedure.

[5] Ex. JJJ (the "Tolling Agreement").

[6] Dkt. 1.

representing Paravue in matters pertaining to its relationship
with Acuity Ventures.[7]

On September 6, 2011, Heller objected to the Claim,
asserting (among other things) that it was time-barred.[8]  After
years of discovery and motion practice, on March 28, 2014,
Heller filed a motion for summary judgment with respect to the
Claim Objection.[9]  Paravue opposed the Motion for Summary
Judgment.[10]

On May 28, 2014, the court held a hearing on the Motion
for Summary Judgment and took the matter under advisement.  On
July 18, 2014, the court entered the Summary Judgment Order
granting the Motion for Summary Judgment and disallowing the
Claim.[11]

Paravue appealed the Summary Judgment Order to the
District Court for the Northern District of California (the
"District Court").[12]  On October 7, 2015, the District Court
affirmed the Summary Judgment Order.[13]  Paravue appealed to the
Ninth Circuit who reversed the Summary Judgment Order.[14]

---

[7] Claim at pp. 2-3 (Summary of Claim).

[8] Dkt. 2556 (the "Claim Objection").

[9] Dkt. 3525 (the "Motion for Summary Judgment").

[10] Dkt. 3550.

[11] Dkt. 3579.

[12] Dkt. 3602.

[13] Dkt. 3701 (the "District Court Order").

[14] Dkt. 3959.

The parties agree that the issue before this court is whether the attorney-client relationship between Heller and Paravue ended on or before July 11, 2007. Because the Tolling Agreement was executed on Monday, July 14, 2008, the parties agree that if the one-year statute of limitations pertaining to Paravue's claims began to run on July 12 or 13, 2007, such claims would be timely if brought on July 14, 2008. Thus, July 11, 2007 is the critical date for purposes of this case. Heller argues that the attorney-client relationship ended on or before July 11, 2007 and the Claim is time-barred; Paravue, in turn, argues that the attorney-client relationship did not end until at least July 17, 2007, if not later.[15] Accordingly, the trial was limited to that singular issue – when did the attorney-client relationship end?

**C. Findings of Fact**

Paravue was founded by Dr. Lauren Barghout and Mr. Lawrence Lee in 2002,[16] in order to develop image detection software developed by Dr. Barghout. Paravue hired Venture Law Group ("VLG") as its general corporate counsel. VLG later merged with Heller which continued as counsel. Both before and after VLG's

---

[15] In its opening brief (Dkt. 4072), Paravue also argued that its injury occurred on the sale of its assets in October 2007, less than one year before execution of the Tolling Agreement. The District Court rejected that argument and held that Paravue suffered actual injury at least as early as May 2007 (if not earlier). [District Court Order at p. 9.] The Ninth Circuit did not address this issue. As such, the District Court's ruling on this issue is law of the case and the court declines to consider this argument. Caldwell v. Unified Cap. Corp. (In re Rainbow Magazine, Inc.), 77 F.3d 278, 281 (9th Cir. 1996).

[16] The company was originally named LizardEye Systems, but later changed its name to Paravue Corporation.

merger with Heller, Mr. Stephen Thau lead Heller's relationship with Paravue.

Mr. Lee acted as Paravue's first Chief Executive Office ("CEO") and served until his resignation in June 2003. Mr. Alex Quan succeeded Mr. Lee, and served as CEO until June 2005. Dr. Barghout succeeded Mr. Quan as CEO, serving until December 2006, when Mr. Lawrence Hootnick assumed the CEO position. Dr. Barghout has been Paravue's Chief Science Office ("CSO") from Paravue's founding and through present. She has also been Paravue's single largest shareholder and a member of its board of the directors from the beginning. Mr. Robert Sweeney acted as Paravue's Chief Financial Officer ("CFO") and Chief Operating Office ("COO") from 2005 until July 2007.

At trial, Dr. Barghout asserted that her tenure as CSO was not continuous, but rather that she was wrongfully terminated from that position by Mr. Hootnick in March 2007.[17] This contention was shown to be at odds with Dr. Barghout's prior sworn testimony in which she confirmed her position as CSO from 2002 through present.[18] This was but one of many instances in which Dr. Barghout was impeached over the course of her testimony. As will be noted throughout below, the frequency with which Dr. Barghout's testimony at trial diverged from her own prior sworn statements, both written and oral, caused the court

---

[17] December 10, 2019 trial transcript (Dkt. 4086; "Tr. 12/10/19"), at pp. II-118:25 to II-119:4.

[18] Id. at pp. II-119:15 to II-120:6 (quoting Ex. PPPP [transcript of Nov. 25, 2019 deposition of Dr. Barghout] at pp. 18:24 to 19:1). Ultimately, whether Dr. Barghout served continuously as CSO did not impact this court's holding.

to seriously question her credibility as a witness, particularly in those instances in which Heller introduced evidence supporting a narrative contrary to the one offered by Dr. Barghout.[19]

In order to fund development of its technology, Paravue borrowed money from the venture capital firm Acuity Ventures.[20] In total, Paravue borrowed $2.1 million from Acuity pursuant to loan agreements that entitled Acuity to convert its debt to equity and/or to foreclose on Paravue's assets of Paravue if it defaulted. Acuity required Mr. Hootnick, a general partner of Acuity, to act as Paravue's "shadow CEO," as a means of protecting Acuity's investment (as noted above, he later became the official CEO). Mr. Sweeney was an investor and limited partner in Acuity at the time that he acted CFO/COO for Paravue.

In addition to borrowing funds from Acuity, Paravue raised an additional $2.72 million through a private equity offering in or around August 2006. The offering projected a product launch in the fourth quarter of 2006.

While Dr. Barghout testified that Paravue was doing "really well" at the close of 2006, the weight of the evidence admitted at trial proved otherwise. Despite the offering's projection of a product launch near the end of 2006, Paravue was nowhere near

---

[19] United States v. Bao, 189 F.3d 860, 865-66 (9th Cir. 1999) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness").

[20] The money was borrowed from funds managed by Acuity Ventures. For purposes of simplicity, the court will refer to these funds and Acuity Ventures collectively as "Acuity".

ready or able to meet that goal.[21]  Dr. Zoran Kurtovic, one of

Paravue's current directors and one of its lead scientists in

2006, indicated that Paravue's technology had been discredited

and its scientific team had lost confidence in Dr. Barghout.[22]

At this point, Paravue was also running out of money.[23]

The parties dispute whether Dr. Barghout resigned in early

March 2007 and whether she was thereafter effectively terminated

by Paravue.  In any event, Dr. Barghout hired attorney Jack Russo

as her counsel to contest the termination.  Even after she

stopped working at Paravue, Dr. Barghout remained one of the two

members of Paravue's board of directors, along with Mr. Hootnick,

and she remained Paravue's largest shareholder.

On April 2, 2007, Acuity exercised its right to convert its

debt to equity.[24]  Due to an apparent stalemate between Dr.

Barghout and Mr. Hootnick, the conversion did not take place and,

on April 13, 2007, Acuity issued a notice of default to

Paravue.[25]  At this point, Paravue had run out of cash and did

not have any working products.[26]

---

[21] December 9, 2019 trial transcript (Dkt. 4085; "Tr. 12/9/19") at pp. I-59:2-3 and I-59:11-15.

[22] Tr. 12/10/19 at p. II-153:5-13.  On direct, Dr. Kurtovic testified that Paravue had achieved a major milestone by the end of 2006 by burning a CD of a beta version of one of Paravue's products.  [Tr. 12/10/19 at p. II-148:11-18.]  This testimony proved less than credible when it was impeached on cross examination.  [Tr. 12/10/19 at p. 11-153:5-13.]

[23] Tr. 12/9/19 at pp. I-62:21 to I-63:1.

[24] Ex. R (April 13, 2007 Notice of Default).

[25] Id.

[26] Tr. 12/9/19 at p. I-65:7-18.

Case: 08-32514   Doc# 4110   Filed: 03/02/20   Entered: 03/02/20 15:03:59   Page 7 of 26

Dr. Barghout demanded that Heller notice a shareholders'
meeting, but it declined to do so.  In response, on April 17,
2007, Dr Barghout issued her own notice of shareholders' meeting
for May 29, 2007 at Mr. Russo's office.[27]  Even after issuing
that notice, however, Dr. Barghout continued to insist that
Heller call a special shareholders meeting,[28] which Heller
declined to do.

On May 10, 2007, Acuity commenced an action against Dr.
Barghout and Paravue in Santa Clara Superior Court ("Superior
Court").[29]  Attorney Robert Hawk of Heller stepped in to assist
in the litigation.  He quickly recognized the conflict between
the two directors of Paravue – Dr. Barghout and Mr. Hootnick –
and the struggle for control of Paravue arising from that
conflict.  Heller and Mr. Hawk determined that it would be best
to withdraw as counsel, given that conflict.[30]

Accordingly, when Acuity sought a temporary restraining
order ("TRO") to prevent Dr. Barghout's noticed shareholders'
meeting from taking place, Heller did not oppose such relief.
While Mr. Hawk attended the May 25, 2007 hearing on that TRO, he
did not oppose Acuity's request.  Instead, Mr. Russo appeared at
that hearing and advocated against issuance of the TRO.[31]  On

---

[27] Ex. 18 (Notice of Special Shareholders Meeting).

[28] Ex. 20 (April 6, 2007 email from Mr. Russo to Mr. Thau).

[29] Acuity Ventures II, LLC, et al. v. Paravue Corporation, et al., Case No. 1-07-CV-085589 (the "Acuity Action").

[30] Tr. 12/9/19 at pp. I-87:23 to I-88:25.

[31] Ex. BB (June 5, 2007 Order Granting TRO).

June 25, 2007, the Superior Court held an evidentiary hearing on the requested TRO, at which Mr. Hawk appeared on behalf of "nominal defendant" Paravue.[32] Mr. Hawk did not take any position at such hearing, and testified that Mr. Russo opposed the relief sought by Acuity.[33]

Based on her filings in the Acuity Action, it became increasingly evident that Dr. Barghout had lost faith in Heller as counsel to Paravue. In particular, in opposition to the aforementioned TRO, Dr. Barghout stated that she "believe[d] that Paravue must be zealously represented in this litigation and that can only happen after a new Board of Directors for Paravue decides a number of important issues including . . . who will be Paravue's corporate counsel and including what positions will be taken in this litigation."[34] By June 26, 2007, Dr. Barghout "firmly believe[d] that Heller Ehrman [was] not neutral, [was] not doing what [was] required by applicable law, and [was] simply acting as additional advocates for [Acuity] in this case."[35] Dr. Barghout believed at that point, well prior to July 11, 2007, that Heller was in breach of its fiduciary duty to Paravue.[36]

---

[32] Ex. KK (June 28, 2007 Decision and Order After Hearing).

[33] Tr. 12/9/19 at p. I-95:11-22.

[34] Ex. Z (May 23, 2007 Declaration of Dr. Barghout filed in the Acuity Action; the "May 23 Barghout Decl.") at ¶ 8.

[35] Ex. GG (June 26, 2007 Declaration of Dr. Barghout filed in the Acuity Action; the "June 26 Barghout Decl."), at ¶ 19.

[36] Tr. 12/10/19 at p. II-109:12-20 (quoting Ex. NNNN [transcript of February 12, 2014 deposition of Dr. Barghout] at p. 657:15-21).

1    At trial, when faced with the foregoing statements, which
2 she made under penalty of perjury, Dr. Barghout attempted to
3 equivocate – she asserted that Heller was in a difficult position
4 given Mr. Hootnick's concurrent positions with Paravue and
5 Acuity, and that she was simply trying to help them get out of a
6 bind.[37]  Despite her attempts to qualify her prior statements,
7 the statements themselves leave little room for qualification –
8 it is evident that Dr. Barghout had little to no faith in
9 Heller's ability to zealously represent Paravue by the end of
10 June 2007, particularly in the context of the Acuity Action, and
11 that she believed Paravue had a basis to sue Heller.  The court
12 gives far more weight to statements made by Dr. Barghout during
13 the relevant period, than to those she made almost thirteen years
14 after the fact and after more than a decade of litigation.

15    On June 27, 2007, Acuity served notice that it would dispose
16 of Paravue's assets at a public sale and would change the locks
17 at Paravue's office.[38]  On July 3 and 6, 2007, both Dr. Barghout
18 and Mr. Russo demanded that Heller take steps to defend Paravue
19 and seek a stay of any foreclosure.[39]  Heller declined to act on
20 such requests.  Rather, on July 6, 2007, Mr. Hawk advised both
21 Dr. Barghout and Mr. Russo that he did not believe Dr. Barghout
22 had the authority to speak for Paravue, but to the extent she
23 believed she had such authority, she "should immediately seek

24

25 [37] Tr. 12/10/19 at pp. II-105:2 to II-109:1.

26 [38] Exs. II and JJ (June 27, 2007 letters from Acuity to Paravue).

27 [39] Ex. LL (July 3, 2007 to July 9, 2007 email exchange) and Ex. MM (July 5,
28 2007 to July 6, 2007 email exchange).

counsel from attorneys other than Heller Ehrman."[40]  Mr. Hawk
also indicated that Heller intended to withdraw as counsel to
Paravue in the Acuity Action.[41]

   At this point, Heller was finalizing its plans to withdraw
as counsel to Paravue in all matters.  Mr. Thomas Garten, then a
junior associate, worked on an application to withdraw on Friday,
July 6, 2007; Sunday, July 8, 2007; and Monday, July 9, 2007.[42]
At 4:45 p.m. on July 9, 2007, Mr. Hawk sent an email to Mr.
Hootnick and Mr. Sweeney stating that, on July 11, 2007, Heller
intended to move to withdraw as counsel to Paravue in the Acuity
Action.[43]  Mr. Hawk further stated, "[m]y understanding is that
Paravue does not oppose this application.  Please let me know as
soon as possible if this is incorrect."[44]  Mr. Sweeney confirmed
that he received the July 9 Email (when he was still CFO and COO)
and that he recalled knowing that Heller's withdrawal was
imminent – he had been previously notified and did not object.[45]
And, indeed, neither Mr. Hootnick nor Mr. Sweeney responded to
the July 9 Email to voice any opposition to Heller's withdrawal.

   Paravue makes much of the fact that Mr. Hootnick resigned
via email sent just prior to transmission of the July 9 Email, at

---

[40] Ex. LL at p. 2 and Ex. MM at p. 1.

[41] Ex. LL at p. 2.

[42] Ex. 49 (Sept. 10, 2007 Heller invoice [the "July Invoice"]) at p. 2.

[43] Ex. PP (the "July 9 Email").

[44] Id.

[45] Tr. 12/9/19 at I-71:19 to I-72:11.

Case: 08-32514   Doc# 4110   Filed: 03/02/20   Entered: 03/02/20 15:03:59   Page 11

3:27 p.m.,[46] and was thus no longer CEO upon receipt of the July 9 Email. This ignores the fact that the July 9 Email served to confirm <u>prior</u> communication of Heller's intent to withdraw, which Mr. Sweeney (who was an officer at the time of his receipt of the July 9 Email) confirmed on the stand. While Mr. Sweeney understandably could not confirm the specifics of the prior communications (given that they occurred more than twelve years ago), he was confident that the intent to withdraw had been previously communicated. Paravue did not impeach Mr. Sweeney on this point or introduce any evidence to suggest that his recollection was incorrect. Moreover, unlike Dr. Barghout, Mr. Sweeney proved to be a credible and consistent witness at trial.[47]

As a result of Heller's refusal to seek a stay of Acuity's foreclosure, Dr. Barghout once again took matters into her own hands. On her instruction, Mr. Russo sought and obtained a TRO staying foreclosure on behalf of herself and Paravue.[48] The Superior Court issued that TRO on Tuesday, July 10, 2007, after a lengthy hearing in which Mr. Russo appeared and advocated on

---

[46] Dkt. 4073 (Paravue Corporation's Post Trial Closing Brief) at p. 15 n.1 (citing Ex. 30 [July 9, 2007 resignation email]).

[47] The court also found Mr. Hawk to be a credible and consistent witness. He confidently testified that he would not have sent the July 9 Email unless he had confirmation either directly from Mr. Hootnick and/or Mr. Sweeney, or indirectly through Mr. Thau, that they did not oppose the withdrawal. [Tr. 12/9/10 at pp. I-110:22 to I-111:10.]

[48] Ex. RR (July 10, 2007 TRO); Tr. 12/10/19 at pp. II-114:3 to II-115:25 (quoting Ex. NNN [April 5, 2012 Declaration of Dr. Barghout; Dkt. 2979]). Dr. Barghout unsuccessfully argued that she had sought such TRO in her capacity as a shareholder of Paravue and that Mr. Russo was acting solely on her behalf, but the TRO itself, as well as her prior sworn statement established that Mr. Russo acted on behalf of both Dr. Barghout and Paravue.

Case: 08-32514    Doc# 4110    Filed: 03/02/20    Entered: 03/02/20 15:03:59    Page 12 of 26

behalf of the defendants in the Acuity Action – Dr. Barghout and Paravue.

Also in attendance at the July 10, 2007 hearing was: Dr. Barghout; Mr. Paul Alexander and Mr. Garten of Heller; and Mr. Michael Ackerman. Mr. Ackerman is an attorney that had learned of the case from Mr. Russo and thereafter introduced himself to Dr. Barghout and sat in on the July 10, 2007 hearing.[49] Mr. Hawk was unable to attend the July 10 hearing, and asked Mr. Alexander to appear in his stead, but not to advocate for any position. Mr. Alexander understood that Heller intended to withdraw due to Paravue's conflicted management.[50] Accordingly, Messrs. Alexander and Garten sat in the audience at the July 10, 2007 hearing and did not formally appear on behalf of Paravue.[51]

It appeared to Mr. Alexander that Mr. Ackerman intended to step in as counsel to Paravue – or at least was preparing to do so – and he advised Mr. Hawk accordingly after the hearing.[52] According to Mr. Alexander, Dr. Barghout acknowledged having made a fee arrangement with Mr. Ackerman (and Mr. Ackerman confirmed having sent her a proposal) and she appeared to be looking to him for legal counsel.[53] From Mr. Alexander's perspective, Mr. Ackerman was taking on the role as Paravue's counsel, including learning about the case through extensive conversation with Dr.

---

[49] Tr. 12/10/19 at p. II-22:3-10.

[50] Tr. 12/9/19 at pp. I-163:17 to I-165:12.

[51] Id. at p. I-166:4-9.

[52] Ex. TT (July 10, 2007 email).

[53] Tr. 12/9/19 at pp. I-168:12 to I-169:5 and I-169:22-25 to I-170:10; Ex. TT.

1  Barghout and Mr. Russo,[54] and Dr. Barghout understood that Heller
2  was withdrawing.[55]  Mr. Alexander's testimony regarding the July
3  10, 2007 hearing was quite credible, and consistent with the
4  email he sent to Mr. Hawk later that day.  In contrast, Dr.
5  Barghout's recollection of the July 10, 2007 hearing was less
6  than credible.

7       Dr. Barghout testified that she learned of Mr. Hootnick's
8  resignation at the July 10, 2007 hearing.[56]  She further
9  testified that she had a lengthy, 45-minute conversation with Mr.
10 Garten that day, and that she also spoke with Mr. Alexander.  She
11 asserted that they advised her that if she became management of
12 Paravue, they would take direction from her.[57]  According to Dr.
13 Barghout, that is why, she prepared a handwritten document
14 appointing herself as CEO of Paravue – so that Heller would take
15 direction from her.[58]

16      Paravue did not present any evidence to support this
17 testimony, which contradicts the convincing evidence that Heller
18 intended to withdraw as counsel to Paravue, regardless of who was
19 in charge.  Mr. Garten had already begun work on an application
20 to withdraw by the time of the July 10, 2007 hearing, and advised
21 Dr. Barghout and Mr. Russo in person at the July 10, 2007 hearing

22

23  _____

24 [54] Tr. 12/9/19 at p. I-173:6-22; Ex. TT.

25 [55] Tr. 12/9/19 at pp. I-176:20 to I-177:11.

26 [56] Tr. 12/10/19 at p. II-70:24-25.

27 [57] Id. at p. II-69:10-19; Ex. WW (handwritten appointment).

28 [58] Id. at p. II-70:14-19 (discussing Ex. 31).

that Heller intended to file it.[59]  And, prior to the July 10, 2007 hearing, Mr. Hawk had advised Mr. Hootnick, Mr. Sweeney, and Dr. Barghout that Heller intended to withdraw.  The evidence simply does not support Dr. Barghout's alleged belief that a change in management would heal the rift between Paravue and Heller.

Indeed, notwithstanding Dr. Barghout's self-appointment as CEO, Heller remained committed to withdrawing as counsel to Paravue.  In the evening of July 10, 2007, after receiving Mr. Alexander's email describing the July 10, 2007 hearing, Mr. Hawk sent an email Mr. Ackerman and Dr. Barghout (among others) in which he once again reiterated Heller's intent to file the Withdrawal Application.[60]  He requested that Mr. Ackerman and Dr. Barghout execute a substitution of counsel to avoid the necessity of doing so.

On the morning of Wednesday, July 11, 2007, Mr. Garten sent Dr. Barghout an email confirming that he had told her the preceding day that Heller intended to file the Withdrawal Application on July 12, 2007.[61]  Mr. Garten inquired whether Dr. Barghout would oppose Heller's withdrawal.  Mr. Russo responded on behalf of Dr. Barghout, in her capacity as acting CEO of Paravue, and demanded to know (among other things) what portion of the fees paid by Paravue, Heller would refund to Paravue as a

---

[59] Ex. BBB ("Withdrawal Application") at p. 6.

[60] Id. at p. 8.

[61] Ex. ZZ (July 11, 2007 emails) at p. 2.

condition of withdrawal.[62]  In response to Mr. Hawk's rejection

of that demand, Dr. Barghout stated her intention to oppose

Heller's withdrawal, noting that it was unprofessional to abandon

Paravue[63] — a claim both she and Mr. Russo had lodged

previously.[64]

That same day (July 11, 2007), Dr. Barghout confirmed to Mr.

Hawk in a telephone conversation that Paravue had no funds

available to pay Heller's past bills or any invoices it might yet

issue.[65]  Mr. Hawk declined Dr. Barghout's email request that

someone from Heller accompany her to Paravue's offices, making it

clear to her that the attorney-client relationship between Heller

and Paravue had ended in all respects.[66]  Meanwhile, Mr. Russo

advised Mr. Hawk over the telephone that Mr. Ackerman was

prepared to serve as litigation counsel to Paravue.[67]

On Thursday, July 12, 2007, Mr. Hawk personally served

Heller's Withdrawal Application on Dr. Barghout, in her capacity

as CEO of Paravue.[68]  In light of Dr. Barghout's opposition, the

Superior Court set the Withdrawal Application for hearing on July

17, 2007.

---

[62] Id. at pp. 1-2.

[63] Id. at p. 1.

[64] Tr. 12/9/19 at p. I-122:12-17.

[65] Withdrawal Application (Ex. BBB) at p. 12; Tr. 12/9/19 at pp. I-125:12 to I-127:2.

[66] Ex. XX (July 11, 2007 emails); Tr. 12/9/19 at p. I-131:1-14.

[67] Withdrawal Application (Ex. BBB) at p. 12; Tr. 12/9/19 at p. I-127:4-11.

[68] Withdrawal Application (Ex. BBB) at p. 15.

On and after July 12, 2007, Heller attorneys billed Paravue for a variety of activities, all of which facilitated the transition of the Paravue relationship to other counsel.[69]  Mr. Hawk engaged in communications with Messrs. Russo and Ackerman regarding corporate governance issues to ease the transition and avoid questions down the road.  Mr. Hawk also attended a July 13, 2007 hearing on another application for a TRO filed by Acuity, but did not oppose that application.  By this time, Mr. Hawk viewed Heller as having concluded its role as Paravue's counsel, aside from returning Paravue's records and minimizing any inconvenience Heller's withdrawal might cause by, for example, providing background information to incoming counsel – Messrs. Russo and Ackerman.[70]  Mr. Hawk also obliged Mr. Ackerman's request to circulate a draft order denying Acuity's TRO on July 17, 2007,[71] and executed a necessary substitution in an appeal arising out of the Acuity Action on July 18, 2007.[72]  Aside from executing that substitution, Heller did nothing on behalf of Paravue in the appeal.[73]

---

[69] See generally July Invoice (Ex. 49).

[70] Tr. 12/9/19 at pp. I-133:4 to I-135:25 and I-145:3-13.  Indeed, in a July 13, 2007 email that Paravue construes as Mr. Hawk providing legal advice regarding the effectiveness of Dr. Barghout's self-appointment, it is apparent that Mr. Hawk is simply providing background information for Mr. Ackerman to utilize in representing Paravue going forward.  [Ex. 41 (July 13, 2007 email).]

[71] Id. at pp. I-146:5 to I-147:3.

[72] Id. at I-148:15-18.

[73] See generally July Invoice (Ex. 49).

1    Mr. Thau was similarly engaged in transitional activities,

2  which are reflected on the July Invoice.  Mr. Thau had been on

3  vacation during the first week of July 2007.  Prior to leaving

4  for his vacation, he understood that Heller would be withdrawing

5  as counsel.[74]  Given that, before his vacation, Mr. Thau gathered

6  and returned to Paravue many of its records.  Those efforts

7  continued upon his return.[75]  On July 12, 2007, Mr. Thau provided

8  information to Dr. Barghout concerning how a shareholder vote

9  could be held, but did not provide legal advice regarding such a

10 vote.[76]  Dr. Barghout utilized this information when she called a

11 board of directors meeting on July 13, 2007 at Mr. Russo's office

12 where it was resolved to ratify her appointment as CEO and to

13 reimburse her for fees incurred by Paravue by Mr. Russo's and Mr.

14 Ackerman's respective firms.[77]  While Messrs. Russo and Ackerman

15 attended that meeting, no attorneys from Heller did so.[78]

16      Similarly, over the following days, Mr. Thau did not provide

17 legal counsel with respect to "cap tables", corporate governance,

18 or stockholder records, but simply worked to make the transition

19 to new counsel seamless, avoid future calls, and avoid prejudice

20 to the former client.[79]  Mr. Thau could not recall being asked

21

22 _____

   [74] Ex. OOOO (except of transcript of deposition of Stephen Thau ["Thau Tr."])
23 at p. 34:10-16.

24 [75] Id. at p. 50:2-20.

25 [76] Id. at p. 75:2-12.

26 [77] Ex. 44 (July 13, 2007 board resolution).

27 [78] Thau Tr. at p. 71:14-25; Ex. 44 (July 13, 2007 board resolution).

28 [79] Id. at pp. 66:6 to 67:4, 80:12-24, and 89:14 to 90:23.

for, or providing, any legal advice to Paravue, including with respect to the powers of a sole director and filling board vacancies.[80]

Ultimately, on July 17, 2007, over Paravue's objection, the Superior Court granted the Withdrawal Application and Mr. Ackerman was formally appointed counsel to Paravue in the Acuity Action. And, on July 19, 2007, Mr. Ackerman substituted in as counsel to Paravue in the appeal arising from the Acuity Action.

**D. Conclusions of Law**

California Code of Civil Procedure ("CCP") section 340.6(a) establishes a one-year statute of limitations for attorney malpractice claims. That statute is tolled, however, during the time that "[t]he attorney continues to represent the plaintiff regarding the specific subject matter in which alleged wrongful act or omission occurred." CCP § 340.6(a)(2). As the Ninth Circuit explained in its decision in this case, "§ 340.6 does not expressly state a standard to determine when an attorney's representation of a client regarding a specific subject matter has ended." Ninth Circuit Decision at p. 2 (citing Gonzalez v. Kalu, 140 Cal. App. 4th 21, 30 (2006)). Relying on Gonzalez, the Ninth Circuit recognized that, "in the event of an attorney's unilateral withdrawal or abandonment of the client, the representation ends when the client actually has or reasonably should have no expectation that the attorney will provide further legal services. . . . Continuous representation should be viewed

---

[80] Id. at p. 81:8-24.

objectively from the client's perspective." _Id._ at pp. 2-3 (quoting _Gonzalez_, 140 Cal. App. 4th at 30-31).

The continuous representation rule is thus "not triggered by the mere existence of an attorney-client relationship." _Foxborough v. Van Atta_, 26 Cal. App. 4th 217, 228 (1994).  And, for purposes of the statute of limitations, termination of the attorney-client relationship "does not depend on a formal termination like withdrawing as counsel of record."  _Truong v. Glasser_, 181 Cal. App. 4th 102, 116 (2009).  The representation may end upon express notification to the client or may be inferred from the circumstances where the attorney remains silent.  _Gonzalez_, 140 Cal. App. 4th at 30-31.  Similarly, where a client asks another attorney to serve as replacement counsel, the representation terminates for purposes of the statute of limitations.  _Hensley v. Caietti_, 13 Cal. App. 4th 1165, 1172 (1993).  Transitional activities, such as transferring files, do not constitute representation for purposes of tolling.  _GoTek Energy, Inc. v. SoCal IP Law Group, LLP_, 3 Cal. App. 5th 1240, 1247–1248 (2016).

Here, the Claim is premised on Heller's alleged malpractice in connection with Paravue's relationship with Acuity.  The question is whether Paravue actually or reasonably should have believed that Heller continued to represent its interests vis-a-vis Acuity after July 11, 2007.  The facts established at trial prove that the answer is "no."

1. Formal Notification

Paravue is a Delaware corporation.  "A basic tenet of [Delaware] corporate law, derived from principles of agency law,

is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." <u>Stewart v. Wilmington Trust SP Servs.</u>, 112 A.3d 271, 302-303 (Del. Ch. 2015), <u>aff'd</u>, 126 A.3d 1115 (Del. 2015).

The evidence established that on or before July 9, 2007, Mr. Hootnick and Mr. Sweeney knew and understood that Heller intended to withdraw from representing Paravue in the Acuity Action. Mr. Hawk confirmed this in his July 9 Email. Although Mr. Hootnick had resigned as CEO less than one hour prior to receiving the July 9 Email, he had clearly learned of the withdrawal – and consented to it – in advance of receiving the July 9 Email. Moreover, at the time that Mr. Sweeney received the July 9 Email, he was acting as both the COO and CFO of Paravue. Mr. Hootnick's and Mr. Sweeney's knowledge of Heller's intent to withdraw, and their consent to such withdrawal, must be imputed to Paravue pursuant to Delaware law.

The court must note that the July 9 Email was not part of the record before the Ninth Circuit when it ruled on Paravue's appeal of the Summary Judgment Order. The Ninth Circuit expressed concern that the court had conflated Paravue with Dr. Barghout who had questionable authority to act on behalf of Paravue at the relevant time. The July 9 Email provides clear evidence that two individuals who possessed unquestionable authority to act on behalf of Paravue received clear notice of Heller's intent to withdraw no later than July 9, 2007.

Turning to Dr. Barghout, the evidence establishes that she, too, received express notice prior to July 11, 2007 that Heller

would no longer represent Paravue in the Acuity Action. On July 6, 2007, Mr. Hawk advised both Dr. Barghout and Mr. Russo that, to the extent they believed Dr. Barghout had authority to act on behalf of Paravue, they should retain counsel other than Heller to act on its behalf and that Heller intended to withdraw as counsel to Paravue in the Acuity Action. At this time, Dr. Barghout was a director of Paravue and her knowledge must be imputed to Paravue under Delaware law.

Thus, whether Dr. Barghout was CSO despite the attempted termination in March 2007 and whether her self-appointment as CEO on July 10, 2007 was effective are immaterial – she was directly notified of Heller's withdrawal at a time when she was a director of Paravue. That knowledge must be imputed to Paravue.

Prior to July 11, 2007, Heller gave express notification to Paravue, through its officers and directors Mr. Hootnick, Mr. Sweeney, and Dr. Barghout, that it would withdraw as counsel. By July 9, 2007, Paravue could not actually or reasonably believe that Heller continued to represent it.

2. <u>Indirect Notice</u>

Starting in April 2007, when Acuity exercised its rights to covert its debt to equity, Heller declined to follow instructions from Dr. Barghout that she believed were essential to defending Paravue against Acuity's actions. While Heller attorneys appeared at the various hearings in the Acuity Action, none took any positions at those hearings, and none presented any opposition – whether written or oral – to any of the relief sought by Acuity. It would be reasonable to infer from these

circumstances that Heller no longer intended to represent
Paravue.  And Dr. Barghout picked up on the inference.

     In May 2007, she attested under penalty of perjury that
Heller was not zealously representing Paravue and needed to be
replaced.[81]  By June 2007, she "firmly believe[d] that Heller
Ehrman [was] not neutral, [was] not doing what [was] required by
applicable law, and [was] simply acting as additional advocates
for [Acuity] in this case"[82]

     Accordingly, Dr. Barghout's assertion at trial that she
believed Heller could and would continue on as counsel to Paravue
once she became management simply was not credible.  Paravue did
not introduce any evidence proving Heller's willingness to
continue as Paravue's counsel following a change in management.
Regardless of who was in control, Paravue could not have
reasonably expected Heller to provide further legal assistance
beyond July 11, 2007, if not long before.  Indeed, Heller
attorneys essentially refused to participate in the Acuity Action
on Paravue's behalf, which leads to the inescapable conclusion
that Heller would render no further services.

     3. Retention of Replacement Counsel

     Although Paravue could not expect further legal services
from Heller, it clearly expected such services from Messrs. Russo
and Ackerman.  On July 10, 2007, in response to Mr. Hawk's
refusal to seek a stay of the Acuity foreclosure, Mr. Russo
sought and obtained a TRO on behalf of Dr. Barghout and Paravue.

---

[81] Mar 23 Barghout Decl. (Ex. Z) at ¶ 8.

[82] June 26 Barghout Decl. (Ex. GG) at ¶ 19.

The same day, Mr. Ackerman sat through the lengthy hearing with Dr. Barghout and Mr. Russo, discussed a fee arrangement with Dr. Barghout, and prepared to serve as replacement counsel to Paravue.  The board resolution executed on July 13, 2007 provides for indemnification of fees already due to Mr. Ackerman by Paravue, confirming that he was already engaged and acting on behalf of Paravue.  Both Messrs. Russo and Ackerman communicated with Heller attorneys to learn additional background regarding Paravue and obtained documents from Heller, ensuring a smooth transition.

Once a client retains replacement counsel, "the die [is] cast and the tolling afforded under Code of Civil Procedure section 340.6(a)(2) [ends]."  <u>Hensley</u>, 13 Cal. App. 4th at 1172. Here, the die was cast by both Messrs. Russo and Ackerman no later than July 10, 2007.  While Mr. Russo was actively engaged in advocating on Paravue's behalf on that day, it was also clear that Mr. Ackerman was being retained as replacement counsel. Paravue could not have reasonably expected that Heller would provide it with legal counsel after it had retained replacement counsel.

4. <u>Transitional Activities after July 11, 2007</u>

Paravue makes much of the time entries from July 12, 2007 through July 18, 2007 set forth in the July Invoice, arguing that they are evidence of a continuing attorney-client relationship after July 11, 2007.  As explained by both Messrs. Hawk and Thau, the work described in those entries was purely transitional in nature.  Paravue had retained new counsel, and Messrs. Hawk and Thau worked to ensure a successful transition by gathering and

turning over documents, addressing background questions regarding corporate governance and shareholders, and performing ministerial tasks, such as executing a substitution of counsel. Both Messrs. Hawk and Thau explained that they wanted to avoid prejudice to Paravue in the transition, and the court views the work performed as essential to achieving that goal. None of the work appeared to be substantive legal work.

It is also worth noting that the Withdrawal Application was pending throughout this time period. Heller took no steps to withdraw that application, but rather, in keeping with its aim, sought to successfully transition representation of Paravue to Messrs. Russo and Ackerman. The work performed by Heller during this period would thus not give rise to a reasonable expectation that Heller would continue to provide legal services on behalf of Paravue.

**E. Conclusion**

The facts established at trial prove conclusively that Heller provided express notification of its intention to withdraw as counsel on July 6 and July 9, 2007, and stopped providing Paravue with legal services no later than July 11, 2007. At that point, Paravue could not have reasonably expected Heller to perform legal services on its behalf, in the Acuity Action or otherwise. Rather, Paravue could (and did) look to Messrs. Russo and Ackerman for legal assistance. Accordingly, the court concludes that the statute of limitations bars the Claim asserted against Heller and the Claim is hereby **DISALLOWED.**

**END OF ORDER**

## Court Service List

[None]